**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 03-2847 T**
**(Judge Allegra)**

**H.J. HEINZ COMPANY AND SUBSIDIARIES,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

# PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Plaintiff H.J. Heinz Company and Subsidiaries respectfully submits its Memorandum of Contentions of Fact and Law, as prescribed by paragraph 14 of Appendix A of the Rules of the United States Court of Federal Claims.

## CONTENTS

STATEMENT OF THE CASE .......... 3

FACTS .......... 4
1. The Parties .......... 4
a. H.J. Heinz Company and the Heinz Group .......... 4
b. H.J. Heinz Credit Company .......... 4
2. Heinz's Historic Stock Repurchase Program .......... 5
3. The Transactions and Their Tax Consequences .......... 5
a. Heinz Stock Purchases by HCC .......... 5
b. Redemption of Stock from HCC .......... 7
c. Sale of the Remaining Stock by HCC .......... 8
4. Later Event – HCC's Conversion of the Note into Heinz Stock .......... 8

ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT .......... 9
1. Factual issues .......... 9
2. Legal issues .......... 10

DISCUSSION OF ISSUES OF FACT .......... 10
1. Business Purpose .......... 10
2. Whether Conversion of the Note Was a Foregone Conclusion .......... 12
3. Valuation of the Note .......... 12

LEGAL PRINCIPLES .......... 13
1. Plaintiff's Affirmative Position .......... 13
a. Analysis of the Transactions .......... 14
2. Defendant's Arguments .......... 18
a. Economic Sham .......... 19
b. Splitting the Redemption into Two Transactions .......... 23
3. Overarching Legal Principles Show that Plaintiff Should Prevail .......... 25
a. Form of Transactions; Economic Substance .......... 25
b. Parent-Subsidiary Relationship Between Heinz and HCC .......... 26
c. Significance of §1059 .......... 27
d. Conclusion .......... 31

WITNESSES AND EXHIBITS .......... 32

BIFURCATION .......... 32

## STATEMENT OF THE CASE

The question in this case is whether Plaintiff was entitled to deduct a short-term capital loss recognized on a sale by a subsidiary of parent stock. To answer that question the Court must determine the tax consequences of three transactions: (1) During August through November 1994, H.J. Heinz Credit Company ("HCC"), a wholly-owned indirect subsidiary of H.J. Heinz Company ("Heinz"), purchased 3,500,000 shares of Heinz common stock in the public market. (2) In January 1995, Heinz redeemed 3,325,000 shares of that stock from HCC for a convertible note. (3) In May 1995, HCC sold its remaining 175,000 shares to an unrelated party for cash.

Plaintiff's position is that the redemption was taxable as a dividend under §302(d)[1] and that, as required by Treas. Reg. §1.302-2(c), HCC's basis in the redeemed shares was added to its basis in its remaining shares. Thus, when HCC sold its remaining shares, it recognized a capital loss. As discussed below, Plaintiff believes that the governing law, which was the product of deliberate and informed choices by Congress and the Treasury Department, dictates the result advocated by Plaintiff.

Defendant's position, as Plaintiff understands it, is that the redemption should be either disregarded as an economic sham or recharacterized as two separate transactions: a dividend of Heinz stock by HCC to Heinz and a contribution of the convertible note by Heinz to HCC's capital. In either case, Plaintiff would not recognize a loss. Defendant's position appears to be based in part on the fact that three years after the redemption, in accordance with the terms of the note, HCC converted the note into Heinz stock. Plaintiff considers Defendant's position regarding the conversion to be factually erroneous and the conversion irrelevant. In addition,

[1] Unless otherwise indicated, references to sections in this memorandum are to sections of the Internal Revenue Code of 1986, as amended (the "Code"), or to the regulations thereunder, as in effect at the time of the transactions at issue.

Plaintiff believes that specific provisions of the Code and regulations preclude Defendant from making these arguments.

## FACTS

### 1. The Parties

#### a. H.J. Heinz Company and the Heinz Group

Heinz, a Pennsylvania corporation, manufactures and markets processed food products worldwide directly and through subsidiaries. The common stock of Heinz is actively traded on the New York Stock Exchange. Heinz is the common parent of a group of domestic corporations filing consolidated Federal income tax returns (the "Heinz Group"). Heinz also has numerous foreign subsidiaries. As its taxable year, the Heinz Group uses the 52-53 week year ending on the Wednesday closest to April 30. The Heinz Group's 1995 taxable year, the year in which all relevant transactions in this case occurred, ended May 3, 1995. Heinz and its domestic and foreign subsidiaries prepare consolidated audited financial statements, and Heinz files such statements with the U.S. Securities and Exchange Commission. As of the close of its 1995 taxable year, Heinz's consolidated net worth was $2.5 billion, and for financial reporting purposes its consolidated net income in that year was $591 million.

#### b. H.J. Heinz Credit Company

HCC was organized as a Delaware corporation in September 1983, and at all times it has been a member of the Heinz Group. From January 1988 on, Heinz Leasing Corporation ("HLC"), a first-tier Heinz subsidiary,[2] owned 99.9%, and Heinz itself owned 0.1%, of HCC's outstanding stock.

---

[2] HLC was organized as a Delaware corporation in July 1986. From that time, Heinz owned all of HLC's outstanding stock, and HLC was a member of the Heinz Group. In November 1995, HLC was merged into HCC, and HCC became a first-tier subsidiary of Heinz.

HCC's business was to own stock and securities issued by Heinz affiliates (both members of the Heinz Group and Heinz's foreign subsidiaries) and to make intercompany loans. As of the close of taxable year 1995, HCC's net worth was approximately $2 billion, and, for financial reporting purposes, its net income in that year was $277.6 million.

**2. Heinz's Historic Stock Repurchase Program**

Like many public companies, Heinz has engaged in a regular program of purchasing its own stock for many years. During 1985 through 1994, Heinz purchased significant amounts of its own stock in every year and spent an average of more than $170 million per year on such stock.

These stock purchases served several important non-tax business purposes. The most important was the management of Heinz's equity base to maximize earnings per share and ultimately stock value. Heinz's purchases of its own stock reduced the number of shares outstanding and allowed Heinz's earnings per share to be computed based on fewer shares. If the stock was undervalued, the purchases increased the value of the remaining stock. In addition, by acquiring stock Heinz could satisfy its stock option commitments and use stock as acquisition currency and could reduce its dividend payments to outside shareholders.

**3. The Transactions and Their Tax Consequences**

**a. Heinz Stock Purchases by HCC**

In July 1994, management decided that purchases of Heinz stock in the market should continue during fiscal 1995, but that HCC, not Heinz, should purchase the stock. Like prior stock purchases by Heinz itself, such purchases would remove stock from the market and so

would serve the purposes described above.[3] In addition, there were benefits to HCC. HCC was in the business of acquiring and owning Heinz Group securities. Not only was the acquisition of Heinz common stock consistent with that business; HCC also viewed it as a good investment opportunity—which it proved to be. Furthermore, purchasing Heinz stock helped HCC to buttress its status as a Delaware investment company, a status that resulted in significant state tax benefits to the Heinz Group.[4] In the early 1990s several state taxing authorities had begun to question the qualification of Delaware investment companies on the ground that they were mere shells, and HCC was anxious to do what it could to protect its favored status, at least for prior years that were still open for audit. HCC believed that adding $130 million of affiliate securities to its assets would help accomplish this goal.

