No. 03-2847 T
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

H.J. HEINZ COMPANY AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

APPENDIX TO DEFENDANT'S MOTION IN LIMINE

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
ROBERT STODDART
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Station
Washington, DC 20044
TEL: (202) 307-6445
FAX: (202) 514-9440

[Electronically filed]

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| Declaration of Robert Stoddart | | 1 |
| Exhibit | Description | |
| 1 | Letter from Goldman, Sachs & Co. to H.J. Heinz Credit Co. (Aug. 24, 1994) | 4 |
| 2 | Letter from John C. Crowe to P. Darivoff, with attachment (July 5, 1994) | 8 |
| 3 | Excerpts from Plaintiff's First Request for Admissions (May 14, 2004) | 10 |
| 4 | Excerpts from Defendant's Responses to Plaintiff's First Request for Admissions (June 10, 2004) | 13 |
| 5 | Letter from Clifton B. Cates, III, to Robert Stoddart (Dec. 9, 2004) | 16 |
| 6 | E-mail from Robert C. Stoddart to C.B. Cates (Jan. 13, 2005) responding to attached e-mail from C.B. Cates to Robert C. Stoddart (Jan. 11, 2005) | 19 |
| 7 | Plaintiff's Disclosure of Expert Testimony (Feb. 4. 2005) | 20 |
| 8 | Expert Report of Aiden E. Hatton, Jr. (Feb. 4. 2005) with exhibits | 22 |
| 8A | Exhibit to 8, supra: Letter from Philip M. Darivoff to H.J. Heinz Credit Co. (Jan. 16, 1995) (the "Darivoff letter") | 27 |
| 8B | Exhibit to 8, supra: Letter from Philip M. Darivoff to James A. Backo (Mar. 4, 1998) | 35 |
| 8C | Exhibit to 8, supra: Charts produced by Bloomberg, L.P. | 42 |
| 8D | Exhibit to 8, supra: Excerpts from H.J. Heinz Co. Zero-Coupon Convertible Note due January 18, 2002 | 46 |
| 9 | Spreadsheet, which was originally Exhibit 3 of the deposition of Aiden Hatton, Jr. (Mar. 23, 2005), excerpts of which constitute Exhibit 10 of this declaration | 48 |

[Declaration of Robert Stoddart, continued]


| Exhibit | Description | |
|---|---|---|
| 10 | Excerpts from the deposition of Aiden Hatten, Jr. (Mar. 23, 2005) | 49 |
| 11 | Excerpts from the deposition of Philip M. Darivoff (Apr. 6, 2005) | 109 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 03-2847 T
(Judge Allegra)

H.J. HEINZ COMPANY AND SUBSIDIARIES,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DECLARATION OF ROBERT STODDART

I, Robert Stoddart, am the attorney assigned by the Department of Justice to defend this case. I make this declaration of my personal knowledge.

1. The parties designated their expert witnesses and exchanged expert reports on February 4, 2005.

2. During his deposition on April 6, 2005, Philip M. Darivoff commented on the expert report submitted by the defendant's expert witness.

3. During these proceedings I have requested and received documents from the plaintiff and have taken several depositions. The following exhibits are true copies of documents received from the plaintiff except for the following: Exhibits 4 and 6, which are true copies of documents I wrote and sent to the plaintiff; Exhibit 9, which is a true copy of a spreadsheet that I produced using Microsoft Excel and that I offered as Exhibit 3 of the deposition of Aiden Hatton, Jr.; Exhibit 10, which is accurately reproduced from an electronic recording of the deposition of

Aiden Hatten, Jr., provided by the stenographer, except that I raised the pitch from 10 to 12 (this did not change the pagination); and Exhibit 11, which is accurately reproduced from an electronic recording of the deposition of Philip M. Darivoff provided by the stenographer, except that I changed the original Notepad to Wordperfect (this did not change the pagination):

| Exhibit | Description |
|---|---|
| 1 | Letter from Goldman, Sachs & Co. to H.J. Heinz Credit Co. (Aug. 24, 1994); |
| 2 | Letter from John C. Crowe to P. Darivoff, with attachment (July 5, 1994); |
| 3 | Excerpts from Plaintiff's First Request for Admissions (May 14, 2004); |
| 4 | Excerpts from Defendant's Responses to Plaintiff's First Request for Admissions (June 10, 2004) |
| 5 | Letter from Clifton B. Cates, III, to Robert Stoddart (Dec. 9, 2004) |
| 6 | E-mail from Robert C. Stoddart to C.B. Cates (Jan. 13, 2005) responding to attached e-mail from C.B. Cates to Robert C. Stoddart (Jan. 11, 2005); |
| 7 | Plaintiff's Disclosure of Expert Testimony (Feb. 4. 2005); |
| 8 | Expert Report of Aiden E. Hatton, Jr. (Feb. 4. 2005) with exhibits; |
| 8A | Exhibit to 8, supra: Letter from Philip M. Darivoff to H.J. Heinz Credit Co. (Jan. 16, 1995) (the "Darivoff letter"); |
| 8B | Exhibit to 8, supra: Letter from Philip M. Darivoff to James A. Backo (Mar. 4, 1998); |
| 8C | Exhibit to 8, supra: Charts produced by Bloomberg, L.P.; |

| Exhibit | Description |
|---|---|
| 8D | Exhibit to 8, supra: Excerpts from H.J. Heinz Co. Zero-Coupon Convertible Note due January 18, 2002; |
| 9 | Spreadsheet, which was originally Exhibit 3 of the deposition of Aiden Hatton, Jr. (Mar. 23, 2005), excerpts of which constitute Exhibit 11 of this declaration; |
| 10 | Excerpts from the deposition of Aiden Hatten. Jr. (Mar. 23, 2005); |
| 11 | Excerpts from the deposition of Philip M. Darivoff (Apr. 6, 2005). |

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, DC, on November 8, 2005.

ROBERT STODDART

Goldman, Sachs & Co. | 85 Broad Street | New York, New York 10004
Tel: 212-902-1000

Goldman Sachs

**PERSONAL AND CONFIDENTIAL**

August 24, 1994

H.J. Heinz Credit Company
One Commerce Center
1201 North Orange Street
Suite 782
Wilmington, DE 19801

EXHIBIT
tabbies
1

Attention: James A. Backo, President

Dear Mr. Backo:

We are pleased to confirm the arrangements under which Goldman, Sachs & Co. ("Goldman Sachs") is exclusively engaged by H.J. Heinz Credit Company (the "Company") as financial advisor in connection with the Company's potential investment in shares of common stock of H.J. Heinz Company (the "Parent").

During the term of our engagement, we will provide you with financial advice and assistance in connection with this potential transaction, which may include performing valuation analyses, assisting you in structuring the financial aspects of the transaction and other matters as to which you and we may agree during the course of our engagement.

Our fee for the above advisory services will be $1,500,000 in cash, $500,000 payable upon execution of this agreement and $1,000,000 payable on April 14, 1995. You also agree to reimburse us for our reasonable out-of-pocket expenses, including the fees and disbursements of our attorneys and other professionals that we may retain to advise us, plus any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in this letter.

The above fee does not include any services Goldman Sachs may render in the future as financial advisor to the Parent or to the Company with respect to the Company's potential investment described above in excess of 3.5 million shares. If at any time the Company wishes to increase the effective transaction size beyond 3.5 million shares, or any other subsidiary of the Parent wishes to participate in the transaction, fees for such increases, or such additional participation, will be negotiated at that time.

In addition, in the event that the Company determines to undertake an offering or placement of securities (expected to exceed one year in maturity) to finance the potential investment described above or to sell any shares purchased by the Company, the Company shall discuss with Goldman Sachs the option to act in such transaction as lead manager or agent; and if Goldman Sachs agrees to act in such capacity, the Company and Goldman Sachs will enter into an appropriate form of underwriting, placement agency or other agreement relating to the type of transaction involved and 24

containing customary terms and conditions, including customary fee provisions and provisions relating to our indemnity. Unless specifically covered by a separate agreement setting forth such arrangement, however, the provisions of the attached Annex A shall apply to each such transaction. The Company acknowledges that this letter agreement is neither an expressed nor an implied commitment by Goldman Sachs to act in any capacity in any such transaction or to purchase or place any securities in connection therewith.

In connection with engagements such as this, it is our firm policy to receive indemnification. The Company agrees to the provisions with respect to our indemnity and other matters set forth in Annex A which is incorporated by reference into this letter.

Our services may be terminated by you or us at any time with or without cause effective upon receipt of written notice to that effect.

Please note that any written or oral advice or opinion provided by Goldman Sachs in connection with our engagement is exclusively for the information of the Board of Directors and senior management of the Company and the Parent and may not be disclosed to any third party or circulated or referred to publicly without our prior written consent.

