UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - -x
                               :
H.J. HEINZ COMPANY AND         :
  SUBSIDIARIES,                :
                               :
        Plaintiffs,            :
                               :  Civil Action No.
     vs.                       :  No. 03-2847 T
                               :
UNITED STATES OF AMERICA,      :
                               :
        Defendant.             :
                               :
- - - - - - - - - - - - - - - -x
```

Washington, D.C.
Wednesday, March 23, 2005

The deposition of AIDEN HATTON, JR., called for examination by counsel for the Defendant in the above-entitled matter, pursuant to notice, in the offices of Ivins, Phillips & Barker, 1700 Pennsylvania Avenue, Northwest, Washington, D.C., convened at 10:46 a.m., before Judy Brown, a notary public in and for the District of Columbia, when were present on behalf of the parties:

[EXHIBIT 10]

APPEARANCES:

On behalf of the Deponent:

CLIFTON B. CATES III, ESQ.
ROBERT H. WELLEN, ESQ.
DAVID D. SHERWOOD, ESQ.
JAMES E. BROWN, ESQ.
Ivins, Phillips & Barker
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 393-7600

On behalf of the Defendant:

ROBERT STODDART, ESQ.
Department of Justice
Tax Division
555 Fourth Street, N.W.
P.O. Box 26
Washington, D.C. 20044
(202) 307-6445

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR DEFENDANT | PLAINTIFFS |
|---|---|---|
| AIDEN HATTON, JR. | | |
| By Mr. Stoddart | 4 | -- |


E X H I B I T S


| HATTON DEPOSITION | MARKED |
|---|---|
| No. 1 | 9 |
| No. 2 | 10 |
| No. 3 | 19 |
| No. 4 | 30 |
| No. 5 | 60 |
| No. 6 | 78 |
| No. 7 | 99 |
| No. 8 | 104 |
| No. 9 | 105 |

P R O C E E D I N G S

Whereupon,

AIDEN HATTON, JR.

having been called as a witness on behalf of the Defendant and having been first duly sworn by the Court Reporter, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. STODDART:

Q Could you please state your name, your business address, and your business phone number, please.

A My name is Aiden Lee Hatton, Jr. My address is 1020 19th Street. My phone number is (202) 530-5708.

Q Are you employed?

A Yes.

Q And what is your employer?

A Farr, Miller & Washington.

Q And what do you do for them?

A I manage money for institutions.

Q And how do you manage money, you

personally, what is it that you do exactly?
A I--I buy and sell both equities and fixed income for clients of the firm that we have a contract with to--to manage money for a fee.
Q Is H.J. Heinz Company one of your clients?
A No.
Q Has H.J. Heinz Company ever been one of your firm's clients?
A No.
Q Does your firm own stock in H.J. Heinz Company?
A Not to my knowledge. It is not on our--our approved list or on our--any of our perspective list, but there could be a client that owns stock from some generational thing, but it is not--it is not one of our core investments.
Q Have you been employed before your present occupation?
A Yes.
Q In any of your earlier employments did you ever manage money?

A Yes.
Q In your earlier employments did any of your earlier employers own stock in H.J. Heinz Company?
A I can't answer that. I don't know the answer.
Q Do you know if they had--
A I can tell you that on the bond side, on the part--the firm that I was in we didn't own bonds. We didn't own any H.J. Heinz bonds.
Q To your knowledge, did any of your earlier employers have H.J. Heinz Company as a client?
A No.
Q What did you major in in college?
A I majored in economics.
Q In any particular branch of economics?
A No. It was just general--general study of economics, undergraduate study.
Q Did you study the valuation of securities?
A No.
Q Have you had any graduate work?
A No.

Q Are you taking any professional continuing legal education?
A No.
Q In your present employment, are you ever called upon to value securities that don't trade in an established market?
A No.
Q Have you ever valued a security that is not traded in an established market?
A No.
Q Have you ever been consulted on valuing securities that are not credited in established markets before this case?
A No.
Q Have you ever valued any security whatsoever?
A I would have to interpret that question. We--we as--
MR. CATES: Excuse me, if you don't understand, you can say so.
BY MR. STODDART:
Q Yes. I should have--I should have said

that at the beginning. Please if you don't understand a question or it seems too broad to give a good answer to, you may just ask me to rephrase it and I'd be happy to.

A Okay. I would like you to rephrase that question.

Q Okay. Has anybody called upon you to offer your opinion about the value of any security before you were engaged for this case?

A No.

Q Have you ever taken any academic course in which you were called upon to value any security, either real or hypothetical?

A No.

Q Have you ever attended a seminar in which persons were instructed on how they might value securities?

A No.

Q Do you know of any books, publications that you would consider authoritative that discussed the subject of valuing securities?

A No.

MR. STODDART: You state in your expert report, which I should probably put on the record as Exhibit 1, various qualifications. I'm going to give you a copy of it and give--I only have four copies, so I'm going to have to--

Would the reporter please mark this as Exhibit 1.

(Hatton Exhibit No. 1 was marked for identification.)

BY MR. STODDART:

Q You say in the second paragraph of this report that your qualification for this assignment is a career of 50 years in the investment industry, 20 years as an institutional salesman and sales manager, and since 1978 as a money manager for various firms.

Could you tell me, oh, in detail how this career has exposed you to the techniques of valuing securities so that you can use those techniques in order to value a security?

A I guess I'm--I don't understand your question.

Q Well, for example, does your experience tell you what the inputs of the Black-Scholes formula should be?

