**IN THE UNITED STATES COURT**

**OF**

**FEDERAL CLAIMS**

**No. 03-2847 T**
**(Judge Allegra)**

**H.J. HEINZ COMPANY**
**AND SUBSIDIARIES,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

# PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION IN LIMINE

PLAINTIFF H.J. HEINZ COMPANY AND SUBSIDIARIES HEREBY OBJECTS to the granting of Defendant's Motion in Limine, filed November 14, 2005. In support of its objection, Plaintiff respectfully shows unto the Court as follows:

## TABLE OF CONTENTS

**Page**

I. Introduction....4

II. Philip M. Darivoff....7

A. Mr. Darivoff's testimony will consist principally of what he did and why he did it. To the extent it includes opinions, such testimony is permitted by law....7

B. Defendant has suffered, and will suffer, no prejudice from Mr. Darivoff testifying as a lay witness, not an expert witness....14

C. Conclusion....18

III. Aiden E. Hatton, Jr....18

A. Defendant makes three arguments for excluding the testimony of Plaintiff's expert, all of which are unpersuasive....18

B. If expert testimony is required at all, Mr. Hatton is qualified to testify as an expert by virtue of actual experience....19

C. Mr. Hatton expresses his own opinion on the value of the Note, properly relying in part on the work done by Goldman Sachs....21

D. Defendant's disparagement of Mr. Hatton's methodology is no basis for excluding his testimony....23

IV. Conclusion....25

## EXHIBIT

| **Exhibit** | **Description** |
| --- | --- |
| 1 | Transcript of Deposition of Philip M. Darivoff, April 6, 2005 |

# TABLE OF AUTHORITIES

**Page**

## Cases

*Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003)........................................ 12, 13-14
*Cuyahoga Metropolitan Housing Authority v. United States*, 60 Fed. Cl. 481 (2004)........................................12
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)........................ 23-24
*Dijo, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685 (5th Cir. 2003)............................8, 14
*Kumho Tire Co. v. Carmichael, [143 L. Ed. 2d 238,] 119 S.Ct. 1167, 1178 (1999)*.........20
*Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn. 2004), *aff'd*, 96 AFTR 2d 2005-6344 (2d Cir. 2005) ..........................................21
*Paddack v. Dave Christenen, Inc.*, 745 F.2d 1254 (9th Cir. 1984)...................................22
*Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213 (11th Cir. 2003)..........................................9
*Tassin v. Sears Roebuck, 946 F. Supp. 1241, 1248 (M.D .La. 1996)* ...............................20
*Teen-Ed, Inc. v. Kimball International, Inc.*, 620 F.2d 399 (3d Cir. 1980)....... 8, 11, 13-14
*Texas A & M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 403 n. 12 (5th Cir. 2003)..........................................14
*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) ..................................................23
*United States v. Jones, 107 F.3d 1147 (6th Cir. 1997)*.....................................................20
*West Tennessee Chapter of Associated Builders and Contractors, Inc. v. City of Memphis*, 219 F.R.D. 587 (W.D. Tenn. 2004)....................................................... 10-12
*Williams Enterprises, Inc. v. Sherman R. Smoot Co.*, 938 F.2d 230 (D.C. Cir. 1991) ..........................................8

## Commentaries

R. Lowenstein, *When Genius Failed: The Rise and Fall of Long Term Capital Management* (2000)..........................................21
J. Weinstein & M. Berger, *Weinstein's Evidence,* §706[01] at 706-07 (1985). ................24

## Rules

Fed. R. Evid. 701 ..........................................7-9, 11-12, 14, 24
Fed. R. Evid. 701(a)........................................ 13
Fed. R. Evid. 701(c)........................................ 9
Fed. R. Evid. 702 .......................................... 7, 10, 12-13, 18- 21, 23-24
Fed. R. Evid. 703 .......................................... 18

## I. Introduction

In its Motion in Limine, Defendant seeks to bar Plaintiff's witnesses from testifying on the value of the Convertible Note that H.J. Heinz Corporation ("Heinz") issued as consideration for stock it redeemed from Heinz Credit Company ("HCC") in January 1995. Plaintiff believes that this motion has no merit, and that its purpose is to divert the Court's attention from the real issues to an insignificant, contrived factual dispute.

