**PLAINTIFF'S EXHIBIT 1**



IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

---------------------------------x

H.J. HEINZ COMPANY AND SUBSIDIARIES,

Plaintiffs,

-against-

THE UNITED STATES,

Defendant.

No. 03-28477

---------------------------------x

DEPOSITION OF PHILIP DARIVOFF

New York, New York

Wednesday, April 6, 2005

Reported by:

DEIRDRE O'MALLEY

PLAINTIFF'S EXHIBIT 1



April 6, 2005
9:00 a.m.

DEPOSITION of PHILIP DARIVOFF, held at the offices of SULLIVAN & CROMWELL, LLP, 125 Broad Street, New York, New York 10004, before Deirdre O'Malley, a Court Reporter and Notary Public within and for the State of New York.



A P P E A R A N C E S:

IVINS, PHILLIPS & BARKER
Attorneys for the Plaintiffs
1925 Century Park East, Suite 2140
Los Angeles, CA 90067

BY: CLIFTON B. CATES III, ESQ
-and-
ROBERT H. WELLEN, ESQ
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006

U.S. DEPARTMENT OF JUSTICE, TAX DIVISION
Attorneys for the Defendant
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington, DC 20044

BY: ROBERT STODDART, ESQ

SULLIVAN & CROMWELL, LLP
Attorneys for the witness
125 Broad Street
New York, New York 10004

BY: MICHAEL T. TOMAINO, JR., ESQ



Q. Are you employed?
A. Yes, I am.
Q. Where are you employed?
A. Goldman Sachs & Company.
Q. Could you please state your business address and phone number?
A. 85 Broad Street, 28th floor, New York, New York 10004. Phone number is (212) 902-8426.
Q. What is your position?
A. I am the chairman of the credit capital markets group and the managing director and partner of the firm.
Q. When did you begin working for Goldman Sachs?
A. July 15, 1985.



Darivoff
Q. What was your position when you began?
A. I was an associate in Morgan securities.
Q. Does Goldman Sachs own stock in the Heinz Company?
A. I don't know.
Q. Does Goldman Sachs have a business relationship with the Heinz Company?
A. Yes, we do.
Q. What is that business relationship?
A. The business relationship that I'm familiar with is an investment banking relationship in which Goldman Sachs calls on Heinz in order to help Heinz in a wide range of corporate finance and corporate advisory work.
Q. Are you their exclusive provider of these services?
A. No.
MR. TOMAINO: Just to be clear, did you mean Goldman Sachs as a firm or Mr. Darivoff?
MR. STODDART: Goldman Sachs as a firm.
MR. TOMAINO: That's what I thought. I just wanted to be clear.
Q. I should probably also ask you if you have been deposed before?

Darivoff

THE WITNESS: Can I ask my counsel a question?

MR. STODDART: Sure.

A. Yes.

Q. When was that?

A. November 21, about November 21, 2003.

Q. In what connection were you deposed?

A. It was a matter regarding --

MR. TOMAINO: I just want to interrupt here because the witness has expressed some uncertainty as to his ability to talk about this.

It was in connection with an SEC investigation having to do with some matters at Goldman Sachs and I was not involved in that one, but I do know from my involvement in other such matters that sometimes that administrative agency, you know, considers it's investigatory matters to be very confidential.

So, unless you need to get into the details of it, what I would like to do is let you know that it was in connection with an SEC investigation and maybe leave it at that for now.



Darivoff

If you would like more information for some reason, I can perhaps investigate and see if it is all right. Obviously you are an agency of the Government too, but I'm a little bit concerned, because of my lack of familiarity with whatever that situation was, with going too much deeper at this point, if that's all right.

Q. Mr. Darivoff, are the facts that your attorney stated true to the best of your knowledge?

A. Yes, they are.

Q. Were you ever deposed in any other matter?

A. No.

Q. Did you ever testify in any judicial proceeding?

A. No.

MR. STODDART: To help us as we go along, I suppose I should say, if you ever have any difficulty understanding any of my questions, please ask me and I will try to rephrase it. If you would ever like to stop for a break, just say so and we will do that.

Every now and then maybe somebody will object. That is for the benefit of the judge



Darivoff

and not for the benefit of anyone here, generally. It's to get it on the record in case the judge has to look at the transcript later and decide if he is going to keep reading.

You should just then answer the question after the objection unless your attorney tells you not to answer.

I am going to be asking you questions that I'm going to try to keep of a factual nature, because I know that Heinz has not designated you as their expert witness. But because I'm asking factual questions about a past opinion, it's going to be difficult to keep facts and opinions completely separate.

So, I'm going to try to thread the needle as best I can, but I may venture into an opinion now and then.

Also, I may be asking questions that seem obvious, but that's only because we need the answer on the record so I'm not relying on my assumptions. I might also ask questions that seem very stupid and that's because I'm ignorant.



Darivoff

Q. Did Heinz contact you with regard to evaluating a convertible note in around 1994?

A. Yes.

Q. Who exactly from Heinz first talked to you about this?

A. John Crowe.

Q. Did anyone else from Heinz talk to you about it?

A. Paul Renne.

Q. Anyone else?

A. Those are the only people I recall.

Q. What did they want you to do?

A. They asked us, largely Mr. Crowe asked us for help in structuring a security on behalf of a subsidiary of the company.

Q. Did they specify what kind of security?

A. A security that would be convertible into shares of the parent company stock.

Q. Did they specify what value the security should have?

A. Yes.

Q. What value was it supposed to have?

A. They wanted us to help them structure a security whose value would be equal to the value of

Darivoff

shares that the subsidiary held. I think that's the value a parent company shares that the subsidiary held.

Q. Did they specify a number of shares?

A. Yes.

Q. Did they specify the date as of which they should be valued?

A. That I don't recall.

MR. STODDART: I'm going ask the reporter to mark this document as Exhibit A.

(Defendant's Exhibit A, letter to HJH Credit Company dated January 16, 1995 from Mr. Darivoff, marked for identification, as of this date.)

Q. This has been marked as Defendant's Exhibit A, do you know what Defendant's Exhibit A is?

A. Yes.

Q. What is it?

A. It is a letter that I wrote to Heinz, HJH Credit Company dated January 16, 1995.

Q. What does this letter do, basically?

A. It provides valuation judgments to the company on a security convertible note.



Darivoff

Q. Is this convertible note the instrument that you drafted at their instruction?

A. It is.

Q. Is this the only draft of this note, the one that is referred to in Defendant's Exhibit A or were there earlier drafts of the note?

MR. TOMAINO: Of the letter?

MR. STODDART: Of the security that's being discussed.

MR. TOMAINO: Okay, I'm not sure there is a draft of the note here, that's why I asked the question. If you understand it, you can go ahead.

A. There were probably other iterations of the security that were done at different points in time.

Q. Take a look at the page in Defendant's Exhibit A that's captioned Summary Comparison of Selected Convertible Debt Securities?

A. Yes.

Q. At the top there is the name Heinz and, as I read it, this sets out some of the provisions of the security that you designed and that you are valuating?



Darivoff

A. Yes.

Q. It has a 7-year effective maturity date. I have been given some documents that show that there was an earlier draft of the note with a longer maturity and if you wait just a moment, I will get out those documents.

MR. STODDART: Can we go off the record while I search for them.

(Pause in the record.)

MR. STODDART: Back on the record, please.

I'm going to be passing this note around, I'm sorry I don't have copies of it --

MR. TOMAINO: I can literally make some in under 45 seconds if you want me to.

MR. STODDART: Okay, we will go off the record.

(Short recess.)

MR. STODDART: Could we go back on the record, please.

I'm going to ask the reporter to identify as Defendant's Exhibit B a document that has the Goldman Sachs Bates number 46 at the bottom right.

(Defendant's Exhibit B, document Bates



Darivoff

stamped GS 46, marked for identification, as of this date.)

Q. Do you know what Defendant's Exhibit B is?

A. No.

Q. Have you ever seen Defendant's Exhibit B before?

A. I may have, I don't recall the -- I just don't recall the document.

Q. It has some identifying information running across the top. There is a person's initials, CM North, do you know of any CM North?

A. If I can make this easy, this appears to be a document that was created by Goldman Sachs with a summary of indicative terms for a Heinz structured convertible note.

I have no recollection of this document, but it appears to be a document that is related to a Heinz structured convertible note.

Q. To your knowledge is this a document that would be produced by, say, a mathematical formula imbedded in a computer or was it typed?

A. This appears to be output from a word processing program.

Q. It speaks of a maturity of 10 years.

Darivoff

MR. STODDART: I would like the reporter mark as Defendant's Exhibit C a document that has the Bates number 78 at the bottom.

(Defendant's Exhibit C, document Bates stamped GS 78, marked for identification, as of this date.)

Q. Do you know what Defendant's Exhibit C is?
A. Yes.
Q. Did you produce Defendant's Exhibit C?
A. I believe I did.
Q. What is it?
A. It is an output from an Excel or Lotus spreadsheet which has summary information and characteristics of a zero coupon convertible note to be issued by the H.J. Heinz Company.
Q. This is the maturity of 15 years?
A. Correct.
Q. This one looks as if it was produced on June 30 of 1994, right?
A. It appears that it was faxed on that date, I'm not sure when it was produced.
Q. To whom would it have been faxed, if you know?
A. I can't tell if that's an incoming fax.



