No. 03-2847 T
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

H.J. HEINZ COMPANY AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
ROBERT STODDART
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Station
Washington, DC 20044
TEL: (202) 307-6445
FAX: (202) 514-9440

[Electronically filed on November 28, 2005]

## TABLE OF CONTENTS

*Page*

***I. Statement of the facts the defendant expects to prove*** . . . . . . . . . . 2

*A. Before the transaction at issue, state-tax considerations and corporate policy determined that the participation of Heinz Credit Company (HCC) would render the transaction a sham* . . . . . . . . . . 2

*1. Heinz formed HCC to shelter interest income from state taxation.* . . . . . . . . . . 3

*2. Heinz formed H.J. Heinz Leasing Company (Leasing), HCC's primary shareholder, to shelter leasing income from state taxation.* . . . . . . . . . . 5

*3. Heinz imposed operating procedures upon HCC and Leasing that required them to pay all their unneeded cash to Heinz.* . . . . . . . . . . 7

*4. Heinz grew anxious about the state-tax status and mounting potential state-tax arrearages of HCC and Leasing.* . . . . . . . . . . 9

*5. To end its state-tax worries, Heinz stripped HCC of its lending business, the only business in which it needed cash. Thus, HCC became a mere cash conduit from its own subsidiaries to Heinz, and Heinz would retain control of any property it gave to HCC.* . . . . . . . . . . 11

*B. When Heinz repurchased its stock through HCC, Heinz frustrated most of the repurchase-plan's declared purposes, increased the transaction costs, and gained no real non-tax benefits.* . . . . . . . . . . 12

*1. When HCC bought Heinz shares, Heinz could not use the shares for its corporate purposes.* . . . . . . . . . . 13

*2. By participating along with Heinz in the stock-repurchase plan, HCC increased the cost and complexity of the plan.* . . . . . . . . . . 14

[Table of Contents, continued] *Page*


*3. No independent third party would have agreed to participate in the stock-repurchase plan under the terms HCC was forced to accept.* . . . . 16

*C. When Heinz traded its Note for HCC's stock, the parties' economic situation remained the same, and the purported "exchange" frustrated its declared purpose.* . . . . 18

*1. HCC was a mere holding company when it accepted the Note.* . . . . 19

*2. HCC was obliged to pay Heinz all of its unneeded cash when it accepted the Note–and as a mere holding company, it needed little cash.* . . . . 19

*3. HCC sold its remaining stock for an economic profit, and Heinz claimed a large tax loss.* . . . . 20

*4. Leasing soon merged into HCC, cementing HCC into its status as a passive holding company.* . . . . 20

*5. HCC converted the Note to Heinz shares–the only product of the Note it could have retained–thus frustrating Heinz's expressed purpose for buying HCC's shares.* . . . . 21

***II. The issues of fact and law to be resolved by the Court*** . . . . 22

***III. Applicable legal principles and the defendant's response to Heinz's arguments*** . . . . 23

*A. If a taxpayer uses a controlled corporation to generate a loss, the loss is not deductible unless the parties demonstrate a genuine business purpose.* . . . . 25

*B. The courts have refused to recognize "business purposes" that actually existed, but that had little weight in motivating the transfer of assets among controlled corporations.* . . . . 27

*1. The desire to strengthen its "substance" did not motivate HCC to buy Heinz stock from the public.* . . . . 29

[Table of Contents, continued] *Page*


2. *By acting in a commercially unreasonable manner, HCC demonstrated that it had no genuine profit motive.* . . . . . 30

C. *HCC could not shift the basis of its sold shares to its retained shares, because Heinz kept all the benefits of the Note and did not redeem HCC's shares within the meaning of Code § 317(b)* . . . . . 31

D. *For tax purposes, the Court should ignore the intra-corporate "sale" of HCC's shares for Heinz's Note because Heinz had no non-tax business purpose for inserting HCC into its stock repurchase plan.* . . . . . 34

CONCLUSION . . . . . 36


## TABLE OF AUTHORITIES

Cases:


*ACM P'ship v. Comm'r*, 115 F.3d 231 (3d Cir. 1998) . . . . . 33

*Del Commercial Properties, Inc., v. Commissioner,* 251 F.3d 210 (D.C. Cir. 2001) . . . . . 35

*Dietzsch v. United States*, 498 F.2d 1344 (Ct. Cl. 1974) . . . . . 34

*Geoffrey, Inc., v. S.C. Tax Comm'n*, 437 S.E.2d 13 (S.C.), *cert. denied*, 510 U.S. 992 (1993) . . . . . 11

*George E. Warren Corp. v. United States,* 141 F. Supp. 935 (Ct. Cl. 1956) . . . . . 30

*Gregory v. Helvering,* 293 U.S. 465 (1935) . . . . . 25, 26, 33

*Higgins v. Smith*, 308 U.S. 473 (1940) . . . . . 26, 28, 33

*Investers Diversified Servs., Inc., v. Comm'r,* 325 F.2d 341 (8th Cir. 1963) . . . . . 31

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*, 599 N.W.2d 721 (Iowa 1999) . . . . . 17

*Long Corp. v. United States*, 298 F.2d 450 (Ct. Cl. 1962) . . . . . 30

*National Lead Co. v. Commissioner*, 336 F.2d 134 (2d Cir. 1964), *cert. denied,* 380 U.S. 908 (1965) . . . . . 30-31

*Northern Pacific Railway Co. v. United States*, 378 F.2d 686 (Ct. Cl. 1967) . . . . . 27-29, 30

*Scully v. United States*, 840 F.2d 478 (7th Cir. 1988) . . . . . 31

*The Falconwood Corp. v. United States*, 422 F.3d 1339 (Fed. Cir. 2005) . . . . . 34-35

*United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968), *cert. denied,* 393 U.S. 1094 (1969) . . . . . 29

[Table of Authorities, continued] *Page*

Statutes:

Internal Revenue Code (26 U.S.C.):
§ 165 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
§ 168 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
§ 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§ 317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23, 31-34
§ 318 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§ 482 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
§ 1011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§ 1059 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§ 7508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Session Laws:
Black Lung Benefits Revenue Act of 1981, Pub. L. No. 97-119,
95 Stat. 1635 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Economic Recovery Tax Act of 1981, Pub. L. No. 97-34,
95 Stat. 172 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Revenue Act of 1928, ch. 852, 45 Stat. 791 . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248,
96 Stat. 324 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Delaware Code Annotated:
Tit. 30, § 1902 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Regulations:

Treasury Regulations (26 C.F.R.):
§ 1.165 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
§ 1.301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31
§ 1.302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§ 1.1059 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§ 1.1502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Miscellaneous:

Alvin C. Warren & Alan J. Auerbach, *Transferability of Tax Incentives and the Fiction of Safe Harbor Leasing*, 95 Harv. L. Rev. 1752 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

John E. Gaggini, John A. Biek, Theodore R. Bots, *State Taxation of Passive Income Subsidiaries*, 447 PLI/Tax 489 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 03-2847 T
(Judge Allegra)

H.J. HEINZ COMPANY AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to RCFC App. A, ¶ 14(b), and the Court's Order of October 17, 2005, the defendant, the United States, presents this memorandum of contentions of fact and law.

The plaintiff, H.J. Heinz Company (Heinz), demands a refund of $42,586,967 attributable to the carryback of an asserted 1995 capital loss of $124,134,139. The transaction that generated the "loss" actually produced an economic profit of $6,372,111–by Heinz's reckoning. The transaction proceeded like this: Heinz had a subsidiary buy Heinz common stock from the public for $130,983,103; Heinz "redeemed" almost all of that stock from the subsidiary; finally Heinz had the subsidiary sell the few remaining shares to a third party for $6,966,120. Heinz now asserts that tax law transferred the basis of all the subsidiary's stock to the few shares it sold to the third party.

