**IN THE UNITED STATES COURT**

**OF**

**FEDERAL CLAIMS**

---

**No. 03-2847 T**
**(Judge Allegra)**

---

**H.J. HEINZ COMPANY**
**AND SUBSIDIARIES,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**JOINT STIPULATION OF FACTS**

---

Plaintiff H.J. Heinz Company and Subsidiaries and Defendant the United States respectfully submit a joint stipulation setting forth all factual matters as to which the parties agree, as required by ¶17 of Appendix A of the Rules of the United States Court of Federal Claims. This document will be electronically filed.

Any stipulation that a particular fact was true through a specified date is not intended to imply that such fact was or was not true after that date.

## DEFINITIONS

For purposes of these stipulations, the following definitions apply:

A. “Convertible Note” means the promissory note entitled “H.J. HEINZ COMPANY, Zero Coupon Convertible Note, due January 18, 2002.”

B. “HCC” means H.J. Heinz Credit Company, a Delaware corporation.

C. “Heinz” means H.J. Heinz Company, a Pennsylvania corporation.

D. “Heinz Leasing” means H.J. Heinz Leasing Company, a Delaware Corporation.

E. “Heinz Consolidated Group” means the affiliated group of corporations, including Heinz, that joined in filing a consolidated federal income tax return.

F. “Heritage” means Heritage International, Inc., an Idaho corporation.

G. “1995 Taxable Year” means, for the Heinz Consolidated Group, the 52-53 week taxable year that ended on May 3, 1995.

H. “Stock Purchase Loans” means the loans by Morgan Guaranty Trust Company of New York to HCC pursuant to the credit agreement, dated August 9, 1994.

Unless otherwise specified, the following stipulations pertain to the 1995 Taxable Year.

## STIPULATIONS

1. Heinz was the common parent of the affiliated group of corporations that comprised the Heinz Consolidated Group.

2. The taxable year of the Heinz Consolidated Group was a 52-53 week year ending on the Wednesday closest to April 30.

3. The Heinz Consolidated Group filed a consolidated federal income tax return.

4. Heinz's common stock, $0.25 par value per share, was listed and actively traded on the New York Stock Exchange.

5. In 1994 and 1995, Heinz's Board of Directors was composed of the following individuals: A.J.F. O'Reilly, W.P. Snyder III, J.J. Bogdanovich, H.J. Schmidt, A. Lippert, E.B. Sheldon, R.M. Cyert, S.C. Johnson, D.W. Sculley, D.R. Keough, S.D. Wiley, L.J. McCabe, D.R. Williams, L. Ribolla, N.F. Brady, W.R. Johnson, W.C. Springer and E.E. Holiday.

6. In 1994 and 1995, the following individuals were officers of Heinz:

a. Chairman of the Board, President, and Chief Executive Officer: Anthony J.F. O'Reilly

b. Vice Chairman of the Board: Joseph J. Bogdanovich

c. Senior Vice President: David W. Sculley

d. Senior Vice President—General Counsel: Lawrence J. McCabe

e. Senior Vice President—Chief Financial Officer: David R. Williams

f. Senior Vice President: Luigi Ribolla

g. Senior Vice President: William R. Johnson

h. Senior Vice President: William C. Springer

i. Vice President—Organization, Development, and Administration: George C. Greer

j. Vice President and Treasurer: Paul F. Renne

k. Vice President—Corporate Affairs: D. Edward I. Smyth

l. Corporate Secretary: Benjamin E. Thomas, Jr.

m. Corporate Controller: Tracy E. Quinn

7. HCC was incorporated in 1983. At all relevant times, HCC was a member of the Heinz Consolidated Group.

8. Heinz formed Heinz Leasing on July 10, 1986, as a Delaware corporation. On July 14, 1986, Heinz transferred to it: (a) 10 of the 12 "safe harbor" leases entered into by Heinz and third parties under former § 168(f)(8) of the Internal Revenue Code, as then in effect; and (b) 50% of the issued and outstanding stock of HCC. On August 13, 1987, Heinz transferred to Heinz Leasing the 2 remaining safe harbor leases and the remaining 50% of the issued and outstanding stock of HCC. On January 21, 1988, Leasing sold one share of HCC back to Heinz for its par value.

9. At all times from July 10, 1986, until November 29, 1995, Heinz owned all of the issued and outstanding stock of Heinz Leasing, and Heinz Leasing was a member of the Heinz Consolidated Group.