During August-November 1994, HCC purchased 3,500,000 shares of Heinz stock in the market. HCC made the purchases for its own account and used its own funds, including the proceeds of a $40 million line of credit extended to HCC (without a Heinz guaranty) by Morgan Guaranty Trust Company of New York. No funds used by HCC were provided, directly or indirectly, by Heinz.

HCC's cost for the shares, including commissions and other expenses, was $131 million. Under section 1012, this was HCC's basis in the shares.

---

[3] Even though Heinz stock held by HCC was outstanding stock under Pennsylvania law, the stock was not treated as outstanding stock on Heinz's consolidated financial statements. CONSOLIDATED FINANCIAL STATEMENTS, Accounting Research Bulletin No. 51, §13 (AICPA Committee on Accounting Procedure 1959). Thus, shares purchased and held by HCC were excluded in computing Heinz's earnings per share, and if the stock was undervalued when HCC purchased it, the purchases would increase the value of the remaining stock.

[4] Qualifying as a Delaware investment company—a corporation whose principal purpose was to own securities—provided tax savings to Heinz Group members in states without unitary tax systems. If HCC was recognized as an investment company in Delaware and in those states, its income from securities (dividends and interest) was not subject to state income tax, but interest paid to HCC by other members of the Heinz Group was deductible.

**b. Redemption of Stock from HCC**

On January 18, 1995, Heinz redeemed 3,325,000 shares of its stock from HCC. The market value of the redeemed stock was $130.5 million. As consideration, Heinz issued its convertible note (the "Note") to HCC. The terms of the Note were developed by Goldman Sachs & Company ("Goldman Sachs"), which HCC had retained for this purpose. The salient terms of the Note were as follows:[5]

| | |
|---|---|
| Payable at maturity | $197,402,412.78 |
| Maturity date | January 18, 2002 (7 years after issuance) |
| Interest coupon | None (zero coupon) |
| Stated issue price | $130,506,683.14.[6] |
| Conversion right | Convertible at holder's option into Heinz common stock |
| Conversion ratio | Convertible into 3,510,000 shares of Heinz stock (adjusted for splits, stock dividends, etc.) |
| Time of exercise | Convertible at any time beginning January 18, 1998 (3 years after issuance)[7] |

Goldman Sachs advised HCC that the value of the Note would be substantially equal to the $130.5 million value of the stock redeemed by Heinz and that the conversion right in the Note had a real but relatively modest value, only about 16% of the value of the Note.

Both Heinz as issuer and HCC as holder had economic risk of loss and opportunity for gain with respect to the Note. These risks and opportunities were significantly different from Heinz's and HCC's risks and opportunities before the redemption, when HCC held Heinz stock.

---

[5] The terms of the Note were similar but not identical to the terms of a common type of financial instrument, sometimes known as a liquid yield option note (or LYON). LYONs were developed in the mid-1980s, and by 1995 more than $20 billion in capital had been raised by various corporations from issuances of LYONs.

[6] The Note was a zero-coupon instrument. Thus, its issue price was the present value, at the time of issuance, of the right to receive $197,402,412.78 upon maturity (seven years later) at the 6.0% stated yield to maturity, compounded semiannually. As discussed in part 3. of DISCUSSION OF ISSUES OF FACT, below, Defendant claims that the issue price was slightly less than that determined by Plaintiff and Goldman Sachs.

[7] On November 9, 1995, a 3:2 split in Heinz stock occurred, and the Note became convertible into 5,625,000 shares. In this memorandum, however, figures such as numbers of shares and per-share values and prices are stated in pre-split-terms.

Because of the conversion right under the Note, the redemption was taxed to HCC as a dividend under §302(d) and was tax-free to HCC under §243(b) and Treas. Reg. §1.1502-14(a). Under Treas. Reg. §1.302-2(c), HCC's basis in the redeemed stock was transferred to the Heinz stock that HCC retained.

**c. Sale of the Remaining Stock by HCC**

In April 1995, Goldman Sachs arranged a private placement sale by HCC of its remaining 175,000 shares of Heinz stock to AT&T Investment Management Corp. ("AT&T"), a corporation unrelated to Heinz. The sale closed on May 2, 1995; the price was $7 million cash.

For tax purposes, HCC recognized a $124 million short-term capital loss ($7 million amount realized less $131 million basis). The Heinz Group carried this loss back against its net capital gains in 1992, 1993 and 1994, and these carrybacks produced the refunds sought by Plaintiff in this case.

**4. Later Event – HCC's Conversion of the Note into Heinz Stock**

As stated above, the Note was convertible into 3,510,000 shares of Heinz common stock at any time beginning on January 18, 1998, three years after the Note was issued. During these three years, there was an unprecedented bull market, and the value of Heinz stock appreciated by about 110%.

In early 1998, HCC retained Goldman Sachs again, this time to advise whether HCC should convert the Note. Goldman Sachs advised that HCC "may achieve better theoretical economic value by converting the [Note] prior to maturity in the current market environment."[8] HCC followed Goldman Sachs' advice and converted the Note on April 18, 1998.

---

8 A holder of coupon-bearing convertible debt usually would delay exercise of the conversion right until shortly before maturity. By waiting, the holder continues to receive its coupon interest and, upon conversion, it receives the same number of shares it would have received in an earlier conversion. Here, the Note was a zero-coupon

Footnote continued on next page

As Plaintiff understands it, Defendant contends that, at the time the Note was issued, conversion was a forgone conclusion. Based in part on this factual premise, Defendant argues that the redemption was an economic sham. In Plaintiff's view, however, at the time the Note was issued, conversion was possible but not especially likely. In any event, Plaintiff considers the conversion irrelevant, because it took place more than three years later and because HCC's decision to convert was based entirely on market conditions at that time.

**ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT**

**Summary of the Parties' Opposing Positions**

Very few facts are in dispute. The parties agree that during August 1994 to May 1995, three transactions occurred: HCC's market purchases of 3,500,000 shares of Heinz stock, HCC's transfer of 3,325,000 shares to Heinz for the Note, and HCC's sale of its remaining 175,000 shares to AT&T. The parties also agree that HCC converted the Note in April 1998.

The parties disagree principally on certain conclusions to be drawn from the facts and ultimately on the tax treatment of the transactions. Based on Defendant's responses to interrogatories and requests for admissions, Plaintiff believes that the factual and legal issues set forth below are in dispute and require resolution by this Court.

**1. Factual issues**

**a.** Were there business purposes for HCC's purchases of Heinz stock (assuming that business purpose in this context is relevant at all)?

**b.** Was conversion of the Note into Heinz stock a foregone conclusion at the time the Note was issued in January 1995?

instrument. Thus, whenever the holder converted the Note, it would collect no cash and lose its accreted interest. By exercising its conversion right early, HCC received the same number of shares it would have received in a later conversion. It also became entitled to the dividends paid on the Heinz stock in the interim, and it reduced the time period during which it lost accreted interest.

**c.** What was the fair market value of the Note at the time it was issued?

**2. Legal issues**

**a.** For tax purposes, should the redemption be taxed as §302 prescribes or should it be disregarded as an economic sham?

**b.** For tax purposes, should the redemption be taxed as § 302 prescribes or should it be recharacterized as two separate transactions: a dividend of Heinz stock by HCC to Heinz and a contribution of the Note by Heinz to the capital of HCC?