As you know, Goldman Sachs is a full service securities firm and as such may from time to time effect transactions, for its own account or the account of customers, and hold positions in securities or options on securities of the Parent, the Company and other companies which may be the subject of the engagement contemplated by this letter.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed copy of this letter, which shall become a binding agreement upon our receipt. We are delighted to accept this engagement and look forward to working with you on this assignment.

Very truly yours,

Goldman, Sachs & Co.

(GOLDMAN, SACHS & CO.)

Confirmed:

H.J. HEINZ CREDIT COMPANY

By: James A. Backo
James A. Backo
President

H. J. Heinz Credit Company
August 24, 1994
Page Three

**Annex A**

*In the event that Goldman Sachs becomes involved in any capacity in any action, proceeding or investigation brought by or against any person, including stockholders of the Company, in connection with or as a result of either our engagement or any matter referred to in this letter, the Company periodically will reimburse Goldman Sachs for its legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith; provided, however, that if it is found in any such action, proceeding or investigation that any loss, claim, damage or liability of Goldman Sachs has resulted from the gross negligence or bad faith of Goldman Sachs in performing the services which are the subject of this letter, Goldman Sachs shall repay such portion of the reimbursed amounts that is attributable to expenses incurred in relation to the act or omission of Goldman Sachs which is the subject of such finding. The Company also will indemnify and hold Goldman Sachs harmless against any losses, claims, damages or liabilities to any such person in connection with or as a result of either our engagement or any matter referred to in this letter, except to the extent that any such loss, claim, damage or liability results from the gross negligence or bad faith of Goldman Sachs in performing the services that are the subject of this letter. If for any reason the foregoing indemnification is unavailable to Goldman Sachs or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by Goldman Sachs as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative economic interests of the Company or any person asserting claims on behalf of or in right of the Company on the one hand and Goldman Sachs on the other hand in the matters contemplated by this letter as well as the relative fault of the Company and Goldman Sachs with respect to such loss, claim, damage or liability and any other relevant equitable considerations. The reimbursement, indemnity and contribution obligations of the Company under this paragraph shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any affiliate of Goldman Sachs and the partners, directors, agents, employees and controlling persons (if any), as the case may be, of Goldman Sachs and any such affiliate, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, Goldman Sachs, any such affiliate and any such person. The Company also agrees that neither Goldman Sachs nor any of such affiliates, partners, directors, agents, employees or controlling persons shall have any liability to the Company or any person asserting claims on behalf of or in right of the Company in connection with or as a result of either our engagement or any matter referred to in this letter except to the extent that any losses, claims, damages, liabilities or expenses incurred by the Company result from the gross negligence or bad faith of Goldman Sachs in performing the services that are the subject of this letter. The provisions of this Annex A shall survive any termination or completion of the engagement provided by this letter agreement and this letter agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.*

EXHIBIT B

## SIGNATURE AND INCUMBENCY CERTIFICATE

The undersigned, KARYLL A. DAVIS, Assistant Secretary, H. J. Heinz Credit Company, does hereby certify that the persons listed below have been duly elected to the offices set forth opposite their names, that they presently hold such offices and that their signatures set forth below are their own true and genuine signatures.

| Name | Office | Signature |
|---|---|---|
| James A. Backo | President, Treasurer and Secretary | James A. Backo |
| F. Nicholas Grasberger | Vice President | F. Nicholas Grasberger III |

In Witness Whereof, the undersigned has hereby set her hand and the seal of H. J. Heinz Credit Company.

Date 8/3/94

Karyll A. Davis

Karyll A. Davis, Assistant Secretary

USX 21516 1699*1 8/4/94

Heinz

WORLD HEADQUARTERS

600 Grant Street
Pittsburgh, Pennsylvania 15219-2857

July 5, 1994

Mr. P. Darivoff
Goldman Sachs

**Share Repurchase**

Dear Phil:

- I would like to talk about the new design of the convertible note. I understand the numbers you sent, but need some help finishing the exercise. Let's assume that we buy 3.2 million shares at $33.00, that we redeem 95% (at $33.00), and that total outstanding shares before the redemption are 252.4 million. Please help me work through the number of shares to be covered by the convert and the exact amount of the note.

- Attached is a description of some opinions that Bob Wellen would like you to supply. Will you be able to do so?

Best regards,

John C. Crowe

jb

Attachment

EXHIBIT 2

[Based on the terms of the Convertible Notes, Parent's investment banker has advised (1) that, on the date of the Redemption, the fair market value of the Convertible Notes will be essentially to the fair market value of the Redeemed Stock; (2) that the fair market value of the convertibility feature of the Convertible Notes will be well below 50%, but more than 10%, of the total fair market value of the Convertible Notes; and (3) that the likelihood of conversion of the Convertible Notes is approximately similar to the likelihood of conversion of other convertible debt instruments issued in the public markets.] ? Call Goldman

**IN THE UNITED STATES COURT**

**OF**

**FEDERAL CLAIMS**

---

**No. 03-2847**
**(Judge Sypolt)**

---

**H.J. HEINZ COMPANY**
**AND SUBSIDIARIES,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS**

---

PLAINTIFF, pursuant to Rule 36 of the United States Court of Federal Claims, requests that defendant admit the truth of the following statements within 30 days of service of this request.

Definitions

For the purposes of this Request for Admissions, the following definitions apply:

A. "Blue Book" means the loose-leaf notebook with 15 documents pertaining to the transactions at issue in this case that Heinz provided to the Internal

EXHIBIT 3

58. Defendant has no objection to the admission into evidence of the following documents:

a. The Convertible Note

b. The Credit Agreement

c. The Promissory Note

d. The Goldman Sachs Opinion

e. The stock price data sheets attached as Exhibit C

Please note that unless you serve upon plaintiff a written answer or objection to each requested admission within 30 days, the matter will be deemed admitted.

Clifton B. Cates by Robert H. Wellen
Clifton B. Cates Robert H. Wellen
Attorney for Plaintiff

1700 Pennsylvania Avenue NW
Suite 600
Washington DC 20006
Tel: (202) 393-7600
Fax: (202) 393-7601

Date: May 14, 2004

Of Counsel:

Ivins, Phillips & Barker Chartered
1700 Pennsylvania Avenue NW
Suite 600
Washington DC 20006
Tel: (202) 393-7600
Fax: (202) 393-7601

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 03-2847 T
(Judge Sypolt)

H.J. HEINZ COMPANY AND SUBSIDIARIES,

Plaintiffs

v.

THE UNITED STATES,

Defendant

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

The defendant offers the following objections and responses to the plaintiff's first request for admissions, and reserves its right to supplement the responses if it later learns that they are in any material respect incomplete or incorrect. See RCFC 26(e)(2).



EXHIBIT
tabbies
4

the recognition of a tax loss occasioned by a sham transaction that was engineered to produce the loss. See the response to request 57(i), supra, here incorporated.

k. Stock of a parent corporation owned by a subsidiary of the issuing corporation is treated in the same manner as any other outstanding stock. *See, e.g.,* Rev. Rul. 80-101, 1980-1 C.B. 70; Rev. Rul. 80-189, 1980-2 C.B. 106.

RESPONSE: Admitted in general–but the defendant repeats that such stock is "unissued" for purposes of securities law and is not treated in the same manner as any other outstanding stock.

58. Defendant has no objection to the admission into evidence of the following documents:

a. The Convertible Note

b. The Credit Agreement

c. The Promissory Note

d. The Goldman Sachs Opinion

e. The stock price data sheets attached as Exhibit C

RESPONSE: Admitted as to a, b, c, and e. Denied as to d. The Goldman Sachs opinion contains hearsay and an opinion stated without a proper foundation.

Respectfully submitted,

*Robert Stoddart*

ROBERT STODDART
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Tel.: (202) 307-6445
FAX: (202) 514-9440

EILEEN J. O'CONNOR
Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section
DAVID GUSTAFSON
Assistant Chief, Court of Federal Claims Section

*David Gustafson*
Of Counsel

June 10, 2004

**IVINS, PHILLIPS & BARKER**
CHARTERED

1700 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20006-4723

TELEPHONE (202) 393-7600
FACSIMILE (202) 393-7601
IPB@IPBTAX.COM
WWW.IPBTAX.COM

H. STEWART DUNN, JR.
CARROLL J. SAVAGE
ERIC R. FOX
CAROL K. NICKEL
ALAN WINSTON GRANWELL
LESLIE JAY SCHNEIDER
ROBERT H. WELLEN
KEVIN P. O'BRIEN
JOSEPH DECARLO, JR.*
PATRICK J. SMITH
MICHAEL R. HUFFSTETLER
LAURIE E. KEENAN
JEFFREY E. MOELLER
STEVEN H. WITMER
ROSINA B. BARKER
WILLIAM L. SOLLEE, JR.
JODI H. EPSTEIN
DEAN R. MORLEY
ROBIN M. SOLOMON
DIRK J. J. SURINGA
ROBERT G. LORNDALE, JR.