A Academically I know what the Black-Scholes, but I have never--I have never used it extensively. I mean, I have--I've had people on my staff, you know, that would--would do it, but, no, I have never, outside of academically knowing the, you know, the--the formula, et cetera. I have other people do it for me.

Q Do you know the inputs of the Black-Scholes formula?

A I couldn't recite them for you right now, no.

MR. STODDART: I'm going to ask the court reporter to list this document as Exhibit 2 and recognize this as a letter of January 16, 1995, from Goldman, Sachs to H.J. Heinz Credit Company.

(Hatton Exhibit No. 2 was marked for identification.)

BY MR. STODDART:

Q This is the letter that contains an analysis. It's also part of your expert report that you say is good and that you I suppose, although I don't want to put words in your mouth, that you basically endorse. Is that true?

A That's true.

Q When Goldman, Sachs valued the straight debt component of the convertible bond at issue here, they used what they call the binomial valuation method; is that correct?

A Yes.

Q Do you know the inputs of the binomial valuation method?

A I know them by reading this.

Q Do you--could you recite them for me now, for example?

A If I could read this, I could recite them for you.

Q Well, there's no need to read it. Let's proceed in your report. At the end of page 1,

beginning of page 2 you say you agree with Goldman's conclusion that the value of the note on the date of issuance was approximately $130,506,000 and that you attempted to value the two components of the note relying on Goldman's valuation model and personal research; is that correct?

A That's correct.

Q And let's look at Exhibit 2 at Goldman's valuation model. I'm no expert, but the way I read the letter is that they had two valuation models for this note. The first of which is a theoretical model that they call their proprietary model; is that correct?

A They call it their convertible bond valuation model.

Q Right. Did you attempt to replicate the results of Goldman, Sachs' analysis using their convertible bond valuation model?

A No.

Q Do you know the inputs of their convertible bond valuation model?

A I know the inputs and I looked at them. I--and I accepted them. I agreed with them.
Q Okay. What are the inputs without looking at the--without looking at the letter?
A Well, the--the input--I'm not certain I can do that, but the input on the--on the--on the fixed income side is straightforward as they suggest.
They take a measurement of--of the--the benchmark U.S. Treasury at the time and model that over, you know, some--some theoretical value over the--over the U.S. Treasury Yield curve.
They--they take a discounting mechanism on the security itself and they--they value the--the fixed income component, and, you know, that's a fairly straightforward valuation model, one that I agree with and one that I have experience with.
Q And you, of course, can calculate compound interest and that sort of thing?
A Yes.

Q And what other inputs for valuing the option component, without looking at that letter?
A I would have to look at the letter to--
Q All right. Do you know the formula of their convertible bond valuation model?
A I do not know it by heart, no, I do not.
Q Have you ever seen the formula for their convertible bond valuation model?
A I saw theirs, yes.
Q When did you see theirs?
A I saw it in the--in the letter that they presented.
Q Does their letter include the formula?
A I don't know. I mean, I--depending upon what you define as formula. I looked at their methodology, and I assume that that's their formula.
Q I would--just guessing now, suppose that the formula is something into which they plug their inputs and do a mathematical calculation inputs, and I'm just guessing I must say, do you

know of any such formula?
A I know of them, but I'm not familiar with them. I mean, I've never modeled securities in that--in that fashion.
Q Did you see such a formula that might underlie the convertible bond valuation model discussed in Goldman, Sachs' letter?
A Will you repeat that, please.
Q Have you ever seen a formula attached to--used in Goldman, Sachs' convertible bond valuation model?
A I'd have to say no.
Q Have you discussed the convertible bond valuation model with anyone from Goldman, Sachs?
A No.
Q They also seem to value the note by separately valuing the equity components. You've just described what their debt valuation model is.
Let's look at your report for a while, that's Exhibit Number 1, the carryover page--the carryover page at the top of page 2.

About the middle of that carryover paragraph you say, I agree with Goldman's analysis, but for verification I double checked the price of H.J. Heinz stock, the yield on the benchmark U.S. Treasury note, and the terms of similar convertible Notes, and concluded that the value of the conversion option was in the range of 10 percent to 40 percent and the value of the fixed income component was 60 to 90 percent of the total value of the note.

My question is: What value of the note were you talking about just in numbers that the range is 60 to 90 percent?

A That was the fixed income component of the--of the convertible note.

Q Yes, but that is worth 60 to 90 percent of what value? Could you give me the numbers? Is it the value of the note on the day it was issued, or the value of the note on the day it was paid or payable?

A It would have been the value of the note on the day that it was issued.

Q And you say on page 1 that that was about 130,506,000; is that correct?
A That's correct.
Q So, let's look at the fixed income portion first, because you say that's the easier. I brought along a calculator, so you can check me. I'm giving you this little calculator to use in case you don't have one.
The value of the note on the date of issuance is 130,506,000, and I calculate 60 percent of that would be 78,303,600. Is that what you get?
A It's 78,303,67--183,036. Is that what you get?
Q No. Could we agree to round up or round down to 78,303,600?
A That's fine.
Q And 90 percent I get, because I have to confess my calculator doesn't have many zeros or decimal places that that can fit on. My 90 percent comes out to 117,455,400?
A Correct.

Q So, is it your opinion that value of the note could be anything from 78 million or so to 117 million or so, that is the debt component of the note could be in that range?
A Yes.
Q Okay. Now, to--how did you calculate that range?
A I calculated from my--my personal experience. The H.J. Heinz is a low volatility stock. Therefore, whatever--whatever equity component, whatever option is there is worth less than 50 percent.