Until Plaintiff filed its refund complaint, Plaintiff and the government had agreed that there were no material facts in dispute, and that the case depended on the resolution of legal issues.[1] During the 18 months of discovery in this litigation, however, Defendant discovered a new factual dispute, one that had escaped the notice of the Internal Revenue Service throughout its 5 years of involvement in this case—the value of the Convertible Note. Defendant hired an expert witness on this issue and thereby obliged Plaintiff to do the same. Defendant's expert, Professor Gregg A. Jarrell, concluded that the value of the Convertible Note was 6.7% less than the value as determined by Goldman Sachs & Co., HCC's investment banker, shortly before the redemption occurred. To Plaintiff's knowledge, Defendant does not argue that Heinz or HCC intended that the redemption be anything other than an equal exchange. Nevertheless, based on Professor Jarrell's valuation of the Convertible Note, Defendant concludes that the Convertible Note was in fact worth 6.7% less than the redeemed stock (which Professor Jarrell did not value). As

[1] A discussion of the legal issues is contained in Plaintiff's Memorandum of Contentions of Fact and Law, filed October 28, 2005.

a result of this supposed discrepancy, Defendant argues that the redemption should be disregarded as a sham.[2]

Defendant's theory faces major difficulties, both legal[3] and factual. Through its Motion in Limine, Defendant attempts to solve one of its factual problems: Two independent witnesses will confirm Plaintiff's contention that the Convertible Note was intended to represent and did in fact represent fair value for the redeemed stock. One is a fact witness, Philip M. Darivoff, the officer of Goldman Sachs who developed the terms of the Convertible Note and concluded, shortly before the redemption, that the Convertible Note would be fair consideration for the redeemed stock. The other witness is Plaintiff's expert, Aiden E. Hatton, Jr. Defendant seeks to prevent both of these witnesses from testifying on this subject so that only its own expert's testimony may be heard.

Defendant's principal objection to Mr. Hatton is that he is supposedly unqualified. Defendant argues that Mr. Hatton lacks the *academic* credentials and experience in "valuing" securities.[4] Defendant's expert, Professor Jarrell, happens to have such qualifications. He is a business school professor who has made a second career out of serving as an expert witness on all types of economic subjects—43 engagements according to his resume. Professor Jarrell has no real-world experience, however, buying or selling corporate debt securities.

---

[2] As noted in Plaintiff's Memorandum of Contentions and Fact and Law, Defendant has also argued that the redemption should be recast as a distribution plus capital contribution.

[3] As noted in Plaintiff's Memorandum of Contentions and Fact and Law, the 6.7% discrepancy may be insignificant as a legal matter. Even if the discrepancy is significant, *and* even if Defendant's expert is right, the result should be a §482 adjustment, not a finding that the entire redemption was a sham.

[4] Although Defendant does not define the term "valuing," Defendant appears to mean a theoretical valuation by a professional appraiser.

Mr. Hatton is neither a professor nor an appraiser nor a professional expert witness. In fact, he has never testified before as an expert. Instead, Mr. Hatton has worked in the securities investment industry for 42 years. During his career he has been responsible for buying and selling hundreds of billions of dollars of corporate debt securities, necessarily valuing the securities in every transaction. Plaintiff believes this real world experience amply qualifies Mr. Hatton as an expert witness in this case.

Defendant argues that Mr. Darivoff's testimony should be excluded for the opposite reason—that he is over-qualified and so may testify only as an expert. Mr. Darivoff's testimony is particularly troublesome to Defendant's case, because (1) Goldman Sachs's work was performed and its advice given as an integral part of the transactions that comprise this case, not to support a party's litigating position; (2) neither HCC nor Heinz nor Goldman Sachs had any incentive to price the Convertible Note incorrectly; (3) Goldman Sachs has a well-deserved pre-eminent reputation in designing, valuing, underwriting, buying and selling securities; and (4) above all, Mr. Darivoff's methodology and work product convincingly rebut the testimony of Defendant's expert.

Mr. Darivoff will testify as a percipient witness about his involvement in the transactions at issue, including how he developed the terms of the Convertible Note. Mr. Darivoff's unquestioned expertise in corporate finance does not disqualify him from testifying from his own personal knowledge about what he did and why he did it. Mr. Darivoff will not testify as an expert witness, because Goldman Sachs does not permit its employees to do so.

As the following analysis shows, under the Federal Rules of Evidence and the case law, Defendant is not entitled to any part of the exclusionary order it seeks.

II. Philip M. Darivoff

A. Mr. Darivoff's testimony will consist principally of what he did and why he did it. To the extent it includes opinions, such testimony is permitted by law.

Defendant's attack on Mr. Darivoff's testimony is based on the erroneous assumption that Mr. Darivoff will offer *expert* opinion testimony about matters in which he was not a participant. On the contrary, Mr. Darivoff's testimony will be largely an account of his participation in the transactions that gave rise to this case—what he was retained to do, what he did and why he did it—all classic lay witness testimony. Among other things, he will testify that he carried out his assignment as directed, and that to the best of his knowledge he achieved the results sought by his client, one of which was to insure that the Convertible Note represented fair consideration for the redeemed stock. As the following discussion shows, his testimony may include conclusions about the quality and result of his own work, and he is entitled under the law to give such testimony.