Darivoff

The fax number was my fax number. I don't know if that was a fax I sent or a fax I received. The fax number was also shared by many other people. So I'm not sure who specifically sent it or received it.
Q. Would you have shared the document, Defendant's C, with anyone except Heinz?
A. Others at Goldman Sachs who were working with me in structuring the security.
Q. Defendant's Exhibit B has a date on it anyway, September 26, 1994?
A. Yes.
Q. I assume that means that the iteration that Defendant's B discusses is a later one than the one that's in C; would that be correct?
A. Yes.
Q. Am I right in assuming that the draft instrument either began at 15-year maturity or was in one form at a 15-year maturity and then went to a 10-year maturity?
A. That appears to be true. There may have been other maturities that were looked at at the time we looked at a 15-year maturity and other maturities we looked at at the time we looked at a 10-year maturity, but the documents pretty much say



Darivoff

one is a 15-year and one is a 10-year.
Q. Why would you have been trying different maturities for the note?
A. Maturity has an impact on value.
Q. Basically what impact on value does it have?
A. Depending on the level of interest rates, longer maturity may increase or decrease the value of a security.
Q. Did the interest rates change in your various drafts of this note?
A. Yes.
Q. I note that Defendant's Exhibit C has an issuer call as one of its terms, it's the ninth line from the top of the list of terms?
A. Yes.
Q. What does that mean?
A. That is a period, a time period where the issuer may redeem the security at the issuer's option, an optional redemption date on the part of the issuer. The security would be redeemable at its accreted value or principal value.
Q. Does this provision, issuer call, have any effect on the valuation of a security?



Darivoff

A. It does.
Q. What is that?
A. A call option would typically require the issuer -- an investor would expect to be paid a higher return in exchange for providing the issuer with an option redemption before the maturity of the note.

In addition, if an issuer has a right to redeem a security before the expiration of the note, and the note has features that would allow the holder of the note to buy shares of the issuer's common stock, then the optional redemption has a way of reducing the value of the holder's right to buy those shares.

So, for example, if I issued in an extreme case, a note that had a 10-year maturity that was convertible into Heinz shares, a holder might view those conversion options or rights to be very valuable.

But if I had the ability to redeem that security next week, the value of those conversion rights would be significantly diminished relative to the possibility of 10-year conversion rights.
Q. Thank you. The iteration described in

Darivoff

Defendant's Exhibit B --

A. That's GS 46?

Q. Yes. Has at the bottom of the entries called Indicative Terms, something called a non call period of 10 years, what does that mean?

A. That means that the security is not redeemable at the option of the issuer prior to its maturity.

Q. Back again to the Summary Comparison of Selective Convertible Debt Securities in Defendant's Exhibit A, that is the terms that you actually settled upon?

A. Yes.

Q. I see there is a non-exercise period among the terms of 3, I suppose that's 3 years, correct?

A. Yes.

Q. You have various comparables, none of which has any non-exercise period, correct?

A. Yes.

Q. I notice that Defendant's Exhibit B also has a non-exercise period of 3 years with a maturity of 10 years instead of 7; is that correct?

A. Yes.

Q. Why did you include a non-exercise period



Darivoff

among the terms of the notes?

A. The non-exercise period was included in order to reduce the value of the conversion feature so that the conversion feature, the right to convert into Heinz shares plus the value of the note would equal the value of the securities that the Heinz Credit Company was exchanging with the parent.

MR. STODDART: I'm going to ask the reporter to identify this document as Defendant's Exhibit D.

(Defendant's Exhibit D, note to Mr. Darivoff from John Crowe dated July 5, 1994 Bates stamped 1561 and 1562, marked for identification, as of this date.)

Q. Do you know what Defendant's Exhibit D is?

A. It's a note written to me by John Crowe on July 5, 1994.

Q. There is an extra sheet of paper attached to it with Bates number 1562, do you know what that is?

A. Yes.

Q. What is it?

A. That is a description of some of the constraints or parameters that Heinz wanted to see



Darivoff

in the notes.

Q. Now, this letter is dated July 5 which makes it later in time than Defendant's Exhibit C which has the Bates number 78 at the bottom?

A. Yes.

Q. Do you remember if this letter, Defendant's D, was discussing the version of the note described in Defendant's C?

A. I don't.

Q. Do you know what version of the note this was discussing?

A. I don't.

Q. The note says there is a description of some opinions that Mr. Wellen would like you to supply, asking, "will you be able to do so?"

Were you able to supply the opinions that Mr. Wellen wanted you to supply that are listed on page 1562?

A. The judgments that we supplied the company are contained in the letter which I think you marked Exhibit A.

In those judgments I think we used the term reasonable value, but I think we came within the parameters that the company asked us to provide.



Darivoff

Q. Did you provide an opinion that the likelihood of conversion of the convertible notes is approximately similar to the likelihood of conversion of other convertible debt instruments issued in the public markets?

A. I don't recall providing that specific opinion.

Q. If I were to tell you that I don't find that opinion in your letter, could you tell me if you would have provided it in any other form? That is, if you did provide that opinion, would it have been in the letter that we marked as Defendant's A?

A. I believe the judgments and opinions that we provided the company are contained in the letter.

Q. If an opinion were not in the letter, it is not an opinion that you provided?

A. I believe that's true.

Q. Can we take a look now at Defendant's Exhibit A, you say that the letter provided what you called a reasonable value, but Mr. Wellen was asking for a fair market value. What do you understand the difference, if any, to be between the reasonable value and the fair market value?

A. I don't think there is any substantive

Darivoff

difference.

Q. What your letter, Defendant's A, provides, is a statement of the value that a person in the market would be willing to pay for the security if he knew all of the relevant facts and was under no compulsion to buy?

A. That's correct.

Q. As I understand Defendant's Exhibit A, it says that you valued the convertible note essentially in two ways, one using what's called a convertible bond valuation model and the other valuing the components separately, is that true?

A. Yes.

Q. What is the convertible bond valuation model?

A. It's a model developed at Goldman Sachs used by people in our convertible bond underwriting business and convertible bond trading business where a professional will input all the relevant characteristics of the security and other relevant market characteristics, and from that input receive output regarding the value of the instrument and the value of the instrument's component parts, its debt value, its option value.



Darivoff

Q. Is it a mathematical formula?

A. It is a number of mathematical formulas.

Q. What are the inputs?

A. The inputs would be the characteristics of the security, its maturity, its coupon payments, its callability, the number of shares underlying the security, the redemption features of the security, the optionality of the security, all of the basic terms of the instrument, its conversion rights.

And then, relevant terms from the marketplace such as volatility of the common stock of the underlying shares, interest rates, the credit spread for the issuer, things of that nature.

Q. Does the convertible bond valuation model have any input or require any information about possible discounts that would be demanded by the market because of any illiquidity of the security?

A. There isn't a specific input for that. There isn't a specific variable for that.

Q. Does the model account for it somehow?

A. The way the model would account for it would be in the credit spread for the instrument.

For example, if the credit spread for an issuer issuing a publicly registered liquid security



Darivoff

was x and the credit spread for an issuer who was issuing a privately placed security might be x plus a certain amount, the principle here is to determine what the proper interest rate is for the debt component of the security and that is the input to the model.

So a private placement security might have a yield that's different than a publicly registered security, an SEC publicly registered security. So the input to the model would be the appropriate interest rate for a private placement security.

Q. By putting that credit spread into the formula, does the formula give you the illiquidity discount that the market would demand for, say, the equity components of the convertible note?

A. No. There is no illiquidity assumed with the option to buy shares of a public company.

Q. In the model or just generally?

A. In the model and generally.

Q. So, an option to buy shares of a publicly traded company would never be discounted for illiquidity I mean?

A. It is assumed generally that the shares underlying the option will be fungible with the



Darivoff

public shares of the company.

Q. So if, say, the option were -- if you had two options identical in terms, one is exercisable at any time and the other is exercisable only after 3 years, would they have the same value?

A. They would have substantially the same value.

Q. Would there be any discount at all in the market?

A. Very little, almost immeasurable.

Q. Have you or Goldman Sachs given opinions on the valuation of employee stock options?

A. We typically do not.

Q. Have you ever?

A. Not to my knowledge.

Q. Have you ever before or after you valued this instrument, given a valuation of any option that was not immediately exercisable?

A. In the regular course of business at Goldman Sachs we are probably providing that advice and judgment many times. Let me explain what I mean.

There are two basic option structures for call options on common stock. One basic structure

is referred to as an American option. An American option can be exercised any time before the maturity of the option.

The other basic structure is a European option. A European option can be exercised only on or about the maturity of the option. So these are the two basic option structures.

Investors in over-the-counter options in equity instruments buy and sell both forms of those options. In the marketplace in an option valuation theory, there is very little difference in the vast majority of cases between the value of an American option, an option that can be exercised any time prior to expiration, and a European option, an option that can only be exercised prior to expiration.

I guess, the layperson's reason for that, just to put it in sort of more easy to understand terms, is that, prior to the options maturity, the option has value in it. So, by exercising the option prior to maturity, the holder would forfeit the remaining value of the option.

So, in the marketplace one generally sees or most universally sees American options and



European options valued substantially similar to one another.

Q. Are there generally American options and European options, that is, that type of right to exercise given on options that are otherwise identical?

A. I don't know. It's not -- I suppose it happens. I can't identify a specific example of two identical options in the marketplace that have the same strike level, same company, same expiration date, but one is European and one's American.