Heinz created a tax loss on paper by arranging what it calls an "exchange [of the subsidiary's Heinz stock] for property" (Internal Revenue Code § 317(b) (Code)). But the subsidiary's circumstances and operating policies show that the exchange was essentially a

pantomime, a shifting of papers from one corporate pocket to another. The subsidiary could not benefit from the property it appeared to receive, and after three years Heinz returned to HCC the stock it had purported to buy plus the equivalent of 185,000 shares more–a result that was foreseeable from the beginning. Thus there was no redemption as the statute defines it, and Heinz is entitled to no refund.

To understand the transaction at issue, the Court must first understand the complex history of the subsidiary Heinz employed to buy and sell the stock, H.J. Heinz Credit Company (hereinafter HCC).

## *I. Statement of the facts the defendant expects to prove*

Heinz is the parent of an affiliated group of corporations (the Heinz group).

### *A. Before the transaction at issue, state-tax considerations and corporate policy determined that the participation of Heinz Credit Company (HCC) would render the transaction a sham.*

Heinz can borrow money in the market at more favorable rates than its subsidiaries, and before 1982 its practice was to borrow money itself and then lend its subsidiaries the working capital they needed. They paid interest to Heinz on their loans, and Heinz reported their payments as income. Because the Heinz group files a consolidated federal return, the intra-corporate payments did not affect the group's federal income-tax liability. *See generally* 26 C.F.R. (Treas. Reg.) § 1.1502-14(a).

Certain states ("unitary" states) also permit consolidated filing.[1] Other states, however–the "non-unitary" states–do not permit consolidated returns; instead, if a group member does business in the state, that member must file a separate return. Heinz is based in Pennsylvania, a non-unitary state, which does not exclude intra-corporate interest payments from the recipient's taxable income. Accordingly, Heinz included its subsidiaries' interest payments in its own state taxable income; and the subsidiaries in non-unitary states deducted from their state taxable income the interest they paid to Heinz. During its 1982 fiscal year,[2] Heinz collected $24.5 million of interest from its subsidiaries, which increased its state tax liability by $874,650 for Pennsylvania alone. The defendant has no data for other states.

*1. Heinz formed HCC to shelter interest income from state taxation.*

In 1983, Heinz's tax lawyers proposed that Heinz should finance its subsidiaries through a Delaware holding company. Delaware law exempts corporations from income tax if their–

> activities within this State are confined to the maintenance and management of their intangible investments . . . and the collection and distribution of the income from such investments or from tangible property physically located outside this State. For purposes of this paragraph, "intangible investments" shall include, without limitation, investments in stocks, bonds, notes and other debt obligations (including debt obligations of affiliated corporations) . . . .

Del. Code Ann. tit. 30, § 1902(b)(8). Heinz's lawyers anticipated the following benefits: (1) the

---

1 The defendant will refer to states as "unitary" if they permit affiliated corporations to file a single return and "non-unitary" if they require separate returns for individual group members. The defendant is adopting the practice of Heinz's tax planners, but the distinction can be more subtle. *See generally* John E. Gaggini, John A. Biek, Theodore R. Bots, *State Taxation of Passive Income Subsidiaries*, 447 PLI/Tax 489, 513-17 (1999) (listing and discussing state requirements).

2 Heinz's fiscal and taxable years comprise 52 or 53 weeks and end on the Wednesday closest to April 30.

Delaware subsidiary's interest income would be exempt from Delaware tax; (2) the Delaware subsidiary could funnel money it collected to Heinz as a tax-free dividend, because Pennsylvania law exempts intra-corporate dividends from tax (Heinz does business in about thirty other states that exempt intra-corporate dividends); and (3) Heinz subsidiaries could continue to deduct their interest payments from their own state taxable income even though the Delaware subsidiary would include no corresponding income in its state return. The director of Heinz's tax department, John C. Crowe (Mr. Crowe) referred to this arrangement as "the quintessential double dip." His department estimated that Heinz would have saved about $1,132,880 in state income tax for its 1982 fiscal year if it had used a Delaware holding company to finance its subsidiaries' activities.

Accordingly, on September 15, 1983, Heinz formed HCC as a Delaware holding company and had HCC finance the activities of Heinz's domestic subsidiaries. Heinz owned all 1,000 shares of HCC's outstanding stock.

HCC, however, was little more than a room, a letterhead, and a bank account. A Delaware corporate service company performed certain ministerial acts for HCC (and for hundreds of similar corporations), but Heinz did not commit the finances of the Heinz group to these rented employees; instead, Heinz itself made every substantive decision for HCC. As early as November 29, 1984, a Heinz tax lawyer warned her superiors that HCC lacked sufficient substance and nexus to Delaware to survive scrutiny by Pennsylvania tax authorities, who might attribute HCC's income to Heinz on the theory that the two corporations were essentially a single entity. On July 3, 1985, she repeated her warning and suggested that Heinz management should

give HCC more substance. But instead of strengthening its existing Delaware holding company, Heinz formed another.

### 2. *Heinz formed H.J. Heinz Leasing Company (Leasing), HCC's primary shareholder, to shelter leasing income from state taxation.*

During its 1982 and 1983 fiscal years, Heinz entered several sale-and-leaseback transactions under the "safe-harbor lease" provisions that Congress enacted in the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, Title II, § 201(a), 95 Stat. 172, 203 (1982) (adding former § 168(f)(8) to the Code, for a short while).[3] Under these arrangements, Heinz bought property from companies that needed cash and that had too little taxable income to profit from the credits and depreciation deductions to which ownership of the property entitled them. Among many other items, Heinz bought U.S. Steel's coke-battery facilities in Clairton, Pennsylvania. Heinz paid the purchase price with a negotiated amount of cash and a nonrecourse note. Heinz then leased the property back to the original owner for payments equal to what Heinz owed on the note. After the first payment, no cash changed hands. Because the safe-harbor provisions recognized Heinz as the property's owner for tax purposes, Heinz was able to use any available credits and to deduct the depreciation and the interest "payments" due under the note.[4]

The safe-harbor leases generated tax benefits for about the first five years, but in the sixth year (Heinz's 1987-88 fiscal years), the lessees' fictitious lease payments began to exceed

---

[3] Congress repealed the safe-harbor-lease provisions in the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, Part II, § 209, 96 Stat. 324, 442.

[4] For a general discussion of safe-harbor sale-leaseback transactions, see Alvin C. Warren & Alan J. Auerbach, *Transferability of Tax Incentives and the Fiction of Safe Harbor Leasing*, 95 Harv. L. Rev. 1752, 1762-63 (1982).

Heinz's deductions. Heinz could not avoid recognizing the imputed income for federal purposes, because Congress had required both lessors and lessees to file informational returns disclosing the leases. See Black Lung Benefits Revenue Act of 1981, Pub. L. No. 97-119, § 112, 95 Stat. 1635, 1640-41. But Heinz had not disclosed the leases to the states; Heinz reported its claimed deductions and credits as totals on the state returns, without specifying the sources.

Heinz's tax lawyers wondered if HCC might be able to shelter the safe-harbor lease income from state taxation just as it had been sheltering interest income. If Heinz could transfer the leases to HCC, they estimated that Heinz would save about $9,700,000 in state taxes over its 1987-1991 fiscal years.

Heinz eventually decided not to contribute the leases to HCC, for several reasons: Heinz feared that HCC might become taxable by non-unitary states in which the leased property was located; and Heinz would have to recognize about $150 million in income if it transferred the leases because at the same time it would be transferring debt represented by the non-recourse notes. Heinz realized that it must transfer assets along with the leases, and that the assets would need a tax basis of at least $150 million. Because the assets would lose their basis by offsetting the liability and would therefore cause a large taxable gain if sold, Heinz decided to transfer the only asset it knew it would never sell–stock in its financing subsidiary, HCC.

Accordingly, on July 10, 1986, Heinz established a new Delaware holding company, Heinz Leasing Company (Leasing), to which it transferred both its 1982 safe harbor leases and 500 shares of HCC. Heinz was Leasing's sole shareholder. On October 7, 1987, Heinz transferred to Leasing the 1983 leases and Heinz's remaining 500 shares of HCC. Leasing then became HCC's sole shareholder.