10. During the period from January 21, 1988, until November 29, 1995, Heinz Leasing owned 99.9% of the issued and outstanding stock of HCC, and Heinz owned the remaining 0.1% of the issued and outstanding stock of HCC.

11. On November 29, 1995, Heinz Leasing was merged into HCC, which was the surviving corporation. As a result of this merger, Heinz became the sole owner of the issued and outstanding stock of HCC.

12. At all times relevant to this case, HCC owned the stock of the following foreign subsidiaries: H.J. Heinz Company, Limited (UK); H.J. Heinz Company of Canada, Ltd.

(Canada); Heinz Italia, S.p.A (Italy); H.J. Heinz BV (Netherlands); Heinz Iberica, S.A. (Spain); COPAIS S.A. (Greece); Custom Foods Limited (Ireland); and Wattie's Limited (New Zealand).

13. At all times from 1983 until January 1995, HCC engaged directly in lending money to members of the Heinz Consolidated Group and its foreign subsidiaries.

14. At the beginning of the 1995 Taxable Year, HCC's net worth (excess of asset book value over liabilities) exceeded $1.8 billion.

15. HCC's net income after taxes for its taxable year ended April 27, 1994, exceeded $137 million.

16. At the end of the 1995 Taxable Year, HCC's net worth (excess of asset book value over liabilities) exceeded $1.99 billion.

17. HCC's net income after taxes for the 1995 Taxable Year exceeded $277 million.

18. From September 4, 1991, through the end of the 1995 Taxable Year, HCC's Board of Directors was composed of the following individuals: Paul F. Renne, Daniel J. Krofcheck and James A. Backo.

19. Heinz had one or more legitimate, non-tax business purposes to acquire shares of Heinz stock. The defendant does not stipulate that Heinz had a legitimate, non-tax business purpose to acquire Heinz shares through HCC.

20. The board of HCC voted to purchase Heinz shares "for investment" at its meeting on August 2, 1994.

21. During the period August 11 through November 15, 1994, HCC purchased 3,500,000 shares of Heinz common stock in the public market.

22. HCC's stock purchases were duly authorized by a resolution of the HCC Board of Directors, adopted on September 20, 1994.

23. HCC paid $129,175,400 (including commissions) for the 3,500,000 shares of Heinz common stock it purchased in 1994.

24. HCC paid the following additional costs, a total of $1,807,703, in connection with its acquisition of the 3,500,000 shares of Heinz common stock:

    a. Goldman Sachs investment banking fees: $1,500,000

    b. Ivins, Phillips & Barker legal fees: $155,800

    c. Other legal fees: $151,903

25. In purchasing the Heinz stock, HCC acted in its own name, and it was the owner of record of the purchased shares.

26. HCC was the sole obligor on the Stock Purchase Loans.

27. The Stock Purchase Loans were unsecured.

28. Heinz did not guarantee the Stock Purchase Loans.

29. On January 18, 1995, HCC transferred ownership of 3,325,000 shares of Heinz stock to Heinz and received the Convertible Note as consideration therefor.

30. Heinz was the sole obligor on the Convertible Note.

31. No person guaranteed the Convertible Note.

32. The Convertible Note was not registered under United States Federal or state securities laws.

33. The stock issued upon conversion of the Convertible Note was not registered under United States Federal or state securities laws.

34. The Convertible Note gave the holder no right to registration of the Heinz stock into which the Note was convertible.

35. On and after the date on which the Convertible Note was issued, the Note itself was a "restricted security" within the meaning of 17 C.F.R. § 230.144(a)(3) (1995).

36. On the date on which the Convertible Note was issued, its holder could have sold it only in a private placement or in a transaction that otherwise qualified as exempt from the registration requirements of United States federal and state securities laws.

37. The acquisition by Heinz of the 3,325,000 shares of Heinz stock from HCC was duly authorized by a resolution of the Executive Committee of the Heinz Board of Directors, adopted on January 10, 1995.

38. The transfer of 3,325,000 shares of Heinz stock by HCC to Heinz was duly authorized by a resolution of the Board of Directors of HCC, adopted on January 10, 1995.

39. Following HCC's transfer of 3,325,000 shares of Heinz stock to Heinz on January 18, 1995, HCC retained 175,000 shares of Heinz stock.

40. At all times during the 1995 Taxable Year, the total amount of Heinz's current and accumulated earnings and profits, earned while HCC was a member of the Heinz Consolidated Group, exceeded $150 million.