## DISCUSSION OF ISSUES OF FACT

**1. Business Purpose**

Defendant has admitted that Heinz had legitimate non-tax business purposes for purchasing its own stock but has denied that there was a business purpose for HCC to purchase Heinz stock. According to Defendant, Heinz could have achieved its business purposes more easily by purchasing its own stock directly from the public. In addition, Defendant points out that, after the conversion, there were more shares of Heinz stock outstanding than there had been when HCC started to purchase Heinz stock. Thus, Defendant argues that HCC's conversion of the Note undercut Heinz's stated business purpose of reducing the amount of its outstanding stock. Defendant also disputes HCC's business purposes for purchasing Heinz stock: to buttress HCC's status as a Delaware investment company and to make an investment consistent with its business of acquiring and owning Heinz Group securities.

At the outset Plaintiff notes that, as a legal matter, no independent business purpose is required to validate a purchase, sale or redemption of stock, that only economic substance and a

transfer of the benefits and burdens of ownership are required.[9] If any business purpose requirement did apply, it would be satisfied by Defendant's admission that Heinz had a legitimate non-tax reason for withdrawing its own stock from the market by purchasing it. Given that fact, Heinz was entitled to achieve its objective in a tax-advantageous manner.[10]

Defendant argues that HCC's purchases of the Heinz stock and conversion of the Note undercut the stated purpose of reducing the amount of outstanding Heinz stock. Plaintiff's response is simple: for purposes of consolidated financial accounting reporting—the purpose that mattered—Heinz stock held by HCC was not treated as outstanding. *See* footnote 3, above.

Finally, by purchasing and owning Heinz stock and the Note, HCC furthered its own business purposes. HCC's business was to purchase and own Heinz Group securities and to make a profit. The investment in Heinz stock made by HCC achieved both. In addition, by so doing HCC strengthened its position as a Delaware investment company, thereby enabling the Heinz Group to protect state tax benefits it had obtained. Protection of state tax benefits is a recognized business purpose.[11]

---

[9] *See, e.g., United States v. Davis*, 397 U.S. 301 (1970) (discussed in part 1.a.ii. of LEGAL PRINCIPLES, below); *Sun Properties, Inc. v. United States*, 220 F.2d 171 (5th Cir. 1955); *Granite Trust Co. v. United States*, 238 F.2d 670 (1st Cir. 1956); *Avco Mfg. Corp. v. Commissioner*, 25 T.C. 975 (1956), *vacated on other grounds*, 1957 U.S. App. LEXIS 5009, 52 A.F.T.R. 1215 (2d Cir. 1957).

[10] *See, e.g., United Parcel Service of America, Inc. v. Commissioner*, 254 F.3d 1014 (11th Cir. 2001) (discussed in part 3.b. of LEGAL PRINCIPLES , below); *Northern Indiana Public Service Co. v. Commissioner*, 115 F.3d 506 (7th Cir. 1997) (discussed in part 3.b. of LEGAL PRINCIPLES, below); *Truck Terminals, Inc. v. Commissioner*, 314 F.2d 449 (9th Cir. 1963); *Nassau Lens Co., Inc. v. Commissioner*, 308 F.2d 39 (2d Cir. 1962); *Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2d Cir. 1956) (discussed in part 3.b. of LEGAL PRINCIPLES, below); *Sun Properties, Inc. v. United States*, *supra* footnote 9, above; *Esmark, Inc. v. Commissioner*, 90 T.C. 171 (1988), *aff'd without published opinion*, 886 F.2d 1318 (7th Cir. 1989); *Hospital Corporation of America v. Commissioner v. Commissioner*, 81 T.C. 520 (1983).

[11] Rev. Rul. 79-289, 1979-2 C.B. 145; Rev. Rul. 76-187, 1976-1 C.B. 97.

**2. Whether Conversion of the Note Was a Foregone Conclusion**

Defendant refuses to acknowledge that HCC's conversion of the Note resulted from dramatic and unforeseeable appreciation in Heinz stock and that any other rational investor would have made the same decision. (*See* part 2.a.iii. of LEGAL PRINCIPLES, below.) Instead, Defendant argues that, when the Note was issued in January 1995, conversion was "wired" to occur. Among other arguments, Defendant has asserted that, as an economic matter, Heinz preferred to pay the Note in stock rather than cash.

Plaintiff adheres to its view that conversion of the Note was a separate transaction and that HCC's decision in 1998 to convert the Note was a reasonable investment decision at that time. When the Note was issued, considering its terms and the historical price movement and volatility of Heinz stock, conversion was possible but not especially likely and certainly not inevitable. Stated in option parlance, the conversion feature of the Note was designed to be "out of the money" but to have real value.

HCC's conversion of the Note in April 1998 was a wise decision based solely on then-prevailing market conditions, particularly the price of Heinz stock at that time, which was 110% higher than it was when the Note was issued more than three years earlier. The conversion right, as an option, had become well "in the money." In making this decision, HCC did not act alone; it hired Goldman Sachs to advise it, and it followed Goldman Sachs' advice.

**3. Valuation of the Note**

The parties also differ slightly about the value of the Note when issued.

Goldman Sachs valued the Note upon issuance at $130.5 million, substantially equivalent to the market value of the 3,325,000 shares of Heinz stock for which it was the consideration. Plaintiff's expert agrees with this valuation.

Defendant's expert, however, concluded that the value of the conversion right in the Note was less than the value determined by Goldman Sachs.[12] He valued the Note at $121.8 million. Based on this valuation, Defendant argues that no independent seller of the Heinz stock would have agreed to accept the Note for the redeemed stock and, therefore, that the entire transaction should be disregarded. (Defendant's expert expressed no opinion on the value of the redeemed stock.)

Plaintiff believes that its valuation of the Note is accurate. Plaintiff notes that the parties' valuations differ by less than 7%, a disagreement that may be insignificant. Plaintiff also notes that Defendant's conclusion that the conversion right had *less* value than that determined by Goldman Sachs is inconsistent with Defendant's assertion that conversion of the Note was a foregone conclusion. *See* part 2.a.iii. of LEGAL PRINCIPLES, below.

## LEGAL PRINCIPLES

### 1. Plaintiff's Affirmative Position: Plain Language and Intent of the Law Support Plaintiff

Plaintiff believes that each of the transactions at issue was what it purported to be and was economically real. The specific language of the Code and the regulations precisely and unambiguously dictates the tax consequences of these transactions. In particular, §1059—its text, history, and implementing regulations—make clear that Plaintiff's position is consistent with Congressional intent. Case law and revenue rulings provide additional, detailed support for Plaintiff's position.

As Plaintiff understands it, Defendant does not dispute Plaintiff's interpretation of the Code, the regulations and the other authorities but instead argues that the redemption of Heinz

[12] Goldman Sachs, Plaintiff's expert and Defendant's expert all agree that the Note can be viewed as having two components for valuation purposes: a straight debt component (the present value of the right to receive the principal at maturity) and the option component (the value of the conversion right). They also agree substantially on the value of the straight debt component.

stock owned by HCC should be either disregarded as a sham or recharacterized for tax purposes as two separate transactions: a dividend of Heinz stock by HCC to Heinz and a contribution of the Note by Heinz to HCC's capital.