DAVID D. SHERWOOD
AMY D. HEALY
STEFAN PRENTISS SMITH*
H. CARTER HOOD
JENNIFER J. FINN
DANIELLE E. ROLFES*
LISA MILOT
SARAH S. MCGONIGLE*
VICTOR S. CHANG*
JAMES E. BROWN*

JAMES S.Y. IVINS (1885-1960)
PERCY W. PHILLIPS (1892-1969)
RICHARD B. BARKER (1906-1988)

OF COUNSEL
JAY W. GLASMANN
WILLIAM L. SOLLEE
DANIEL B. STONE
CLIFTON B. CATES III
ERIC D. CHASON

LOS ANGELES OFFICE
1925 CENTURY PARK EAST
SUITE 2140
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 551-6633
FACSIMILE (310) 551-1188

* NOT ADMITTED IN THE DISTRICT OF COLUMBIA

December 9, 2004

***By Messenger Delivery***

Robert Stoddart, Esq.
United States Department of Justice, Tax Division
Court of Claims Section
555 4th Street, N.W.
Room 8804-A
Washington, D.C. 20001

**Re: H.J. Heinz Company and Subsidiaries v. United States**
**No. 03-2847**
**Designation of Expert Witnesses**

Dear Mr. Stoddart:

Absent a stipulation or court order to the contrary, each of us must designate expert witnesses and exchange expert witness reports by January 4, 2005. While I hope neither side will need to use an expert witness, as long as issues related to the convertible note remain unsettled, we must be prepared to introduce expert testimony on those issues.

At this point, we have not decided whether to use Phil Darivoff, another expert, or both. It will probably come as no surprise that Phil's report would consist solely of the Goldman Sachs opinion of January 16, 1995. Thus, you already know what his testimony will be. (We appreciate and accept your offer to depose Phil only once. Please let us know when you would like to do so.) I note from your responses to Plaintiff's Second



EXHIBIT 5

Interrogatories that defendant may also designate an expert witness but has not yet made a decision to do so.

Therefore, I request that the parties stipulate that the disclosure of expert testimony required by RCFC 26(a)(2) is not due until February 4, 2005, a one-month extension. In order to give each of us reasonable time to depose the other's expert, the stipulation would also extend the discovery cut-off from March 15, 2005, to April 15, 2005.

As I said earlier, I hope the convertible note ultimately will not be an issue at trial. Although I realize that you are not in a position to stipulate to anything yet, I would appreciate your considering why we believe that ostensible issues related to the convertible note are really non-issues:

1. Fair market value of the note. I know you think that this may be relevant, but I suggest that it really is not. Our theory of the case is based on HCC's *cost* of acquiring the Heinz stock, not the amount realized by HCC on the redemption. No matter what that amount, it is a non-taxable dividend, as you have conceded. Your theory of the case is that the entire transaction was an economic sham. If you are correct, the value of the convertible note is irrelevant.

2. Lack of registration. It is undisputed that neither the convertible note nor the shares redeemed with it were registered securities. Lack of registration would probably have some negative effect on the value of each. As noted above, the value of the note is not important. For the same reasons, neither is the value of the stock.

3. Likelihood of conversion. John Crowe has already testified and will testify again if necessary that conversion of the note into Heinz stock was by no means planned or intended when the note was issued. Rather, conversion was the result of a decision made more than three years later by HCC, acting rationally based on the value of Heinz stock and other economic factors at the time. Goldman has already opined and Phil will confirm that, when the note was issued, the equity component of the note did not make conversion particularly likely, let alone a sure thing.

Robert Stoddart, Esq.
December 9, 2004
Page 3

4. Features of the note. You have never said so, but I surmise that you regard the convertible note as a unique designer instrument. But the data on which Goldman relied, as summarized in "Summary Comparison of Selected Convertible Debt Securities" (an exhibit to the January 16, 1995 opinion), indicate that the note was well within the normal range for convertible debt securities issued by other unrelated issuers.

If there are other issues pertaining to the convertible note that trouble you, I would appreciate your letting me know. In any event, I hope that, after you consult with your expert and after all depositions are completed, we will be able to deal with the convertible note by stipulation instead of expert testimony.

I look forward to your response on extending the time for designation of experts.

Very truly yours,

Clifton B. Cates III gjb

Clifton B. Cates III

**Stoddart, Robert C. (TAX)**

**From:** Stoddart, Robert C. (TAX)
**Sent:** Thursday, January 13, 2005 4:44 PM
**To:** 'cbcates@mindspring.com'
**Subject:** RE: Heinz v. United States--Phil Darivoff

Dear Clif,

Thanks for the information.

For the next few weeks I'll be so busy with my 50-or-so coal excise tax cases that I'll have little time to consider deposing Mr. Darivoff. On the whole, it might be a better idea to hold off on depositions until we have our conference call with the Judge.

Bob

-----Original Message-----
From: cbcates@mindspring.com [mailto:cbcates@mindspring.com]
Sent: Tuesday, January 11, 2005 1:17 PM
To: Stoddart, Robert C. (TAX)
Cc: rwellen@ipbtax.com
Subject: Heinz v. United States--Phil Darivoff

Dear Bob,

This is just a heads up to let you know that we have decided not to designate Phil Darivoff of Goldman Sachs as an expert witness. We do, however, intend to designate someone else as an expert who will offer testimony on the subject of corporate securities generally and convertible debt in particular. Furthermore, if there is a trial plaintiff fully intends to have Phil Darivoff testify as a percipient witness. I hope that this information will facilitate the scheduling of Phil's deposition, which is something that Goldman has been inquiring about for some time now.

Clif



EXHIBIT 6

**IN THE UNITED STATES COURT**

**OF**

**FEDERAL CLAIMS**

---

**No. 03-2847 T**
**(Judge Allegra))**

---

**H.J. HEINZ COMPANY**
**AND SUBSIDIARIES,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF'S DISCLOSURE OF EXPERT TESTIMONY

---

Plaintiff H.J. Heinz Company and Subsidiaries hereby discloses to defendant, pursuant to Rule 26(a)(2)(A) of the United States Court of Federal Claims, that plaintiff may call Aiden E. Hatton, Jr. at trial to offer expert testimony under Rule 702 of the Federal Rules of Evidence. Attached hereto is Mr. Hatton's written report, which incorporates the additional information required to be disclosed under Rule 26(a)(2)(B).



EXHIBIT
tabbies
7

Clifton B. Cates
Attorney for Plaintiff

1700 Pennsylvania Avenue NW
Suite 600
Washington DC 20006
Tel: (202) 393-7600
Fax: (202) 393-7601

Date: February 4, 2005

Of Counsel:

Ivins, Phillips & Barker Chartered
1700 Pennsylvania Avenue NW
Suite 600
Washington DC 20006
(202) 393-7600

My name is Aiden E. Hatton, Jr., and I have been retained by the H.J. Heinz Company (HJH) as an expert in the matter of *H.J. Heinz Company and Subsidiaries v. The United States*. I have been asked to address six issues arising out of the H.J. Heinz subordinated convertible Note, 0% coupon, due January 18, 2002 (Note), and related transactions: were the terms of the Note unusual; what was the value of the Note, and were the two components, equity and fixed income, realistically valued; could it have been foreseen at issuance that the Note was likely to be converted; would a prudent investor convert in 1998 with or without an opinion from a prominent investment banking firm; was it reasonable for a major bank to make an unsecured loan to a subsidiary with no guarantee from the parent; and finally was it reasonable to believe the issuer had the ability to redeem the Note in 2002 for cash when it matured?

My qualification for this assignment is a career of close to fifty years in the investment industry, twenty years as an institutional salesman and sales manager for several large Wall Street firms, and since 1978 as a money manager for large pension funds, both public and private; profit sharing plans; mutual funds; foundations; and other large pools of money. My experience includes managing the fixed income department of Alliance Capital Management, one of the largest and most successful investment firms with over $400 billion under management. I have both managed and have had management responsibilities for the successful investment management of all fixed income securities, including but not limited to, money market instruments, all U.S. Treasury Securities, all government agency securities, corporate, finance, and utility bonds, tax exempt bonds, foreign bonds, derivatives, and all forms of convertible securities. I am a Vice-President of Farr, Miller & Washington, Washington, D.C. managing institutional equity and fixed income accounts. I have not published any articles in the last ten years, and I have never testified as an expert in any other cases. I am being paid $600 per hour by HJH.