So, I just arbitrarily determined that it is in a range--worth--in a range of 10 to 40 percent, but I just base that on my experience for being in the business for a long period of time.
Q Did you base it on anything except that experience?
A Well, no. I based it on my--my own personal experience.
Q So, you didn't, you say, discount it to

present value or anything like that?

A No, I did not.

Q Well, because you say you agree with Goldman's way of doing this, let me do the math now. What percentage would Heinz have to pay in order to get the debt component worth 78 million or so equal to the payoff of 197 million or so in seven years with semi-annual compounding?

A I don't know.

(Hatton Exhibit No. 3 was marked for identification.)

BY MR. STODDART:

Q Well, I took the liberty of running this on an Excel spreadsheet, which I would like to have marked as Exhibit 3, and I'll give you the opportunity to check the math of my computer. You see at the bottom at seven years there is a payoff amount of 197.402 million, let's say, which is rounded--

MR. CATES: Mr. Stoddart, excuse me a moment, could we take a really quick break and maybe get an HP-12, if you've got one floating

around, David.

MR. STODDART: That would be fine.

MR. CATES: So we can follow along with this.

MR. STODDART: Oh, yes.

(Recess.)

BY MR. STODDART:

Q We were looking at Exhibit 3. I was pointing out that at Year 7 at the bottom you have the payout amount of 197.402 million.

What I tried to do was to plug in various percentages that would get you back to a beginning principal value for the debt component of about 78.303 million and the best I could do on Excel, because it has only two percentage points after the decimal place for the percentage, is 78.33 million.

And as you see the interest rate that you need to get that amount to the payoff amount is 13.65 percent. Now, to get the value back to what you say is the bottom reasonable value for the debt portion of the note on the day of

issuance, wouldn't the interest rate have to be slightly higher?
A Not in my opinion.
Q You don't need a higher interest rate to get a smaller amount of principal to the same amount of payoff?
A If you're taking--if you're telling me that--that the--the--the debt component is only worth 60 percent, not theoretically but in an absolute sense, then you need 13.65 percent, I agree with your--your calculation, yes.
Q I was just asking to get it--instead of being--this is a quibbling point I admit. But to get the beginning principal back to 78.303 instead of 78.33, would the interest rate have to be slightly higher or slightly lower?
A Will you repeat that, please.
Q If I wanted to get the beginning value down to 78.303 instead of 78.33, would the interest rate have to be higher or lower?
A The interest rate would have to be higher than what?

Q Then 13.65 percent.
A Well, by your calculation, 13.65 would be the interest rate required to get to 78 million, if I understand your--your calculation.
Q All right. We'll just move on. As I understand Goldman's valuation of the fixed income portion, looking at page 1 of Exhibit 2 at the bottom, he says, we believe that the issuer, which is Heinz, would be able to issue a ten-year, subordinated zero coupon note at a rate equal to .70 percent over the relevant U.S. Treasury benchmark.

Based on this approach, we have concluded that the debt component represents 84.1 percent of the value proposed by the issuer.

How many bases points over the benchmark U.S. Treasury note would Heinz have to pay to get an initial value of 78.303 million up to a payout of 197.402 million?
A By your calculation of 13.65 percent and the then benchmark Treasury was 7.87, so--what did I say, 7.87, you would have to do 578 bases

points over, if I understand that question.
Q Do you think it's reasonable to assume that H.J. Heinz Company would have to pay over 500 bases points above the Treasury benchmark in order to place a debt security at this time?
A No.
Q So, is it--is a 60 percent valuation range for the debt component of the note a reasonable range?
A From my experience, yes.
Q So, from your experience, would it be reasonable for Heinz to have to pay 13.65 percent to issue this debt security?
A No.
Q From your experience, would it be reasonable for this convertible note issued by H.J. Heinz to have a debt component that was worth 60 percent of the value on the date of issuance?
A It would not be reasonable. But when valuing securities, you have to--you can't--you can't make an absolute determination that 84.1

percent, whatever Goldman, Sachs, in my opinion and from my experience I have to broaden the range to determine what--what the valuation is.

Q Is it reasonable to broaden the range to 60 percent?

A Yes.

Q For H.J. Heinz?

A Yes.

Q At the date of the issuance of this note?

A Yes.

Q So, it's reasonable to broaden the range of the value of the debt component of this security on the date of issuance to 60 percent of the present value of the note?

A Yes.

Q Even though that necessarily results in an interest rate 500 bases points above the Treasury value?

A In theory, yes.

Q In your experience, what is a reasonable premium over the Treasury value that you would expect Heinz to have to pay in order to place a

debt security?
A In this illustration that Goldman used, they determined it was 70 bases points. I looked at their methodology. I looked at comparable securities, and I would say that 70 bases points was the correct--correct number.
Q Is there a reasonable range of premiums that were at Treasury security level that a person valuing that debt securities would consider when valuing the debt portion of this note?
A Would you repeat that question, please.
Q When valuing the debt portion of this convertible note issued by H.J. Heinz, would the person who is setting the value on the debt portion of the note have a reasonable range of premiums over the Treasury level that he would consider?
A Yes.
Q And what is that reasonable range?
A Sixty to ninety percent.
Q As bases points over the interest rate?

A Oh, I'm sorry, I didn't--
Q We know that over 500 bases points is what comes of the 60 percent valuation. Would that be a reasonable amount to consider that Heinz would have to offer above the Treasury rate?
A That would not be a reasonable amount that they would pay over the Treasury yield curve.
Q Then what would be the bottom reasonable premium and bases points over the Treasury yield that Heinz would conceivably have to offer in order to place a debt security in your experience?