Defendant relies on Rule 701 of the Federal Rules of Evidence:

> Rule 701. Opinion Testimony by Lay Witnesses
>
> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.[5]

Rule 701 is a limitation on opinion testimony by lay witnesses. It does not bar a lay witness from testifying as to what he knows about events in controversy or about

[5] The Supreme Court added subpart (c) to Rule 701 in 2000. 529 U.S. 1189 (April 17, 2000), effective December 1, 2000.

what he did and why. Defendant's expansive concept of expert testimony would prohibit anyone in an occupation involving specialized knowledge from testifying about doing his job, except as an expert witness. Sensibly, that is not the law.

Prior to the amendment of Rule 701 in 2000, it was well established that a lay witness could give testimony in the form of opinions or inferences applying specialized knowledge, so long as the testimony was admitted because of the witness's personal knowledge of relevant facts and not because of his or her expertise. *Dijo, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685 (5th Cir. 2003). Thus, a witness whose expertise was involved in the events giving rise to a case could testify regarding his or her involvement without being required to qualify as an expert witness.

An example of admissible lay opinion testimony involving specialized knowledge is testimony about business damages from someone personally familiar with the business. In *Teen-Ed, Inc. v. Kimball International, Inc.*, 620 F.2d 399 (3d Cir. 1980), the Third Circuit vacated and remanded the trial court's award of nominal damages for breach of contract, because the court had failed to admit an accountant's testimony regarding his client's lost profits. The court reasoned as follows:

> The fact that [the accountant] might have been able to qualify as an expert witness on the use of accepted accounting principles in the calculation of business losses should not have prevented his testifying on the basis of his knowledge of appellant's records about how lost profits could be calculated from the data contained therein.

620 F.2d at 403.

Similarly, in *Williams Enterprises, Inc. v. Sherman R. Smoot Co.*, 938 F.2d 230 (D.C. Cir. 1991), the District of Columbia Circuit affirmed the trial court's decision to allow testimony from a contractor's insurance broker regarding the increase in the

contractor's insurance premiums resulting from an accident caused by the plaintiff. The court noted: "As long as [the broker] had personal knowledge of the facts, he was entitled to draw conclusions and inferences from those facts—regardless of whether he applied any specialized expertise." 938 F.2d at 234.

Rule 701(c), added in 2000, was designed to prevent evasion of the rules applicable to expert witness testimony. Under the new rule, however, a lay witness still may give testimony in the form of opinions or inferences applying specialized knowledge, so long as the testimony is admitted *because of* the witness' personal knowledge or perception, not *because of* his or her expertise.

*Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213 (11th Cir. 2003) is the leading post-2000 case addressing the application of Rule 701 to opinion testimony based on knowledge of lay witnesses who might also have qualified as experts. In that case, Tampa Bay sued Cedar to recover the unpaid balance of an invoice for the repair of one of Cedar's ships. The district court denied Cedar's motion in limine and allowed the President of PG&H, a subcontractor that had worked with Tampa Bay on the repairs, to testify (1) whether PG&H's charges were "in line with similar services provided by other similar operations as PG&H," and (2) that PG&H's work was "being done in accordance to normal engineering standards." 320 F.3d at 1219. The court also allowed a consultant involved in observing the repairs and negotiating with Cedar to testify "based on [his] experience as an estimator in the shipyard business for 15 years" that Tampa Bay's prices were "fair." 320 F.3d at 1220.

The Eleventh Circuit affirmed and in its opinion discussed the history of Rule 701(c). The court noted that between the proposed revision to Rule 701 and the final

revision, the Advisory Committee on Evidence Rules added the words "*within the scope of Rule 702*." (Rule 702 contains the requirements applicable to expert witnesses.) As the Court noted, clause (c) was added to prevent evasion of the rules applicable to expert witness testimony, but the reference to Rule 702 was also intended to avoid "just the conclusion Cedar asks us to make here, a determination that anyone who testifies based on specialized knowledge they possess, whether through experience or professional learning, is subject to expert disclosure rules." 320 F.3d at 1222.

Even closer to the case at hand is *West Tennessee Chapter of Associated Builders and Contractors, Inc. v. City of Memphis*, 219 F.R.D. 587 (W.D. Tenn. 2004). In that case, the City commissioned a study to determine whether there were racial disparities in its award of construction contracts. The study, presented to the City Council in 1994, was prepared by D.J. Miller and Sherry Williams Miller of D.J. Miller & Associates ("DJMA"). Based on the study, in 1996 the City established a program to award construction contracts to businesses owned by African-Americans. The plaintiff construction contractors sued the City under the Equal Protection Clause of the U.S. Constitution and argued that the study was inadequate basis for legislation based on racial classifications. The City retained no expert witnesses and sought to rely on the Millers' study.