You know, they are easily created, one could do that. One could easily do that. They very well may exist. I mean, we do that, our firm and many other firms do that type of thing all the time.

Q. Well, I think you answered this already, but just to clear up my own probably obvious confusion, could we assume that there are two options completely identical. One of them is American, one of them is European not exercisable for 3 years. What is the relative value?

A. All other things being equal?

Q. Yes.

A. The European option will be slightly less



valuable than the American option in most circumstances.

Q. In what circumstances would it not be slightly less?

A. It will always be slightly less expensive, but I'm talking almost an immeasurable amount. It's pretty, pretty universally true and the difference is really quite small.

Q. Could you give me a range of the differences that you have seen in your experience, I suppose you have no direct experience, but in your judgment what would be the range of the difference in the value between two identical options, one exercisable at any time, the other exercisable only after 3 years.

A. .05 percent. Put another way, if the value of the American option was 100, the value of the European option would be 99.995 percent.

Q. Have you had an opportunity to look at a valuation of the convertible note we have been discussing that was produced by Professor Gregg Jarrell?

A. I have.

MR. STODDART: I'm going ask the reporter



to identify this as Defendant's Exhibit E.

(Defendant's Exhibit E, excerpt of a valuation of the convertible note produced by Professor Gregg Jarrell, marked for identification, as of this date.)

Q. This I can tell you is an excerpt from that evaluation, because I copied it myself.

On page 25 of Defendant's Exhibit E, footnote 55 cites an article by gentlemen named Luft, Levine and Howe, are you familiar with that article?

A. No, I'm not.

Q. Have you heard of or are you familiar with, from other sources, the data that Luft, Levine and Howe analyzed? And I will tell you what it was. It was records of the discounts observed in market trading of options from 1967 to 1975, have you seen such data?

A. No.

Q. Could you take a look at Defendant's Exhibit E page 20, footnote 43. Could you, please, look through footnote 43 and tell me if you are familiar with any of the literature noted there?

A. I'm not.

Darivoff

Q. Are you familiar with any literature discussing an assertive need to discount the value of an option that is calculated by any of the common methods in valuing an option?

A. I have a general knowledge of the difficulty that companies have in the current environment in valuing employee stock options or equity options provided to executives, which I believe most of these reference materials and footnotes apply to.

Q. Do you have knowledge in specific of difficulties caused by an illiquidity provision of those options?

A. I have a general understanding of those issues, yes.

Q. What is your general understanding of the amount of any illiquidity discount that might be required?

A. Well, that I don't know. I don't have -- what I understand is why employee stock options or executive stock options are not as valuable as over-the-counter options.

But I don't know specifically what the valuations might be or what the valuation



Darivoff

differences might be because of the differences between employee and executive options, and options that one might typically see in the capital markets.

Q. What is your understanding of the reasons for the difference?

A. Well, there are many. There are vesting issues. Typically the employee must stay with the company for a certain period of time in order to vest in the option.

Then the employee has restrictions with regard to their ability to exercise the option and often has to be with the company in order to exercise the option.

Then employees often have restrictions, and this is particularly true of executive employees, have restrictions with regard to their ability to buy and sell shares of the company or to exercise the options that they hold. There are limitations, there could be insider trading orientated limitations and a number of other limitations.

So, for example, an employee could be granted options that on the surface might be quite valuable, but if the employee leaves the company in



Darivoff

2 years, the employee might forfeit 100 percent of the value of the option.

The employee can't sell the option or trade the option and, so, it's unclear in many of the employee compensation schemes when the employee will be able to recognize the actual value of the instrument.

Q. Do you know of any other reasons?

A. There may be others, those basically summarize the ones that I understand.

Q. To your knowledge would Heinz have been able to trade, or rather would the Heinz subsidiary have been able to trade the convertible note that you valued on January 16, 1995?

A. I believe that they could.

Q. On the open market?

A. The instrument we understood would have been a privately placed instrument. They would have been able to sell the instrument to accredited investors which would include nearly every institutional investor in the marketplace, nearly every insurance company, nearly every mutual fund as well as certain high net-worth individuals, certain wealthy individuals would also qualify as accredited



Darivoff

investors.

The overwhelming majority of investors in convertible debt securities and in investment grade debt securities are accredited investors. So there is a large marketplace that, a large number of investors that would be willing to buy a high credit quality instrument such as this.

Q. To your knowledge do the purchasers of privately placed securities generally require a discount from the market value?

A. Not from the market value. They require a discount relative or a premium yield, in this case relative to publicly registered securities, all other things being equal, in some cases. In many cases they require no premium at all.

Q. What are the cases in which they require no premium at all?

A. When the investors or when there are a wide range of numerous buy and hold oriented investors who would expect to own the security to maturity and in an environment where the security is dearly valued by that group of investors.

Q. What are the circumstances in which they do require a discount?

Page 34

Darivoff

A. Where the instrument has limited appeal, where they are a unique owner, where there may be challenge to find other potential buyers of the instrument and the ability to find those buyers would be more difficult. It might take them a long time to identify buyers relative to other instruments.

We at Goldman Sachs do privately placed securities, securities placed under Rule 144A regularly at yields that are substantially similar to where the same instrument would be placed if it was publicly registered with the SEC.

These are typically securities of high credit quality issuers.

Q. Were you involved in a private placement of any of the securities that Heinz or that a Heinz subsidiary got by converting the convertible note that you valued?

A. No, not by converting the convertible note. We were involved in the placement of shares held by Heinz Credit, but I don't think that was related to the shares underlying the convertible note.

Q. You are quite right and I did one of the

Page 35

Darivoff

stupid things I warned you about. You told me what I wanted to know anyway, that you were involved in a private placement of some Heinz shares owned by the Heinz Credit Company?

A. Yes.

Q. What was your involvement with that placement?

A. Heinz Credit contacted us, indicated that they wanted to sell a certain number of shares. The shares were at the time not registered.

I contacted the people in our equities division and asked them to find buyers. A buyer was identified and the shares were sold to that buyer.

Q. Was that your only personal involvement in that placement?

A. Yes. I'm not an equities professional. I was merely helping introduce the company to our equities people.

Q. Do you know if the buyer in that case required a discount?

A. Yes.

Q. Do you know what the discount was?

A. I know it because of my reading of Dr. Jarrell's opinion. That's the way I was able to

Page 36

Darivoff

recall what the discount was.

Q. Assuming that factual statement is correct, it seemed like a reasonable discount for Heinz nonpublicly traded shares?

A. That was the discount that the investor and the company agreed to and the parties viewed it to be reasonable. So I can only conclude that it was reasonable.

Q. Were you surprised at the discount?

A. I don't recall being surprised or -- I just don't recall.

MR. STODDART: I have only one copy of this document and I'm not going ask about it, but I would like to identify it and have it made part of the record.

It begins with a page that is stamped Goldman Sachs 27 and it's a letter to H.J. Heinz Credit Company of April 13, 1995.

Could you please mark this as Defendant's F.

(Defendant's Exhibit F, letter to H.J. Heinz Credit Company dated April 13, 1995, Bates stamped GS 27 to GS 34, marked for identification, as of this date.)

Page 37

Darivoff

Q. Mr. Darivoff, I'm showing you Defendant's Exhibit F, do you know what it is?

A. This is an engagement letter between Goldman Sachs and Heinz Credit in which Heinz Credit has authorized Goldman Sachs to act as placement agent for 175,000 shares of Heinz common stock.

Q. Did you sign that?

A. I don't know.

Q. Is that a document from Goldman Sachs?

A. It is.

MR. CATES: Excuse me, could we get copies during a break?

MR. STODDART: Fine, sure. Would you like to take a break now?

MR. TOMAINO: This was among the documents that we produced, so it ought to be in that packet. I mean, I'm happy to make other copies, but it is Bates 27, so it ought to be in the copies I provided to you.

MR. CATES: Thank you.

MR. STODDART: While we are looking at documents that I was given this morning, we might as well get some others on the record and clear them up. I'm looking now at a document

Page 38

Darivoff
with the Bates number 42.
I'm going to ask the reporter to mark that has a Defendant's G.
(Defendant's Exhibit G, letter to Paul Renne dated August 22, 1994 from James Ziperski of Goldman Sachs, Bates stamped GS 42, marked for identification, as of this date.)
Q. Mr. Darivoff, I'm showing you Defendant's Exhibit G, do you know what it is?
A. This is a letter to Paul Renne, the treasurer of H.J. Heinz Company from August '94 from James Ziperski of Goldman Sachs.
Q. Who is James Ziperski?
A. A former employee of Goldman Sachs who was in our equity derivatives and equity capital market group.
Q. In this letter Mr. Ziperski says that he is enclosing three copies of the equity derivative strategies and share repurchase presentations, do you know what those are?
A. I don't. I don't know exactly what those are. I know what an over-the-counter terms and condition master and equity options confirmation is.
Q. What's that?