After this reorganization, however, HCC still needed capital contributions from Heinz to finance the subsidiaries' operations, and the intermediate corporation complicated the accounting. On November 4, 1987, Mr. Crowe addressed the difficulty in a memo to a subordinate:

> You raise a good question. To keep things clean, I will have HLC [Leasing] sell one share of HCC common stock to Heinz for par value. Future increases of loan balances (always supported by proper board action at HCC) could be reflected as an increase in the Heinz investment in this single share. Capital reductions must, however, be reflected on a per-share basis with Heinz receiving a small portion and the balance flowing through HLC.
>
> It is my ultimate hope to merge HCC and HLC, but that must await, among other things, resolution of tax proposals currently before Congress.

Meanwhile, Heinz's tax lawyers continued to worry about the Delaware companies' lack of substance. On March 18, 1987, Mr. Crowe told Heinz's treasurer, Paul F. Renne, that HCC and Leasing should both be billed for the management services Heinz performed in their names. He "believed that a fee would help to give [the companies] more substance."

*3. Heinz imposed operating procedures upon HCC and Leasing that required them to pay all their unneeded cash to Heinz.*

Mr. Crowe also proposed that HCC and Leasing should follow written procedures of their own, and on October 19, 1988, he circulated a draft captioned "H.J. HEINZ CREDIT COMPANY [/] H.J. HEINZ LEASING COMPANY [/] Operating Procedures." One suggested procedure provided: "If the company has excess cash which is not expected to be *redeployed as a loan* in the near future, a dividend should be declared." (Emphasis added.) The company's assistant treasurer was to propose the dividend using a form attached to the draft procedures as Exhibit E, which provides:

EXHIBIT E

[Heinz Credit/Leasing Letterhead]

To: Board of Directors
From: Vice President
Subject: Cash Position

Based upon analysis of the Company's cash flow position, I estimate that there will be $_______ of uninvested cash on hand on _(date)_ which will not be needed to pay liabilities or to make loans. Accordingly, the Board should consider declaring a dividend of $__________ payable on ________.

On March 13, 1989, Mr. Crowe circulated the final version of the operating procedures, which contains the same Exhibit E. Under the final version, Leasing was expected to declare a dividend if it had cash on hand not needed to pay bills–so Mr. Crowe stated during a deposition. Leasing and HCC followed identical procedures.[5]

HCC seldom had unneeded cash on hand because it continued to lend money to Heinz's domestic subsidiaries.[6] In fact, Heinz often contributed funds to support HCC's lending business –as long as HCC operated a lending business. But around the time of the transactions before the Court, Heinz decided that HCC should abandon that business because of state-tax considerations.

---

5 The Court permitted a second deposition of Mr. Crowe so that the defendant could inquire about Heinz Leasing Company, which Heinz disclosed (after discovery ended) to be HCC's principal shareholder. Heinz's attorney ordered Mr. Crowe not to answer questions about HCC, but the defendant points out that Exhibit E refers to HCC as well as to Leasing–and Leasing did not make loans.

6 HCC's active business was finance. In 1992, however, Heinz contributed the stock of several foreign subsidiaries to HCC, which then assumed what Heinz calls "the additional role of holding company."

*4. Heinz grew anxious about the state-tax status and mounting potential state-tax arrearages of HCC and Leasing.*

On March 2, 1989, a member of the Heinz tax department reported that the Pennsylvania Department of Revenue was about to audit the tax returns for Heinz's 1987 fiscal year. She worried that the auditors might treat HCC, Leasing, and Heinz as a single entity because HCC and Leasing lacked sufficient substance and nexus with Delaware. She estimated the tax arrearages for 1987 alone to be: (1) for Leasing–$205,000 if the auditors attributed a portion of Leasing's income to Pennsylvania and $587,000 if they assumed that Leasing did all its business there; (2) for HCC–$322,000 if the auditors attributed a portion of its income to Pennsylvania, and $920,000 if they treated HCC as conducing all of its business there. She warned that the auditors would make similar adjustments for fiscal year 1988 if they questioned the 1987 returns. The auditors, however, did not raise the issue.

On April 10, 1990, Mr. Crowe sent a memorandum to Heinz's treasurer insisting that Heinz should hire a person qualified to make important decisions for HCC and Leasing in Delaware rather than "a person who merely parrots instructions from Pittsburgh and copies accounting reports prepared here . . . ." He estimated that Heinz had a potential tax exposure of $20 million. During the same month, Mr. Crowe gave a slide presentation that summarized in these words the tax difficulties faced by HCC and Leasing:

> [F]rom inception to the end of FY 89 $100 million of income has been sheltered from Pennsylvania tax. We estimate that as of the end of FY 90 the total exposure to state tax, interest, and penalties is $20 million. (This is also a rough measure of the benefit that the Company has derived from this structure.)

> In order to collect this tax Pennsylvania would have to successfully assert either
>
> (a) that HCC is a sham company that should be treated as part of Heinz, or
>
> (b) that HCC is doing business in Pennsylvania.
>
> Because of the lack of substance in HCC is it highly likely that the state would win such an argument. Because of the fact that HCC does not file tax returns in Pennsylvania, the statute of limitations will never expire.
>
> Nothing can be done about the lack of substance in prior years. We must simply hope that our luck holds.
>
> If the Company is not willing to take the steps required to create substance, then it is my strong recommendation that HCC and HLC [Leasing] be liquidated.

Heinz eventually hired James A. Backo to be president of both HCC and Leasing. (The two companies also had identical boards of directors.) Mr. Backo worked in Delaware.

Despite this infusion of what Heinz considered to be substance, state auditors began to notice the infirmities of HCC and Leasing. On May 17, 1993, a member of the Heinz tax department reported that Connecticut proposed to combine HCC and Leasing with Heinz on the ground that the Delaware corporations had no payroll or operating expenses during the fiscal years 1988 through 1990 (Heinz contested that assertion). On November 10, 1993, Massachusetts proposed to add Leasing's income to Heinz's for fiscal years 1988 through 1991 on the ground that the lease assignments lacked economic substance. On February 11, 1994, New York proposed adjustments to Heinz's return arising from the treatment of HCC and Leasing. And on August 24, 1994, a member of the Heinz tax department reported her suspicion that North Carolina auditors would include Heinz, HCC, and Leasing in combined returns for fiscal years 1989 through 1992.

These tax difficulties also affected Heinz's corporate structure. On June 23, 1992, Heinz's tax department began to research the state-tax effects of a merger of Leasing with HCC. On August 17, 1992, Heinz's manager of state taxation advised against the merger because several non-unitary states "take the position that the ownership of SHL [safe-harbor lease] property creates sufficient nexus with the state so as to subject the lessor (owner) to tax." Heinz did not want to risk making HCC taxable, so it kept Leasing separate from HCC despite the inconvenience.

*5. To end its state-tax worries, Heinz stripped HCC of its lending business, the only business in which it needed cash. Thus, HCC became a mere cash conduit from its own subsidiaries to Heinz, and Heinz would retain control of any property it gave to HCC.*

While Heinz was preparing and executing the federal tax-planning contrivance that it has brought before this Court, it was also considering ways to shield HCC from state attack. The Supreme Court of South Carolina had recently approved imposing taxes on a Delaware holding company that lacked any conventional connection with the state. *See Geoffrey, Inc., v. S.C. Tax Comm'n*, 437 S.E.2d 13 (S.C.), *cert. denied*, 510 U.S. 992 (1993) (Delaware trademark subsidiary had taxable nexus wherever the licensee parent used a trademark and paid a royalty). Afterwards, state auditors routinely asked corporations if they had Delaware subsidiaries. Heinz finally decided that it could no longer use HCC to shelter intra-corporate interest payments from tax in non-unitary states. Instead, Heinz would establish a new, taxable financing subsidiary based in a unitary state.