41. On May 2, 1995, HCC sold its remaining 175,000 shares of Heinz stock to AT&T Investment Management Corp., an unrelated party, for $6,966,120 cash.

42. That sale of stock was duly authorized by Heinz's Board of Directors on April 12, 1995.

43. HCC incurred $117,156 in costs in selling the 175,000 shares of Heinz stock to AT&T Investment Management Corp.

44. On August 2, 1995, pursuant to a registration rights agreement, Heinz filed a Registration Statement on Form S-3 to effect registration of the 175,000 shares of Heinz common stock that AT&T Investment Management Corp. had purchased from HCC on May 2, 1995.

45. The registration statement referred to in paragraph 45., above, was amended on August 18, 1995, and the SEC declared the registration statement effective on August 18, 1995, at 5:00 P.M., New York City Time.

46. At some time before January 27, 1995, Heinz considered having HCC transfer its lending business to a new Idaho corporation to be named Bristol, Inc.

47. When Heinz discovered that the name “Bristol, Inc.” was not available, it decided to name HCC’s Idaho lending subsidiary, “Heritage International, Inc.”

48. In July of 1995, HCC applied for a certificate of authority to do business in Idaho, and on July 31, 1995, the Idaho Secretary of State issued a certificate permitting it to do business in Idaho under the name H.J. Heinz Credit Company.

49. On November 21, 1995, the shareholders of Heritage voted to change its name to “CMH, Inc.,” and on November 30, 1995, the Idaho Secretary of State issued a certificate of amendment to the articles of incorporation that effected the name change.

50. At all times from its organization through 1998, Heritage/CMH was a wholly-owned subsidiary of HCC.

51. At all times from its organization through 1998, Heritage/CMH was engaged in the business of making intercompany loans to Heinz and its affiliates.

52. Defendant's proposed Exhibits 14a through 14m are 13 letters that HCC sent to J.P. Morgan between September 13, 1994 and November 16, 1994, informing J.P. Morgan of HCC's payments of principal, interest and commitment fees on Stock Purchase Loans, and initiating Stock Purchase Loans.

53. Defendant's proposed Exhibit 15a is a fax that HCC received from J.P. Morgan on November 21, 1994, informing HCC of a LIBOR rate setting in connection with Stock Purchase Loans.

54. Defendant's proposed Exhibit 15b is a fax that HCC received from J.P. Morgan on November 29, 1994 attaching statements for LIBOR interest due on Stock Purchase Loans.

55. Defendant's proposed Exhibits 16a through 16cd are 81 faxes titled "Daily Rate Sheets" that HCC received from J.P. Morgan between August 22, 1994 and January 3, 1995. The faxes show, for each date, the rates of the following standard floating indices: (1) the CD rates for 30, 60, 90, 120, 150, 180, 270, and 360 days; (2) the bankers' acceptances rates for 1, 2, 3, 4, 5 and 6 months; (3) the LIBOR rates for 1, 2, 3, 4, 5, 6, 9, and 12 months; and (4) the federal funds rate as of the close of the previous business day. On each of the exhibits except the Daily Rate Sheet for 12/30/94, someone added a handwritten ".75" to the federal funds rate and showed the sum, also handwritten. Neither Plaintiff nor Defendant stipulates to the accuracy of the facts contained in the faxes that HCC received from J.P. Morgan.

56. Defendant's Exhibit 17 is a fax that HCC received from J.P. Morgan on January 3, 1995. The first page of the fax refers to a statement of fees, which is attached.

57. On September 12, 1995, Heinz authorized a 3:2 stock split on the Heinz Stock, and such split became effective at the close of business on October 3, 1995.

58. On April 18 1998, HCC exercised its right to convert the Convertible Note and received 5,265,000 shares of Heinz Stock.

59. In stipulating to facts contained in the preceding 2 paragraphs, Plaintiff does not stipulate that HCC's conversion of the Convertible Note in 1998 is relevant to the proper characterization of any event occurring in 1994 or 1995.

The defendant's trial attorney has agreed that the plaintiff's attorney may file this document as a joint filing.

Respectfully submitted,

s/Clifton B. Cates_____
Clifton B. Cates
Attorney for Plaintiff

Of Counsel:
Ivins, Phillips & Barker Chartered
1700 Pennsylvania Avenue, N.W.
Sixth Floor
Washington, D.C. 20006
(202) 393-7600

Date: December 23, 2005