Even if Defendant's arguments found support in the law—which they do not—Plaintiff still believes the plain language of the Code and the regulations requires a decision for the Plaintiff. This conclusion is consistent with recent tax decisions of the Supreme Court and the Federal Circuit, as well as this Court.[13]

**a. Analysis of the Transactions**

**i. Stock Purchases by HCC**

Section 304(a)(2) provides that, when a shareholder of a parent corporation sells parent stock to a subsidiary of the parent, the sale price "shall be treated as a distribution in redemption of the stock" of the parent.[14] The Internal Revenue Service (the "Service") has ruled that the subsidiary's basis in the parent stock purchased in such a transaction is its cost under §1012. Rev. Rul. 80-189, 1980-2 C.B. 106. Here, HCC purchased 3,500,000 shares of Heinz common stock from shareholders for $131 million. That became HCC's basis in those shares. Because §304(a)(2) specifically governs HCC's purchases of Heinz stock, the stock purchases may not be

---

[13] *Gitlitz v. Commissioner*, 531 U.S. 206, 220 (2001) ("Because the Code's plain text permits the taxpayers here to receive these ['double windfall'] benefits, we need not address this policy concern."); *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463, 1468-70 (Fed. Cir. 1997) ("Where the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' [citations omitted] . . . '[A]bsent a clear showing of contrary legislative intent, the plain meaning analysis of the statutory language begins and ends the judicial inquiry.' [citations omitted]"); *Yocum v. United States*, 66 Fed. Cl. 579, 588 (2005) (". . . the objective here must be to effectuate, rather than defeat, the obvious intent of the Congress. And, in the case *sub judice*, the court need do nothing to the words of the relevant statutes, but to accept them . . ."). *See also United States v. Davis*, 397 U.S. 301, 306 (1970), discussed in part 1.a.ii., below (following "the plain language of the statute" to hold that constructive stock ownership rules of §318 apply under §302(b)(1)).

[14] The predecessor of §304(a)(2) was enacted to overturn a court decision that such a transaction was taxed as a sale to the subsidiary and not, as the Government contended, as a dividend by the parent. *Rodman Wanamaker Trust v. Commissioner*, 11 T.C. 365 (1948), *aff'd per curiam*, 178 F.2d 10 (3d Cir. 1949).

recharacterized in any other manner. For example, neither HCC's purchases of Heinz stock nor its ownership of such stock may be reattributed to Heinz itself.

**ii. Redemption of Stock by Heinz from HCC**

Heinz redeemed 3,325,000 shares from HCC for the Note. After the redemption, HCC continued to own 175,000 shares of Heinz stock and, under §318(a)(4), it also owned constructively the 3,510,000 shares into which the Note was convertible. For tax purposes, then, the redemption increased HCC's equity interest in Heinz from 3,500,000 shares to 3,685,000 shares. Accordingly, the redemption was taxed to HCC as a dividend pursuant to §302(d). The authorities on this point are detailed and specific.

The principal authority is *United States v. Davis*, 397 U.S. 301 (1970). In *Davis* the Supreme Court held that a stock redemption is always taxed as a dividend unless it results in "a meaningful reduction of the shareholder's proportionate interest in the corporation." 397 U.S. at 313. The Court also held that this determination takes into account all the stock the redeeming shareholder owns, both actually and constructively under §318(a). Other factors do not matter. For example, the Court held specifically that the existence or non-existence of a business purpose for the redemption is not relevant to its tax treatment. 397 U.S. at 309-313.

For many years, the government has interpreted §302 and *Davis* broadly, to favor dividend treatment of redemptions.[15] Because dividends have been taxed as ordinary income to individual shareholders, such treatment has yielded greater tax revenue than would capital gains

---

[15] Rev. Rul 89-64, 1989-1 C.B. 91 (constructive ownership existed even though option may be exercised only after fixed time period); Rev. Rul. 85-106, 1985-2 C.B. 116 (stock owned by family members constructively owned); Rev. Rul. 81-289, 1981-2 C.B. 82 (self-tender treated as dividend to public shareholder whose proportionate interest slightly increased); Rev. Rul. 80-26, 1980-1 C.B. 66 (stock owned by family members constructively owned even though there was family hostility); Rev. Rul. 68-601, 1968-2 C.B. 124 (warrants and conversion rights under convertible securities result in constructive stock ownership, even though exercisable against issuing corporation, not another shareholder).

resulting from treating redemptions as exchanges. The opposite is true for corporate shareholders, which are generally taxed at lower rates on dividends than capital gains. But the rules for taxing redemptions do not vary depending on whether the redeemed shareholder is an individual or a corporation. Furthermore, the fact that HCC was a wholly-owned Heinz subsidiary did not affect the treatment of the redemption as a dividend for tax purposes. It is well-established in case law and in revenue rulings that stock of a parent corporation owned by a subsidiary is subject to the same tax rules (including the rules relating to redemptions) as stock owned by other shareholders and other property owned by the subsidiary.[16] Finally, the consequences of dividend treatment do not affect the determination whether a redemption is a dividend.[17]

In sum, the authorities are overwhelming that the Note was taxed to HCC as a dividend under §302. Indeed, Defendant initially agreed that the redemption was taxable to HCC as a

[16] *Rodman Wanamaker Trust v. Commissioner, supra*, footnote 14; Notice 94-93, 1994-2 C.B. 563 (tax on built-in gain in subsidiary stock owned by parent is not avoided in "inversion transaction" – transfer by parent shareholders of parent stock to subsidiary in exchange for subsidiary stock); *H.B. Zachry Company v. Commissioner*, 49 T.C. 73 (1967) (§351 exchange of property for common stock of subsidiary was separate from parent's later sale of its preferred stock to subsidiary); Rev. Rul 80-189, *supra*; Rev. Rul. 80-101, 1980-1 C.B. 70 (liquidation of 70%-owned subsidiary that owned 25% of parent stock viewed as redemption by parent); Rev. Rul. 79-314, 1979-2 C.B. 132 (two corporations held small amounts of stock in each other; exchange of these minority interests viewed as redemptions by both corporations); Rev. Rul. 77-428. 1977-2 C.B. 117 (triangular merger of parent corporation into its second-tier subsidiary (S2) with parent shareholders receiving first-tier subsidiary (S1) stock qualifies as a tax-free reorganization, as does merger of S2 into parent where S1 receives parent stock); Rev. Rul 70-305, 1970-1 C.B. 169, *modified*, Rev. Rul. 74-503, 1974-2 C.B. 117 (parent stock purchased and held by subsidiary not treasury stock; sale of such stock to third party results in gain or loss recognition to subsidiary); Rev. Rul. 69-265, 1969-1 C.B. 109 (triangular §368(a)(1)(C) reorganization in which second-tier subsidiary (S2) acquires target assets, and target shareholders receive stock in first-tier subsidiary (S1) convertible into parent stock satisfies the "solely for voting stock" requirement under §368(a)(1)(C) where conversion involves actual transfer of parent stock by parent to S1). (Rev. Rul. 80-101 and Rev. Rul. 79-314 were obsoleted by Rev. Rul. 2003-99, 2003-2 C.B. 388, because they relied on pre-*General Utilities* repeal §311(a)(2) to treat redemptions as tax-free to the redeeming corporation.) *See also* §304(a)(2), discussed in part 1.a.i.,, above, and §1059(e)(2), discussed in part 3.c., below.