In reviewing the opinion letter from Goldman, Sachs & Co. (Goldman) to H.J. Heinz Credit Company (HJHCC) dated January 16, 1995, I agree with their conclusions. Zero percent coupon notes and bonds for both convertible and straight debt have been accepted by the markets since the early 1980s when Wall Street firms began splitting U.S. Treasury 30 year bonds between interest and principal creating a 0% coupon 30 year stripped U.S. Treasury bond and a stream of interest only income. So a 0% coupon feature on this Note was not unusual. Since the early 1980s it has also not been unusual for 0% coupon convertibles to be convertible into the common stock of the issuer. Goldman demonstrated this by providing a comparison of similar securities issued and outstanding. Their analysis is a good one, and I agree with it.

I also agree with Goldman's conclusion that the value of the Note on the date of issuance was approximately $130,506,000, equal to the value of the 3,325,000 shares of



EXHIBIT
8

H.J. Heinz common stock for which the Note was exchanged on January 17, 1995 when H.J. Heinz stock had a market value on the New York Stock Exchange of $39.25. In attempting to value the two components of the Note, equity and fixed income, I relied on Goldman's valuation model and my personal research using the Bloomberg News Service, probably the most complete data base in the financial services industry. I agree with Goldman's analysis, but for verification I double checked the price of H.J. Heinz stock, the yield on the benchmark U.S. Treasury note and the terms of similar convertible notes, and concluded that the value of the conversion option was in a range of 10% to 40% and the value of the fixed income component was 60% to 90% of the total value of the Note. My experience suggests that the option value of securities convertible into low volatility stocks is less than 50% of the total value of the securities.

The conversion of the Note at issuance on January 17, 1995, was neither a foregone conclusion, nor could it have been forecast. I base my opinion on the low volatility of H.J. Heinz stock for the two years prior to the issuance of the Note. The conversion option had a minimum value of 10%, but the maximum value of 40% would not have suggested the Note would be converted. The Note was converted into 3,510,000 shares of H.J. Heinz common stock in April 1998, slightly three years after issuance and approximately three months after the non-conversion period expired. Based on the performance of H.J. Heinz stock, increasing in value from $26.17, adjusted from $39.25 because of a 3 for 2 split in the stock, to $56.94 as illustrated in Goldman's letter dated March 4, 1998, stating their rationale for conversion, I concluded HJHCC's decision to convert was reasonable. The price appreciation was over 117% for the three plus years, versus 13.11% suggested in the analysis. Any prudent investor would have converted under those circumstances, but HJHCC took the more conservative route by having Goldman do an analysis of the transaction. I agree with Goldman's analysis, and would have given HJHCC similar advice.

In my judgment, there was nothing unusual regarding J.P. Morgan Co. loaning money to HJHCC with no guarantee from HJH nor requiring assets to secure the loan. HJHCC had a net worth, independent of HJH, of over $1 billion. So an unsecured loan of $45 million was prudent.

H.J. Heinz Company, a Fortune 500 Company, with a solid AA rating by both major rating services, Moody's and Standard & Poor's, has ready access to the capital markets worldwide. In today's competitive global market, major corporations are excellent cash managers. Heinz therefore, in my opinion, would have had no difficulty in redeeming the Note with cash had it matured on January 18, 2002.

In conclusion, I have reviewed Goldman's letters dated January 16, 1995 and March 4, 1998, and have done independent research using the Bloomberg News Service. From my experience, I find nothing unusual in the terms of the Note; the value of the Note at issuance was equal to the value of the stock sold to HJH by HJHCC in the transaction; when the Note was issued in January, 1995, it could not have been foreseen that the Note would be converted; the conversion in 1998 was due to unprecedented market circumstances that could not have been forecast; a $40 million unsecured loan to a

company with a net worth in excess of $1 billion was reasonable; and H.J. Heinz Company has immediate access to the capital markets, and therefore could easily have paid off the Note.

Aiden E. Hatton, jr. 2/4/2005
Aiden E. Hatton, jr. Date

Attachments

1. Goldman, Sachs letter dated January 16, 1995
2. Goldman, Sachs letter dated March 4, 1998
3. Four Bloomberg Charts
4. Copy of the Note

**Aiden Emmet Hatton, Jr.**

| | |
|---|---|
| Vice President<br>Farr, Miller & Washington, LLC<br>Washington, D.C.<br>**1999 to present** | $500 Million<br>Investment Management Firm |
| Retired, Medical Leave<br>**1997 to 1999** | |
| Executive Director<br>Travelers Aid Society<br>Washington, D.C.<br>**1995 to 1997** | |
| Retired<br>**1993 to 1995** | |
| President<br>Acorn Asset Management<br>Bloomfield Hills, MI<br>**1991 to 1993** | $2.5 Billion<br>Investment Management Firm |
| Senior Vice President and<br>Manager, Fixed Income Department<br>Alliance Capital Management<br>New York, NY<br>**1979 to 1990** | $200 Billion<br>Investment Management Firm |
| Senior Vice President and<br>Manager, Fixed Income Department<br>INA Capital Management<br>Philadelphia, PC<br>**1978 to 1979** | |
| Institutional Salesman and<br>Sales Manager<br>Various Investment Banking Firms<br>**1955 to 1978** | |
| U.S. Military Intelligence<br>Counter Intelligence Corps.<br>Washington, D.C.<br>**1956 to 1958** | |

Villanova University
Villanova, PA
**1951 to 1955**
Bachelor of Science in Economics

Married
Four Adult Children
Date of Birth: 7/12/1933

Goldman, Sachs & Co. | 85 Broad Street | New York, New York 10004
Tel: 212-902-8426

Philip M. Darivoff
Vice President
Capital Markets Division

Goldman Sachs

**PERSONAL AND CONFIDENTIAL**

January 16, 1995

H.J. Heinz Credit Company
One Commerce Center
1201 North Orange Street
Suite 782
Wilmington, DE 19801

Attention: James A. Backo, President

Dear Mr. Backo:

We have attached to this letter a summary of indicative terms for a convertible debt security which the H.J. Heinz Company may propose to issue. We analyzed the characteristics of this security and we believe that it is reasonably valued in the context of current market conditions. In order to assess the value of this security we used two different approaches. We used our own proprietary model for valuing convertible bonds, and we also separated the security into a debt and equity option component and valued each of those components separately. Both approaches produced substantially the same result.

Convertible Bond Valuation Model

The convertible bond valuation model is a theoretical model which values a security based on several important inputs. These key inputs include the current borrowing costs for the issuer, current U.S. Treasury rates, an assumption on the dividend yield of the issuer's common stock, and an assumption on the expected volatility of the issuer's common stock price. Based on these inputs which are shown in the attached material, we have concluded that the debt value of the proposed convertible security represents 84.1% of the total value of the security. The theoretical option value represents 18.9% of the value of the security. These values sum to equal 103% (84.1% + 18.9%) of the value of the security. It is common for convertible securities to be valued below the theoretical values derived in our model, and we believe that the difference between the theoretical value and the value proposed is reasonable.

Valuing the Debt and Equity Option Components

A second approach to valuing the proposed security is to separate the security into its two principal components, straight debt and an option to purchase the issuer's common stock. Valuing the debt component is very straightforward. The issuer is a highly rated corporate credit with actively traded senior debt and a wide number of comparable credits are available for comparison. We believe that the issuer would be able to issue a 10 year, subordinated zero coupon note at a rate equal to .70% over the relevant U.S. Treasury benchmark. Based on this approach we have concluded that the



EXHIBIT 8A

debt component represents 84.1% of the value proposed by the issuer. This figure is consistent with the result from the convertible bond valuation model.

Separately valuing the equity option component of the security is not as straightforward as valuing the debt component. The option imbedded in the security is economically equivalent to a series of options to purchase the issuer's stock at variable strike rates and maturities. Furthermore, these options can only be exercised by redeeming the debt security. However, if an option to purchase stock is exercised before the maturity of the security, the investor foregoes the value of continuing to hold the security and exercise the option at a later date. Because of these added complications, we generally rely on the convertible bond valuation model; nonetheless, separately valuing some of the imbedded equity options may assure an investor that they are receiving fair value. Importantly, we have assumed a stock price of $39.25 per share, a dividend yield of 3.67%, and volatility rate of 19%. As shown in the attached materials, the volatility rate of 19% is consistent with the historical levels experienced in the past 2 years.

With these assumptions we have valued two separate equity options using a standard binomial equity options valuation methodology. First we valued the option to purchase the issuer's stock at the end of 7 years at a price of $56.36 per share. This is the effective strike rate implied in the proposed security at maturity. Based on our assumptions the value of this option represents 14.6% of the value of the total security and when added to the debt value derived earlier creates a debt and equity option value equal to 98.7% of the total value of the proposed security. This methodology ignores the possible value of exercising the option before maturity at lower effective strike levels, and, therefore, we can conclude that the fair value will be no less than the value implied by this methodology. In other words, the security should be worth no less than 98.7% of the proposed value.