A In my experience, I would say that Goldman's methodology was correct, that 70 bases points was--was the correct spread over the Treasury yield curve.
Q Is there a range of extra yield?
A You could broaden it to 60 to 80, but 70 bases points--I mean, if you look at their methodology, 70 bases points was--was the market at the time.
Q Okay. So, the range is 80 bases points

over the Treasury yield to--on the other extreme?

A Narrow of 60 bases points.

Q And do you know working that out, how that would affect the percentage value of the debt component of the note if you worked that out?

A I did not do the calculation. But clearly if it were 80 bases points, it would be a slightly higher interest rate. If it was 60 bases points, it would be a slightly lower interest rate.

Q You also say on page 2 of your report that you double checked the price of Heinz stock, the yield on the benchmark Treasury note, and the terms of similar convertible notes and concluded that the value of the conversion option was in the range of 10 percent to 40 percent.

And we have looked at your range for the fixed income component and let's look at the range for the option.

How did you calculate that the option would be from 40 percent to 10 percent of the

value of the note on the date of issuance?
A I relied on Goldman, Sachs' study and their analysis, and I concluded by using my own experience in looking at convertible securities and determined that the equity component for a low volatile stock, such as H.J. Heinz, would be less than 50 percent.
And in this situation, I checked the volatility. They suggest 19 percent. I checked the volatility myself, and I would agree with them that 19 percent was the volatility that's a very low volatile stock and, therefore, the option would be less than 50 percent. And I just arbitrarily determined that it was in a range of 10 to 40 percent.
If 60 to 90 percent of the--of the--of the security is fixed income, then clearly, you know, 10 percent, at least 10 percent, has to be equity.
Q So, did you choose the range of 10 percent to 40 percent of the option, because you already had the range of 60 to 90 for the debt?

A Basically.
Q And you say that you got this from your experience and from something in Goldman's valuation. What exactly in Goldman's valuation did you use to come up with the range of 10 to 40 percent?
A Goldman used two valuation models. One, they valued the fixed income of 84.1 percent and the equity at 18.9. The option pricing model they--they came up with a value of--they came up with a value of 14.6 percent on the equity component, and I can't find what they valued the fixed income component, but the total value was 98.7 percent.
So, I looked at their methodology, I looked at the--and I based--I based it on my experience. This is a theoretical valuation model. Mine is a practical experience of buying and selling securities, and 10 to 40 percent seemed like a reasonable level for--for this type of security.
Q Again, looking at page 2 of your report,

and I'll just pick up reading where I left off at the carryover paragraph at the top.

My experience suggests that the option value of securities convertible into low volatility stocks is less than 50 percent of the total value of the securities.

How much less in your experience?

A As I stated it was in a range of 10 to 40 percent.

Q Would you say that 40 percent is significantly lower than 50 percent?

A Twenty percent less.

Q Is that significant?

A I would say that's significant.

MR. STODDART: I have an exhibit that I would like to the reporter to mark as the next number, whatever it is.

(Hatton Exhibit No. 4 was marked for identification.)

BY MR. STODDART:

Q From looking at your responses to the subpoena I know that you have this document,

because you had the deposition I took of Mr. Crowe with the exhibits, and this was one of the exhibits, but do you recognize this document that I just handed to you, Exhibit Number 4?
A I would have to say no.
Q Would you look at the second page?
A May I read the first page?
Q You may. You certainly may.
A Okay. I'm sorry, go ahead.
Q You see from this exhibit that when Heinz was having the convertible note drafted, Mr. Wellen wanted Goldman, Sachs to give an expert opinion that the market value of the convertibility feature of the note would be below 50 percent but more than 10 percent--so something like 40 percent, 10 percent--did you see that value, that range of values, in the opinion that Goldman actually gave?
A Did I see this range?
Q Um-hum.
A Of below 50, but at least more than 10?
Q Yes.

A I did not.
Q Did Exhibit 4 have anything to do with the range of 40 to 10 percent that you came up with?
A No.
Q Did you discuss that range of 40 to 10 percent with plaintiffs' counsel before drafting your report?
A Yes.
Q And when was that, at what stage of drafting?
A I can't remember. I honestly don't--can't remember.
Q Was it before or after you independently came up with the range?
A Oh, it would have been after I came up with the--after the--it was after I came up with my own range.
Q So, you mentioned the 40 to 10 percent to them and not vice versa?
A No--I mean, yes. I mentioned it to them, not vice versa.
Q Okay. Continuing with the valuation of

the option feature of the note, did Goldman's valuation discount the value of the option for the option's inability to be exercised within the first three years after issuance?

A Will you repeat that? I was writing something up, but I want to answer that question carefully.

Q From your reading of the Goldman opinion, which is Exhibit 2, did Goldman's opinion, does its valuation of the option portion, include any discount of the value of the option for the option's feature that it cannot be exercised for the first three years after issuance?

A No.

Q Does your valuation of the option include any discount for that illiquidity feature?

A No.

Q And why not?

A Because I looked at Goldman's methodology. I looked at the comparables that Goldman used and the pricing in their--in their--all the matrix of the then outstanding convertible bonds

of similar quality, similar characteristics, et cetera.

And I determined that--that I think there were eight or nine securities, you know, that they compared in their analysis of pricing the security.

I came up--and these are AA, AAA similarly rated securities, and I came up where the average convertible feature, although it began on Day 1, was 20 percent.