The plaintiffs filed a motion in limine arguing that (1) the City could not rely on the study at trial, and (2) "[b]ecause DJMA is not designated as an expert, DJMA is a lay witness who cannot give opinion testimony that is based upon scientific, technical, or other specialized knowledge." 219 F.R.D. at 589. The district court denied the motion, reasoning in part as follows:

> The Court first looks to the nature of the Millers' testimony within the definition of the Federal Rules of Evidence. The fact that a person has expertise does not lead to the conclusion that the person may be offered as an expert [at] trial . . . Nor does the fact that a person has expertise mean that the person must be offered as an expert at trial. *See Teen-Ed v. Kimball Int'l*, 620 F.2d 399 (3d Cir. 1980). Federal Rule of Evidence 701 provides that a witness not testifying as an expert may offer his opinion only if it is "rationally based on the perception of the witness" and "helpful to a clear understanding of his testimony or the determination of a fact in issue." Defendant proffers the Millers "to testify concerning how the study was written and how the conclusions were formulated." [citation omitted] The Millers have opinions rationally based on their perceptions of the study, since they were the individuals who conducted the study. Their testimony could be helpful to a clear understanding of the facts at issue, since the methods of the study are undisputedly at the center of the controversy in this case. Any personal information the Millers could convey would be welcome to the factfinder, and they qualify as lay witnesses.
>
> * * *
>
> The fact that the Millers were not retained as consultants for this litigation is pivotal to the Court's determination. . . . The Millers, doing business as DJMA, conducted a study for the Memphis City Council nearly a decade ago, long before the commencement of this action. . . .

219 F.R.D. at 589-591.

Like the Millers in *West Tennessee*, Mr. Darivoff was not retained for the purpose of testifying in this litigation. He was a major participant in the events at issue, the man who, long before there was any litigation, developed the terms of the Convertible Note to the specifications of his client. In Defendant's view (though not Plaintiff's), the value of the Convertible Note, like the conclusion in the Millers' study in *West Tennessee,* is at the center of the case. Plaintiff proffers Mr. Darivoff to testify concerning several matters, including how the terms of the Convertible Note were developed, why he included the terms he did and how he reached the conclusions expressed in his letter of

January 16, 1995 (Ex. 8A to Defendant's Motion in Limine). Like the Millers in *West Tennessee*, Mr. Darivoff reached a conclusion based on the work he performed. If the value of the Convertible Note is relevant, then Mr. Darivoff's work and his conclusion are essential to understanding what that value really is.

Mr. Darivoff's proposed testimony should be contrasted with the affidavit held inadmissible by this Court in *Cuyahoga Metropolitan Housing Authority v. United States*, 60 Fed. Cl. 481 (2004). In that case, Cuyahoga entered into contracts with the U.S. Department of Housing and Urban Development ("HUD") to provide low-income housing. This Court had previously decided that the United States breached these contracts when Congress amended the low-income housing legislation and altered how rent subsidies were determined. *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003). The parties then filed cross-motions for summary judgment with respect to damages. The United States attached to its motion an affidavit of Dennis Morton, a HUD official responsible for oversight of assistance payments made by HUD with respect to the properties in question. In his affidavit, Morton asserted that the adjusted rent sought by Cuyahoga exceeded the amounts needed to operate comparable properties. His conclusion was based on analyses of comparable properties identified by his staff. 60 Fed. Cl. at 482. This Court granted Cuyahoga's motion to strike the affidavit as inadmissible under Rule 701, holding that "the evidence can only be offered through a qualified expert under Rule 702." 60 Fed. Cl. at 484.

Mr. Darivoff's proposed testimony is readily distinguishable from Morton's affidavit for a variety of reasons:

First, the Court found that, because the comparable properties were selected by Morton's co-workers, Morton's opinion was not based entirely on his own personal knowledge or perception, as required by Rule 701(a). In contrast, Mr. Darivoff was present at the creation of the Convertible Note. In fact, he was the creator. Any opinions Plaintiff elicits from Mr. Darivoff will be based entirely on terms of the Convertible Note that he himself devised.

Second, unlike Mr. Darivoff, Morton was not involved in the events in controversy. He performed his analysis and arrived at his conclusions for the purpose of supporting the Government's position in the damages phase of the litigation.

Third, Mr. Morton's affidavit bore the unique hallmark of expert testimony: answering hypothetical questions.[6] As this Court noted, "it should not be overlooked that, in his declaration, Morton effectively answers hypothetical questions about what comparable rents would have been during the years in question – answering such conditional question is also generally reserved for experts qualified under Rule 702." 60 Fed. Cl. at 483-84. Here, Plaintiff will call Mr. Darivoff to ask him what he did and why he did it. Hypothetical questions are not necessary.

It is true that Mr. Darivoff's ultimate conclusion—that the Convertible Note was worth $130.5 million and constituted fair consideration for the stock redeemed—might be considered based on "specialized knowledge." However, as this Court acknowledged in *Cuyahoga*, Mr. Darivoff's specialized knowledge does not preclude him, an officer of Goldman Sachs and the creator of the Convertible Note, from testifying as a lay witness:

[6] The Third Circuit Court of Appeals has explained the fundamental difference between lay opinion and expert opinion testimony: "The essential difference, however, is that a qualified expert may answer hypothetical questions." *Teen-Ed Inc. v. Kimball International Inc.*, *supra* at 404.