Page 39

Darivoff
A. Those are -- I'm going to make a guess as to what I think was involved here. James Ziperski was involved in working with companies who are interested in writing options on their stock, typically put options, which gave the holder the right to sell the company shares.
I don't recall exactly, but this appears to be material related to a discussion that Jim Ziperski had with Paul Renne regarding using put options as a component to the company share repurchase program.
So the company would be able to buy shares in the open market or would be able to write options to Goldman Sachs or to other parties giving those parties the right to sell shares to the company, the company would receive an option premium for that.
I believe that that's what that involves. It is a fairly standard practice in corporate finance.
Q. Do you know if Heinz ever commissioned anyone at Goldman to draft such puts?
A. I don't believe we did.
Q. Do you know what was in the accounting opinion from Cooper & Lybrand that's referenced in

Page 40

Darivoff
Defendant's Exhibit G?
A. Probably, I'm guessing, there was an opinion on how a company would account for written options, put options on its stock.
Q. Do you know what was in the legal opinion from Sullivan & Cromwell that's referenced in Defendant's Exhibit G?
A. Probably, again, related to put options on a company's stock, a securities law issue associated with that, I'm not sure. I'm guessing.
MR. TOMAINO: Just so I may clarify, the referenced enclosures to that letter were not among the documents that I described to you having been withheld, they simply weren't located in the files.
MR. STODDART: Thank you. While we are on that subject --
A. If I may also mention, I don't believe that those materials related to the structuring of the note, if that's one of your questions. I just don't think they were connected at all.
Q. Thank you. One very quick question about the documents that Goldman Sachs has withheld.
There were apparently internal drafts of

Page 41

Darivoff
correspondence and analyses and handwritten notes of materials relating to your design and valuation of the convertible note that was sent to your legal department and it had writings on them, maybe from your attorneys.
To your knowledge, did anybody send these documents to Heinz?
A. I don't recall.
Q. To your knowledge did anybody discuss these, the opinions or writings of your legal department that were on these documents with Heinz?
A. I don't believe we discussed with Heinz the discussions that we had with our legal department, if that was your question.
Q. Yes, it was. Did you discuss with Heinz any problems that your legal department may have raised?
A. I don't believe we did.
MR. TOMAINO: Again, just to be clear, because I don't want this to appear more secretive than it must be.
We were simply protecting the privilege. Many of those documents we withheld were not related to the opinions by Goldman Sachs. They

Darivoff

were things like draft engagement letters.

Things that I'm quite sure, based on listening to your questions, you wouldn't be very interested in anyway.

MR. STODDART: Thank you, I'm grateful to be spared any more paper.

Q. Could you take a look again at Defendant's Exhibit E?

A. That's the expert opinion?

Q. Yes. I would like you to look at paragraph 60, do you disagree with anything stated in paragraph 60?

A. No. Well, let me check something, pardon me.

MR. WELLEN: Excuse me, can we take a break?

MR. STODDART: Sure.

(Short recess.)

MR. STODDART: Back on the record.

Q. Before we continue with Defendant's Exhibit E, I might as well ask some odds and ends that I may have forgotten.

Is the output of your convertible bond valuation model a dollar amount or a percentage?



Darivoff

A. It's typically both.

Q. You say about the convertible bond valuation model, in paragraph 2 of the Defendant's Exhibit A, sorry, for jumping around --

A. No problem.

Q. Last sentence of that paragraph, "it is common for convertible securities to be valued below the theoretical values derived in our model," do you know why?

A. There is, at the time there were inefficiencies in the marketplace that have since been greatly reduced. The inefficiencies derived from the fact that many of the buyers of convertible securities at this time were buying securities in part because of their view of the common stock.

And over time there has been a significant increase in the number of investors who buy convertible securities based more on the value of the option and less on their view of the common stock.

So, the largest buyers now of convertible securities in the marketplace is a category of buyers we refer to as hedge funds or arbitrage buyers. Those buyers buy the security to take



Darivoff

advantage of the valuation differences and the component pieces of the convertible instrument.

Q. To your knowledge has the convertible bond valuation model been changed since 1995?

A. I don't know, but I presume it has because we are constantly changing and updating and improving our technology and analytic tools, but I imagine it has been changed.

Q. How did you or Goldman Sachs know that it's common for convertible securities to be valued below the theoretical values derived in your model back in 1995?

A. Goldman Sachs is a leading underwriter and trader of convertible securities. Therefore, we have firsthand experience in where the marketplace prices and trades these instruments and where the theoretical values might be for those instruments in our model.

Q. I have probably asked this before, so forgive me if I have, but have you valued either convertible bonds or any other kind of securities or options that had liquidity restrictions?

A. I don't recall doing it other than in the ordinary course of our business and in my



Darivoff

professional activities where we are creating securities that may be private securities and selling them.

We would advise issuers and investors on what we believe the proper value of those securities are and issuers and investors would reach an agreement as to where they were willing to buy and sell securities.

Q. To your knowledge have any of the buyers required a discount because of the illiquidity provision?

A. Again, the answer is yes. It is provided for, in my experience, in the yield or coupon that the investor requires to buy a private placement, security relative to a publicly registered security.

Q. Has Goldman designed, to your knowledge, of course, securities that have an illiquidity provision that is a restriction on the exercise of an option?

A. Yes.

Q. Do you know whether the buyer of that security required a discount because of that provision?

A. Yes, it is common. A very common feature

Darivoff

in convertible securities today is to place on the conversion a contingency that requires the stock price to be over a certain level before the investor is able to convert the security. We call that a contingent convertible feature.

The majority of convertible debt securities that are issued have contingent convertible features that require, if a stock is priced today as 100, as an example, and has a effective conversion price of 120, the contingent convertible feature may require the stock to be at 150 prior to conversion, if the conversion is before maturity.

We would refer to that as an instrument that has a 20 percent conversion premium and a 50 percent contingent conversion premium.

The market does not value that contingent convertible instrument significantly differently from the way it would value that same instrument without the contingent convertible feature.

Q. Do you have any experience with negotiations of placement of these convertible notes with contingent convertible features?
A. I have a general knowledge. I have not



Darivoff

been directly involved in the negotiation and placement of those securities.
Q. Do you know of any specific discount that a purchaser may have requested because of the feature?
A. No.
Q. Do you know if purchasers have requested discounts because of that feature?
A. Well, we deal with sophisticated institutional investors. If an investor believes that they have an ability to ask for better terms, they will ask for better terms.

So, I wouldn't be surprised if an investor asked for better terms. But whether or not that investor has the ability on their own to change the pricing of an offering in the marketplace of a new issue, would depend on how many other investors believe they should get better terms as well.
Q. Do you know if any purchaser has requested better terms because of the contingent convertibility feature?
A. I don't have firsthand knowledge of that.
Q. Do you have secondhand knowledge?
A. I believe investors have asked for better



Darivoff

terms.
Q. Based on that feature?
A. Based on that feature.
Q. Do you have first or secondhand knowledge of the amount of discount or the bettering of the terms that they requested because of that feature?
A. No.
Q. Who would?
A. The professionals in our equity capital markets group.
Q. Could you name some of them?
A. David Ryan.
Q. Who is the head of that group?
A. The head of our equity capital markets group would be Steve Pearce.
Q. Is he based here?
A. Yes. The person in our equity capital markets group who is viewed to be the person responsible for equity convertible business is David Ryan.
Q. R-y-a-n?
A. Yes.
Q. Is he based here?
A. Yes. I should also add, while I don't



Darivoff

know directly what discount investors have asked for, it is not material. It is not large or significant.
Q. Do you know directly that it is not large?
A. Yes.
Q. How do you know that?
A. In my discussions with our professionals in equity capital markets, in pricing and marketing convertible instruments to issuers, I frequently ask them, is there a benefit to removing the contingent convertible feature or is there a cost to putting in the contingent convertible feature? And they tell me there is no cost or benefit of a material nature.
Q. With whom have you had these discussions?
A. David Ryan and other professionals in the equity capital markets group.
Q. Do you remember the most recent time when you had such a discussion?
A. No.
Q. Can you remember any time when you had such a discussion?
A. Sure.
Q. When was that?
A. When we worked on a convertible securities

Darivoff

offering for Bristol Myers which we did in the past year or 2, Lockheed Martin which we did in the past year or 2, Tyco convertible offerings that we did for Tyco, which we did in the past year or 2.

Q. Thank you. Can we go back to Defendant's Exhibit E?

A. Sure.

Q. Could you look at paragraph 62 and tell me if you disagree with anything to paragraph 62?

A. Can we get back to your first question on this document, which was your question on paragraph 60?

Q. Yes.

A. You had asked if I disagreed with anything in paragraph 60, I believe?

Q. Yes.

A. I do.

Q. Okay, what's that?

A. The last sentence of that paragraph reads, "Goldman Sachs used a binomial model to arrive at its opinion that the option portion was worth $22.07 million."

In our letter we provided several potential values for the option. This particular



Darivoff

value was one of several we provided.

I don't believe we rendered an opinion that the option portion was worth 22.07, but that was a potential value. One potential value that could be derived, not the only value.

Q. Could you look at paragraph 62 and tell me if you disagree with anything in that?

A. I have no basis to agree or disagree with that.

Q. Do you know the common practice among valuation practitioners when they valuate options for restrictions on liquidity and marketability?

A. I'm not familiar with that, no.

Q. Could you look at paragraph 63, please?

A. Yes.

Q. Do you disagree with anything in paragraph 63?

A. Yes.

Q. What do you disagree with?

A. The author here has analogized the option in the convertible security to an employee option that has vesting requirements and to an option that is not freely tradable on a developed market.

These are poor analogies. The option



Darivoff

imbedded in the security, if we use the vesting analogy, is 100 percent vested in the owner of the security.