In late 1994 and early 1995, Heinz developed "Project Turbo," a complex re-financing of Heinz affiliates that aimed to extricate HCC from its lending business. The final plan, in its basic

outline, was as follows: (1) Heinz and HCC form a new corporation, Heritage International, Inc. (Heritage), in Idaho; (2) Heinz advances to its subsidiaries enough credit to repay existing loans from HCC; (3) HCC contributes to Heritage all of the funds it collects; (4) Heritage makes new loans to the subsidiaries at current market rates; (5) The subsidiaries use the loans to repay the advances from Heinz; and (6) Heinz contributes about $900 million to Heritage's capital. In a memorandum dated January 27, 1995, Heinz summarized the expected result in this way:

> At the end of the day, [Heinz] and HCC will own 100% of [Heritage], an Idaho corporation, which holds receivables from affiliates of approximately $2.4 billion. . . . HCC will be out of the lending business and will, henceforth operate merely as an investment company holding some [Heinz] common stock, a [Heinz] convertible note, and the common shares of several foreign affiliates . . . .

On January 10, 1995, HCC's board resolved to abandon the lending business. On January 18, 1995, Heinz and HCC carried out the stock "redemption" at the heart of this case.

HCC's corporate policies and structure made the redemption a sham. Before discussing the redemption, however, the defendant will briefly show how HCC acquired its Heinz stock and will show that the purchase was motivated solely by the desire for tax benefits.

*B. When Heinz repurchased its stock through HCC, Heinz frustrated most of the repurchase-plan's declared purposes, increased the transaction costs, and gained no real non-tax benefits.*

Heinz has often repurchased its own stock from the public. On June 9, 1993, Heinz's chief financial officer asked the board of directors to authorize the repurchase of another 10,000,000 shares of Heinz common stock, and he gave the following reason for the repurchase program (emphasis added):

> Mr. Williams stated that though as of April 30, 1993, the Company held approximately 33,026,008 shares of Common Stock in the Treasury which were *purchased for the purpose of* issuing shares under the Company's Stock Option

> Plans, as contributions to the Trustee of the Company's Employees Retirement and Savings Plan, and to those holders of the Company's Third Cumulative Preferred Stock, $1.70 First Series, who convert their shares into the Common Stock of the Company, *additional shares will be needed for other corporate purposes*.
>
> Moreover, Mr. Williams, in commenting upon the advantages of a stock repurchase program noted that the purchases of the Company's Common Stock would increase current and future levels of earnings per share; improve return on equity; and enhance the intrinsic value and appreciation potential of shares of Common Stock outstanding.

The board authorized the new repurchase program.

Sometime before July 1, 1994, while Heinz was still making the purchases authorized the year before, Mr. Crowe, the director of the tax department, had an idea. The first person to whom he revealed his idea was not an employee of Heinz: he was Heinz's outside tax lawyer, Robert Wellen, of Ivins, Philips & Barker. Only after discussing the idea with Mr. Wellen did Mr. Crowe explain it to Heinz officials. He suggested that HCC should participate in Heinz's stock repurchase plan: once HCC had purchased 3,500,000 shares, Heinz would buy 95% of those shares from HCC for a convertible note, transfer the basis of that 95% to the shares HCC continued to hold, have HCC sell the remaining 5% to a third party before the short-term capital-gain period could run, and then claim a large tax loss. The idea presented difficulties from the beginning, and at every stage HCC's participation appeared awkward and tax-driven. Heinz and HCC had no real non-tax purpose for arranging its stock-repurchase plan in this way.

*1. When HCC bought Heinz shares, Heinz could not use the shares for its corporate purposes.*

If HCC were to buy Heinz stock from the public, Heinz knew it could not use the stock for any of the corporate purposes that had justified the earlier repurchase plans. At most, HCC's

purchases would improve earnings per share, but Mr. Williams listed this as "one of the *advantages* of a share repurchase program," not as one of the purposes (emphasis added). If Heinz wanted to accomplish its stated purposes–to issue the shares to its stock-option plan, to contribute them to its employee retirement plan, to issue them to holders of its convertible preferred shares, or to meet any other need of its own–Heinz would first have to repurchase the same shares yet again, this time from HCC. Heinz would not have inserted another corporation between itself and the stock if it had really wanted the stock for its own corporate purposes.

*2. By participating along with Heinz in the stock-repurchase plan, HCC increased the cost and complexity of the plan.*

On July 13, 1994, Heinz's board of directors authorized HCC to participate in the 1993 stock-repurchase plan; it also authorized HCC to borrow up to $40 million to finance the purchases. On August 2, 1994, the HCC board resolved to have HCC purchase up to 1,100,000 shares of Heinz common stock (the amount remaining to be purchased under the 1993 authorization). The board also authorized HCC to borrow up to $40 million. HCC soon purchased the 1,100,000 shares. On September 13, 1994, the Heinz board authorized both Heinz and HCC to purchase up to another 10,000,000 shares for the same purposes claimed in Heinz's resolution of June 9, 1993; and Heinz authorized HCC to borrow an additional $30 million to finance the purchases. On September 20, 1994, the HCC board amended its earlier resolution to permit HCC to purchase up to 3,500,000 shares of Heinz stock and to borrow up to $70 million.

Before participating in the 1993 and 1994 stock-repurchase plans, HCC had never borrowed money from a commercial lender or purchased stock on the open market. After buying the authorized 3,500,000 Heinz shares, HCC never again borrowed money or purchased stock. To

make Mr. Crowe's tax-planning contrivance possible, HCC incurred the following costs for the first and only time in its existence: HCC paid Dillon Read, a brokerage firm, to purchase the stock; HCC paid Mellon Bank to open a custody account and enter an institutional asset services agreement; and HCC paid both interest and commitment fees to Morgan Guaranty Trust Company for advancing money used to buy the stock.

Heinz itself has never borrowed money specifically to fund stock repurchases, though it frequently borrows to cover cash shortfalls. Mr. Crowe insists that HCC was able to borrow on terms that were as favorable as what Heinz itself could have negotiated, but his assertion conflicts with other statements Heinz has made about the borrowing costs of its subsidiaries. *See* page 2, *supra*. At the very least, HCC had to duplicate the work Heinz was already performing. Yet Heinz asserts that it had a non-tax motive for involving HCC in its stock repurchase plan.

HCC itself asserts that it borrowed money and bought Heinz stock in 1994 for two non-tax reasons: (1) to enhance its "substance" as a Delaware holding company; and (2) to make a profit. Yet from March of 1987 through April of 1990, when Heinz's tax division agonized about HCC's lack of substance and made various proposals, no one suggested that HCC could achieve "substance" by borrowing money and buying Heinz stock. In 1993, the Supreme Court of South Carolina had upheld taxation of a Delaware holding company–regardless of its "substance"–if it had financial dealings in the taxing state. HCC had financial dealings and intangible property (debt) wherever it had borrowers. By the time HCC joined the repurchase program, the question of "substance" seems to have become less pressing; and after it purchased the 3,500,000 shares, HCC never again sought to buttress its substance by borrowing money or purchasing stock. Furthermore, if HCC's motive was to make a profit, it chose a uniquely unsuitable investment.

3. *No independent third party would have agreed to participate in the stock-repurchase plan under the terms HCC was forced to accept.*

When HCC's board first considered buying Heinz common stock, one of the members noted that HCC was an affiliate of Heinz, and thus "the purchase of Heinz Common Stock must be done in compliance with all laws and regulations which are applicable to repurchases of stock by Heinz [itself] . . . ." Under securities law, when Heinz or any of its affiliates buys Heinz shares, those shares become unregistered securities and cannot be sold publicly. Therefore HCC knew that it would have to buy the Heinz stock on public exchanges at the current market price, but that it could not sell the stock on public exchanges at the current market price unless Heinz first registered a new issuance of the stock with the Securities and Exchange Commission. Heinz offered no guarantee that it would register the shares, and HCC insisted on no guarantee. (When HCC did sell a small portion of the stock to a third party, it had to use a private placement and accept a 4% discount from the market price even though Heinz promised the purchaser in writing that it would register the stock within 180 days of the sale.) Yet HCC asserts a profit motive.