[17] In *Boise Cascade Corp. v. United States*, 1998 U.S. Dist. LEXIS 18740, 82 A.F.T.R. 2d 98-7249 (D. Id. 1998), *aff'd*, 329 F.3d 751 (9th Cir. 2003), a redemption of stock from an employee stock ownership plan trust was held to be a dividend under §302, deductible to the redeeming corporation under §404(k). The Government argued, *inter alia*, that the result would be an impermissible double deduction. The district court rejected this argument, and it was not renewed on appeal.

dividend but subsequently changed its mind and now argues that the redemption should be disregarded or recharacterized.

When a redemption is taxed as a dividend, the amount of the dividend is the full amount of consideration paid by the redeeming corporation. Even though the redeemed stock ceases to exist, the shareholder's basis in such stock is not taken into account. Here, the amount of the dividend paid by Heinz to HCC was the fair market value of the Note. §301(b)(1); Treas. Reg. §1.301-1(d)(1)(ii).

To prevent a redeeming shareholder's basis in the redeemed stock from disappearing altogether, the regulations transfer this basis to other stock in the redeeming corporation the redeemed stockholder owns. Treas. Reg. §1.302-2(c), especially *Examples (1)* and *(3)*. Transfer of stock basis applies to all dividend redemptions, including redemptions of stock of consolidated group members held by another group member (like the Heinz stock held by HCC). Rev. Rul. 66-37, 1966-1 C.B. 209. The Service and the Treasury Department have long considered this transfer of stock basis as a necessary part of taxing redemptions as dividends.[18]

---

[18] The Treasury Department has proposed regulations that would eliminate this stock basis transfer and substitute another mechanism to preserve stock basis. In its preamble to the proposed regulations, Treasury described the purpose of stock basis transfer as follows:

> . . . the unutilized basis of the redeemed stock should not disappear and should be taken into account for Federal income tax purposes at some time. In addition, the tax benefit associated with the unutilized basis of redeemed stock should remain with the taxpayer that made, or succeeded to, the investment that gave rise to the unutilized basis.

REG-150313-01, 67 Fed. Reg. 64,331, 64,334 (Oct. 18, 2002).

In G.C.M. 35793 (Apr. 24, 1974), the IRS Chief Counsel explained the importance of stock basis transfer under the current regulations:

> It is our opinion that the regulation [Treas. Reg. §1.302-2(c)] was intended to require an allocation which would directly or indirectly grant the redeemed shareholder the full benefit of his basis in the redeemed stock. It is thus our view that the regulation should be interpreted to require a reasonable allocation of basis in dividend equivalency cases *so that basis will not disappear*.

(Emphasis added.) This G.C.M. is not cited as precedent. §6110(k)(3). Plaintiff respectfully brings it to the Court's attention as a description of the IRS view of the purpose for the stock basis transfer under §302.

Therefore, HCC's basis in the 175,000 shares of Heinz stock it continued to own after the redemption was increased by its basis in the redeemed stock, to $131 million.

**iii. Stock Sale by HCC**

HCC sold its remaining 175,000 shares of Heinz stock to AT&T for $7 million. Again, the tax law is clear. This sale was taxed like any other sale. Under §1001(a), the loss realized by HCC was $124 million, the excess of HCC's basis in the stock sold ($131 million) over the amount realized ($7 million). Under §1001(c), the full amount of that loss was recognized.[19]

Under §1059, if a corporate shareholder receives a tax-free "extraordinary dividend," its stock basis may be reduced. Had §1059 applied here, no loss would have been recognized. However, as discussed in part 3.c, below, §1059 specifically excludes the type of dividend involved here.

**2. Defendant's Arguments**

Defendant does not challenge the validity of HCC's purchase of stock in the market or HCC's sale of stock to AT&T.[20] However, not liking the results of the redemption as prescribed by Congress and its own regulation, Defendant asks this Court either to disregard the redemption as an economic sham or to recharacterize it as two separate transactions: a dividend of the stock by HCC to Heinz and a contribution of the Note by Heinz to HCC's capital.

---

[19] Under §1032, no gain or loss is recognized to a corporation upon the issuance of its own stock. This rule does not apply, however, to a sale by a subsidiary of stock of its parent. Rev. Rul 70-305, 1970-1 C.B. 169, *modified*, Rev. Rul. 74-503, 1974-2 C.B. 117 (described in footnote 16, above).

Treas. Reg. §1.1502-13(f)(6)(i)(A) now disallows a consolidated subsidiary's loss on a sale of common parent stock. This regulation, however, became effective only for transactions in taxable years beginning on or after July 12, 1995.

[20] On June 2, 2005, Defendant advised Plaintiff by e-mail as follows:

> "We respect all the transactions between Heinz and third parties (e.g., the purchase of stock from the public and the sale to AT&T). For tax purposes we propose to ignore only the tax-motivated, intra-group exchange of paper."

**a. Economic Sham**

Defendant argues that the redemption should be disregarded as an economic sham.[21] Defendant has suggested a variety of factual and legal arguments in support of this position, but none of them is valid.

**i. HCC's Financial Resources**

Defendant has suggested that HCC did not have sufficient cash on hand to buy Heinz stock from the public without the assistance of Heinz. Presumably, Defendant believes this point contributes to its argument that the redemption should be disregarded. With a $2 billion net worth and $277 million net income, however, HCC had more than sufficient assets and cash flow to purchase the stock, and it did so with its own assets. HCC's short-term borrowings under its $40 million line of credit were normal corporate financing transactions, and HCC repaid its borrowings under the line of credit in the ordinary course of its business.

**ii. Alleged Inadequacy in Value of the Note**

HCC retained Goldman Sachs to advise it on the redemption. Goldman Sachs advised HCC that the Note would be worth approximately $130.5 million, the same as the redeemed stock. Plaintiff's expert agrees with Goldman Sachs's analysis and its conclusion.

Defendant claims, however, that the Note was inadequate consideration for the stock Heinz redeemed from HCC. Defendant's expert has valued the Note at $121.8 million. Plaintiff believes that this conclusion and the analysis supporting it are flawed and that the value of the Note was as determined by Goldman Sachs and confirmed by Plaintiff's expert. In this regard,

[21] An "economic sham," sometimes referred to as a "sham in substance," is one which has no practical economic consequences other than the creation of income tax losses or deductions. *Knetsch v. United States*, 364 U.S. 361 (1960); *United Parcel Service of America, Inc. v. Commissioner*, *supra* (discussed in part 3.b., below); *Casebeer v. Commissioner*, 909 F.2d 1360 (9th Cir. 1990); *Kirchman v. Commissioner*, 862 F.2d 1486 (11th Cir. 1989). Sham transactions are simply disregarded for tax purposes. *Knetsch v. United States, supra*.

HCC had no incentive to value the Note incorrectly or to sell its Heinz stock at less than fair market value, and Heinz had no incentive to cause HCC to do so. Even if Defendant's expert were correct, one could question whether the Note's being worth 6.7% less than the stock would have any significance.

Defendant argues that, because of the alleged discrepancy in value, no independent third party would have agreed to the terms of the redemption, and, therefore, that the entire transaction should be disregarded. Defendant has advised Plaintiff that *Long Corp. v. United States,* 156 Ct. Cl. 197, 298 F.2d. 450 (Ct. Cl. 1962) and *Baldwin Bros., Inc. v. Commissioner*, 361 F.2d 668 (3d Cir. 1966), support its position. But *Long* does not support Defendant's position, and *Baldwin Bros.* refutes it.