Alternatively, the security allows the investor to tender the convertible debt security to purchase stock after 3 years. Using the accreted value of the debt security as a proxy for its expected value in 3 years, results in an effective conversion price in 3 years of $40.29 per share. The option to purchase the issuer's stock in 3 years at $40.29 is worth 16.9% of the total value of the security proposed which, when added to the debt component, equals 101.0% of the value of the proposed security. This approach ignores two potentially important (and potentially offsetting) values. First, by exercising before maturity the investor gives up the benefit of the downside protection offered in the convertible security and instead is exposed to the full risk of a decline in the issuer's stock price before the maturity of the security. Second, this approach assumes that the value of the debt security in 3 years will equal the accreted value, when in fact the investor may benefit from being able to use the debt to exercise the option even if interest rates go up and the debt value declines. Nonetheless, despite the shortcomings of this approach, we can conclude that the proposed security represents a reasonable value.

Conclusion

While a market for this security does not currently exist and one cannot be assured that a market will develop, we can conclude that based on our analyses the security proposed by the H.J. Heinz Company is reasonably valued in the context of current market conditions. Furthermore, you should recognize that this security will offer the opportunity to participate in the potential appreciation of the issuer's common stock while at the same time offer assurance of a minimum fixed return due to the high credit quality of the issuer.

This conclusion, nevertheless, should not be taken as a specific indication of any guaranteed realizable value at which the security may trade in the market at any point in time. In addition, it is our understanding that you have requested this information from us for your use in negotiations concerning certain transactions between you and H.J. Heinz Company. We have not participated in any of these negotiations. Furthermore, we are not experts in accounting, taxation or legal matters, and, therefore, we can make no representation as to the adequacy of this information for any such purpose and express no view as to the accounting, tax or legal treatment of any transactions. This letter is exclusively for the information of the Board of Directors and senior management of H.J. Heinz Credit Company and H.J. Heinz Company in connection with such transactions and may not be disclosed to any third party without our prior consent.

Very truly yours,

Philip M. Darivoff

Philip M. Darivoff

# Summary Comparison of Selected Convertible Debt Se

| Issuer | Effective Maturity | Coupon | Initial Conversion Premium (1) | Effective Conversion Premium (2) | Yield | Call Protection | Non Exercise Period | Common Yield | Common Volatility | Credit | Relevant UST Yield at Issue |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Heinz | 7 | 0.000 | 13.30% | 43.8% | 6.00% | 7 | 3 | 3.7% | 19% | Aa2/AA | 7.87% |
| ADP | 5 | 0.000 | 20.00 | 55 | 5.25 | 4 | 0 | 1.0 | 30 | Aa3/AA- | 6.60 |
| Disney | 5 | 0.000 | 15.00 | 55 | 6.00 | 2 | 0 | 0.5 | 25 | A1/AA- | 6.51 |
| Du Pont | 5 | 0.000 | 19.56 | 75 | 7.75 | 2 | 0 | 4.2 | 22 | Aa2/AA | 6.41 |
| Loews | 5 | 0.000 | 14.90 | 54 | 6.00 | 2 | 0 | 1.0 | 23 | A1/AA- | 6.00 |
| Motorola | 5 | 0.000 | 22.00 | 36 | 2.25 | 5 | 0 | 0.4 | 32 | A1/A+ | 4.80 |
| Home Depot | 5 | 4.500 | 20.39 | 50 | 4.50 | 3 | 0 | 0.2 | 25 | A1/A- | 6.41. |
| Cinn Fincl | 10 | 5.500 | 18.20 | 18 | 5.50 | 5 | 0 | 1.7 | 20 | A2/AA- | 7.58 |
| Old Republic | 10 | 5.750 | 25.00 | 25 | 5.75 | 3 | 0 | 1.5 | 30 | Aa3/A+ | 6.46 |
| Royce Value Tr | 10 | 5.750 | 12.00 | 12 | 5.75 | 3 | 0 | NA | 18 | Aaa/AAA | 7.09 |
| News Corp | 5 | 0.000 | 12.00 | 64 | 7.75 | 3 | 0 | 6.8 | 40 | B3/B | 6.98 |
| Solectron | 5 | 0.000 | 15.00 | 62 | 7.00 | 4 | 0 | 0.0 | 55 | B2/B+ | 6.85 |
| RPM | 5 | 0.000 | 12.91 | 47 | 5.25 | 4 | 0 | 2.5 | 25 | BBB- | 5.54 |
| Elan Int'l | 5 | 0.000 | 18.00 | 55 | 5.75 | 4 | 0 | 0.0 | 45 | Ba2/BB+ | 5.34 |
| Office Depot | 5 | 0.000 | 15.00 | 47 | 5.00 | 4 | 0 | 0.0 | 40 | Ba2/BB- | 6.10 |
| Time Warner | 5 | 0.000 | 21.21 | 65 | 6.25 | 5 | 0 | 0.8 | 27 | Ba2/BBB- | 6.03 |
| Time Warner | 5 | 0.000 | 26.86 | 65 | 5.00 | 5 | 0 | 0.8 | 33 | Ba2/BBB- | 5.18 |
| Fremont Gen | 5 | 0.000 | 18.00 | 51 | 5.00 | 5 | 0 | 3.0 | 30 | Ba2/BB- | 4.70 |
| Discovery Zone | 5 | 0.000 | 18.37 | 50 | 4.75 | 5 | 0 | 0.0 | 60 | B3/B- | 4.69 |
| Office Depot | 7 | 0.000 | 20.00 | 58 | 4.00 | 7 | 0 | 0.0 | 35 | Ba2/BB- | 5.00 |
| AST | 5 | 0.000 | 19.34 | 55 | 5.25 | 4 | 0 | 0.0 | 50 | B2/B | 5.09 |
| Fidelity Nat'l | 5 | 0.000 | 17.00 | 53 | 5.49 | 5 | 0 | 1.2 | 37 | Ba3/B+ | 5.39 |
| USF&G | 5 | 0.000 | 20.97 | 51 | 4.50 | 5 | 0 | 1.5 | 40 | Ba2/BB+ | 5.64 |
| Bank of NY | 10 | 7.500 | 18.04 | 18 | 7.50 | 5 | 0 | 6.0 | 50 | Baa1/BBB+ | 7.87 |
| PZL/Chevron | 20 | 6.500 | 22.50 | 23 | 6.50 | 5 | 0 | 4.0 | 17 | Baa2/BBB | 7.44 |
| Cigna | 25 | 8.200 | 20.80 | 21 | 8.20 | 3 | 0 | 4.4 | 25 | Baa2/A- | 10.66 |
| Gencorp | 10 | 8.000 | 19.00 | 19 | 8.00 | 4 | 0 | 4.0 | 40 | Ba3/BB- | 8.86 |
| Hanson | 7 | 2.390 | 19.00 | 41 | 2.39 | 5 | 0 | NA | 22 | A3/A+ | 5.65 |

(1) Initial Conversion Premium equals the premium over the current stock price where the investor may first convert their holdings into the issuer's common sto
(2) The Effect Conversion Premium is the conversion premium over the current stock price at the earlier of the maturity of the Notes or the investor's first optior

Summary of Indicative Terms of Zero Coupon Convertible Notes

Pricing as of the close of business 01/13/95

| | |
|---|---|
| Issuer: | H.J. Heinz Company |
| Ranking: | Subordinated |
| Coupon: | Zero |
| Maturity: | 7 Years |
| Note Value: | $130.506 Million |
| Face Amount: | $197.402 Million |
| Issue Price: | 66.112% of Face |
| Yield to Maturity: | 6.00% |
| Issuer Call: | 7 years (Non-Call Life) |
| Convertible After: | 3 years |
| Underlying Shares: | 3.5025 Million Shares in Total |
| Shares per Bond: | 26.8379 Shares per $1,000 Bond |
| Current Share Price: | $39.25 per share |

| | |
|---|---|
| Repurchased Stock: | 3.500 Million Shares |
| Redeemed Stock: | 3.325 Million Shares |
| Current Share Price: | $39.25 per share |
| Redeemed Stock: | $130.506 Million |

| Option Value | St.Debt 1st. Call | Last Call | |
|---|---|---|---|
| Maturity: | 3.00 | 7.00 | Years |
| Volatility | 19.00 | 19.00 | % per annum |
| Discount Rate: | 8.40 | 8.56 | % per annum |
| Dvd. Yld. | 3.67 | 3.67 | % per annum |
| Style: | European | American | |
| Method: | Binomial | Binomial | |
| Strike: | $40.29 | $56.36 | per share |
| Call Value: | $6.30 | $5.45 | per share |
| Call Value: | $22.07 | $19.09 | MM Total |
| Option %total: | 16.9% | 14.6% | |

| Market Debt Rate | |
|---|---|
| US Treasury Rate: | 7.870% |
| Credit Spread: | 0.700% |
| Comparable Debt Rate: | 8.570% |
| Straight Debt Value: | 84.1% of total value |
| Residual Option Value: | 15.9% of total value |