Now, these are all low volatile stocks. So, that at 20 percent conversion premium is the equivalent of some sort of a restriction. So, I determined arbitrarily that the 13 percent or 13 plus percent that Goldman came up with at the end of three years when the restrictive aspect expired was still less than the 20 percent of the average of these eight or nine securities.

So, my judgment, my personal opinion, was that the--the restrictive covenant of this three-year period of time was more than offset by the higher conversion price. So, I saw

nothing unusual for it.

Q And just for the record, which eight securities were those that you looked at?

A If you turn to page--it doesn't have a page. This is the--can you see that?

Q And you are pointing to the portion of Exhibit 2--

A That says summary comparison of selected convertible debt securities in that first section, and it is labeled similar credits. And it begins with ADP and it ends with Royce Value Trust I dropped Royce Value Trust.

I dropped Royce Value Trust, because it's a mutual fund and I didn't think there was a--it may be a similar rated security, but it didn't have similar characteristics.

So, I just took these eight securities, ADP down to Old Republic. And if you look at that--if you look at the conversion premium and add them up, divide by eight, you come up with I think about a 19 percent premium over the--and that was at issuance.

And if you look at--looked at the premium that Goldman suggested for the Heinz convertible it's 13.3 percent, so that was, if anything, was a discount to the similarly rated, similarly structured securities. So, the three-year lockout, in my opinion, was offset by the--by the higher premium.

Q So, is it your opinion that if there were no three-year illiquidity provision in the Heinz note, the value of the conversion feature would be 20 percent?

A I'm not suggesting that. All I'm saying is that this was the--these were--the comparables that they used I'm very accustomed to this in our business. I look at the comparables. I look at the--they can look at the security, that is--that is--you know, the security that is being compared to and I--I draw a conclusion, I make my own judgment.

Q Just to be clear, these eight securities that you looked at, did any of them an option that was not exercisable immediately upon

issuance?
A No.
Q If--assume that the convertible security issued by Heinz had no restriction on exercise of the option, would the valuation of the option change in your opinion?
A That's a hypothetical question.
Q Yes, it is.
A I'm going to give you a hypothetical answer.
Q Please.
A If there were no restriction on the--on the period of time that you can convert, it is reasonable to assume that the conversion price would have been higher, that the premium would have been higher.
Q Would the value of the debt security, assuming everything was the same, be less?
A I don't think that the--I asked myself that same question, and I came to the conclusion that the--that the matrix that they used, the pricing matrix, would have been pretty much the

same regardless of what the--because the three-year restriction was an offset to the higher premium.

And, therefore, the valuation that they determined that the two components were worth, you know, they were in a reasonable ballpark. Now, whether it would have been 84.1 percent versus 82.2 percent, I don't know, but it would have been--it would have been similar. It would have been in the ballpark.

Q So--I don't want to put words in your mouth, so please correct me if I'm understanding you wrong.

But is it your opinion that the conversion feature of the convertible note, in essence, already does have an illiquidity discount because the feature was valued at less than 20 percent of the present value of the note?

A Again, that's a hypothetical question, and I would say hypothetically, yes, the discount was already built into it.

Q So, there already is a discount in the

valuation that Goldman did?
A You could interpret it that way. I wouldn't, but you can.
Q Again, you're basing this on your experience and your--and the average of the value of the conversion feature of these eight securities that you mentioned before?
A Yes.
Q Going back to that sheet captioned Summary Comparison of Selected Convertible Debt Securities, could you point to the column in which the value of the conversion feature of these notes is listed.
A (Complies.)
Q And for the record you have circled the third column of figures over from the names of the securities, the one at the top that says 13.3 percent and then goes on with 20, 15, 19, et cetera; is that true?
A That's true.
Q So, as in all averages, some of the these premiums are the below 20 and some are above;

correct?
A Yes.
Q And I believe you just said that the portion of the value of the note for a debt security would remain the same?
A Yes, in my opinion.
Q And yet the percentage value of the conversion feature would rise?
A Would you repeat that.
Q The percentage of the value of the present value of the convertible note represented by the conversion feature would rise, even though the percentage of that value represented by the convertible note would remain the same?
A I didn't say that.
Q Okay. What did you say?
A I said that the--the two components would have been--would have been valued similarly regardless of--of the restrictive covenant.
If--in your hypothetical example, if they had put no restriction on the convertibility and it started on Day 1, you asked me if there would

have been a higher premium. I suggested that that may have been a reasonable conclusion, but that would not change the valuation of either the equity or the fixed income component of the total security.

Q So, if there were no restrictions at all on exercise of the option, the value of the entire note would still remain $130,506,000?

A Approximately, in my opinion.

Q I'd like to ask you another hypothetical question just to get something clear. I'd like you to assume two options: One of which is exactly identical to the one included in the convertible note and the other is in a note that contains no restriction on the exercise of the option.

In your opinion would the notes be valued identically or would one be worth more than the other?

A In my opinion, they would be worth--they would be worth approximately the same.

Q Why?

A If you go over to the third column from the end--

Q And that's again on the Summary Comparison Selected Convertible--

A You see there the bond value at issue and the first number at the top of the page is the H.J. Heinz, they have a 84.1 percent.

Q And that--excuse me, that is the third column from the end?

A Third column from the end. The title at the top is bond value at issue. That is the--and this is not Goldman, Sachs doing this work. This is a matrix that is put together and they--they are just taking these numbers from whatever source. I don't know what their source is, but it doesn't necessarily have to be...

But if you'll see there it's in a range of 90.9 percent for ADP down to at the low end is 65.3 percent for Motorola, but if--I didn't add those up.