> To be sure, courts have held that the 2000 amendments to Rule 701 do not "place any restrictions on the preamendment practice of allowing business owners or officers to testify based on particularized knowledge derived from their own position." *Dijo, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685-86 (5th Cir. 2003) *quoting Texas A & M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 403 n. 12 (5th Cir. 2003). (additional citations omitted)

60 Fed. Cl. at 484.

In *Cuyahoga*, Morton was in fact an expert witness in lay witness' clothing, and his affidavit was properly excluded. He was offering his opinion on a technical matter based not on personal perception but on information provided to him by others. Any opinion offered by Mr. Darivoff will be a product of the work he did himself. When Morton offered his affidavit, he had an incentive to support the litigating position of the United States. When Mr. Darivoff designed and valued the Convertible Note, he had no incentive other than to do so correctly.

B. Defendant has suffered, and will suffer, no prejudice from Mr. Darivoff testifying as a lay witness, not an expert witness.

Defendant claims that, by not designating Mr. Darivoff as an expert witness, Plaintiff has prevented Defendant from obtaining necessary information and so has prejudiced Defendant.

As noted above, Plaintiff was not obliged to designate Mr. Darivoff as an expert witness. *Teen-Ed v. Kimball Int'l, supra; Western Chapter of Associated Builders and Contractors, Inc. v. City of Memphis, supra.* Thus, even such prejudice would not be grounds for granting Defendant's motion.

In any event, the extensive information that Defendant has obtained from Mr. Darivoff eliminates any possibility of prejudice. Mr. Darivoff's work is no surprise to

Defendant. Plaintiff gave the government the January 16, 1995, letter (Defendant's Ex. 8A), which was drafted by Mr. Darivoff, more than seven years ago. Defendant used the letter at Mr. Darivoff's deposition.[7] Plaintiff did not play "hide the ball," and neither did Goldman Sachs. When Defendant noticed the deposition of Goldman Sachs, that firm designated Mr. Darivoff as its representative, because he is the most knowledgeable individual at the firm about the Convertible Note. When Defendant took his deposition, Mr. Darivoff answered fully all the questions put to him on a wide variety of subjects. *See generally* the Deposition of Philip M. Darivoff, April 6, 2005 (Plaintiff's Exhibit 1). As the transcript shows, it is difficult to imagine what more Defendant could have learned if Plaintiff had designated Mr. Darivoff as an expert. Moreover, Plaintiff did not seek any advantage in not designating Mr. Darivoff as an expert witness. As a policy matter, Goldman Sachs would not permit Mr. Darivoff to be so designated, and Plaintiff had no alternative but to comply with this policy.

Finally, despite the broad claim that Plaintiff's failure to designate Mr. Darivoff as an expert witness impeded its discovery, Defendant cites only two areas in which it claims not to have obtained information: (1) any compensation Mr. Darivoff will be paid for his testimony and (2) Goldman Sachs's convertible bond valuation model used in valuing the Convertible Note. As to the former, Defendant could have inquired but did not. As to the latter, Defendant questioned Mr. Darivoff at length, and Mr. Darivoff answered in detail.

Defendant could have asked either Plaintiff or Mr. Darivoff about any compensation Mr. Darivoff will receive for testifying as a lay witness. However

[7] In fact, it is Defendant's first exhibit to Mr. Darivoff's deposition transcript.

insulting this question would have been,[8] both would have answered that Mr. Darivoff will receive no compensation except reimbursement of expenses. Defendant may, of course, confirm this fact at trial.

The Goldman Sachs convertible bond valuation model figured prominently in Mr. Darivoff's deposition. *See generally* Plaintiff's Exhibit 1, transcript pp. 22-25 and pp. 42-44. A few quotations from the deposition of Mr. Darivoff will demonstrate that Defendant was not at all prevented from inquiring into the convertible bond valuation model. Mr. Darivoff defined the model and explained what it was designed to do.[9] He described the inputs.[10] He explained how the model accounts for any illiquidity of the Convertible Note[11] and its conversion feature.[12] He also identified the model's outputs.[13]

---

[8] It is unethical to pay a lay witness for his testimony, except for reimbursement of expenses, and Plaintiff's counsel, in over 30 years of tax practice and over 40 tax cases, has never made or offered to make such a payment.

[9] Q: What is the convertible bond valuation model?

A: It's a model developed at Goldman Sachs used by people in our convertible bond underwriting business and convertible bond trading business where a professional will input all the relevant characteristics of the security and other relevant market characteristics, and from that input receive output regarding the value of the instrument and the value of the instrument's component parts, its debt value, its option value.

Plaintiff's Ex. 1, transcript p. 22.

[10] Q: What are the inputs [to the mathematical formulae that comprise the model]?