The option has no limitation on its transferability as it is part of a note that may be transferred. And as we understood the note, we would expect there to be a very large number of institutional investors who would be willing to buy the note of a very high credit quality issuer, convertible into a very large market cap liquid stock.

So, there is a number of flawed assumptions that have been made here. The prohibition against exercising the option for 3 years does not have a material impact on the value of that option. Again, because the holder of an option is unlikely to exercise the option prematurely and therefore forfeit the remaining value of the option.

Q. Could you take a look at paragraph 64, please.

MR. TOMAINO: Sorry, can we take a very short break?

MR. STODDART: Sure.



Darivoff

(Short recess.)

Q. We are on paragraph 64, do you disagree with anything in 64?

A. Yes.

Q. What?

A. I don't believe that the option's lack of liquidity is created by the inability to exercise early. I don't believe that the inability to exercise early is equivalent to receiving restricted illiquid shares.

Q. Why not?

A. Because, one, they are two different items, it's apples and oranges.

The option is not illiquid. The illiquidity of the option is based on the liquidity of the note and I believe the note to be freely transferable and would be valued and in demand with sophisticated institutional investors.

And that the holder could recognize the value of the option by selling the note or by entering into option agreements with others that are substantially similar to the options imbedded in the notes.

Q. By freely transferable do you mean

Darivoff
sellable on a public market or in a private placement?
A. In a private placement.
Q. So assuming that there is stock that is tradable only in a private placement, would that make the analogy any closer?
A. I don't understand the question. Restricted shares would trade at a discount to publicly traded shares.
Q. Would a restricted convertible note, restricted in the same sense, trade at a similar discount?
A. Not necessarily, no.
Q. Why not?
A. Well, the shares -- the question is, will the shares be restricted when the holder exercises the note? Convertible notes are commonly sold as private placements.
In fact, I believe the majority of convertible notes today are sold as private placements. Sometimes subject to registration rights, but initially distributed at private placements.
And the shares underlying the convertible



Darivoff
note are ultimately registered with the SEC by the issuer. So if and when at some time in the future the holder exercises their option to buy shares, those shares are fungible with publicly traded stock.
Q. Assume a convertible note that is not publicly traded because it is not registered, and it is placed with a sophisticated investor, would the investor typically require a discount because it is not registered?
A. The note?
Q. Yes, the convertible note.
A. They might, but it would not be significant.
Q. Why wouldn't it be significant?
A. Because the parties that are engaged in the purchase of most convertible notes, particularly convertible notes issued by large companies, are the same whether they are publicly or private, are pretty much the same parties.
Q. Do you mean the purchaser and the seller are the same parties?
A. Those people who buy publicly registered convertible notes are substantially similar to those



Darivoff
people that buy privately placed convertible notes.
So, one does not increase significantly the demand or the number of people or the capital available in the marketplace to when one registers a convertible note versus a privately placed convertible note.
Q. Assume an issue of stock by the same issuer of the convertible note, the stock is also not registered, would there be a discount claimed for stock?
A. Yes, unregistered stock does trade at a discount.
Q. Is it traded at a smaller or larger discount or an equal discount to an unregistered convertible note?
A. It would be a larger discount.
Q. Why is that?
A. Because there is a more limited universe of investors who are willing to buy unregistered shares.
Q. So, there are more investors who are willing to buy unregistered convertible notes than investors who are willing to buy unregistered shares of the same issuer?



Darivoff
A. Correct.
Q. Why is that?
A. And, by the way, included in my judgments here is an assumption that the shares underlying a privately placed convertible note, will be registered by the issuer upon conversion. That is the common form in which privately placed convertible notes are sold.
Q. Could we assume a privately placed convertible note that has no registration rights?
A. Sure.
Q. Would that note trade at a discount greater to, equal to or less than an issue of unregistered stock by the same issuer?
A. I don't know. It will be closer to the -- well, it's hard to say. It's hard to say.
The debt value of the security would trade at a very small discount because debt instruments are commonly structured as private and public instruments.
The equity value of it might trade at a more significant discount if it is viewed to be less valuable because one does not hold the option to buy public shares.

Darivoff

Q. Would the equity component of this note trade at a discount equal to, less than, greater than the discount required for an issuance of unregistered shares by the same issuer?
A. I don't know. I have no basis in which to make that -- I'm just not experienced enough.
Q. Would it strike you as surprising if it traded at the same discount rate?
A. You are going to have to repeat your question. Would the option to buy unregistered shares trade at the same discount as unregistered shares?
Q. By the same issuer, yes, and the option is also unregistered.
A. The option to buy unregistered shares, the unregistered option to buy unregistered shares?
Q. Yes.
A. I would think would trade at a smaller discount than the underlying shares.
Q. Why?
A. Because the option would be a smaller capital investment and would be relatively easily monetized by the holder.
Q. What do you mean easily monetized?



Darivoff

A. The value would be relatively easily replicated in some other form.
Q. Such as?
A. So, if I had an unregistered option to buy unregistered shares of client stock that matures in 3 years, I could sell a more liquid option to buy Heinz liquid shares and receive value equal to the value of -- equal to or exceeding the value that I paid for the option I bought.
Q. So to monetize this option --
A. And it would be -- I'm sorry, it would be a very small percentage, the option is a very small percent of the value of the underlying shares.
So, for example, if one said, well, you know, you had $100 million of stock that were illiquid and hypothetically because of the illiquidity you would say, well, I'm only willing to pay $95 million for a that $100 million of fair marked value if it was in liquid stock.
The option to buy that liquid stock, right, would be a small percentage of the $100 million and would not necessarily be worth, you know, the discount would not be the same.
The options, for example, the option on



Darivoff

something that's 5 percent out of the money is not 5 percent different than the option that's at the money.
The option prices don't move linearly, they move in a nonlinear fashion.
Q. I basically understand you to say that to monetize this unregistered option to buy unregistered shares, basically the holder would have to issue another security, an option of liquid shares?
A. The holder could, but wouldn't have to. The holder could develop a trading strategy to monetize the value which a number of option investors do.
If they are long in option in the stock, then they short the stock and manage that short position to replicate the optionality of the stock itself.
But back to your question on 64, paragraph 64, it's, I think, a very flawed assumption.
Q. Can you look at paragraph 67, please?
A. Sure, yes.
Q. Do you disagree with anything in paragraph 67?



Darivoff

A. Yes.
Q. What's that?
A. I don't think one could take the single trade and extrapolate it in the way that the author extrapolated it to derive the discount that they derived.
Q. Why not?
A. It's not the way the market works and nor would it be consistent with the way one would expect rational players to behave.
Q. On what do you base your opinion?
A. Well, I will just say, if the non-exercised period involved here was not 3 years but was 10 years, would the author here then imply that the discount should be 80 percent?
Q. I have no idea.
A. I believe that that's what they would imply based on the math here and that would be nonsensical.
Q. Take a look at paragraph 68.
A. Sure. I'm not familiar with the studies of pre-'97 stock with 2-year restrictions.
Again, let me emphasize that the convertible note was structured to be consistent

Page 62

Darivoff
with where in our judgment an institutional investor would be willing to buy the note and not where an institutional investor would buy restricted shares of Heinz stock that had a 3-year restriction on them.
Q. All right. Could you take a look at paragraph 69?
A. Sure. And your question?
Q. Do you disagree with anything in it?
A. I don't believe liquidity discounts are linear. So I believe this is a flawed approach.
Q. And why?
A. For this instrument in particular, the fact that there is an active liquid market and identical securities, identical securities in the Heinz shares, that the value of a position in restricted shares of Heinz is directly related to the value of the public market for Heinz shares and the ability of the holder to substitute publicly traded shares for privately traded shares or to hedge a position of privately traded shares with publicly traded shares.
So, if I gave you as a holder, privately traded shares, restricted shares that were

Page 63

Darivoff
restricted for 3 years, and you could short sell an exact amount of those shares in the market and maintain that short position for that restriction period, you would have an arbitrage profit, a risk-free profit, okay.
The amount of risk-free profit that the market would require, you know, would be based on a number of conditions. But it wouldn't be linear and to the extent that holders were able to monetize the value here in a fairly riskless way, holders would do that.
So it would be unlikely that one would see for this type of instrument, unless there were restrictions on the holder, the holder had restrictions on the ability trade and monetize the value, which employees do have the restrictions, employee stock options. But I don't think this is consistent with the way the market would approach these types of restrictions.
Q. It costs something to sell short, doesn't it?
A. Yes, it does, and that's why it costs something. There may be capital that the holder has to maintain and all of that would be included in the

Page 64

Darivoff
return that they would want to get for managing and maintaining that position.
Q. Would they consider this in negotiating, say, a discount on the purchase price?
A. Sure.
Q. Is there a range that you would expect?
A. I just wouldn't know.
Q. Could you take a look at page 25?
A. Sure.
Q. Do you know of the data referred to in paragraph 56?
A. You mean footnote 56?
Q. Yes. On page 26, the first full sentence on paragraph 26 --
A. But again, sorry, the footnote 56 applies to employee stock options which are not capital market instruments.
Q. Page 26, the first full sentence?
A. "Another study?"
Q. Well, yes, are you familiar with the study performed on currency options that found a 25 percent discount to exchange traded options?
A. No.
Q. So I have to assume, then, that you are

Page 65

Darivoff
not familiar with the article listed in paragraph 58?
A. No.
Q. That you are not familiar with it?
A. I am not.
MR. STODDART: Can we go off the record for just a second.
(Short recess.)
MR. STODDART: Just to satisfy my curiosity, I'm looking at documents I was given this morning with Bates numbers 48 and 49 and captioned Ovid, one of my favorite poets, Quantitative Strategies Options Calculator.
Could you please mark these a the next exhibits.
(Defendant's Exhibit H, document Bates stamped GS 48, marked for identification, as of this date.)
(Defendant's Exhibit I, document Bates stamped GS 49, marked for identification, as of this date.)
Q. Mr. Darivoff, I'm showing you what's been marked as Defendant's H and I, do you know what these are?