Furthermore, Heinz claims to have redeemed 3,250,000 shares of its stock from HCC with a convertible note (the Note). Goldman, Sachs & Co. designed the Note to Heinz's specifications, which included written suggestions by Heinz's outside tax counsel. Goldman, Sachs then advised HCC that the Note was worth exactly what Heinz wanted it to be worth–the current market price

of the redeemed shares. This is a classic conflict of interest.[7] Or rather, it would have been a conflict of interest if Heinz and HCC had been an actual buyer and an actual seller. As any independent appraiser would have told HCC, the Note was worth less than the current market price of HCC's Heinz stock–worth even less than what HCC had paid for it.

The Note was a zero-coupon instrument convertible–three years after issuance–into the equivalent of 3,510,000 Heinz common shares (185,000 more shares than HCC exchanged for the Note). It accrued interest of 6% per year, compounded semi-annually, and would pay $197,402,412.78 at maturity, which was to have been seven years after issuance. Goldman, Sachs valued the straight-debt portion of the Note at about $109.58 million–the present value of the payout amount discounted by 8.75%, which Goldman, Sachs considered to be the market rate Heinz would have to offer the public in order to place a comparable straight-debt security. The defendant does not contest that part of Goldman, Sachs's valuation. But Goldman, Sachs valued the equity portion of the Note (the conversion feature) as if the Note were liquid, *i.e.*, readily tradeable in an existing market. Goldman, Sachs calculated no discount for the Note's illiquidity.

At trial, the defendant will offer the opinion of Prof. Gregg Jarrell, former chief economist of the Securities and Exchange Commission and now Professor of Economics and Finance at the University of Rochester's William E. Simon Graduate School of Business. Prof. Jarrell will

---

[7] A lawyer would face sanctions for allowing this sort of conflict. *See*, *e.g.*, *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*, 599 N.W.2d 721, 726 (Iowa 1999) (imposing three-month suspension, despite lawyer's limited disclosure of conflict) ("[T]he differing interests between buyer and seller are obvious, and price is only one of many areas in which those interests differ: The process by which a buyer and seller of property transact their business is fraught with conflicts of interests. Indeed, a lawyer's simultaneous representation of a buyer and a seller in the same transaction is a paradigm of a conflict of interest").

explain why the Note's illiquidity lowered the value of the option on the date of issuance.

The defendant, however, considers the proposition self-evident; and Heinz itself has recognized the principle that illiquid securities are worth less than securities that are tradeable without restriction.[8] In the defendant's view, Heinz will have to argue that a right to receive 3,510,000 shares at any time within three years is worth no more that than a right to receive 3,510,000 shares only after three years.

Adding the true value of the option to the value of the straight-debt component, Prof. Jarrell values the Note at $121.82 million. HCC had paid $124.2 million for the 3,325,000 Heinz common shares it was forced to exchange for the Note.

### *C. When Heinz traded its Note for HCC's stock, the parties' economic situation remained the same, and the purported "exchange" frustrated its declared purpose.*

HCC had purchased its 3,500,000 shares of Heinz common stock by the end of November, 1994. On January 10, 1995, Heinz's treasurer made the following proposal to the Heinz executive committee (emphasis added):

> Mr. Williams indicated HCC had repurchased 3,500,000 shares under the program. He recommended that the Company at this time offer to purchase 3,325,000 shares from HCC. Mr. Williams said that the purchase would *move the shares into the Company's treasury* where they would be available for stock option exercises and other transactions requiring shares and would also enable the Company to discontinue paying dividends on the shares that it purchases from HCC.

---

[8] On April 28, 1998, soon after conversion became possible, HCC converted the Note to Heinz common stock, which it held until November 12, 2002. HCC then exchanged the common stock for shares of Heinz's Third Convertible Preferred Stock, Third Series, which Heinz issued solely to redeem Heinz common stock held by its subsidiaries. When Heinz considered what the new stock should yield, it added 60 basis points to the yield on comparable securities "to account for the fact that the Preferred Stock is *privately held and illiquid as opposed to trading publicly on a national exchange.*" (Emphasis added.)

Mr. Williams suggested that the purchase price should be the January 13, 1995, closing price of Heinz stock on the New York Stock Exchange, and that the price should be paid using the Note just described. The executive committee accepted the proposal.

*1. HCC was a mere holding company when it accepted the Note.*

Also on January 10, 1995, HCC's board of directors accepted Heinz's offer. At the same meeting, one of HCC's directors stated–

> that due to changing views among the states regarding the treatment of Delaware holding companies, the directors of the company have resolved to demand repayment of all affiliate loans, and discontinue all Delaware holding company lending activities as soon as reasonably possible.

On January 18, 1995, HCC accepted the Note and transferred 3,325,000 of its 3,500,000 shares to Heinz. HCC had been destined to be a passive holding company for over a week; it would have no active business. Its only function was to hold the stock of Heritage, the Heinz group's new financing company, the stock of certain foreign Heinz subsidiaries, and the Note.

*2. HCC was obliged to pay Heinz all of its unneeded cash when it accepted the Note–and as a mere holding company, it needed little cash.*

After January 10, 1995, HCC would never again be able to deploy cash as a loan. It would receive dividends from its own subsidiaries, and under its corporate policies it would have to pay all its unneeded cash to its shareholders–ultimately to Heinz. (Leasing was HCC's majority shareholder, but whatever money Leasing received it passed directly to Heinz in one form or another, either as dividends or as payments of the intercorporate loans Heinz booked to cover Leasing's share of the group's consolidated tax liability.) Even before HCC accepted the Note, it owned more than enough sources of income to pay its modest bills. Therefore, when HCC accepted the Note, HCC was bound to pay Heinz any cash the Note would generate: Heinz would

collect the payout if HCC held the Note to maturity; Heinz would collect the capital gain if HCC sold the Note or the stock issued upon conversion; and Heinz would collect the dividends paid on that stock. In economic effect, Heinz never parted with the Note.[9]

3. *HCC sold its remaining stock for an economic profit, and Heinz claimed a large tax loss.*

On April 12, 1995, Heinz's treasurer asked the board to approve HCC's plan to sell its remaining 175,000 Heinz shares to a third party in a private placement. "Mr. Williams said that the shares would be sold at current market price less a discount to be negotiated because the shares would not be initially registered under the Securities Act of 1933." The board approved the sale. HCC had purchased those 175,000 shares for $6,778,098 and it incurred disposal costs of $117,156 (including the cost of SEC registration). HCC sold the shares for $6,966,120, a 4% discount from the current market price. In the eyes of the world, HCC made a profit of $70,866. In the eyes of Heinz, HCC suffered a loss of $124,134,139.

4. *Leasing soon merged into HCC, cementing HCC into its status as a passive holding company.*

On August 8, 1995, Mr. Crowe asked his subordinates to arrange something he had long desired–the downstream merger of Leasing into HCC. Now that HCC had abandoned its lending business, it had less to fear from Leasing's taxable nexus with so many states. The merger became final on November 29, 1995. Afterwards, HCC could not have reentered the lending

---

[9] The defendant bases its argument upon HCC's status as of January 18, 1995; but later events demonstrate that the defendant's view of that status is correct. Between the time HCC accepted the Note and the date on which the Note would have matured, HCC collected $1,837,034,292.23 in dividends from all sources, including dividends Heinz paid on the stock HCC held after converting the Note. During the same period HCC paid Heinz $2,597,109,587.35 in dividends. Whatever came to HCC went to Heinz, as anyone could have predicted on January 18, 1995.

business without inviting the scrutiny of state-tax auditors. HCC has never filed Pennsylvania returns, and as Mr. Crowe once noted, the statute of limitations will never run.