In *Long* the question was whether a parent corporation could deduct cost overruns it incurred in performing a construction contract with its subsidiary. In upholding the deduction, the court stated:

> Our approach has been to ascertain whether the transaction was 'one that could have reasonably been made between parties dealing at arm's length,' and if it were, a business loss would be deductible.' [citations omitted] . . . Plaintiff and subsidiary have dealt with each other as if they were entirely unrelated corporations.

298 F.2d. at 453. Of course this result is correct when related parties deal with each other as if they were unrelated. But this broad language does not provide the result when dealings between related parties are not on perfect arm's-length terms. "If A then B" does not mean "if not A, then not B."

Tax law specifies the remedy for the kind of pricing discrepancy that Defendant alleges here. The remedy is not to ignore the transaction. Instead, only the *difference* between the values of the items exchanged is recharacterized as something else. Treas. Reg. §1.301-1(j) specifically provides that, if a corporation transfers property to a shareholder for consideration

worth less than the property's fair market value, the *difference* is treated as a dividend. The balance of the transaction remains an exchange of equivalent values.[22] The Service has ruled that this is the proper approach.[23]

More generally, §482 exists for the very purpose of correcting pricing errors among related parties. Again, the solution in §482 is to allow the Service to reallocate income, deductions and credits among commonly-controlled enterprises to reflect income clearly. This is exactly what happened in *Baldwin Bros.* In that case, the Third Circuit upheld the Service's use of §482 to deny a loss incurred by a parent corporation on a sweetheart lease of real property to its subsidiary. But while the loss resulting from the bargain element of the lease was denied, the lease itself was not disregarded. If the Service could invalidate any transaction between related parties, because the values of the property exchanged were not perfectly equal, there would be no need for §482.

**iii. Likelihood of Conversion of the Note**

Defendant also argues that the conversion of the Note was a foregone conclusion, and that, as a result, the redemption lacked economic effect.

First, Defendant has suggested that Heinz did not keep on hand sufficient cash to repay the Note at maturity. It strains credulity, however, to suggest that Heinz, a multi-billion dollar corporation, did not have the resources to pay the $197 million Note in cash. Defendant has also suggested that Heinz preferred to issue its stock rather than repay the Note in cash. The evidence

---

[22] Under the literal language of this regulation, individual and corporate shareholders are treated differently. But the regulation was adopted before §301(b) was amended to eliminate the difference in treatment between corporate and individual shareholders, and it has not been updated. Under current law, individual and corporate shareholders are treated alike. In any event, neither individual nor corporate shareholders were ever forced to treat the entire amount of property received as a §301 distribution, unless they paid nothing for it.

[23] *See, e.g.,* Rev. Rul. 78-83, 1978-1 C.B. 79 (no constructive distribution to parent to the extent payment from one subsidiary to another subsidiary constituted reasonable compensation); Rev. Rul. 69-630, 1969-2 C.B. 112 (same for intercompany sale of property).

will show that Heinz intended to honor the terms of the Note in full, that Heinz was prepared to issue stock or pay cash, *whichever the holder chose,* and that Heinz had no particular preference as between stock and cash. There is no evidence to the contrary.

More generally, Defendant's view is patently at odds with what happened. As of January 18, 1995, when the Note was issued, the historical rate of appreciation of Heinz stock had been modest, and its volatility had been quite low. Heinz stock then traded at approximately $39.25 per share. During the next three years, however, there was an unprecedented bull market. By January 1998, when the Note became convertible, Heinz stock was trading at $82.22 per share (split-adjusted), 110% appreciation in three years. As the chart set forth below shows, this appreciation was far greater than experience would have suggested or the parties could have anticipated when the Note was issued.




* Prices before Oct. 24, 1989, adjusted for 2:1 split on that date; prices on and after Nov. 10, 1995, adjusted for 3:2 split on that date.

By the time the Note became convertible in January 1998, the conversion right had become deep in the money. In fact, the value of the stock HCC would receive by converting the Note was $288.6 million – 46% more than the amount of cash payable when the Note would mature *four years later*. Conversion, therefore, was an eminently sensible investment decision for HCC, as it would have been for any other holder of the Note. Goldman Sachs so advised HCC. HCC followed this advice and converted the Note.

**b. Splitting the Redemption into Two Transactions**

As an alternative to its argument that the redemption was an economic sham, Defendant claims that the redemption should be taxed not as a redemption but as two separate transactions: a dividend of the Heinz stock by HCC to Heinz and a contribution of the Note by Heinz to HCC's capital. Neither the facts nor the law, however, allow the redemption to be split this way.

**i. The Redemption Was a Redemption as a Matter of Fact**

The facts show that the redemption was a real exchange of value for value, not two separate transactions. As a matter of form, the parties intended a redemption, and the documents reflect this intention without ambiguity. Furthermore, the transactions significantly altered the parties' respective economic positions, thereby satisfying any "economic substance" requirement that may apply.[24]

In accepting the Note in place of its Heinz stock, HCC changed its position from that of a pure equity investor to that of a creditor holding an instrument with debt and equity features. By

[24] The test for "economic substance" in *ACM Partnership v. Commissioner*, 157 F.3d 231, 248 (3d Cir. 1998) is as good as any: "whether the transaction has any practical economic effects other than the creation of income tax losses. . . ." (quoting *Jacobson v. Commissioner*, 915 F.2d 832, 837 (2d Cir. 1990)). Another formulation of the test is whether there was a "reasonable possibility of profit . . . apart from tax benefits." *IES Industries v. United States*, 253 F.3d 350, 354 (8th Cir. 2001) (quoting *Shriver v. Commissioner*, 899 F.2d 724, 726 (8th Cir. 1990); *Rice's Toyota World v. Commissioner*, 752 F.2d 89, 94 (4th Cir. 1985)).

so doing, HCC protected the value of its investment while retaining upside potential via the conversion right.

On the other side, by acquiring its own stock and issuing the Note, Heinz became a debtor. Heinz was obligated to pay a fixed cash amount at a fixed future date, or if the holder decided to convert, to issue a fixed number of shares of its stock. By substituting its debt for equity, Heinz also eliminated—for at least three years and perhaps forever—its obligation to pay dividends on the redeemed stock. Heinz also acquired stock for use in its stock option programs or as acquisition currency.

**ii. The Redemption Was a Redemption as a Matter of Tax Law**

As a matter of tax law, the redemption perfectly fit the definition of "redemption" in §317(b):

> . . . stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired or held as treasury stock.

Thus, as discussed in part 1.a.ii., above, the redemption is governed by §302 and is treated as a dividend *by Heinz to HCC, not a distribution by HCC to Heinz*.

Section 302 means what it says. Plaintiff is aware of no authority that permits a redemption of stock, including stock of a parent held by a subsidiary, to be treated as a dividend of the redeemed stock to the redeeming corporation and a contribution by the redeeming corporation to the capital of the redeemed shareholder. On the contrary, the Service has made clear that a redemption of parent stock held by a subsidiary is treated the same as any other redemption.[25] The law simply does not permit Defendant to break apart the redemption and invert the dividend distribution that §302 prescribes.

[25] Rev. Rul. 80-101, 1980-1 C.B. 70; Rev. Rul. 79-314, 1979-2 C.B. 132. *See* footnote 16, above.