Conversion Price and Call Schedule of Zero Coupon Convertible Notes

| Year | Accreted Principal | Principal (% of Face) | Call Schedule | Effective Conversion Price | Effective Conversion Premium | Straight Debt Values: Accreted Debt Value | Straight Debt Values: Effective Conversion Premium |
|---|---|---|---|---|---|---|---|
| 0.0 | $130.506 | 66.11% | | | | $109.710 | |
| 0.5 | 134.421 | 68.10% | | | | 114.411 | |
| 1.0 | 138.454 | 70.14% | | | | 119.314 | |
| 1.5 | 142.608 | 72.24% | | | | 124.426 | |
| 2.0 | 146.886 | 74.41% | | | | 129.758 | |
| 2.5 | 151.293 | 76.64% | | | | 135.318 | |
| 3.0 | 155.831 | 78.94% | | 44.49 | 13.35% | 141.116 | 40.29 |
| 3.5 | 160.506 | 81.31% | | 45.83 | 16.75% | 147.163 | 42.02 |
| 4.0 | 165.321 | 83.75% | | 47.20 | 20.26% | 153.469 | 43.82 |
| 4.5 | 170.281 | 86.26% | | 48.62 | 23.86% | 160.045 | 45.69 |
| 5.0 | 175.389 | 88.85% | | 50.08 | 27.58% | 166.903 | 47.65 |
| 5.5 | 180.651 | 91.51% | | 51.58 | 31.41% | 174.055 | 49.69 |
| 6.0 | 186.071 | 94.26% | | 53.12 | 35.35% | 181.513 | 51.82 |
| 6.5 | 191.653 | 97.09% | | 54.72 | 39.41% | 189.291 | 54.04 |
| 7.0 | 197.402 | 100.00% | $197.402 | 56.36 | 43.59% | 197.402 | 56.36 |

# Heinz Common Stock Price Volatility

The graph below shows the volatility of Heinz's common stock price ov
calculated over rolling one-year periods using daily closing stock price:




-32-

# Indicative Terms for Domestic Fixed Rate D

## January 13, 1995

***HNZ 10 Yr. Sr. Zero Indication @ +60/strip curve***

***Sub. Debt @ +10 vs. Sr.***

***10 Yr. Sub. Zero Indication @ +70/strip curve***

***10 Yr. UST Strip Yield: 7.87%***

**Terms**

| | | | | |
|---|---|---|---|---|
| Maturity (years): | 3 | 5 | 7 | |
| Principal Amount (mm): | $200 | $200 | $200 | |
| Redemption Option: | NCL | NCL | NCL | |
| Sinking Fund: | None | None | None | |

**Indicative Pricing**

| | | | | |
|---|---|---|---|---|
| U.S. Treasury Yield: | 7.54% | 7.66% | 7.70% | |
| Spread over Treasuries (bp): | 30 | 30 | 37 | |
| Coupon: | 7.84% | 7.96% | 8.07% | |
| Public Offering Price: | 100.000% | 100.000% | 100.000% | 10 |
| Gross Underwriting Spread: | 0.350% | 0.550% | 0.625% | |
| Net Proceeds: | 99.650% | 99.450% | 99.375% | 9 |
| All-in-Cost to Maturity: | 7.97% | 8.10% | 8.19% | |
| All-in-Spread over Treasuries (bp): | 43 | 44 | 49 | |

(a) Assumes senior debt ratings of Aa2/AA (on review/watch for possible downgrade from Moody's

-33-

# Selected Secondary Trading Levels

| Offer Date | Issuer | Principal Amount ($mm) | Coupon | Structure |
|---|---|---|---|---|
| 09/14/92 | HJ Heinz | 250.0 | 5.500 | 5 NCL |
| 10/22/92 | HJ Heinz | 300.0 | 6.750 | 7 NCL |
| 01/20/93 | HJ Heinz | 200.0 | 6.875 | 10 NCL |
| 07/15/93 | Coca-Cola | 150.0 | 6.000 | 10 NCL |
| 10/04/93 | Abbott Laboratories | 200.0 | 5.600 | 10 NCL |
| 03/18/92 | El du Pont de Nemours | 350.0 | 8.125 | 12 NCL |
| 11/13/91 | Procter & Gamble | 200.0 | 8.000 | 12 NCL |
| 08/05/93 | Gillette | 150.0 | 6.250 | 10 NCL |
| 05/07/93 | Archer-Daniels-Midland | 250.0 | 6.250 | 10 NCL |
| 03/18/93 | Eli Lilly | 200.0 | 6.250 | 10 NCL |
| 05/18/94 | Wal-Mart Stores | 500.0 | 7.500 | 10 NCL |
| 02/19/92 | Norfolk Southern | 250.0 | 7.875 | 12 NCL |
| 06/11/93 | Boeing | 300.0 | 6.350 | 10 NCL |
| 09/30/92 | Anheuser Busch | 200.0 | 6.900 | 10 NC7 |
| 01/26/94 | Hoechst Celanese | 250.0 | 6.125 | 10 NCL |
| 09/11/92 | Grand Metropolitan Investment | 200.0 | 7.125 | 12 NCL |
| 05/23/94 | Grand Metropolitan Investment | 1,224.0 | Zero | 10 NCL |

(a) As of January 13, 1995.

Goldman, Sachs & Co. | 85 Broad Street | New York, New York 10004
Tel: 212-902-1000

Goldman Sachs

**PERSONAL AND CONFIDENTIAL**

March 4, 1998

Mr. James A. Backo
President
H.J. Heinz Credit Company
877 West Main St. #510
Boise, Idaho 83702

Dear Mr. Backo:

We have attached to this letter a summary of the final terms for the Zero Coupon Convertible Note due January 18, 2002 (the "Convertible Bond") issued by H.J. Heinz Company (the "Company" or the "Issuer") to H.J. Heinz Credit Company (the "Credit Company") on January 17, 1995. At your request, we have analyzed the characteristics of this security in an effort to determine the merits of converting this security as of the date of this letter into common shares of the Company (the "Shares" or "Common Stock"), versus continuing to hold the security in its current form. For the purposes of analyzing the available options, we have relied on our own convertible bond valuation model, and we also separated the Convertible Bond into its Common Stock and equity option components to value each of these components independently. Both approaches produced substantially similar results.

**Convertible Bond Valuation Model**

The convertible bond valuation model is a theoretical model which values a security based upon several important inputs. These key inputs include the current borrowing costs for the issuer, current U.S. Treasury rates, an assumption on the dividend yield of the issuer's common stock, and an assumption on the expected volatility of the issuer's common stock price. Given that the Company is a highly rated corporate credit with publicly traded senior debt and a wide number of comparable credits (see attached), we believe that the appropriate borrowing cost for the Issuer is 35 basis points above the relevant U.S. Treasury benchmark (5.75%). In addition we have assumed a volatility of 21%, an annual dividend yield for the Company of 2.21% and a Common Stock price of $56.94 per share. Based on these inputs, the theoretical value of the Convertible Bond (as developed by the Convertible Bond Valuation Model) is equal to $299.8 million, which is the value of the Common Stock underlying the Convertible Bonds ("Parity"). The model is not ascribing any value to the embedded Put Option due to the fact that the model assumes (based on the analysis outlined below) that an investor will convert the security immediately in order to capitalize on the differential between the Common Stock and Convertible Bond yields.

EXHIBIT
8B

Goldman, Sachs & Co. | 85 Broad Street | New York, New York 10004
Tel: 212-902-1000

Goldman Sachs



## Valuing the Component Pieces- Holding the Security to Maturity

In order to determine the value of the Equity Put Option embedded in the Convertible Bond, we have valued the security by separating it into its principal components. Given that the Parity value of the Convertible Bond ($299.8 million) is well above its accreted value ($155.8 million), we believe that these principal components should consist of Common Stock and an Equity Put Option. Valuing the Common Stock component is very straightforward. There are 5.265 million shares underlying the issue, and based on the Company's closing stock price of $56.94 per share on March 4, 1998, the Common Stock component is worth $299.8 million (the value attributed to the security by the Convertible Bond Valuation Model).

Separately valuing the Equity Put Option component of the security is not as straightforward as valuing the Common Stock component. While the Equity Put Option embedded in the security is economically equivalent to a European Style Put Option on the Company's Common Stock at a price of $37.49 per share at maturity, such option can only be exercised by redeeming the security at maturity. Nonetheless, separately valuing this Equity Put Option should provide a proxy for the value of both components in aggregate. Importantly, we have assumed a stock price $56.94 per share, an annual dividend of $1.26 per share, and a volatility rate of 21%. As shown in the attached materials, the volatility rate of 21% is consistent with the historical levels experienced in the past three years.