But just eyeballing it, I would say that the average value of the--of the securities in

this matrix that Goldman used to price the H.J. Heinz note is approximately the same as--as Heinz was--in other words, the value of the Heinz security if I averaged out these things, I would say it's pretty similar.

So, by changing the characteristics of the conversion premium, in my judgment, doesn't change the matrix of the--the pricing of the security.

Q In your experience managing money and securities, have you ever had under your direction or control a security that was subject to some restriction making it illiquid?

A Yes.

Q Was it your experience that this security was worth about the same as similar security would be that was not illiquid?

A It depends on the security.

Q I'm asking in your general experience.

A Well, in my general experience, you have everything from quasi nonpublic companies that have zero liquidity up to very large

organizations that happen to do--and make--do a private placement.

Now, you know, a very highly liquid public Fortune 500 company that does a private placement, we would look at it, I would look at it, and value it the same as I would a publicly traded security, because it has just as much liquidity from our standpoint.

But on the other hand, if we invested in a much smaller company with little or no marketability, yes, there is going to be a tremendous liquidity discount. So, you just can't say arbitrarily or hypothetically, because the range is too--too wide.

Q I'll restate the hypothetical and narrow the range a bit. Let's assume a block of H.J. Heinz stock, one--they're both equal in number. The stock in one block is immediately salable to the general public. The stock in the other block is subject to restrictions and it can't be sold to the general public for sometime between the date of issuance and six months later.

Is it your opinion that these two blocks of stock would be identical in value, or would one be worth more than the other?

A In my judgment, I mean, that's a hypothetical question and, you know, you would have to--you would have to determine, you know, in what period of time is the stock registered, who are you marketing it to. You know, if a major Wall Street firm, Goldman, Sachs or another investment banker, were marketing a restrictive stock that could be registered in some reasonable period of time, it would sell at a very, very minor discount, very minor.

Q Well, let's assume it could be registered at any time within that six months, we just don't know?

A It would be a negligible discount.

Q And what--what would the discount be?

A I--I can't hypothetically--you know, I could tell you that, you know, that now adays you trade stocks at five cents a share at three cents a share. So, your transaction costs are

negligible.

So, you know, a--a $25 stock that--that is unregistered today but can be registered tomorrow, the discount, you know, you may pay seven cents a share instead of five cents a share on the transaction cost, but it's not--it is not a significant--it's not a significant item.

Q Well, for that restriction that might last one month and might last six, would you say that something over four percent would be a reasonable discount?

A Four percent strikes me as being high.

Q So, you wouldn't advise the reasonable client to sell that stock, would you?

A I make the decision and I--I would--I would not--if I were a seller of the security, I would not accept the four percent discount for the price of it.

Q Suppose instead of registration being guaranteed sometime within six months, one month to six, instead there's an inflexible rule there

will be no registration until three whole years afterwards, what would be the reasonable discount in your experience?

MR. CATES: Excuse me, for interrupting. Are we still talking about this hypothetical block of Heinz common stock?

MR. STODDART: Common stock at the moment, yes.

MR. CATES: Thank you.

THE WITNESS: I have a problem answering hypothetical questions, because, I live in a world of reality, you know, where I do these things every day--well, not every day, but I've done them in my career.

And--and buying a stock that has a three-year lockout of it, three-year restriction, yes, I would accept--I would expect them to--to buy that at a--at a discount. What discount, I don't know.

First of all, I wouldn't buy it, because--so, therefore--but I don't manage that kind of money. But if I were with an insurance

company, you know, I probably would look at it and I would probably negotiate some sort of a discount, yes. What, I don't know.

BY MR. STODDART:

Q Could you give me a range?

A I don't like to--to give ranges, because I'm just--it--you know, I would have to sit down with pencil and paper and figure out just what--just what I would need. Three years is a long time to be locked out.

Q Yes. Well, let's assume it's a bond that has a restriction then, to get really hypothetical now, but bonds are more in your experience and you did give us a range of the value of the fixed debt component.

So, could you give me a range of the discount you would expect for a bond that couldn't be sold let's say on the open market for three years after issuance?

A The reason I have a problem with a--you know, your hypothetical example is that nothing is restricted for three years. That restriction

may be on there, but believe me there is a market for it somewhere.

You know, you may not be able to go out and sell it on the New York Stock Exchange, but you could find another buyer. There's a buyer and seller of restricted securities. In many cases, people believe that the unregistered market is larger than the--than the registered market.

Q Exactly what I'm asking you. What discount would you expect if you were selling this?

A I can't answer that. I don't know. Because I--again, if I were the seller of it, I would--I would demand a very minor discount. If I were the buyer of it, I may be a little more difficult and want a big discount. But that, you know, it depends on what side of the market I'm on.

Q In your experience with people who value securities for a living, do--are such people able to come up with ranges of reasonable

discounts for securities that contain restrictions?

A Yes. We have in our industry what is known as a pricing matrix and it's a very mechanical, very arbitrary, and it--it, you know, it has certain inputs. It's just a software program.

You put inputs on there and that will give you a price, and those inputs, you know, everything from the coupon, to the rating, to the maturity, to the other features, and it comes up with a price. But rarely do human beings price security. It's almost always done by a matrix, by a computer model.

Q So, if you were going to value a security with a restriction on it for some client, would you do it or would you hire an expert to do it?

A First of all we never value securities, because our fee is based on the value of the--of the--of the money we're managing. So, we never get involved in pricing client's securities. It's always, you know, you have a public mark on

the New York Stock Exchange, that's done automatically.