A: The inputs would be the characteristics of the security, its maturity, its coupon payments, its callability, the number of shares underlying the security, the redemption features of the security, the optionality of the security, all of the basic terms of the instrument, its conversion rights. And then, relevant terms from the marketplace such as volatility of the common stock of the underlying shares, interest rates, the credit spread for the issuer, things of that nature.

Plaintiff's Ex. 1, transcript p. 23

[11] Q: Does the convertible bond valuation model have any input or require any information about possible discounts that would be demanded by the market because of any illiquidity of the security?

A: There isn't a specific input for that. There isn't a specific variable for that.

Q: Does the model account for it somehow?

A: The way the model would account for it would be in the credit spread for the instrument. For example, if the credit spread for an issuer issuing a publicly registered liquid security was x and the credit spread for an issuer who was issuing a privately placed security might be x plus a certain amount, the

Footnote continued on next page

These are just a few examples of Defendant's questioning of Mr. Darivoff on this subject. Far from being prejudiced by an inability to inquire into Goldman Sachs's convertible bond valuation model, it appears that Defendant asked everything he could think of—and received complete, clear answers.

Defendant covered much more in its deposition of Mr. Darivoff than the convertible bond valuation model, and the pattern was the same. The questions put to Mr. Darivoff at the deposition were comprehensive, and Mr. Darivoff answered them fully. Plaintiff interposed not one objection. If after the deposition Defendant felt that it needed additional information from Goldman Sachs, Defendant could have asked for it or subpoenaed it. Defendant did neither. Thus, Defendant is in no position to claim prejudice and ask the Court to exclude evidence problematic to its case—which Plaintiff suspects is Defendant's real objection to the testimony of Mr. Darivoff.

More important, even if the value of the Convertible Note is really at issue, the Goldman Sachs's convertible bond valuation model is not. In valuing the Convertible Note, Professor Jarrell accepted the model but applied a discount to take into account the fact that it could not be converted for 3 years after issuance. Only this proposed adjustment is at issue.

---

principle here is to determine what the proper interest rate is for the debt component of the security and that is the input to the model. . . .

Plaintiff's Ex. 1, transcript pp. 23-24.

[12] Q: By putting that credit spread into the formula, does the formula give you the illiquidity discount that the market would demand for, say, the equity components of the convertible note?

A: No. There is no illiquidity assumed with the option to buy shares of a public company.

Plaintiff's Ex. 1, transcript p. 24.

[13] Q: . . . Is the output of your convertible bond valuation model a dollar amount or a percentage?

A: It's typically both.

Plaintiff's Ex. 1, transcript pp. 42-43.

C. Conclusion

Most of what Mr. Darivoff will have to say at trial is not opinion at all. Whatever portion may be opinion is not inadmissible under the Federal Rules of Evidence, as the case law cited above makes clear.

Moreover, Defendant has suffered no harm on account of Mr. Darivoff's not being designated as an expert witness, something which Plaintiff was never obliged to do. Defendant's discovery was complete. Had Defendant wanted even more information, Defendant should have asked. Defendant can still do so.

III. Aiden E. Hatton, Jr.

A. Defendant makes three arguments for excluding the testimony of Plaintiff's expert, all of which are unpersuasive.

Defendant seeks to exclude the testimony of Aiden E. Hatton, Jr., Plaintiff's expert, on three grounds: (1) Mr. Hatton is not qualified to testify as an expert witness; (2) in his expert report, Mr. Hatton merely "parrots" Goldman Sachs's conclusions; and (3) Mr. Hatton's methodology is unreliable. Plaintiff disagrees on all counts.

Although he is not a professor or a practiced expert witness, as is Defendant's expert witness, Mr. Hatton has 42 years of real-world experience buying and selling corporate debt securities. Under Fed. R. Evid. 702, such experience qualifies him as an expert. Mr. Hatton *relies* in part on Goldman Sachs's analysis, as Fed. R. Evid. 703 permits him to do, and he *agrees* with it. The opinions he expresses, however, are his own. Finally, Mr. Hatton's methodology in reaching his conclusion as to the value of the Convertible Note is not "unreliable," even though his approach differs from the approaches used by Goldman Sachs and by Professor Jarrell. If Defendant thinks Mr. Hatton's approach is unreliable, Defendant can so demonstrate in cross-examination.

This will be a bench trial, and there is no need to protect unsophisticated jurors from any confusion or undue influence.

B. If expert testimony is required at all, Mr. Hatton is qualified to testify as an expert by virtue of actual experience.

Rule 702 of the Federal Rules of Evidence sets the standard for expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In arguing that Mr. Hatton's testimony should be excluded, Defendant focuses on his qualifications as an expert. Defendant overlooks the threshold criterion for the admissibility of expert testimony—that it "assist the trier of fact to understand the evidence or determine a fact at issue." Plaintiff does not know whether the Court needs assistance in understanding convertible debt generally or the Convertible Note in particular. Unlike typical jurors, the Court may be familiar with the concepts of zero-coupon debt, prevailing Treasury yields, convertibility of debt into common stock, conversion premiums and related concepts. Expert testimony on the valuation of the Note may not be necessary at all, given that the experts' valuations of the Note differ by only 6.7%. If the Court concludes that *no* expert testimony on this point is necessary, Plaintiff will not complain. If the Court prefers to hear expert testimony on this issue, however, Plaintiff respectfully submits that both sides' experts should be heard.