Darivoff

A. I have not seen these before.

MR. CATES: Sorry, what are we looking at?

MR. STODDART: Bates numbers 48 and 49, it says Ovid at the top.

A. I'm not quite sure what this is.

Q. Was it produced by Goldman Sachs?

A. It appears to be produced by the equity derivatives group at Goldman Sachs & Company.

Q. Does it have anything to do with the valuation of the convertible note?

A. I don't know. It appears to.

Q. What does it appear to do?

A. It appears to be valuing a series of options with increasing strike prices at increasing maturities from January 15, 1998 to January 15, 2002, those options being put options on H.J. Heinz stock.

Q. Could they have had anything to do with the opinion that you later gave about the advisability of converting the convertible note into stock at a certain period?

A. Yes, I assume that they relate to that analysis, yes.

Q. Thank you.



Darivoff

A. And what the analysis seems to show, again as we discussed, I believe that opinion dealt with whether or not the holder should exercise their option to buy shares.

What this is attempting to understand is what the holder would forfeit by taking the shares now as opposed to waiting until the maturity of the note.

What the holder forfeits is the protection in the value they have from the underlying value of the debt instrument. That protection we define as a put right, a value to get a fixed amount at some time in the future and no less than that amount from the value of their holdings.

So, again, this is consistent with what I described to you as the challenge in understanding the value of options, exercising options prematurely.

I believe what this says is, if the holder gives up their rights, they would lose a certain value. I believe we described that in the letter as well.

MR. STODDART: Thank you very much, those are my direct questions.



Darivoff

THE WITNESS: Okay.

MR. CATES: My turn.

EXAMINATION BY MR. CATES:

Q. Mr. Darivoff, in your opinion of January 16, 1995, Exhibit A, you say, "we analyzed the characteristics of this security and we believe that it is reasonably valued in the context of current market conditions."

I believe that in answer to one of Mr. Stoddart's questions you said reasonable value meant fair market value. Do you recall what number that value turned out to be?

A. Yes, the reasonable value was defined as the value of the shares that Heinz Credit Company was exchanging with Heinz Company for the underlying note.

So, the current market price of Heinz stock times the shares, I believe, was the value. We believe that the convertible note had a value that was substantially similar to the value of those instruments and provided Heinz Credit Company with our inputs, our analysis, our assumptions and that was it.

Q. Do you recall an actual number?



Darivoff

A. The number I recall is the number that we have here in our letter, in the exhibits that were attached to our letter and that number would have been $130.5 million.

Q. As the assumed value of convertible note?

A. Yes.

Q. What do you think was Goldman Sachs' margin of error in valuing that note?

A. Well, as described in our letter, we had derived the values for this note that were as high as 103 percent, 130.5 million, to as low as I think we had a value that was 98.7 percent. So I think that's the range of error. So with a plus or minus 2 or 3 percent.

Q. I understand. If Goldman Sachs owned the note --

A. Yes.

Q. -- would you have sold it for 122 million willingly?

A. No.

Q. In 1995 other than in pricing this note, had Goldman Sachs ever priced any other convertible data?

A. Yes.

Darivoff

Q. Would you briefly describe the firm's experience in pricing convertible debt?

A. Sure. Goldman Sachs is a leading underwriter of equity, of securities, and is a leading underwriter of convertible securities.

Fischer Black who is the coauthor of the Black-Scholes model which is the foundational tool used for valuing equity options and financial options is a long-term partner of Goldman Sachs.

The firm is quite expert in the valuation and trading of equity options and financial options generally.

Q. In addition to Goldman's experience in pricing convertible debt, does Goldman also buy or sell convertible debt?

A. Yes, Goldman Sachs is an active market maker in convertible debt securities. Over-the-counter -- and it is typically an over-the-counter market as opposed to an exchange trades market.

Q. In 1995 wasn't Goldman the largest such dealer in convertible securities in the country?

A. I don't recall. We are consistently one of the leading underwriters and leading traders of



Darivoff

convertible securities and equity securities.

Q. How would you compare Goldman's real world experience in pricing, buying and selling convertible debt with everyone else who does it in the country?

A. We believe we are one of the most expert parties in valuing and trading equity securities and convertible debt.

Q. And have had such experience for how long before 1995?

A. I believe the firm will have as much experience as the marketplace has. The firm has a 135-year history or something close to that and have been an active participant in the market for many, many years.

Q. Present at the creation?

A. I'm not quite sure how far the history of the market goes back, but for many years.

Q. There has been a lot of discussion about the so-called illiquidity of the note. Were there any significant liquidity restrictions on the note?

A. We were privy to the negotiations in the final documentation associated with the note. There were no liquidity restrictions in our valuation that



Darivoff

were assumed other than the possibility of the instrument being a private placement debt security.

And we believed our valuation incorporated any liquidity discount that would be associated with the private placement debt security.

Q. So in pricing the note, Goldman did take into account whatever liquidity restrictions it thought there might be?

A. Yes.

Q. You didn't overlook this point?

A. An underlying assumption in the valuation of the note is that the shares in the note would be fungible with the shares of Heinz common stock upon the exercise of the conversion option by the holder.

Q. I want you to assume now that the note, which in a moment I will introduce as an exhibit, was registered, all other terms the same, any estimate on how much more valuable an identical registered note would have been given the marketplace?

A. It would be less than 2 percent more valuable, probably less than 1-and-a-half percent more valuable.

Q. And, again, I don't mean to put words in



Darivoff

your mouth, correct me if I don't have it right. As a practical matter this unregistered note could be sold?

A. Yes, that's correct. The note was structured to be consistent with where we believe the H.J. Heinz Company could have sold the note to institutional investors.

Q. I would like to focus briefly on the 3-year conversion lockout --

A. Yes.

Q. -- if that's the right term. Again, in pricing the note you were aware of this feature, were you not?

A. Yes.

Q. Did you take it into account?

A. Absolutely.

Q. I know you have explained this a couple of times, but could you just state once more how did you take into account in pricing this note the 3-year conversion lockout?

A. The 3-year conversion limitation was fundamental to valuing the note and was included in our valuation of the equity option characteristics of the instrument.

Page 74

Darivoff

If the -- well, you know, the note itself was valued to be equal to the value of the shares being exchanged. And the value of the shares being exchanged was substantially -- the number of shares being exchanged, I believe, was similar to the value of shares underlying the note.

So, that the note -- in order to structure the note properly, we pushed out the exercise date and in doing that with a zero coupon security, increased the exercise price. Because the value of the debt security accreted over time and, therefore, the option strike price, the implied strike price was out of the money, slightly out of the money sometime in the future.

Q. I'm glad you mentioned that. Could you explain briefly the relationship between these features of the note? There was a zero coupon note?

A. Yes.

Q. There was a 3-year prohibition against conversion and the effect of a conversion premium at any particular time as you just mentioned?

A. Sure. A lower conversion price would increase the value of the option to buy the securities. All other things being equal, a shorter

Page 75

Darivoff

exercise restriction given the same strike price, would reduce the value of the option.

With this particular instrument we have a strike price that grows over time and so we were balancing out at what maturity date or what initial exercise date we would have the correct option value for the characteristics that the company was looking for.

Q. Explain briefly please, why the strike price grows over time on this note?

A. Sure. The implied strike price grows because the value of the debt, the debt is issued at a discount, I can't recall the exact discount, but it accretes to par.

But at maturity the debt is 100 percent of face, at issue it was worth a certain amount of the face, and the number of shares remains constant.

If you will, the numerator grows over time, the denominator remains constant and the numerator which is the accreted principal value divided by the denominator, the number of shares, equals the implied convertible price.

Q. Again, there has been some discussion about this, but I would like to try to wrap it all

Page 76

Darivoff

up.

Why doesn't it make much of a difference that the note was not convertible for the first 3 years? Or put another way, why doesn't that lead, in your opinion, to a substantial discount in the value of the option portion of the note?

A. Because holders of financial options are unlikely to exercise the option prior to expiration, because to do so forfeits the underlying value of that option.

And, so, in both the analysis of option values using Black-Scholes and in the trading and pricing of options in the marketplace, one sees very little difference between what are referred to as American options which can be exercised any time prior to expiration, and European options which can only be exercised at expiration.

Q. Bottom line, a 3-year lockout doesn't make much difference in value, is that a fair statement?

A. That is correct.

Q. In general --

A. Let me amend that answer slightly. A 3-year lockout, a value to buy Heinz stock at a certain price 3 years in the future, an option to

Page 77

Darivoff

buy Heinz stock 3 years in the future that is an out-of-the-money option, will not be valued differently if it is exercisable today or if it is exercisable before expiration any time or at expiration only.

If one made in this particular instrument, the option exercisable at any time prior to expiration, it may have effected the value of the security by the interplay of the value of the intervening options at various strike prices, okay.