*5. HCC converted the Note to Heinz shares–the only product of the Note it could have retained–thus frustrating Heinz's expressed purpose for buying HCC's shares.*

HCC could convert the Note to stock at any time after January 18, 1998. By January 28, 1998, Goldman, Sachs had already prepared an elaborate draft opinion recommending conversion, complete with charts, a diagram, and consideration of 19 comparable securities. Goldman, Sachs had no contract to prepare such an opinion until February 17, 1998. Goldman, Sachs printed "March 4, 1998 " on the final version of its opinion, which seems to be identical to the earlier draft–the one prepared before Goldman, Sachs had a contract to prepare it.[10] On April 28, 1998, HCC formally elected to convert the Note. Accordingly, Heinz's treasurer instructed Heinz's agent to "transfer 5,265,000 shares from H.J. Heinz treasury stock into the name of H.J. Heinz Credit Company." These shares were the equivalent of 185,000 more shares than Heinz had bought from HCC.[11] The treasurer later told the agent: "[T]hese shares are to be considered non-voting and should not receive a proxy statement. They should, however, receive quarterly dividends." (Original emphasis.)

---

[10] On May 6, 1998, Mr. Crowe indirectly demonstrated why HCC and Goldman, Sachs generated paperwork requesting an opinion HCC had already requested and received (emphasis added): "The originals [of HCC's notice converting the Note] have been put in Len's files which are presently in Tax Department custody *awaiting the IRS audit of the original transaction*."

[11] The Heinz board had declared a three-for-two split of its common stock, effective at the close of business on October 3, 1995. Thus HCC received 5,265,000 shares rather than the 3,510,000 shares originally promised. HCC sold 3,325,000 shares to Heinz.

As of the day HCC accepted the Note, its status and operating procedures predetermined that it would have to return the payout if it held the Note to maturity. It would have to return every product of the Note except bare ownership of the stock issued upon conversion. That nominal ownership was at least something–on paper–though HCC could neither retain the dividends nor vote the shares. Thus Heinz should have known that HCC would convert the Note to stock and that Heinz's purchase of HCC's stock would cause a net loss of shares from its treasury. Heinz's stated purpose was doomed to frustration.

## *II. The issues of fact and law to be resolved by the Court*

1. Did Heinz have a non-tax business purpose for interposing HCC between itself and the public during a stock buyback program?

2. Did HCC have a non-tax business purpose for buying shares of its parent, which became unregistered securities in its hands, after the Supreme Court of South Carolina had already upheld state taxation of Delaware holding companies that had financial dealings with a corporation in the taxing state regardless of the Delaware company's "substance?"

3. Would an independent third party have engaged in the transaction before the Court under the conditions that HCC was required to accept?

4. What was the value of the Note on January 18, 1995?

5. Did Heinz transfer the benefits of the Note in exchange for HCC's stock after HCC had become a mere holding company that was required to pay Heinz any excess cash it might receive?

6. Did Heinz's purported redemption of HCC's stock have economic substance?

7. Did Heinz have a non-tax business purpose for purchasing 3,325,000 shares of its common stock from HCC in exchange for a Note convertible into 3,510,000 shares when HCC had become a mere holding company that was required to pay Heinz any excess cash it might receive?

8. As of January 18, 1995, when HCC had become a mere holding company and operated under directives requiring it to pay Heinz any excess cash it might receive, would HCC have anticipated accepting cash for the Note rather than converting it to stock?

9. Did Heinz's purchase of HCC's stock for the Note constitute an "exchange for property" and thus a "redemption" within the meaning of Code § 317(b)?

### *III. Applicable legal principles and the defendant's response to Heinz's arguments*

Heinz is not the first taxpayer to demand a refund after forcing a controlled corporation to produce a tax loss. Like most similar litigants, Heinz stresses the form of its transaction, glosses over the substance, and claims to have followed all applicable statutes and regulations to the letter. Unlike most others, however, Heinz also glosses over the statute on which it must base its argument, Code § 317. The words of that statute, understood in their plain English meaning, defeat Heinz's argument.

Heinz's capital loss is deductible, if at all, under Code § 165, which provides in pertinent part:

> SEC. 165. LOSSES.
>
> (a) General Rule.–There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
>
> (b) Amount of Deduction.–For purposes of subsection (a), the basis for determining the amount of the deduction from any loss shall be the adjusted basis

provided in section 1011 for determining the loss from the sale or other disposition of property.

Under Code § 1011, an item's basis generally equals its cost, and the 3,325,000 shares Heinz obtained with the Note had cost HCC $124.2 million; that was their basis. At this point, however, Heinz's reasoning fails: Heinz asserts that it "redeemed" the shares with the Note. As the defendant will demonstrate, Heinz did not redeem the shares within the meaning of § 317(b); but if there had been a real redemption, then (Heinz argues) HCC would have owned both the Note and–constructively–the 3,510,000 shares of Heinz stock into which the Note would be convertible. *See* Code § 318(a)(4). Because the asserted redemption would not have changed HCC's equity position in Heinz, the redemption would be treated as a dividend under § 302(d), and the basis of the 3,325,000 redeemed shares would shift to HCC's remaining 175,000 shares.[12] *See* Treas. Reg. § 1.302-2(c) (Exs. 1 & 3). Thus, Heinz concludes, when HCC sold those shares to AT&T, HCC would recognize a tax loss attributable to the shifted basis.

---

[12] Code § 1059(a) & (e)(1)(A) reduces the basis of stock by the amount of any "extraordinary dividend" a corporation receives in a redemption that is not pro rata as to all shareholders. If this rule applied to Heinz's transaction, it would prevent the basis shift. HCC, however, received a "qualifying dividend" (one eligible for the dividends-received deduction allowed by § 243). The term "extraordinary dividend" does not include any qualifying dividend. § 1059(e)(2)(A).

Treas. Reg. § 1.1059(e)-1(a) would now treat Heinz's payment to HCC as an extraordinary dividend despite the qualifying-dividend exception, but § 1.1059(e)-1(c) limits the regulation's effect to dividends announced on or after June 17, 1996. HCC received its dividend in January of 1995. Of course, it does not follow that Heinz is entitled to a basis shift because its transaction preceded the regulation's effective date. *See, e.g., Higgins v. Smith*, 308 U.S. 473, 479-80 (1940).

These statutes, however, apply to reality, not to appearances–and, despite Heinz's arguments to the contrary,[13] it is not just judicial doctrines that require the Court to look behind the appearances Heinz has arranged. Congress authorized the Treasury Department to interpret the revenue statutes (*see* Code § 7805(a)), and the Secretary provided the relevant guidance in Treas. Reg. § 1.165-1(b), which states, in part (emphasis added)–

> Nature of loss allowable.–To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and except as otherwise provided in section 165(h) and § 1.165-11, relating to disaster losses, actually sustained during the taxable year. Only a bona fide loss is allowable. *Substance and not mere form shall govern in determining a deductible loss.*

The defendant will now set out some of the tests courts have devised to carry out the will of Congress, as implemented by the Executive Branch.

*A. If a taxpayer uses a controlled corporation to generate a loss, the loss is not deductible unless the parties demonstrate a genuine business purpose.*

In *Gregory v. Helvering,* 293 U.S. 465 (1935), one of the earliest and best-known tax cases involving the manipulation of a controlled corporation, the Supreme Court ignored a corporate reorganization the taxpayer had structured in strict conformity with the applicable statute, the Revenue Act of 1928, ch. 852, § 112(g), 45 Stat. 791, 818. The taxpayer was the sole owner of a corporation, United Mortgage Corp., that held shares of the Monitor Securities Corp.–stock the taxpayer wished to sell. If United Mortgage had transferred the Monitor shares to her, they would have constituted a dividend, taxable at the ordinary rate. Instead, she had United Mortgage transfer the Monitor shares to a new corporation she had recently formed, Averill Corp. The

[13] See pages 27-28 and 31-32 of Plaintiff's Memorandum of Contentions of Fact and Law, filed on October 28, 2005 (Pl. Memo).

transfer was meant to qualify as a tax-free reorganization. Three days later, Averill dissolved and transferred its assets, the Monitor shares, to its sole shareholder, the taxpayer. Averill had transacted no other business. The taxpayer then sold the Monitor shares and reported a capital gain. The Commissioner ignored the reorganization–the transfer of shares between the controlled corporations–and characterized the taxpayer's receipt of Monitor shares as a dividend paid to her by United Mortgage. He assessed a deficiency, which the Court upheld.