There is another, entirely independent, reason why Defendant's recharacterization is wrong as a matter of law. The courts have held that a dividend occurs only to the extent a shareholder receives a benefit from a corporation.[26] Heinz, as a shareholder of HCC, could have received a dividend from HCC only to the extent it received a net benefit from the redemption. However, a redemption for value, like any other sale, entails no net benefit to the redeeming corporation, and hence there could have been no dividend to Heinz. As discussed in part 2.a.ii., above, even if Defendant were correct in arguing that HCC transferred Heinz stock to Heinz for less than its fair market value, under Treas. Reg. §1.301-1(j) only the excess of the value of the stock over the value of the Note—*the difference*—could have been treated as a dividend by HCC to Heinz. The redemption itself would not be transformed into two separate transactions.

Defendant's recharacterization of the redemption as a distribution of Heinz stock by HCC and a capital contribution of the Note by Heinz fails for either reason.

**3. Overarching Legal Principles Show that Plaintiff Should Prevail**

**a. Form of Transactions; Economic Substance**

Plaintiff acknowledges that the form of the transactions was determined in large measure by the anticipated tax benefits. But that makes no difference. The courts have consistently rejected attacks on real transactions that resulted in non-tax changes in a taxpayer's economic position even if tax-avoidance was the principal—or even the sole—motivating factor. *Frank Lyon Co. v. United*

[26] *Wilkinson v. Commissioner*, 29 T.C. 421 (1957) (transfer by bank of subsidiary stock to trust for the benefit of bank shareholders not a dividend, because shareholders did not benefit; they still had indirect interest in subsidiary tied to ownership of bank stock); *Rushing v. Commissioner*, 52 T.C. 888 (1969), *aff'd* 441 F.2d 593 (5th Cir. 1971) (advances of funds from corporations to sister corporations not constructive dividends to shareholders); *Broadview Lumber Co. v. United States*, 561 F.2d 698, 704 (7th Cir. 1977) ("Unless something of measurable value has passed to the shareholder there is no constructive dividend.").

*States*, 435 U.S. 561 (1978);[27] *Gulf Life Ins. Co. v. United States*, 118 F.3d 1563 (Fed. Cir. 1997).[28] *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001); *IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001); *Northern Indiana Public Service Co. v. Commissioner*, 115 F.3d 506 (7th Cir. 1997)[29]; *Nassau Lens Co., Inc. v. Commissioner*, 308 F.2d 39 (2d Cir. 1962); *Truck Terminals, Inc. v. Commissioner*, 314 F.2d 449 (9th Cir. 1963)**;** *Esmark, Inc.. v. Commissioner*, 90 T.C. 171 (1988), *aff'd without published opinion*, 886 F.2d 1318 (7th Cir. 1989). Even *ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998), a notable government victory in the economic sham area, recognizes this principle.[30] That the redemption possessed substantial economic substance for both Heinz and HCC (for the reasons explained in part 2.b.i., above) is undeniable.

**b. Parent-Subsidiary Relationship Between Heinz and HCC**

Defendant points out that Heinz and HCC were parent and subsidiary and for this reason characterizes the redemption as mere "paper-shuffling" between them. This proposition is not valid. So long as a transaction has objective economic consequences, it makes no difference that it occurs between parent and subsidiary.

---

[27] "The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction." (footnote omitted). 435 U.S. at 580.

[28] "Tax planning is not a disapproved activity. . . . A 'major motive' to reduce taxes is not grounds of illegality." 118 F.3d at 1566.

[29] In this case the Seventh Circuit stated that *Gregory v. Helvering*, 293 U.S. 465 (1935), and similar cases "do not allow the Commissioner to disregard economic transactions . . . which result in actual, non-tax-related changes in economic position" regardless of tax avoidance motive. 115 F.3d at 512.

[30] "While it is clear that a transaction such as ACM's that has neither objective non-tax economic effects nor subjective non-tax purposes constitutes an economic sham whose tax consequences must be disregarded, and equally clear that a transaction that has both objective non-tax economic significance and subjective non-tax purposes constitutes an economically substantive transaction whose tax consequences must be respected, it is also well established that where a transaction objectively affects the taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations." 115 F.3d at 248 n.31. Consequently, said the court, the economic consequences of ACM's transactions were ". . . *essential* to assessing whether the transaction's tax consequences may be disregarded. . . ." 115 F.3d at 249 n.33 (emphasis added).

The leading authority on this point is *Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2d Cir. 1956). In *Kraft* a wholly-owned subsidiary distributed an interest-paying note to its parent as a dividend. The government argued that a dividend should be disregarded as an economic sham and the subsidiary's interest deductions disallowed. The taxpayer conceded that the principal purpose of the dividend was to generate interest deductions for the subsidiary that, because of a forthcoming change in the law, would no longer be allowed to file consolidated returns with the parent. The Second Circuit upheld the interest deductions even though tax-avoidance was the driving force:

> However, it is one thing to say that transactions between affiliates should be carefully scrutinized and sham transactions disregarded, and quite a different thing to say that a genuine transaction affecting legal relations should be disregarded for tax purposes merely because it is a transaction between affiliated corporations. We think that to strike down a genuine transaction because of the parent-subsidiary relation would violate the scheme of the statute and depart from the rules of law heretofore governing intercompany transactions. . . . [A]ll legitimate and genuine corporation-stockholder arrangements have legal -- and hence economic -- significance, and must be respected in so far as the rights of third parties, including the tax collector, are concerned.
>
> * * * *
>
> We do not think that these [substance-over-form] cases hold that tax minimization is an improper objective of corporate management; they hold that transactions, even though real, may be disregarded if they are a sham or masquerade or if they take place between taxable entities which have no real existence. The inquiry is not what the purpose of the taxpayer is, but whether what is claimed to be, is in fact.

232 F.2d at 124, 128 (footnote omitted).

In other situations, even more similar to the one in this case, the courts have approved the use of a subsidiary to obtain tax advantages. *See, e.g., Northern Indiana Public Service Co. v. Commissioner, supra* (financing through Netherlands Antilles subsidiary respected even though purpose was tax avoidance); *United Parcel Service of America Inc. v. Commissioner, supra* (reinsurance arrangement with foreign subsidiary respected even though subsidiary's insurance risk was small, and arrangement was tax-motivated).

**c. Significance of §1059**

At the heart of this case lies the legislative design for the tax treatment of dividends and stock basis. The Code provisions and regulations on which Plaintiff relies represent carefully-

developed policy determinations by the Legislative and Executive Branches within the intricate system of taxing income of corporations and their shareholders. In recent income tax cases, both the Federal Circuit and Judge Braden of this Court have recognized that the courts should not upset such determinations through the use of judicial doctrines.[31]

Corporate shareholders pay little or no tax on dividends, and dividends reduce the value but generally not the basis of stock. Thus, a tax-free dividend paid to a corporate shareholder can reduce the shareholder's gain or increase its loss on a sale of stock—exactly what happened here. Congress has long been aware of the tax advantages of such "dividend stripping," but Congress has had to balance its concern in this area against another important policy: avoiding triple or more taxation of the same income.

Under our "classical" system, there are supposed to be two levels of tax on corporate income. Corporations are taxed on their income as earned, and shareholders are taxed again on the same income, either when they receive the income as dividends or when they sell stock at a price that reflects undistributed income. To the extent a *corporate* shareholder is taxed (or its stock basis is reduced) when it receives a dividend, the same income may be taxed three times. For this reason, corporate shareholders are entitled to a dividends-received deduction under §§243-247 or to an exclusion of dividends from income under the consolidated return regulations.