With these assumptions, we have valued the Equity Put Option (using a standard binomial equity option valuation methodology) to put the Issuer's Common Stock at January 17, 2002 at a price of $37.49 per share, the effective per share value received at maturity if the Convertible Bond is not converted. Based on our assumptions, the value of this option represents $0.62 per share, or $3.3 million, and when added to the Common Stock value derived earlier, creates a Common Stock and Equity Put Option value equal to $303.1 million.

## Valuing the Component Pieces- Early Conversion

Conversely, the Credit Company could choose to exercise its conversion right immediately. To the extent that the Credit Company chooses to exercise its right, the value of the underlying Common Stock, as outlined above would equal $299.8 million. However, as we have seen, by exercising prior to maturity, the Credit Company will forego the value of the Equity Put Option embedded in the Convertible Bond. Offsetting this however, is the fact, that by converting into Common Shares, the Credit Company will be eligible to receive the cash dividends paid by the Company on its Common Stock. In order to compare the two alternatives of holding the Convertible Bond or converting immediately, it is necessary to determine the present value of all potential future cash dividends earned by the Credit Company on the Common Shares from conversion until the maturity of the Convertible Bond. This will allow the company to compare the value of the dividends versus the value of the Equity Put Option. This also has implications for the timing of the conversion, as it

Goldman, Sachs & Co. | 85 Broad Street | New York, New York 10004
Tel: 212-902-1000

Goldman Sachs



suggests converting just prior to the next ex-dividend date. This will allow the Credit Company to maintain the Equity Put Option for the longest possible time without requiring the Credit Company to forego the next cash dividend payment.

While determining the value of the Common Stock component is straightforward, determining the present value of the future dividend payments is more difficult. While recognizing that dividend policies can change over time, and a termination of the Company's current dividend program would seriously change the dynamics of our analysis, we have assumed for purposes of this exercise that the Company maintains a constant quarterly cash dividend of $0.315 per share from the date of this letter until the maturity of the Convertible. Based on this approach, we have assumed that the present value of all future cash dividends over this period, discounted at a U.S. Treasury rate of 5.75%, would be equal to $4.72 per share. Based on 5.265 million underlying shares, this is equal to a value of $24.9 million. Thus the Common Stock value of each bond, coupled with the present value of future cash dividends would yield a present value of $324.6 million, to the extent that the Credit Company converted immediately. This compares very favorably to the accreted value of $155.8 million, parity of $299.8 million and a theoretical value of the convertible equal to $303.1 million.

**Conclusion**

While our analysis may not fully account for certain tax, legal and regulatory issues which may arise in connection with an early conversion, based upon the assumptions outlined, the Credit Company may achieve better theoretical economic value by converting the Convertible Bond prior to maturity in the current market environment.

This conclusion, nevertheless, should not be taken as a specific recommendation or indication of any guaranteed value which may be recognized in the marketplace at any point in time. In addition, it is our understanding that you have requested this information from us for your use in negotiations concerning certain transactions between you and H.J. Heinz Company. We have not participated in any of these negotiations. Furthermore, we are not experts in accounting, taxation or legal matters, and therefore, we can make no representation as to the adequacy of this information for any such purpose and express no view as to the accounting, tax or legal treatment of any transactions. This letter is exclusively for the information of the Board of Directors and senior management of H.J. Heinz Credit Company and H.J. Heinz Company in connection with such transactions and may no be disclosed to any third party without our prior consent.

Sincerely,

Philip M. Darivoff

# Summary of Convertible Analysis (
# Zero Coupon Convertible Notes

**Indicative Terms of Zero Coupon Convertible Notes**

| | | |
|---|---|---|
| Issuer: | H.J. Heinz Company | |
| Ranking: | Subordinated | |
| Coupon: | Zero | |
| Maturity: | 7 Years | |
| Value at Issuance: | 130.506 | |
| Face Value: | 197.402 | |
| Issue Price: | 66.112% percent of Face | |
| Yield to Maturity: | 6.00% | |
| Initial Conversion Ratio: | 26.6714 | |
| Initial Conversion Price: | 24.79 | |
| Maturity: | 7 years- Non-call life | |
| Convertible After: | 3 years | |
| Underlying Shares: | 5.265 | |
| Stock Price at Issuance: | 26.17 | Current Price: 56.94 |

**Market Debt Rate**

| | Today: |
|---|---|
| US Treasury Rate: | 5.75% |
| Credit Spread: | 0.35% |
| Comparable Debt Rate: | 6.10% |

| | |
|---|---|
| Option Value: | Put Value |
| Maturity: | 01/15/02 |
| Volatility: | 21.0 |
| Discount Rate: | 5.75% |
| Current Dividend Yield: | 2.21% |
| Style: | European |
| Method: | Binomial |
| Strike: | 37.49 |
| Put Value (per share): | 0.62 |
| Put Value (total): | 3.28 |
| Option Value: | 2.10% |

**Conversion Price and Call Schedule of Zero Coupon Convertible Notes**

| Year | Accreted Principal | Principal (% of face) | Call Schedule | Effective Cvn. Price | Effective Cvn. Premium |
|---|---|---|---|---|---|
| - | 130.506 | 66.1% | | 24.79 | -5.27% |
| 0.50 | 134.421 | 68.1% | | 25.53 | -2.43% |
| 1.00 | 138.454 | 70.1% | | 26.30 | 0.50% |
| 1.50 | 142.608 | 72.2% | | 27.09 | 3.51% |
| 2.00 | 146.886 | 74.4% | | 27.90 | 6.62% |
| 2.50 | 151.293 | 76.6% | | 28.74 | 9.82% |
| 3.00 | 155.831 | 78.9% | | 29.60 | 13.11% |
| 3.50 | 160.506 | 81.3% | | 30.49 | 16.51% |
| 4.00 | 165.321 | 83.7% | | 31.40 | 20.00% |
| 4.50 | 170.281 | 86.3% | | 32.34 | 23.60% |
| 5.00 | 175.389 | 88.8% | | 33.31 | 27.31% |
| 5.50 | 180.651 | 91.5% | | 34.31 | 31.13% |
| 6.00 | 186.071 | 94.3% | | 35.34 | 35.06% |
| 6.50 | 191.658 | 97.1% | | 36.40 | 39.11% |
| 7.00 | 197.402 | 100.0% | 197.402 | 37.49 | 43.29% |

Goldman Sachs

- 38 -

# H.J. Heinz Company
# Common Stock Price Volatility




Goldman Sachs

-39-

# Domestic Financing Alternatives

## H.J. Heinz Company

**As of March 5, 1998**

| Maturity (years): | 2 | 3 | 4 |
|---|---|---|---|
| Benchmark Treasury: | 5.50% due 2/00 | 5.375% due 2/01 | 6.625% due 3/02 |
| U.S. Treasury: | 5.61% | 5.62% | 5.75% |
| Reoffer Spread (bps): | +27 area | +30 area | +35 area |
| Coupon: | 5.88% | 5.92% | 6.10% |
| Gross Underwriting Fee: | 0.250% | 0.500% | 0.550% |
| All-in-Cost: | 6.01% | 6.10% | 6.26% |
| All-in Spread to UST (bps): | +40 | +48 | +51 |

| Additional Cost of Subordinated Debt | ← + 15 bps → |
|---|---|

(a) Assumes senior debt ratings of A1/A+

Goldman Sachs

- 40 -

# Comparable Secondary Trading Leve

## As of March 5, 1998

| Short Term | |
|---|---|
| Issuer (Moody's/S&P) | |
| Anheuser-Busch Cos. Inc. (A1/A+) | 6.750% due 08/03 |
| H.J. Heinz Company (A1/A+) | 6.875% due 01/03 |
| Campbell Soup Company (Aa3/AA-) | 6.150% due 12/02 |
| E.I. Dupont Nemours (Aa3/AA-) | 6.750% due 10/02 |
| Honeywell Inc. (A2/A) | 6.750% due 03/02 |
| Disney (A2/A) | 6.375% due 03/01 |
| Campbell Soup Company (Aa3/AA-) | 8.580% due 03/01 |

| Intermediate Term | |
|---|---|
| Issuer (Moody's/S&P) | |
| Anheuser-Busch Cos. Inc. (A1/A+) | 9.000% due 12/09 |
| Warner Lambert (A1/AA-) | 6.000% due 01/08 |
| McDonald's Corp. (Aa2/AA) | 5.950% due 01/08 |
| Knight Ridder (A3/A) | 6.625% due 11/07 |
| E.I. Dupont Nemours (Aa3/AA-) | 6.750% due 09/07 |
| Gap Inc. (A2/A) | 6.900% due 09/07 |
| IBM Corp. (A1/A) | 6.450% due 08/07 |
| Honeywell Inc. (A2/A) | 7.000% due 03/07 |
| Rubbermaid Inc. (A2/A+) | 6.600% due 11/06 |
| Lucent Technologies Inc. (A2/A) | 7.250% due 07/06 |
| Walt Disney Co. (A2/A) | 6.750% due 03/06 |
| Sears Roebuck (A2/A-) | 6.125% due 01/06 |