If we get into less liquid securities that are say convertible bonds or corporate bonds, we have three dealers. We have at least two, but normally three dealers who price it.

We take an average of those three prices, and we put something in the file to the extent that these have been priced by an outside source.

Q So, if it came up that you had to buy or were considering buying a restricted security, you would get someone else to give you a value?

A You're misinterpreting buying and valuing. If we own the security, we get someone to value it for us. If we're considering buying or selling that security, we determine that ourselves. We have our--we have our own methodology of pricing it.

Q So, you do have your own methodology of--

A Well, it's not written down.

Q Well, you have an unwritten methodology

for valuing securities that have restrictions?

A Yes.

Q And what is that methodology?

A It is--you know, it's the same matrix that--that Goldman and we would put an overlay on it. And, Again, it would done depending on whether we were a buyer or a seller.

If we own the security and it has some unusual restrictions, we are probably going to assume less of a discount, you know, because we are trying to get the best client price for our client.

If we're buying a security, we're going to try to extract as much of a discount as we possibly can. So, it's a, you know, it's a very arbitrary thing. You're dealing. It's a negotiated market.

Q Well, let's--another hypothetical. Let's assume that you are buying an option and it can't be exercised for three years.

A You see I have a problem with that hypothesis, because it can be traded in three

years.
Q Yes. That's why you're buying it.
A Right. The--there is a restriction. There may be a written restriction, but that doesn't mean in the--with qualified buyers that you can't buy and sell that security.
Q Yes, but would you expect a discount?
A Again--
Q If you were buying it.
A Again, if I were buying it, yes, I would want a discount.
Q In about what range would you say, assuming it's H.J. Heinz?
A I can't answer that. I don't know.
Q And if you needed to do that, where would you find out that information if you were buying?
A Mr. Stoddart, it depends on so many things in our business. If I'm sitting there with 90 percent of the accounted cash and I have to get invested, I'm going to make one decision. If I'm sitting there with four percent in cash and

I'm in no hurry to invest money, I'm going to make a decision.

So, it is--you know, it's a very arbitrary thing and I can't hypothesize as to what I would do under those circumstances.

Q Okay. Let's go through both of those circumstances that you mentioned, and you may add any other qualifications you'd like and make it as real as you like and tell me what ranges you would use.

A Okay. Let's--we're hypothecating. We're talking about H.J. Heinz or a similar type security, low volatile--low volatility, you know, an expected total rate of return using modern portfolio theory that you would expect the stock to grow, total return, appreciation plus dividend of approximately six to seven percent a year; okay.

Now, if I were--if I were looking at that type of security, what type of a discount would I expect--

Q On an option.

A On an option, probably not--not very much, because I would look at it on a risk reward. If my reward is on six percent a year, then my risk is not a lot more than that. So, I would--I would not.

Now, if you're talking about a high octane stock, let's say Microsoft, Cisco, you know, Dell, something of that nature, where the volatility is 120 percent, you know, where--if it's a 120 percent on the high side, it's a 120 percent on the low side also. So, your risk--reward is entirely different, so you would want--you would require a bigger--a larger discount.

Q And, again, could you give me a range of the reasonable discount for the Heinz stock under the circumstances you were just stating?

A I really can't. I mean, I don't--I don't live in that world of hypothesis. I live in a real world where I have to make real decisions, and I just can't--I just can't tell you. I don't know.

Q And when people ask for your opinion about valuing say something that can't be traded, what do you tell them? It has these restrictions, there's no market for it.

A See, that's where we differ. I mean, there is a market for it. I mean, there--

Q This is just issued. It hasn't been marketed yet. We want to know the value.

A I would go back to my original statement that I looked at Goldman's methodology, I looked at the matrixes that they used, I looked at the two formulas they used for the option, and I looked at the whole--the whole package. I compared those--those--those elements on my own to see what the price of the securities, of the Treasury, and the stock was at the time, and I came to the conclusion that it was a reasonably--it was reasonably priced.

The two components were within the range of the acceptability and that the total security was valued pretty much the way it should have been.

Q One more hypothetical before we move on. Assume that there is no letter from Goldman, I'm asking you to value the convertible note at the date of issuance and it has a discount--well, and it has a--the features it has now as a restriction on the exercise of the option, what value do you come up with? Is there a discount for the value of the option because of the illiquidity?
A Again, we're hypothecating. Okay. You're asking me without Goldman's opinion, without any--if a dealer came to me and said here is issue, what--what--you know, what would you pay for it. My conclusion would be pretty much the same as I already said.
And let's hypothecate from my standpoint, let's assume that I'm managing money for--for an insurance company and I have $200 million of GICs that I've just written for the Ford Motor Company, so I've got a liability out there of $200 million.
Q Just a moment, what is a GIC?

A It's a guaranteed insurance contract. It's something that people--it's part of a 401(k) plan that you can opt--it's a guaranteed--it's a guaranteed--it's similar to a CD, but know that the insurance companies write them.

Now, if I've got a liability of $200 million and that liability costs me four percent and I can negotiate six percent from the H.J. Heinz Company, which is a AA company, low risk, low volatility, and they give me an equity kicker in addition to that and I can buy that at six percent and cover my liability and expenses, you've got one percent expenses.

So your--your liability costs you four percent, you've got one percent expenses. If you can buy a security at six percent with those characteristics, I've got a one percent profit margin built in there.

So, for that risk that I'm taking with the Ford Motor Company, I have $200 million of liability. I've got a one percent cost of doing

business and I make one percent profit margin, would I buy that security, yes, I would. I would buy it at six percent.