Defendant argues that Mr. Hatton is unqualified because he lacks the credentials like those possessed by Defendant's expert: a Ph.D. degree and experience as a teacher of

finance and as an expert witness in cases involving valuations of property and property rights. Rule 702 specifically permits an expert witness to be qualified on the basis of *experience*. In fact, as the draftsmen of the Rule made clear, experience *alone* is a sufficient basis:

> Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *See, e.g., United States v. Jones, 107 F.3d 1147 (6th Cir. 1997)* (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail); *Tassin v. Sears Roebuck, 946 F. Supp. 1241, 1248 (M.D .La. 1996)* (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches"). See also *Kumho Tire Co. v. Carmichael, [143 L. Ed. 2d 238,] 119 S.Ct. 1167, 1178 (1999)* (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Advisory Committee Note to Rule 702 (2000).

Mr. Hatton has spent 42 years in the securities industry. During his career, he has overseen purchases and sales of hundred of billions of dollars of corporate debt securities, including convertible securities and unregistered securities like the Convertible Note. Every such purchase and sale involves a judgment about valuation—a judgment involving real money and real consequences. Yet Defendant claims that Mr. Hatton has never valued a security, and that his only experience is with securities that are traded in established markets. Motion in Limine, p. 8. The truth is that Mr. Hatton values

securities virtually every day, both publicly-traded and privately-traded—not by appraising them or testifying about them but by buying and selling them.

Plaintiff believes that, by virtue of real-world experience in the securities industry, Mr. Hatton is *better* able to value the Convertible Note than Professor Jarrell, who has no such experience. The actions of capital markets regularly confound economists and academics who have devised formulae that they believe value securities better than the marketplace. In one well-known recent instance, the Federal Reserve had to pressure money-center banks to bail out just such a group of geniuses in order to preserve the financial system.[14]

Plaintiff does not suggest that Professor Jarrell's lack of real experience disqualifies him as an expert witness. Should the Court wish to hear expert testimony on valuation of the Note at all, it would be helpful to hear the differing approaches of *both* experts.

C. Mr. Hatton expresses his own opinion on the value of the Note, properly relying in part on the work done by Goldman Sachs.

Defendant claims that Mr. Hatton merely "parroted" the opinion of Goldman Sachs, and that such testimony is inadmissible hearsay. In fact, although Mr. Hatton did rely on Goldman Sachs's work, in particular the letter of January 16, 1995 (Defendant's Motion in Limine, Ex. 8A), he did considerably more.

Mr. Hatton's reliance on Goldman Sachs's analysis was entirely proper. The Notes of the Advisory Committee on the 2000 amendments of Rule 702 provide that

[14] *See* R. Lowenstein, *When Genius Failed: The Rise and Fall of Long Term Capital Management* (2000); *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn. 2004), *aff'd*, 96 AFTR 2d 2005-6344 (2d Cir. 2005).

"[t]he amendment requires that expert testimony be based on sufficient underlying 'facts or data.'"

That an expert may rely on hearsay is a well-established rule. The principle is illustrated in *Paddack v. Dave Christenen, Inc.*, 745 F.2d 1254 (9th Cir. 1984), a case cited in Defendant's Motion in Limine at p. 4. In *Paddack,* the facts were quite similar to those involved here. The trustees of several employee trust funds hired the accounting firm Touche Ross to audit an employer's compliance with certain collective bargaining agreements. The firm prepared audit reports concluding that the employer had contributed less to the trust funds than was required. The trustees sued for breach and sought to introduce the audit reports through the testimony of their expert witness[15] as proof of the funding deficiencies. The district court concluded that the trustees had presented no evidence of the alleged contribution deficiencies other than the audit reports, which were inadmissible hearsay, and found for the employer.

The Ninth Circuit affirmed the holding that the audit reports were inadmissible to prove the contribution deficiencies, but it reversed and remanded on the grounds that the (1) the expert's testimony itself was evidence of the funding deficiencies, and (2) the audit reports should have been admitted for the limited purpose of explaining that testimony. 745 F.2d at 1262-1263. Ground number (1) permits Mr. Hatton to testify about the value of the Convertible Note. Ground number (2) permits him to use the Goldman Sachs opinion to explain the basis of his testimony.

On page 4 of its Motion in Limine, Defendant cites *United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003), in support of its argument that Mr. Hatton's statement of

[15] The expert was another accountant at Touche Ross, one who had not participated in the audits.

agreement with Goldman Sachs is inadmissible hearsay. *Dukajini,* however, addresses a very different situation—an expert's attempt to use hearsay evidence to prove facts beyond the scope of his expert testimony. The Second Circuit held that an expert may rely on hearsay testimony when he testifies as an expert but not when he testifies as a lay witness. Here there can be no question that Mr. Hatton will be testifying as an expert only and thus he may rely on hearsay.