Because the instrument has multiple strike prices, multiple debt values that are potentially exchanged for equity.

But, it is not accurate to say that there is a substantial discount associated with options that are exercisable only at expiration and options that can be exercised any time prior to expiration, in the marketplace and in value theory there is virtually no difference between those two options.

Q. Turning now to the analogy of employee stock options. You mentioned some of the differences between employee stock options and capital market options vesting transferability.

A. Yes.

Darivoff

Q. Just to clarify, was the option feature, the convertible note fully vested?
A. Yes, it was part of the convertible note, could not be separated from the convertible note.
Q. Was the option feature transferable?
A. Not separately, but transferable as part of the convertible note.
Q. You mentioned briefly the ability to monetize a capital market option?
A. Yes.
Q. Can employees who have employee stock options monetize their options in the same fashion?
A. It's, I would think, pretty difficult. There are limitations employees, particularly senior executives, have limitations on their ability to buy and sell securities of their employer.
Many limitations, limitations based on insider knowledge, limitations on shorting employer's stock is very common, limitations on buying put options or writing call options. There are a number of limitations that employers place on employees in their trading of the stock of the company.
Q. In pricing, buying or selling capital



Darivoff

market options, would Goldman use the same methodologies as in valuing employee stock options?
A. Goldman Sachs doesn't value employee stock options. Goldman Sachs trades and values capital market instruments, instruments traded in value by corporations and institutional investors, so we don't.
We recognize there are many complexities in trying to understand the value of employee stock options.
Q. You don't feel you need to be familiar with the literature on the valuation of employee stock options to do your job?
A. We are not valuing employee stock options. We don't value employee stock options as a general rule at Goldman Sachs. I'm sure our CFO will have to value employee stock options for many of the people at Goldman Sachs, but in this particular case we are valuing an option to convert a high credit quality debt instrument into shares of actively traded common stock.
Q. Goldman doesn't feel impaired or disadvantaged in valuing capital market instruments by its lack of participation in the valuation of



Darivoff

employee stock options?
A. Not at all.
Q. Is there any relevance at all?
A. I imagine that there could be some relevance, but not I would think, when compared to the overwhelming evidence of real market evidence of sophisticated players valuing instruments, buying and selling instruments.
Q. When the note was issued in January of 1995, a note which I would like to have marked as Plaintiffs' Exhibit 1 --
(Plaintiffs' Exhibit 1, note issued in January of 1995, marked for identification, as of this date.)
Q. At the time the note, which has now been marked as Plaintiffs' Exhibit 1, was issued, was conversion into Heinz common stock by the holder a foregone conclusion?
A. No.
Q. Why not?
A. Conversion was dependent upon the future path of Heinz stock price which is uncertain.
Q. Let me ask it another way. How would you describe the option component of the note upon



Darivoff

issuance, was it in the money, at the money or out of the money?
A. It was out of the money.
Q. Again, why was it out of the money?
A. It was out of the money to be consistent with the way other convertible instruments are structured. I believe that's what the issuer wanted. And its strike price and other characteristics were consistent with the value package that the issuer and investor were looking for.
Q. If there had been no 3-year lockout on the conversion, the option feature of the note would have been well within the money, would it not, since it was convertible into however many shares it says?
A. I think it would have been at the money. I think it would have been exactly at the money.
Q. The number of shares being sold was 3,325,000 and the note was convertible into 3,500,000 shares, does that cause you to --
A. Well, then the option would have been in the money, that's right.
Q. It would have been a ridiculous convertible out?

Page 82

Darivoff

A. It would be atypical.

Q. Excuse me, that is a better term. I don't know if you know, but Heinz Credit Company, the holder of the note, did convert in the Heinz stock in January of 1998?

A. Yes.

Q. Are you familiar with that?

A. I wasn't aware that they did convert. I was aware that we provided Heinz Credit Company with a letter in which we discussed the value of converting compared to not converting.

Q. And I would like to introduce that as Plaintiffs' Exhibit 2, this is the January 1998 opinion, I will do that in a moment, you don't need to refer to it.

If you know, do you think that Heinz Credit Company's decision to convert was an economically reasonable one?

A. It may have been. I don't recall all of the details of the opinion, but it seemed that the value of the shares received in the conversion were very similar to the value of holding the note to maturity.

It seems that they were reasonable,

Page 83

Darivoff

closely valued and that the conversion option was at the time deeply in the money. So the risk and return characteristics of the convertible security at the time was substantially similar to the risk and return characteristics of Heinz common stock.

Q. I would like you to assume that Professor Jarrell is correct when he said that AT&T Management Corporation purchased 175,000 shares of unregistered Heinz common stock from Heinz Credit Company at a 4.08 percent discount, discount in relation to comparable registered stock.

A. Yes.

Q. Can you tell simply based upon that arithmetic discount, the reason for the discount?

A. No.

MR. WELLEN: I would like to ask just one question, Mr. Darivoff.

BY MR. WELLEN:

Q. What I would like to do is try reconcile two points that I'm sure you can reconcile.

You said earlier in your general discussion of European versus American style options that it would be very unusual for a holder of an American style option to exercise in advance of

Page 84

Darivoff

expiration, whereas, here Heinz Credit Company did in fact convert the note exercising its option well in advance of expiration?

A. Yes.

Q. Can you conceptually explain why that would have made sense, might have made sense here when it ordinarily wouldn't?

A. Well, where one finds an option holder willing to exercise prior to expiration is typically in cases where the option is deeply in the money and the remaining option value is very, very small relative to the value of the instrument.

There may be other characteristics of the instruments that make holding the underlying security more valuable.

For example, the option denies the holder the right to receive dividends, and the right to receive dividends could be valued for tax purposes or for cash-flow purposes by the investor.

So the investor in a deeply in-the-money option or deep-in-the-money convert, has risk characteristics that are similar to the underlying common stock, but the income characteristics or cash-flow characteristics may be different.

Page 85

Darivoff

So, if you have an option to buy a stock at $1 a share and the stock is at $100 a share, the option will be worth something very close to the underlying stock.

And if the stock price drops 1 percent, the value of your option will drop 1 percent. It goes up 1 percent, the option will go up 1 percent.

So your risk is very similar. Your return characteristics are similar, but the holder of the option gets no dividend.

So some holders exercise in order to get dividend payments. Sometimes there is a difference in the market liquidity of a convert relative to the common stock.

So, for example, a convertible instrument, its $150 million size instrument might have a somewhat different trading liquidity than $150 million worth of Heinz stock because there are $8 billion of Heinz stock traded in the marketplace.

So if one was looking to sell, the execution that you could get could potentially be better.

When institutional investors are worrying about this execution, they are really in small

Page 86

Darivoff

percentage changes in value. You are talking quarters of a point, which for an institutional investor is important, particularly if you are liquidating your position.

So that can affect the decision. There may be other factors, but those are a couple of them.

BY MR. CATES:

Q. Taking into account everything you know up until this moment, do you think that Goldman priced the note properly in January of 1995?

A. I believe we did. Again, it was our objective to price the note to be consistent where the H.J. Heinz Company could sell that note to institutional investors in the marketplace at that time and that was the basis for our valuation.

Q. Had Heinz Credit turned right around and said we will sell this note to you for 129 million, I mean, you, Goldman Sachs, would Goldman have considered buying that, you have a $1 million spread in there?

A. Well, Goldman Sachs you know likes to work for a little bit more than that, but yes. The instrument would have been fairly valuable for

Page 87

Darivoff

Goldman Sachs or another sophisticated party to purchase the note.

MR. CATES: I have no further questions.

MR. STODDART: I have about four. It is coming very close to 12:00.

EXAMINATION BY MR. STODDART:

Q. You said that conversion of the convertible note into stock was not a foregone conclusion at the date of issuance.

In giving that opinion did you know that Heinz Credit, purchaser, taker of the note, had the very day it decided to take the note, also decided to change its business from the business of lending money to the business solely of holding securities of members of the Heinz group?

A. No.

Q. Assuming that's true, would that have changed your opinion about whether this note was more likely at the date of issuance to be converted into Heinz security or to be held for the money?

A. Well, in the note they were holding a security of the Heinz group. They had an option in the note to hold securities of the Heinz group. So I don't see how it would change the opinion at all.

Page 88

Darivoff

Q. What would they do with the money, buy securities at the Heinz group?

A. What money?

Q. The money they got by holding this note to maturity?

A. To maturity, it is quite common for major corporations to have affiliates that are set up to loan money to members of its group and those loans could be represented as notes, securities, any number of things, it's extremely common.

Q. Assume hypothetically that this lending subsidiary which had been doing what you say, decided to get out of that business of lending and was only going to hold securities, would that make any difference?

A. No.

Q. Why not?

A. Dead instruments are securities, I find very little difference between loans and bonds.

Q. Speaking of holding to maturity and getting cash?

A. No. I'm not sure I understand what your condition is or what your question is, but --

Q. Basically, what would it do with the cash?

Page 89

Darivoff

If it isn't going to lend it and it's only business is to hold Heinz securities, would it give the cash to parents as a dividend, would it buy Heinz securities?

A. I couldn't tell you.

Q. It makes no difference to your opinion?

A. No.

MR. STODDART: I have several others, but you do have business to get to. I hate to make you come back for it --

A. I'm hoping I answered the question you just asked. Whether one makes a loan to Heinz or whether one buys a debt security of Heinz, one has effectively lent money to Heinz.