The applicable statute allowed one controlled corporation to transfer assets to another controlled corporation tax-free if the distribution was made "in pursuit of a plan of reorganization" (*id.* at 468). United Mortgage's distribution to Averill met every requirement of the statute, read mechanically; but the Commissioner objected that the transaction had only one purpose–tax reduction. The Court described the problem in this way (*id*. at 469, emphasis added, citations omitted):

> It is quite true that if a reorganization in reality was effected within the meaning of [the statute], the ulterior purpose mentioned will be disregarded. The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. . . . . But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute *intended*.

Ignoring the taxpayer's characterization of the transfer and "fixing the character of the proceeding by what actually occurred," the Court found "an operation having no business or corporate purpose," a mere device to get the Monitor shares into the hands of the taxpayer who controlled the corporate actors. *See ibid.*

The Court later expanded the holding of *Gregory* to every transfer of assets to or from a controlled corporation. In *Higgins v. Smith*, 308 U.S. 473 (1940), the Court disallowed a capital

loss claimed by a shareholder who had sold stock to his wholly-owned corporation (at the current market price) both because the sale had no non-tax business purpose and because the taxpayer effectively retained control of the stock. The Court viewed *Gregory v. Helvering* as "precedent for the disregard of a transfer of assets *without a business purpose* but solely to reduce tax liability," and it concluded that "*transactions, which do not vary the control or change the flow of economic benefits, are to be dismissed from consideration*." *Id*. at 476 (emphasis added).

As the defendant has already shown, when Heinz purported to trade the Note for HCC's stock, the trade did not vary the control of the Note or change the flow of its benefits. The defendant will detail the legal consequences of the trade later in this brief. But the defendant has also shown that neither Heinz nor HCC had any genuine business purpose for the transfer.[14]

*B. The courts have refused to recognize "business purposes" that actually existed, but that had little weight in motivating the transfer of assets among controlled corporations.*

In *Northern Pacific Railway Co. v. United States*, 378 F.2d 686 (Ct. Cl. 1967), this Court's predecessor denied a refund generated by a claimed capital loss that was incurred when one controlled corporation (NWI) sold the parent's stock to another controlled corporation (Cuyuna). Cuyuna decided to buy the Northern Pacific stock from NWI, which was about to be liquidated, but the "decision was dictated by Mr. McFarlane, President of Northern Pacific, who . . . also was

[14] The defendant has found no case that considers an intra-corporate transfer meant to shift the basis of one block of stock to other shares that a controlled subsidiary could sell to a third party at a loss. Heinz's case may be a case of first impression. But the courts have often analyzed losses generated by sales to controlled corporations. In both those cases and in the present case, the controlling party was in the position to retain the benefit of the transferred property, and no intra-corporate transfer can have tax effect unless it is a real transfer. This Court must determine if Heinz actually transferred the Note to HCC in return for stock, and the discussed cases consider similar transfers between controlled entities and their controllers. For this reason the defendant considers the cases instructive.

President of NWI and Cuyuna." *Id*. at 689. The sale resulted in a loss. Cuyuna's ostensible reason for buying the shares was that it "needed the shares as earning assets in order to build up much needed working capital." *Ibid*. Another reason was to keep the shares out of Northern Pacific's treasury, to which they would have passed upon NWI's liquidation. The Cuyuna board received advice from tax counsel, and the Court assumed that the participants had tax advantages in mind as well. *See id.* at 690.

Citing *Higgins v. Smith*, the Court stated that an intra-corporate transfer could produce no recognizable tax-loss unless the transfer was motivated by a business purpose (*id*. at 691), and it refused to accept the purposes Cuyuna alleged. The desire to hold the stock as an investment could "be given very little weight as a motivating force" because Cuyuna had to borrow money to buy the stock, and in eight years the total dividends did not amount to even half of what the stock had cost. Cuyuna would have been better off if Northern Pacific or NWI had simply contributed the stock to it. *Ibid*.

The Court also refused to accept the other alleged business purpose–Northern Pacific's wish to keep the stock out of its own treasury while keeping control of the stock. The Court found Northern Pacific's reasons suspect, and it also refused to attribute the parent's business purpose to the subsidiaries. *See id.* at 692. The requirement of a business purpose for an intra-corporate transfer–

> was developed primarily to assure that a transaction sought to be recognized for tax purpose would have some substantial basis other than a hoped-for tax saving. But it is not every non-tax use of a subsidiary (or related corporation) which can

> properly be called a "business purpose". Some non-tax aims, though they are present, must be disregarded.

*Ibid*. The Court determined to disregard Northern Pacific's stated purposes, because they could not be attributed to the business of Cuyuna. *See ibid.*

The defendant has admitted that Heinz's stock-repurchase plans had a non-tax business purpose (though Heinz had only tax motives for involving HCC in the plans). But no non-tax business purpose motivated HCC either to buy Heinz stock from the public or to sell that stock to Heinz for a Note that would give it no benefits. Heinz's non-tax purposes could not give tax effect to HCC's actions even if HCC had furthered those purposes rather than frustrating them. *Cf., e.g., United States v. Ingalls*, 399 F.2d 143, 146 (5th Cir. 1968), *cert. denied,* 393 U.S. 1094 (1969) (for its own non-tax purposes, controlled corporation agreed to pay a settlement amount that taxpayer demanded in installments rather than as a lump sum, to defer recognition of income; the court ignored the company's non-tax purpose for entering the agreement and treated the payment to the taxpayer as a lump sum).

*1. The desire to strengthen its "substance" did not motivate HCC to buy Heinz stock from the public.*

The Heinz tax department did all it could to bolster HCC's "substance" in 1990, when Mr. Crowe alerted Heinz's management to HCC's potential $20 million Pennsylvania tax liability. There is no record that in 1990 anyone thought of having HCC borrow money and buy Heinz stock. Furthermore, in Mr. Crowe's view, what HCC most needed was a manager qualified to make important decisions for HCC and Leasing in Delaware rather than "a person who merely parrots instructions from Pittsburgh . . . ." HCC would hardly demonstrate its separate existence and independent decision-making if it purchased Heinz stock on instructions from Pittsburgh,

especially if it bought the shares under conditions that no third party would accept. On the contrary, it would demonstrate that it was Heinz's puppet.

As the Court of Claims showed in *Northern Pacific*, this Court cannot accept HCC's asserted business purposes at face value. The claimed desire to bolster its substance seems to be an excuse for HCC's involvement in the plan rather than the motive for it. "This ground can be given very little weight as a motivating force." *Northern Pacific*, 378 F.2d at 691.

2. *By acting in a commercially unreasonable manner, HCC demonstrated that it had no genuine profit motive.*

This Court's predecessor developed a test that other courts have also employed to examine the substance of intra-corporate transfers:

> In determining whether or not the form used was one of substance, and not a sham, this court has closely scrutinized those transactions in which a common ownership factor was present. Our approach has been to ascertain whether the transaction was "one that could have reasonably been made between parties dealing at arm's length," and if it were, a business loss would be deductible.

*Long Corp. v. United States*, 298 F.2d 450, 453 (Ct. Cl. 1962) (*quoting George E. Warren Corp. v. United States,* 141 F. Supp. 935, 939 (Ct. Cl. 1956)).

Heinz believes that courts have used this test only to approve intra-corporate transfers that were made at arm's length–never to void transfers that an owner forced upon a controlled entity but could never have persuaded an independent party to accept. In such a case, Heinz insists that the courts must recognize the transfer; at most they may adjust the claimed amounts of gain or loss under Code § 482 or Treas. Reg. § 1.301-1(j). *See* Pl. Memo at 20-21. Heinz has excessively narrowed its research. For example, in *National Lead Co. v. Commissioner*, 336 F.2d 134 (2d Cir. 1964), *cert. denied,* 380 U.S. 908 (1965), the Second Circuit Court of Appeals affirmed an

assessment against a parent corporation that had used a subsidiary to generate a capital loss for tax purposes even though the net effect of the transactions was a profit, not a loss. The sales were solely at the parent's instigation. The court found "not only that there was no arm's length deal between the parties, but also that the transaction was not one that would be entered into by parties dealing at arm's length." *Id.* at 141. The opinion mentions neither Code § 482 nor Treas. Reg. § 1.301-1(j).