Over the years, to prevent specific types of tax benefits for corporate shareholders while limiting triple tax as much as possible, Congress has legislated repeatedly but selectively. In

[31] *Falconwood Corp. v. United States*, 422 F.3d 1339 (Fed. Cir. 2005); *Coltec Industries, Inc. v. United States*, 62 Fed. Cl. 716 (2004) (discussed in part 3.d., below).

these legislative activities, Congress created a carefully articulated system for the taxation of dividends that corporate shareholders receive.[32]

Most important here, in 1984 Congress added §1059 to the Code, a new rule to restrict the tax benefits obtainable from specific kinds of corporate dividend stripping. Section 1059 provides generally that a corporate shareholder's basis in stock is reduced by the untaxed portion of certain types of dividends, called "extraordinary dividends." Under §1059(e)(1), which was added to §1059 in 1986, if stock is redeemed from a corporate shareholder, and if the redemption is taxed as a dividend but is not pro rata among all shareholders, the dividend is an "extraordinary dividend." At the same time, Congress added an important exception.[33] Section 1059(e)(2)(A) provides:

> Except as provided in regulations, the term "extraordinary dividend" does not include any qualifying dividend (within the meaning of section 243).

Section 1059(e)(2)(A) applies here. As parent and wholly-owned subsidiary, Heinz and HCC were members of the same affiliated corporate group, and any dividend paid by Heinz to HCC was a "qualifying dividend" under §243(b)(1), excluded from stock basis-reduction under §1059(a). Because §1059(e)(2) was enacted at the same time as §1059(e)(1), which relates specifically to *non pro rata dividend redemptions*, there can be no doubt that the exclusion carved out by §1059(e)(2) was meant to apply to redemptions taxed as dividends under §302, along with all other dividends.

---

[32] For a complete history of legislative activities in this area until the late 1980s, *see* G. Mundstock, "Taxation of Intercorporate Dividends Under an Unintegrated Regime," 44 Tax L. Rev. 1 (1988).

[33] Section 1059(e)(2)(B), enacted in 1988, excludes from the exemption dividends paid out of earnings and profits attributable to activities of the distributing corporation while it was not a member of the affiliated group. Heinz has been a member of the affiliated group for many decades. HCC has been a member of the group since its organization in 1983.

When it enacted §1059(e), Congress realized that additional types of dividends could be covered by the stock basis reduction rule of §1059 and that the matter deserved further study. The language of §1059(e)(2)—"except as provided in regulations"—gave the Treasury Department the power to expand the coverage of §1059(e)(2), but only by adopting regulations. Treasury did adopt such a regulation, but it did not become effective until 17 months after the redemption in this case.

In January 1995, when this redemption occurred, no regulations under §1059(e)(2) had been issued or even proposed. On June 17, 1996, the Treasury Department proposed a regulation to exercise its authority under §1059(e)(2) and expand the coverage of §1059. Prop. Treas. Reg. §1.1059(e)-1(a), reads in part:

> . . . if a redemption of stock is not pro rata as to all shareholders, any amount treated as a dividend under section 301 is treated as an extraordinary dividend, regardless of whether the dividend is a qualifying dividend.

The regulation was adopted on July 15, 1997, effective for distributions announced on or after June 17, 1996. If the regulation had been in effect at the time of the redemption here, it would have reduced HCC's basis in its Heinz stock by the fair market value of the Note. But the regulation was not in effect.

Later legislative developments do not control the tax consequences of prior transactions. Nevertheless, Plaintiff notes that Congress continued to legislate in the dividend-strip area but made no changes in either §302 or §1059(e)(2), the two Code provisions on which Plaintiff relies. In 1995, the Chairmen and Ranking Minority Members of the Senate Finance Committee and the House Ways and Means Committee introduced bills that would have amended §302 to

tax redemptions from corporate shareholders as sales, not dividends, if the redemption was "not pro rata as to all shareholders." The legislation also would have repealed §1059(e).[34]

Reaction to the bills was adverse for several reasons, including the concern that sale treatment could make tax losses available.[35] As a result, §302 was not amended and §1059(e) was retained. Instead, in 1997 Congress amended §§1059(d) and 1059(e)(1) but made no changes to either §302 or §1059(e)(2). Again, Congress chose to address corporate dividend stripping issues through §1059 while leaving §302 alone. In adopting this legislation, Congress was certainly aware of the recently-issued regulations in the closely-related area of §1059(e)(2), including their effective date, and Congress did nothing to disturb the Treasury Department's determinations.

**d. Conclusion**

Section 302, Treas. Reg. §1.302-2(c), §1059(e)(2), and Treas. Reg. §1.1059(e)-1(c) specify the tax treatment of the transactions at issue in this case. Those laws reflect the considered judgment of Congress and the Treasury Department, and the courts should not interfere with them. In Plaintiff's view, Judge Braden of this Court has summarized the dispositive principle:

> Under our time-tested system of separation of powers, it is Congress, not the court, that should determine how the federal tax laws should be used to promote economic welfare. *See, e.g., Gitlitz v. Commissioner,* 531 U.S. 206, 220 (2000) ("Because the Code's plain text permits the taxpayers here to receive these benefits, we need not address ... policy concern[s]."); *United States v. Byrum,* 408 U.S. 125, 135 (1972) ("When a principle of taxation requires reexamination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences. When courts readily undertake such tasks, taxpayers may not rely with assurance on what appear to be established rules[.]"); *see also American Trucking Ass'ns v. Smith,* 496 U.S. 167, 201 (1989) (Scalia, J., concurring) (reminding the judiciary that their role "is to say what the law is, not to prescribe what it shall be."). Accordingly, the court has determined that where a taxpayer has satisfied all statutory requirements established by Congress, as Coltec did in this

---

[34] S. 750 and H.R. 1551, 104th Cong., 1st Sess. (May 3, 1995).

[35] *See, e.g.,* Letter from Deborah Walker, Chair, AICPA to Hon. Bill Archer, July 12, 1995, 95 TNT 142-24.

> case, the use of the "'economic substance" doctrine to trump "mere compliance with the Code" would violate the separation of powers.

*Coltec Industries v. United States*, 62 Fed. Cl. 716, 756 (2004).

Defendant's economic sham and recharacterization arguments are efforts to use just such doctrines to "trump" Plaintiff's compliance with the Code. The law applicable to the transactions at issue is clear. HCC's basis in the stock sold to AT&T was $131 million. HCC realized and recognized a capital loss of $124 million when it sold those shares for $7 million, and the carryback of that capital loss produces the refunds sought by Plaintiff.

**WITNESSES AND EXHIBITS**

In accordance with paragraph 14(a)(3) of Appendix A of the Rules of the United States Court of Federal Claims, Plaintiff is filing concurrently herewith a motion containing its objections to Defendant's witnesses and exhibits. Plaintiff is also filing concurrently herewith separate statements containing its witness list and exhibit list, as required by paragraphs 15 and 16 of Appendix A of the those Rules.

**BIFURCATION**

Plaintiff does not believe that bifurcation of issues is appropriate for trial.

Respectfully submitted,

s/ Clifton B. Cates ___________

Clifton B. Cates
Attorney for Plaintiff

1700 Pennsylvania Avenue, N.W.
Sixth Floor
Washington, D.C. 20006
(202) 393-7600

Date: October 28, 2005

Of Counsel:

Ivins, Phillips & Barker Chartered
1700 Pennsylvania Avenue, N.W.
Sixth Floor
Washington, D.C. 20006
(202) 393-7600