Goldman Sachs

- 41 -






EXHIBIT
tabbies
8C


GT5 Govt GP/GPO
N170 Govt
GP
US TREASURY N/B T 3 ½ 12/15/09 99-13+ / 99-14 ( 3.63 /62) BGN @15:01
Mid Line
GT05 Govt
1/4
Range 12/31/94 - 12/31/99
Period D Daily
Upper Chart: 3 Mid Line
Moving Averages
1) News
BGN/NY/Close/Mid
Last 6.344
High 01/09/95 7.900
Average 5.889
Low 10/05/98 3.970
8.000
7.500
7.000
6.500
6.000
5.500
5.000
4.500
4.000
1995
1996
1997
1998
1999
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2004 Bloomberg L.P.
G718-698-0 03-Jan-05 15:12:04


GT10 Govt GP/GPO
N170 Govt GP
US TREASURY N/B T 4 ¼ 11/15/14 100-08 /100-09 ( 4.22 /21) BGN @15:05
Mid Line GT10 Govt 1/5
Range 12/31/94 - 1/ 2/02 Period D Daily
Upper Chart: 3 Mid Line Moving Averages
1) News
BGN/NY/Close/Mid
Last 5.160
High 01/03/95 7.875
Average 5.893
Low 10/05/98 4.162
8.000
7.500
7.000
6.500
6.000
5.500
5.000
4.500
4.000
1995
1996
1997
1998
1999
2000
2001
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2004 Bloomberg L.P.
G718-698-0 03-Jan-05 15:09:01

HJH Equity TRA N170 Equity TRA

# TOTAL RETURN ANALYSIS

HJH GR
HJ HEINZ CO

PER M Monthly

CURR USD

| | SHARES | DATE | | PRICE |
|---|---|---|---|---|
| BUY | 1000 | 1/31/95 | @ | 26 ¼ |
| REVIEW | | 4/30/98 | @ | 53.241257 |

--- Hit 1 <GO> for divd/split data ---

COMMISSIONS

TYPE 1) % 2) amt/shr 3) flat amt
COMMISSION RATE/AMT
TOTAL COMMISSION




| RETURNS | HOLDING PERIOD | ANNUAL EQUIVALENT |
|---|---|---|
| SIMPLE PRICE APPRECIATION | 102.8238 % | 24.3363 % |
| REINVEST G Gross DVD IN SECURITY | 103.9179 % | 24.5425 % |
| REINVEST AT 2.1669 % | 104.0268 % | 24.5630 % |

| DIVS REINVESTED IN SECURITY | |
|---|---|
| TOTAL DIVIDENDS | 315.00 |
| ADDL SHARES PURCH | 5.39 |
| CAPITAL GAIN/LOSS | 26991.26 |
| TOTAL GAIN/LOSS | 27278.45 |

| DIVS REINVESTED AT 2.1669 % | |
|---|---|
| TOTAL DIVIDENDS | 315.00 |
| REINVESTMENT INCOME | .78 |
| CAPITAL GAIN/LOSS | 26991.26 |
| TOTAL GAIN/LOSS | 27307.04 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2005 Bloomberg L.P.
G718-698-0 04-Feb-05 10:32:25

THE NOTE REPRESENTED BY THIS CERTIFICATE WAS ORIGINALLY ISSUED ON JANUARY 18, 1995, HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, HYPOTHECATED OR OTHERWISE ASSIGNED EXCEPT PURSUANT TO (i) A REGISTRATION STATEMENT WITH RESPECT TO SUCH NOTE WHICH IS EFFECTIVE UNDER SUCH ACT OR (ii) RULE 144 OR 144A UNDER SUCH ACT (OR ANY OTHER EXEMPTION FROM REGISTRATION UNDER SUCH ACT RELATING TO THE DISPOSITION OF SECURITIES).

This Note has original issue discount for Federal income tax purposes, determined pursuant to Sections 1271 through 1275 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder. For Federal income tax purposes, the total amount of original issue discount is $338.88 per $1,000 principal amount as maturity of this Note. The Issue Date is January 18, 1995 and the yield to maturity on the Issue Date is 6.0%, compounded semi-annually on each January 18 and July 18. The issue price per $1,000 principal amount at maturity of this Note is $661.12 (the "Issue Price").

**H. J. HEINZ COMPANY**
**Zero Coupon Convertible Note**
**due January 18, 2002**

No. 1 $197,402,412.78

H. J. Heinz Company, a Pennsylvania corporation (the "Company"), promises to pay to H. J. Heinz Credit Company, or registered assigns, the principal amount at maturity of ONE HUNDRED NINETY SEVEN MILLION FOUR HUNDRED TWO THOUSAND DOLLARS AND 78/100 CENTS on January 18, 2002 (the "Maturity Date").

This Note is continued on the following pages and the additional provisions there set forth for all purposes have the same effect as if set forth on this page. The Note shall not bear interest except as specified herein.

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually by its duly authorized officers and its corporate seal to be affixed to this Note.

Dated: January 18, 1995

ATTEST:

By: Karyll A. Davis
Assistant Secretary

H. J. HEINZ COMPANY

By: Paul F. Renne
Vice President-Treasurer

USX 6025 1699*1



EXHIBIT 8D

**H. J. HEINZ COMPANY**
**Zero Coupon Convertible Note**
**due January 18, 2002**

1. Interest.

This Note shall not bear interest, except that if the principal amount at maturity of this Note or any portion of such principal amount at maturity is not paid when due, or if shares of H. J. Heinz Company common stock, par value $.25 per share (the "Common Stock") (or cash in lieu of any fractional share) in respect of a conversion of this Note in accordance with the terms of Paragraph 3 below are not delivered when due, then in each such case the overdue amount (or, if applicable, the amount sought to be converted in accordance with Paragraph 3 below) shall bear interest at the rate of 8% per annum, compounded semi-annually, which interest (to the fullest extent payment of such interest shall be legally enforceable under applicable law), shall accrue from and including the date such overdue amount was due (or, if applicable, such amount was sought to be converted) to but excluding the date payment of such amount, including interest thereon, has been made or duly approved for, or the date when such conversion shall have been effected. All such interest shall be payable on demand.

This Note shall accrete in the period during which the Note remains outstanding, at 6% per annum, on a semi-annual basis compounding on each January 18 and July 18, using a 360-day year comprised of twelve 30-day months, commencing on the Issue Date and shall cease to accrete upon (a) payment in full on the Maturity Date, or (b) the Conversion Date (as defined in Paragraph 3 below).

2. Method of Payment.

The holder must surrender this Note to the Company to collect payments of amounts due upon final payment with respect thereto. The Company will pay all such amounts due in lawful money of the United States of America in money or by check.

3. Conversion.

The holder of this Note may convert it into shares of Common Stock at any time after January 17, 1998 and before the close of business on January 18, 2002.

The initial conversion rate is 17.7809377 shares of Common Stock per $1,000 principal amount at maturity of this Note, subject to adjustment upon the occurrence of certain events described in Paragraph 4 below (the "Conversion Rate"). The Company will deliver cash in lieu of any fractional share of Common Stock.

In order to convert this Note the holder must surrender the Note at the office of the Company, accompanied (i) by written notice of conversion (the "Conversion Notice") in the form attached to this Note (or such other notice which is acceptable to the Company), that the holder elects to convert this Note or, if less than the entire principal amount of this Note is to be converted, the portion thereof to be converted, and (ii) if the certificates representing the Common Stock into which this Note is convertible are to be issued in a name other than that of the holder thereof, by any tax payable upon issue of such certificates or by evidence satisfactory to the

| years | Accre-ted principal | |
|---|---|---|
| 0 | 78.330505 | 13.65% |
| 0.5 | 83.676562 | |
| 1 | 89.387488 | |
| 1.5 | 95.488184 | |
| 2 | 102.00525 | |
| 2.5 | 108.96711 | |
| 3 | 116.40412 | |
| 3.5 | 124.3487 | |
| 4 | 132.8355 | |
| 4.5 | 141.90152 | |
| 5 | 151.5863 | |
| 5.5 | 161.93206 | |
| 6 | 172.98392 | |
| 6.5 | 184.79008 | |
| 7 | 197.402 | |

EXHIBIT
tabbies
9

EXHIBIT
PENGAD 800-631-6989
Hatton 3
JD 3/23/06