I would look at all the matrix, you know, I would have done the same work that--I wouldn't personally, but if I were running a large insurance company, I would have a staff of a gazillion people in there who could do the work for me and they would do it exactly like--like Goldman did.

Q And if you were valuing this note, would you value in a discount for the option that can't be exercised for six months?

A Again, I would not, because if I looked at the matrix and determined that similar securities had a higher--had a 19 or 20 percent premium, although their exercised immediately, I would say that the trade-off is roughly the same.

I'm getting a conversion premium of 13 percent at the end of the third year, somebody else is getting 20 percent on Day 1, I

would look at that as pretty much of a trade-off.

And as you suggested hypothetically, the restrictive covenant is already priced into the option. So, I would not--I would not see that this is an unusual security and unusual event.

Q If somebody brought you the identical security without any restrictions in it, would you assign the same value to it?

A Again, hypothetically, yes.

Q Have you been able to take a look at the report prepared by Professor Jarrell for this case?

A Are you asking me?

Q Yes.

A Yes, I have.

MR. STODDART: I'm going to hand around the extract from that report that deals with valuation of the option feature and have the reporter assign the next number to it.

(Hatton Exhibit No. 5 was marked for identification.)

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

------------------------------------------------------------x

| | | |
|---|---|---|
| H.J. HEINZ COMPANY AND SUBSIDIARIES, | ) | |
| Plaintiffs, | ) | |
| -against- | ) | No. 03-28477 |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

------------------------------------------------------------x

DEPOSITION OF PHILIP DARIVOFF

New York, New York

Wednesday, April 6, 2005

Reported by:
DEIRDRE O'MALLEY

[EXHIBIT 11]

April 6, 2005

9:00 a.m.

DEPOSITION of PHILIP DARIVOFF, held at the offices of SULLIVAN & CROMWELL, LLP, 125 Broad Street, New York, New York 10004, before Deirdre O'Malley, a Court Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

IVINS, PHILLIPS & BARKER
Attorneys for the Plaintiffs
1925 Century Park East, Suite 2140
Los Angeles, CA 90067

BY: CLIFTON B. CATES III, ESQ
-and-
ROBERT H. WELLEN, ESQ
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006

U.S. DEPARTMENT OF JUSTICE, TAX DIVISION
Attorneys for the Defendant
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington, DC 20044

BY: ROBERT STODDART, ESQ

SULLIVAN & CROMWELL, LLP
Attorneys for the witness
125 Broad Street
New York, New York 10004

BY: MICHAEL T. TOMAINO, JR., ESQ

P H I L I P D A R I V O F F, having been first duly sworn by the Notary Public (Deirdre O'Malley), was examined and testified as follows:

THE COURT REPORTER: Can you state your name for the record, please.

THE WITNESS: My name the Philip Michael Darivoff.

EXAMINATION BY MR. STODDART:

Q. Are you employed?

A. Yes, I am.

Q. Where are you employed?

A. Goldman Sachs & Company.

Q. Could you please state your business address and phone number?

A. 85 Broad Street, 28th floor, New York, New York 10004. Phone number is (212) 902-8426.

Q. What is your position?

A. I am the chairman of the credit capital markets group and the managing director and partner of the firm.

Q. When did you begin working for Goldman Sachs?

A. July 15, 1985.

difference.

Q. What your letter, Defendant's A, provides, is a statement of the value that a person in the market would be willing to pay for the security if he knew all of the relevant facts and was under no compulsion to buy?

A. That's correct.

Q. As I understand Defendant's Exhibit A, it says that you valued the convertible note essentially in two ways, one using what's called a convertible bond valuation model and the other valuing the components separately, is that true?

A. Yes.

Q. What is the convertible bond valuation model?

A. It's a model developed at Goldman Sachs used by people in our convertible bond underwriting business and convertible bond trading business where a professional will input all the relevant characteristics of the security and other relevant market characteristics, and from that input receive output regarding the value of the instrument and the value of the instrument's component parts, its debt value, its option value.

Darivoff

Q. Is it a mathematical formula?

A. It is a number of mathematical formulas.

Q. What are the inputs?

A. The inputs would be the characteristics of the security, its maturity, its coupon payments, its callability, the number of shares underlying the security, the redemption features of the security, the optionality of the security, all of the basic terms of the instrument, its conversion rights.

And then, relevant terms from the marketplace such as volatility of the common stock of the underlying shares, interest rates, the credit spread for the issuer, things of that nature.

Q. Does the convertible bond valuation model have any input or require any information about possible discounts that would be demanded by the market because of any illiquidity of the security?

A. There isn't a specific input for that. There isn't a specific variable for that.

Q. Does the model account for it somehow?

A. The way the model would account for it would be in the credit spread for the instrument.

For example, if the credit spread for an issuer issuing a publicly registered liquid security

these shares in the public market?

A. The shares are easily sold into the public market pursuant to the parent company registering the shares.

Q. These were unregistered at the time, though?

A. That's correct. I don't know that we were aware of that or not aware of that, but the one who holds the shares would want to receive the value that they would get in a public market sale, so that's the way we value the instrument.

Q. Before you valued this instrument, had you valued convertible debt instruments before?

A. Yes, Goldman Sachs is in the business of valuing convertible debt instruments.

Q. I mean you personally?

A. No. I was not personally responsible, solely and personally responsible for the valuation of this security. The security was valued by a number of people at Goldman Sachs who contributed to the determination of the value of the security.

Q. But --

A. And I have been part of teams of people who have participated in the valuation of