There is more to Mr. Hatton's testimony than reliance on Goldman Sachs, as his expert report and deposition transcript demonstrate. In valuing the two components of the Note (straight debt and conversion feature), Mr. Hatton used the Bloomberg News Service to conduct his own personal research into then-prevailing yields of Treasury securities and the terms of comparable convertible debt securities. He also reviewed the table of comparable securities attached to the Goldman Sachs letter of January 16, 1995, and considered the historical price movement and volatility of Heinz stock. Based on these data and his own experience, he determined the value of the conversion feature of the Note and the likelihood of its conversion at the time the Note was issued. App. to Defendant's Motion, Ex. 8, p. 23. These were *his* opinions.

D. Defendant's disparagement of Mr. Hatton's methodology is no basis for excluding his testimony.

As Defendant states, Rule 702 of the Federal Rules of Evidence requires that expert testimony be "reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), sets forth a non-exclusive list of factors for determining reliability; and one of these factors is whether the expert's technique or theory can be tested.

Mr. Hatton's basic approach in valuing the Note involves his consideration of comparable debt securities, as well as the historical performance and volatility of Heinz

stock, and his extensive experience investing in fixed income securities. This method differs from the approaches used by Goldman Sachs and by Defendant's expert, which essentially involve treating the conversion feature as an option and valuing the option by a variant of the Black-Scholes formula. Also, as a fixed income investment professional, Mr. Hatton is familiar with Black-Scholes and similar formulae and with their role in determining the value of convertible securities. He is also familiar with common terms of convertible debt instruments and with the effect of such terms, and combinations of such terms, on value. In any event, the validity of Mr. Hatton's methods can be tested, as Defendant did at Mr. Hatton's deposition and presumably will do again if Mr. Hatton testifies.

*Daubert* establishes another important rule: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596. *H.J. Heinz Company and Subsidiaries v. United States* will not be tried before a jury which might be unduly swayed by expert testimony, a principal concern of the draftsmen of Rules 701 and 702.[16] Defendant's deposition of Mr. Hatton, which Defendant quotes selectively to paint Mr. Hatton in the most unfavorable light possible, was a one-way street. Only Defendant did the questioning. If Mr. Hatton testifies at trial, Plaintiff will be able to elicit the whole story, whether on direct or re-direct examination. Defendant will have the opportunity to question Mr. Hatton's methodology on cross-examination, as Rule 702 and *Daubert* contemplate. The Court then will be able to

[16] "When the evidence relates to highly technical matters and each side has shopped for experts favorable to its position, it is naïve to expect the jury to be capable of assessing the validity of dramatically opposed testimony." J. Weinstein & M. Berger, *Weinstein's Evidence*, §706[01] at 706-07 (1985).

decide what testimony is helpful and what is not—if the Court concludes that expert testimony on the Convertible Note should be received at all.

## IV. Conclusion

To base its case on "sham redemption," Defendant must convince the Court that the Convertible Note was grossly inadequate consideration for the stock redeemed from HCC—so inadequate that the redemption should be ignored entirely rather than adjusted under §482. Whether Defendant can make such a showing by introducing expert opinion testimony that the Convertible Note was worth 6.7% less than what Heinz and HCC believed to be, based on the advice of Goldman Sachs, is for the Court to decide. Defendant cannot succeed in demonstrating even this modest discrepancy in value, however, if the Court accepts the testimony of Mr. Darivoff or Mr. Hatton.

Defendant's solution to this problem is to ask the Court to exclude their testimony—in Mr. Darivoff's case because he is over-qualified and Plaintiff should have designated him as an expert, and in Mr. Hatton's case because he is under-qualified and Defendant finds his methodology inadequate. Defendant would have the Court hear only Defendant's expert who, despite his academic and other credentials, has no real-world experience with capital market securities.

Even though Plaintiff believes that Defendant's "sham redemption" case is a stretch, Plaintiff acknowledges that Defendant should be able to put its case on as it chooses. It appears, however, that Defendant does not wish the Court to hear from Plaintiff. But the law does not allow, and common sense does not support, what Defendant has requested.

WHEREFORE, Plaintiff prays that this Court deny Defendant's Motion in Limine in its entirety.

s/ Clifton B. Cates

Clifton B. Cates
Attorney for Plaintiff

1700 Pennsylvania Avenue NW
Suite 600
Washington DC 20006
Tel: (202) 393-7600
Fax: (202) 393-7601

Date: November 28, 2005

Of Counsel:

Ivins, Phillips & Barker Chartered
1700 Pennsylvania Avenue NW
Suite 600
Washington DC 20006
(202) 393-7600