Q. Yes.

A. So, if Heinz Credit Company decided it wasn't aware of this, that they didn't want to structure their inner-company instrument as loans anymore but wanted to structure as securities, perhaps for their ability to sell those to others if they chose to, it wouldn't effect at all the judgment as to whether or not they wanted to convert or didn't want to convert, expected to convert expected not to convert. I just don't see how they

Page 90

Darivoff

relate.

MR. STODDART: We are off the record for the moment.

(Luncheon recess.)

MR. STODDART: We are back on.

THE WITNESS: You were talking about Heinz Capital changing its purpose of business, I think.

MR. STODDART: Yes. I'm going to apologize in advance for having you come back to answer so have few questions and ones you may find a bit silly or obvious.

Q. You stated that you designed the note to be priced to equal the value of the shares being exchanged. By that did you mean the shares with the value they had in the hands of Heinz or shares that would have been valued on the public market at the time?

A. We used a public market valuation.

Q. So you weren't valuing the shares that were held by Heinz that were unregistered?

A. The value realizable by the holder in a public market sale.

Q. Even though Heinz could not have sold

Page 91

Darivoff

these shares in the public market?

A. The shares are easily sold into the public market pursuant to the parent company registering the shares.

Q. These were unregistered at the time, though?

A. That's correct. I don't know that we were aware of that or not aware of that, but the one who holds the shares would want to receive the value that they would get in a public market sale, so that's the way we value the instrument.

Q. Before you valued this instrument, had you valued convertible debt instruments before?

A. Yes, Goldman Sachs is in the business of valuing convertible debt instruments.

Q. I mean you personally?

A. No. I was not personally responsible, solely and personally responsible for the valuation of this security. The security was valued by a number of people at Goldman Sachs who contributed to the determination of the value of the security.

Q. But --

A. And I have been part of teams of people who have participated in the valuation of

Page 92

Darivoff

convertible securities.

Q. What was your role in valuing this particular security?

A. My principal area of work is in the area of high grade debt securities and my principal role in the value of this security was in the valuation of the debt component of the security, whether it was working with the client and the other members of the Goldman Sachs team on the structure and valuation of the security.

Q. Before valuing the security had you ever personally valued the equity portion of a convertible note?

A. In the course of my job at Goldman Sachs I have at times calculated for my own purposes, for the purposes of our clients, estimates of what I believed the bond value and equity value of notes, convertible notes, would be.

Q. Had you done that before valuing this convertible note?

A. Yes.

Q. Has your valuation of the equity component ever diverged from the valuation offered by others at Goldman Sachs?

Page 93

Darivoff

A. My valuations of equity components were typically made in cooperation with others at Goldman Sachs. So, rarely do people at Goldman Sachs work alone in isolation.

So if I was valuing the equity component of a convertible note, I was valuing it with a colleague at Goldman Sachs and I would expect that the two or three or four of us would have reached an agreement as to what we thought the debt value and equity value of that instrument would have been.

Q. You say that the valuation of this convertible note included or took account of the liquidity restriction in the equity portion, how was that inputted, let's say, or included in the convertible bond valuation model?

A. I want to again try to explain that the liquidity issue that we were focussed on in contemplating the value of this instrument, was the liquidity of the instrument itself, the liquidity of the convertible debt securities.

Now, we assess that liquidity based on our confidence that other investors would be willing to buy the instrument and would be able to make a decision reasonably quickly and in terms of what

Page 94

Darivoff

they would be willing to pay and how they would have assessed the terms of the security.

So, the value of the security, we believe, is consistent with what institutional investors would have paid for the security, so that included any liquidity discount that might be associated with the fact that the security was not an SEC registered debt instrument, but a private placement debt instrument.

So when we built up the credit spread that the market would require for a debt instrument of Heinz, we included in that credit spread liquidity and subordination premium for the instrument.

Q. Do you have an opinion about what the spread would have been if there had been a registration of this instrument with the SEC?

A. I think it would have been 15 to 25 basis points per annum lower in yield to maturity which would have been translated into a price difference of approximately 1 to 1.7 percent.

Q. Permit me to say, wow, I'm very impressed.

A. Arithmetic is reasonably quite easy because it is a 7-year zero coupon bond and I'm merely multiplying .15 percent times 7 and

Page 95

Darivoff

.25 percent times 7. So those are the approximate numbers I'm giving you.

And we provided the company with a range of valuations that were, I think in our letter we said 98.7 percent of the stated value to 103 percent of the stated value and, so, we felt like there was appropriate liquidity premium included in the security and built up the credit spread from the senior, the estimated public senior debt levels.

We added 20 to 30 basis points on top of that for subordination, for maturity, for liquidity, which we thought was sufficient additional yield that would create and meet what an institutional investor would look to purchase.

MR. STODDART: I have no more redirect.

EXAMINATION BY MR. CATES:

Q. I said I wouldn't have any questions and I have no specific questions, but, Mr. Darivoff, is there anything at this point that you think you need to say, whether about Goldman's methodology, Goldman's opinions, the Professor's methodology, the Professor's opinions, the floor is yours.

A. Well, I really am struck by the ease with which the Professor in his opinion assumes a

Page 96

Darivoff

liquidity discount in connection with an option that cannot be exercised for a certain period of time.

The professor in looking through his materials does identify the understanding that there are American options and European options, I saw that in one of his footnotes.

But somehow the understanding of how American options and European options are valued is overlooked in his assumption. That an option that cannot be exercised for 3 years is dramatically less valuable than an option that can be exercised any time until expiration, that is quite flawed, substantially inconsistent with the way the market operates, the way parties involved in the market trade and value its instruments and the way fundamental theory values the instruments.

A convertible security, it has limitations on the conversion of the instrument, either as is common in the market contingent convertible securities or an instrument such as the one we structured for Heinz, where the conversion could not be exercised for 3 years, are not valued as if they were employee stock options, which are hindered with substantially more limitations on exercise and the

Page 97

Darivoff

holder's ultimate right to realize the value.

The simple fact that an employee can be fired and lose the value for all the options, I think places a great deal of question as to the ultimately realizable value in those options.

So, the author of the opinion, the expert opinion has taken employee stock option valuation, challenges and difficulties, which is almost entirely a theoretical accounting discussion and has translated that into the real world capital markets where securities are bought and sold and purchased and valued.

And I don't think it translates well.

MR. CATES: Thank you.

MR. WELLEN: Thank you.

THE WITNESS: Sure.

MR. STODDART: Just in case there is an attempt to introduce the deposition at trial, I would move to strike all of that. But in case there isn't, that is just fine with me.

Thank you very much for your testimony, and sorry for having you come back.

I would like to thank both you and Mr. Tomaino for arranging this very nice room.

**PLAINTIFF'S EXHIBIT 1**



Darivoff

MR. TOMAINO: You are very welcome.

MR. CATES: Should we have a stipulation as to the handling of the transcript as we usually do?

MR. STODDART: We can go off the record.

(Discussion off the record.)

MR. CATES: I propose the following stipulation, that a copy of the transcript be provided to the deponent, Philip Darivoff.

That he have 30 days from receipt to review, correct and then sign the version and return it to Mr. Stoddart.

MR. STODDART: Fine.

MR. CATES: Agreed.

(Plaintiffs' Exhibit 2, letter dated March 4, 1998, marked for identification, as of this date.)

(Time noted: 1:28 p.m.)

-o0o-



A C K N O W L E D G E M E N T

STATE OF NEW YORK )
COUNTY OF NEW YORK )

I, PHILIP DARIVOFF, hereby certify, I have read the transcript of my testimony taken under oath in my deposition of April 6, 2005; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

PHILIP DARIVOFF

Subscribed and sworn to before me
this day of , 2005.

NOTARY PUBLIC



C E R T I F I C A T I O N

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

I, DEIRDRE O'MALLEY, a Court Reporter and Notary Public within and for the State of New York, do hereby certify:

That PHILIP DARIVOFF, the witness whose examination is hereinbefore set forth, was duly sworn by me and that this transcript of such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this _______ day of ________, 2005.

DEIRDRE O'MALLEY



I N D E X

WITNESS
PHILIP DARIVOFF


| EXAMINATION BY | PAGE |
|---|---|
| Mr. Stoddart | 4 |
| Mr. Cates | 68 |
| Mr. Stoddart | 87 |
| Mr. Cates | 95 |


E X H I B I T S
(Attached)


| DEFENDANT'S LETTER | DESCRIPTION | PAGE |
|---|---|---|
| A | Letter to HJH Credit Company dated January 16, 1995 from Mr. Darivoff. | 10 |
| B | Document Bates stamped GS 46. | 12 |
| C | Document Bates stamped GS 78. | 14 |
| D | Note to Mr. Darivoff from John Crowe dated July 5, 1994 Bates stamped 1561 and 1562. | 19 |
| E | Excerpt of valuation of the convertible note produced by Professor Gregg Jarrell. | 29 |
| F | Letter to H.J. Heinz Credit Company dated April 13, 1995, Bates stamped GS 27 to GS 34. | 36 |
| G | Letter to Paul Renne dated August 22, 1994 from James Ziperski of Goldman Sachs, Bates stamped GS 42. | 38 |
| H | Document Bates stamped GS 48. | 65 |
| I | Document Bates stamped GS 49. | 65 |