The defendant does not ask the Court to ignore Heinz's purchase of HCC's stock simply because the parties did not deal at arm's length; no parent corporation can ever deal with its subsidiaries at arm's length. In this case, however, Heinz dealt with HCC in ways no third party would accept. By failing to treat HCC as it would have been obliged to treat a separate entity, Heinz showed that HCC was acting as its *alter ego. See, e.g., Investers Diversified Servs., Inc., v. Comm'r,* 325 F.2d 341, 352 (8th Cir. 1963). This fact, and Heinz's retention of the Note's benefits, shows that Heinz merely transferred assets "from one pocket to another." *See generally, e.g., Scully v. United States*, 840 F.2d 478, 485-86 (7th Cir. 1988) (citing authorities) (commonly-owned separate entities can claim no tax loss on intra-group sales that do not change the flow of economic benefits).

*C. HCC could not shift the basis of its sold shares to its retained shares, because Heinz kept all the benefits of the Note and did not redeem HCC's shares within the meaning of Code § 317(b).*

Heinz claims a shift in basis and sets out its statutory argument in detail at pages 14 through 18 of Pl. Memo. The defendant does not doubt that the statutes can have the effect Heinz attributes to them when they apply to facts rather than to fiction.

Heinz begins its legal analysis with a flawed factual assertion: "Heinz *redeemed* 3,325,000 shares from HCC for the Note." Heinz's entire claim depends upon the existence of this "redemption," as the defendant showed at page 24, *supra*. Heinz spends several pages insisting that the claimed redemption must be treated as a dividend, with a resulting shift in basis. *See* Pl. Memo at 15-17 (listing cases and many other authorities). But Heinz does not trouble to prove the first step of the argument–that Heinz redeemed the shares. It merely states a conclusion: "As a matter of tax law, the redemption perfectly fit the definition of 'redemption' in § 317(b)." Pl. Memo at 24.

Heinz's entire argument depends upon the application of Code § 317, which provides (emphasis added):

> (a) Property.--For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).
>
> (b) Redemption of stock.--For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder *in exchange for property*, whether or not the stock so acquired is cancelled, retired, or held as treasury stock.

If Heinz hopes to transmute HCC's capital gain into an even more profitable capital loss, Heinz must prove that it *exchanged property* for HCC's 3,325,000 shares of Heinz stock. And the property cannot be the 5,265,000 Heinz shares HCC held when the transaction ended.

Heinz took HCC's 3,325,000 shares of stock and put the Note in their place. Under ordinary circumstances, this would seem to be an exchange of property for stock. HCC, however, operated under directives that required it to pay all its unneeded cash to Heinz, and HCC had recently abandoned the only business for which it needed cash. Behind the form of an exchange

stands the reality that HCC had become a mere cash-conduit to Heinz. In such a situation, the courts have never recognized an exchange. "[T]ransactions, which do not vary the control or change the flow of economic benefits, are to be dismissed from consideration." *Higgins*, 308 U.S. at 476.

The claimed redemption did not change the flow of economic benefits expected from ownership of the Note: Heinz remained the effective owner because HCC was obliged to return all the profits under its then-existing policies, which it followed scrupulously. HCC's obligation was fixed at the time–it is neither the product of the defendant's speculations nor an inference from later, merely accidental occurrences. As of the day it accepted the Note, HCC was bound to pay Heinz all the cash the Note would have produced at maturity, all the cash that might be received from sale of the Note to a third party, all the cash that might be earned by sale of the stock received upon conversion, and all the dividends paid on that stock. In fact, HCC did return to Heinz all the dividends Heinz paid on the stock, according to the policies in effect on the date of the claimed redemption. "It is command of income and its benefits which marks the real owner of property." *Id.* at 478. Heinz had command of the Note's income and benefits, because it had arranged to keep control of all HCC's income. Heinz remained the Note's owner in everything but name.

Because HCC's policies and structure guaranteed that Heinz would keep the income and benefits of the Note, the Note's transfer had no economic substance and must be ignored for tax purposes. *See, e.g., ACM P'ship v. Comm'r*, 115 F.3d 231 (3d Cir. 1998) (transaction without objective, non-tax economic consequences is a sham). Heinz's purported exchange is not the "exchange" that the statute intended. *See Gregory,* 293 U.S. at 469. Thus, Heinz never redeemed

the stock within the meaning of Code § 317(b), and without this foundation the whole tax-planning edifice falls to the ground.

*D. For tax purposes, the Court should ignore the intra-corporate "sale" of HCC's shares for Heinz's Note because Heinz had no non-tax business purpose for inserting HCC into its stock repurchase plan.*

In the transaction before the Court, independent parties engaged in only two events, and only those events are the only ones that had genuine economic effect: (1) HCC bought Heinz shares from the public; and (2) HCC sold Heinz shares to AT&T. The intermediate "redemption" was a sham for the reasons given above. As Heinz admits (*see* Pl. Memo at 25), it had planned a series of steps in large part to create a tax loss. Heinz insists that each of the steps was "economically real" (Pl. Memo at 13), but the facts show otherwise. The Court must ignore any step that lacks substance. *See*, *e.g., Dietzsch v. United States*, 498 F.2d 1344, 1346 (Ct. Cl. 1974).

When Heinz transferred the Note to HCC, which had recently become a mere conduit back to Heinz, it effectively transferred nothing. Applying the step-transaction doctrine, the Court can recognize the transaction for what it was: an intra-corporate asset shift with no tax consequences. In effect, Heinz transferred the Note to HCC's capital, and HCC distributed the stock to Heinz as a tax-free, intra-group dividend. At the end of the transaction, Heinz held most of the stock HCC had purchased from the public, and AT&T held the rest.

The step-transaction doctrine is one more manifestation of "the general tax law ideal that effect should be given to the substance, rather than the form, of a transaction . . . ." *The Falconwood Corp. v. United States*, 422 F.3d 1339, 1349 (Fed. Cir. 2005); *see generally, id.* at 1349-1351 (listing and discussing authorities). In *Falconwood*, the Federal Circuit refused to ignore an intermediate step in a chain of events, and it explained, "we . . . place great weight on

the existence of a business purpose independent of the associated tax consequences . . . ." *Id*. at 1352. *Falconwood* also suggests what the Federal Circuit views as a business purpose: As part of its legal discussion the court had cited *Del Commercial Properties, Inc., v. Commissioner,* 251 F.3d 210 (D.C. Cir. 2001), and it quoted the following language of the D.C. Circuit, adding its own emphasis: "Under the step-transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step *for no other purpose* than to avoid U.S. taxes." *Falconwood*, 422 F. 3d at 1350 (*quoting Del Commercial Properties*, 251 F.3d at 213-14).

Heinz had injected HCC into its stock repurchase program for only one purpose–to generate a tax loss. Heinz could have achieved its object more directly if it had bought the shares from the public for itself. This Court should therefore ignore the intermediate step by which Heinz indirectly "repurchased" 3,500,000 shares from the public through HCC because Heinz had no genuine business purpose for such a repurchase. HCC did transfer shares to Heinz, but the transfer cannot be treated as part of the repurchase program. It was a dividend, pure and simple.

## CONCLUSION

For the reasons given, the defendant asks the Court to dismiss Heinz's complaint with prejudice.

Respectfully submitted,

s/Robert Stoddart

ROBERT STODDART
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-6445
FAX: (202) 514-9440
E-MAIL: Robert.C.Stoddart@usdoj.gov

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Acting Chief, Court of Federal Claims Section

November 28, 2005