**IN THE UNITED STATES COURT**

**OF**

**FEDERAL CLAIMS**

**No. 03-2847 T**
**(Judge Allegra)**

**H.J. HEINZ COMPANY AND SUBSIDIARIES,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

# PLAINTIFF'S INITIAL POST-TRIAL BRIEF

Clifton B. Cates
Robert H. Wellen
Attorneys for Plaintiff

Ivins, Phillips & Barker Chartered
1700 Pennsylvania Avenue, N.W.
Sixth Floor
Washington, D.C. 20006
(202) 393-7600

[Electronically filed on March 23, 2006]

# TABLE OF CONTENTS


**Page**

I. Statement of the Case .......... 1

II. Facts .......... 2

A. Heinz and HCC .......... 2

B. Background .......... 3

1. Heinz's Stock Purchase Program .......... 3
2. State Tax Planning .......... 4

C. Transactions Giving Rise to this Case .......... 5

1. Purchases of Heinz Stock by HCC .......... 5
2. Redemption of Stock by Heinz from HCC .......... 7
3. Sale of Heinz Stock by HCC to AT&T .......... 11

D. Additional Events .......... 11

1. Project Turbo .......... 11
2. Conversion of the Note into Heinz Stock in April 1998 .......... 12

III. Legal Analysis of Plaintiff's Case .......... 13

A. The Plain Language and Intent of the Code, the Regulations, and the Authorities Construing Them Support Plaintiff's Analysis of Each Transaction .......... 13

1. Purchases of Heinz Stock By HCC .......... 14
2. Redemption of Stock by Heinz from HCC .......... 14
3. Sale of Heinz Stock by HCC to AT&T .......... 19

B. Section 1059 Is of Special Significance to Plaintiff's Case .......... 20

IV. Responses to Defendant's Arguments .......... 25

A. The Business Purpose Doctrine Cannot Invalidate the Redemption .......... 26

1. Tax-Avoidance Motive Is Irrelevant Because the Transactions Had Economic Substance .......... 26
2. Taxpayers May Choose the Manner of Carrying Out Transactions So Long as They Have Economic Substance .......... 28
3. Defendant Misinterprets *Gregory v. Helvering* and *Higgins v. Smith* .......... 29
4. Although Not Required, Heinz and HCC Had Substantial Business Reasons for the Transactions .......... 33

B. The Redemption Was Effected on Arm's-Length Terms .......... 34

1. HCC and Heinz Intended That the Terms of the Redemption Be Arm's-Length .35
2. Even if a Small Discrepancy in Value Had Existed, It Would Not Justify Disregarding the Redemption .......... 35
3. The Value of the Note Was Reasonably Equal to the Value of the Redeemed Stock .......... 38

C. Heinz Transferred the Full Economic Value of the Note to HCC ................................ 39

1. Conversion of the Note Was Not Predetermined...................................................40
2. Had HCC Held the Note to Maturity, It Would Have Had Many Ways to Employ $197.4 Million Cash Other Than Returning It to Heinz ........................................41
3. Defendant's Argument that HCC Was an *Alter Ego* of Heinz Is Barred by §1059 and by Case Law.........................................................................................43

V. Conclusion ......................................................................................................... 46

Appendix 1 Defined Terms

Appendix 2 Internal Revenue Code Provisions and One Regulation (That Were in Effect at the Time of the Transactions at Issue But Subsequently Have Changed) and One Administrative Decision

## TABLE OF AUTHORITIES

**Internal Revenue Code Provisions**
IRC §162 ........ 18
IRC §165 ........ 20
IRC §243 ........ 18, 20-23
IRC §267 ........ 19
IRC §269 ........ 17
IRC §301 ........ 18, 23, 37
IRC §302 ........ 1, 13, 15-17, 22-24, 30
IRC §304 ........ 13-14, 16, 18
IRC §311 ........ 16
IRC §317 ........ 14-15
IRC §318 ........ 15, 17, 24
IRC §351 ........ 16
IRC §368 ........ 16
IRC §404 ........ 17
IRC §482 ........ 17, 36-37
IRC §1011 ........ 13
IRC §1012 ........ 13-14
IRC §1032 ........ 20
IRC §1059 ........ 13, 16, 20-24, 30, 43-45
IRC §1212 ........ 19
IRC §6110 ........ 19
IRC §7874 ........ 16

**Other Statutory Provision**
Securities Act of 1933, 15 U.S.C. §77a et seq., as amended ........ 7, 9-10

**Treasury Regulations**
Treas. Reg. §1.301-1 ........ 18, 37
Treas. Reg. §1.302-2 ........ 1, 18-19, 22, 24
Treas. Reg. §1.1059(e)-1 ........ 23-24
Treas. Reg. §1.1502-13 ........ 20
Treas. Reg. §1.1502-14 ........ 20
Treas. Reg. §1.1502-21A ........ 19

**Proposed Treasury Regulations**
Proposed Treas. Reg. §1.1059(e)-1 ........ 23
Proposed Treas. Reg. §1.162(k)-1 ........ 17

**Proposed Legislation**
H.R. 1551, 104th Cong., 1st Sess. (May 3, 1995) ........ 23
S. 750, 104th Cong., 1st Sess. (May 3, 1995) ........ 23

**Other Regulation**
Regulation D, 17 C.F.R. §230.501(a) et seq. ........ 10

**Cases**


*ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998) .......................................... 25-27
*Avco Mfg. Corp. v. Commissioner*, 25 T.C. 975 (1956), *vacated on other grounds*, 1957 U.S. App. LEXIS 5009, 52 A.F.T.R. 1215 (2d Cir. 1957) .......................................................... 27
*Baldwin Bros., Inc. v. Commissioner*, 361 F.2d 668 (3d Cir. 1966)........................................... 36
*Black & Decker Corp. v. United States*, 97 AFTR 2d 2006-841 (4th Cir. 2006)......................... 44
*Casebeer v. Commissioner*, 909 F.2d 1360 (9th Cir. 1990) .......................................................... 25
*Chrysler Corp v. Commissioner*, 97 AFTR 2d 2006-937 (6th Cir. 2006)................................... 17
*Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001) .................................... 26
*Davis, United States v.* 397 U.S. 301 (1970) .......................................................... 15, 17, 24, 27
*Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463 (Fed. Cir. 1997) ............................ 24
*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978)................................................................... 26
*Gilbert v. Commissioner*, 248 F.2d 399, 406 (2d Cir. 1957) ....................................................... 29
*Gitlitz v. Commissioner*, 531 U.S. 206, 220 (2001)....................................................................... 24
*Granite Trust Co. v. United States*, 238 F.2d 670 (1st Cir. 1956) .................................................. 27
*Gregory v. Helvering*, 293 U.S. 465 (1935) .......................................................... 29-32, 45
*Gregory, Helvering v.* 69 F.2d 809 (2d Cir. 1934), *aff'd*, 293 U.S. 465 (1935), .......................... 28
*Gulf Life Ins. Co. v. United States*, 118 F.3d 1563 (Fed. Cir. 1997)............................................. 26
*H.B. Zachry Company v. Commissioner*, 49 T.C. 73 (1967)....................................................... 16
*Hanover Bank v. Commissioner*, 369 U.S. 672 (1962)................................................................. 24
*Higgins v. Smith*, 308 U.S. 473 (1940) ............................................................................29, 30-31
*IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001)......................................... 25, 26
*Investors Diversified Services, Inc. v. Commissioner*, 325 F.2d 341 (8th Cir. 1963)............. 30, 43
*Kirchman v. Commissioner*, 862 F.2d 1486 (11th Cir. 1989) ....................................................... 25
*Knetsch v. United States*, 364 U.S. 361 (1960)............................................................................. 25
*Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2d Cir. 1956)................................ 29, 32, 45-46
*Litton Industries Inc. v. Commissioner*, 89 T.C. 1086 (1987), *acq. in result* .............................. 21
*Long Corp. v. United States*, 156 Ct. Cl. 197 (1962)...................................................................... 36
*Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943)................................30-32, 44-46
*Nassau Lens Co. v. Commissioner*, 308 F.2d 39 (2d Cir. 1962)..................................................... 29
*National Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949)................................................. 31
*National Investors Corp. v. Hoey*, 144 F.2d 466 (2d Cir. 1944) ............................................. 31-32
*National Lead Co. v. Commissioner*, 336 F.2d 134 (2d Cir. 1964), *cert. denied*, 380 U.S. 908 (1965)............................................................................................................................... 37
*Northern Indiana Public Service Co. v. Commissioner*, 115 F.3d 506 (7th Cir. 1997).................... 32
*Northern Pacific Railway Co. v. United States*, 180 Ct. Cl. 388 (1967) ...................................... 30
*Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985)............................... 25, 44
*Rodman Wanamaker Trust v. Commissioner*, 11 T.C. 365 (1948) *nonacq.*, *aff'd per curiam*, 178 F.2d 10 (3d Cir. 1949) ..........................................................................14, 16
*Scully v. United States*, 840 F.2d 478 (7th Cir. 1988) ........................................................... 30, 44
*Shriver v. Commissioner*, 899 F.2d 724 (8th Cir. 1990)................................................................ 25
*Sun Properties, Inc. v. United States*, 220 F.2d 171 (5th Cir. 1955) ...................................... 27, 28
*TSN Liquidating Corp. v. United States*, 624 F.2d 1328 (5th Cir. 1980) ....................................... 21
*Uniroyal Inc. v. Commissioner*, T.C. Memo. 1993-214 (1993)...................................................... 21
*United Parcel Service of America, Inc. v. Commissioner*, 254 F.3d 1014 (11th Cir. 2001).. 25, 28,32

*Waterman Steamship Corp. v. Commissioner*, 430 F.2d 1185 (5th Cir. 1970), *cert. denied*, 401 U.S. 939 (1971) ....... 21
*Yocum v. United States*, 66 Fed. Cl. 579 (2005) ....... 24

**Administrative Decisions**

G.C.M. 35793 (Apr. 24, 1974) ....... 19
Notice 94-93, 1994-2 C.B. 563 ....... 16
Rev. Rul. 66-37, 1966-1 C.B. 209 ....... 19
Rev. Rul. 67-269, 1967-2 C.B. 298 ....... 15
Rev. Rul. 68-601, 1968-2 C.B. 124 ....... 15-16
Rev. Rul. 69-265, 1969-1 C.B. 109 ....... 16
Rev. Rul. 69-630, 1969-2 C.B. 112 ....... 37
Rev. Rul. 70-305, 1970-1 C.B. 169 ....... 16, 20
Rev. Rul. 74-503, 1974-2 C.B. 117 ....... 16
Rev. Rul. 75-493, 1975-2 C.B. 108 ....... 21
Rev. Rul. 76-187, 1976-1 C.B. 97 ....... 34
Rev. Rul. 77-428. 1977-2 C.B. 117 ....... 16
Rev. Rul. 78-83, 1978-1 C.B. 79 ....... 37
Rev. Rul. 79-289, 1979-2 C.B. 145 ....... 34
Rev. Rul. 79-314, 1979-2 C.B. 132 ....... 16
Rev. Rul. 80-26, 1980-1 C.B. 66 ....... 15, 17
Rev. Rul. 80-101, 1980-1 C.B. 70 ....... 16
Rev. Rul. 80-189, 1980-2 C.B. 106 ....... 14, 16
Rev. Rul. 81-289, 1981-2 C.B. 82 ....... 15
Rev. Rul. 85-106, 1985-2 C.B. 116 ....... 15
Rev. Rul. 85-119, 1985-2 C.B. 60 ....... 15
Rev. Rul. 89-64, 1989-1 C.B. 91 ....... 15
Rev. Rul. 2001-6, 2001-1 C.B. 491 ....... 17
Rev. Rul. 2003-99, 2003-2 C.B. 388 ....... 16
Rev. Rul. 2006-2, 2006-2 I.R.B. 1 ....... 16

**Secondary Sources**

B. Bittker & J. Eustice, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS (7th ed.) ....... 18, 23, 45
C. Goss & J. Doloboff, “Stock Sales Subject to Section 304,” 768-2nd T.M., A-2 ....... 14
G. Mundstock, “Taxation of Intercorporate Dividends Under an Unintegrated Regime,” 44 Tax L. Rev. 1 (1988) ....... 21

**Other**

Consolidated Financial Statements, Accounting Research Bulletin No. 51, §13 (AICPA Committee on Accounting Procedure 1959) ....... 5
Ltr from D. Walker, AICPA to Hon. Bill Archer, July 12, 1995, 95 TNT 142-24 ....... 23

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 03-2847 T**
**(Judge Allegra)**

**H.J. HEINZ COMPANY AND SUBSIDIARIES,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

**PLAINTIFF'S INITIAL POST-TRIAL BRIEF**

Pursuant to the Court's orders filed February 2 and March 14, 2006, Plaintiff H.J. Heinz Company and Subsidiaries respectfully submits its Initial Post-Trial Brief.

## I. Statement of the Case

The issue in this case is whether H.J. Heinz Credit Company ("HCC"),[1] a subsidiary of the H.J. Heinz Company ("Heinz"), may deduct a capital loss on a sale of 175,000 shares of Heinz common stock in May 1995. In 1994 HCC had purchased 3,500,000 shares of Heinz stock, and in January 1995 Heinz had redeemed 3,325,000 of these shares from HCC for a Heinz convertible note (the "Note"). Pursuant to IRC §302(d),[2] this redemption was taxed as a dividend. Accordingly, pursuant to Treas. Reg. §1.302-2(c), HCC's basis in the redeemed stock

[1] For convenience, a glossary of defined terms used in this brief is attached as Appendix 1.

[2] Unless otherwise indicated, references to sections are to sections of the Internal Revenue Code of 1986, as amended (the "Code"), or the regulations thereunder. Copies of provisions of the Code and of the Treasury Regulations that were in effect in 1994-1995 but which have subsequently changed and a copy of a General Counsel Memorandum are attached as Appendix 2. Provisions of the Code and of the Treasury Regulations and other administrative decisions that remain unchanged have not been included, by permission of the Court.

was added to its basis in the Heinz stock it retained. HCC sold this stock in May 1995 and recognized a capital loss. The loss on the stock sale was the result of the transfer of basis from the redeemed stock to the stock HCC retained after the redemption and then sold.

Defendant seeks to disallow HCC's loss deduction on the theory that Heinz's redemption of stock from HCC should be disregarded as an economic sham. As Plaintiff understands it, this theory is based on three arguments: (1) Heinz and HCC had insufficient non-Federal tax business purposes for the transactions leading to the loss; (2) the redemption was not conducted on arm's-length terms, because the Note was worth less than the redeemed stock; and (3) Heinz did not transfer the economic benefit of the Note to HCC in the stock redemption, because HCC was obligated to return any cash proceeds of the Note to Heinz as a dividend.

In Plaintiff's view, explicit provisions of the Code and regulations and all of the authorities that interpret them—including case law and the government's rulings—specify the precise tax treatment of the transactions involved and establish that HCC is entitled to the loss deduction. Defendant's factual contentions are inaccurate, and its legal arguments lack merit. Far from being a sham, the redemption had substantial economic substance and must be given effect as the Code prescribes.

## II. Facts

### A. Heinz and HCC

Heinz, a Pennsylvania corporation, manufactures and markets processed food products worldwide directly and through subsidiaries. The common stock of Heinz is actively traded on the New York Stock Exchange. Jt. Stip. ¶ 4. Heinz is the common parent of a group of domestic corporations filing consolidated Federal income tax returns (the "Heinz Group"). Jt. Stip. ¶¶ 1, 3. Heinz also has numerous foreign subsidiaries, which were owned by its subsidiary, HCC. Jt. Stip. ¶ 12. The Heinz Group uses the 52-53 week taxable year ending on the Wednesday closest

to April 30. Jt. Stip. ¶ 2. The Heinz Group's 1995 taxable year, during which the relevant transactions occurred, ended May 3, 1995. Pl. Ex. 1, p. 3628; Jt. Stip. ¶ G.

HCC was organized as a Delaware corporation in September 1983, and at all times it has been a member of the Heinz Group. Jt. Stip. ¶ 7. HCC's business was to own stock and securities issued by Heinz affiliates (both domestic and foreign) and to make intercompany loans to finance Heinz affiliates. Jt. Stip. ¶¶ 12-13. HCC was a substantial corporation in its own right. For financial reporting purposes, HCC's net income in fiscal 1995 was $277.6 million, and at the close of that year its net worth was approximately $2 billion. Jt. Stip. ¶¶ 16-17. HCC was a Delaware investment company, a status that resulted in considerable state tax benefits to the Heinz Group. Tr. 119-120.

**B. Background**

**1. Heinz's Stock Purchase Program**

Like many public companies, Heinz has engaged regularly in purchases of its own stock for many years. Tr. 95-96. During fiscal 1984-1994, Heinz spent an average of more than $170 million per year on such stock and purchased substantial amounts of stock in each year. Pl. Ex. 10.

The principal purpose of Heinz's stock purchase program was to control the number of its outstanding shares and thereby manage earnings per share. Tr. 89-90. Heinz maintained a generous stock option program for its officers and employees, and over time option exercises gradually increased the number of outstanding shares. Tr. 89. To keep its equity base relatively constant, Heinz purchased its own stock in the market. Tr. 89-90. Also, when management considered the stock to be undervalued in the market, Heinz purchased more stock. Tr. 90-91. As an additional benefit, the stock purchase program permitted Heinz to dampen the volatility in its stock price. Tr. 92-94. In effect, the managers of the stock purchase program became

"shadow specialists."[3] Tr. 92-93. Heinz's stock purchase program was so important that the Chairman and Chief Executive Officer of Heinz monitored its operation on a daily basis. Tr. 99-100.

**2. State Tax Planning**

Because of inconsistent state tax rules, companies such as the Heinz Group that operate in numerous states may be taxed on the same income in more than one state and may be able to avoid state tax on other income altogether. Thus, state income tax planning is important to companies like Heinz.

From its formation in 1983, HCC was a Delaware investment company—a corporation whose principal purpose was to own securities. D. Ex. 44, p. 118. This status provided state income tax savings to Heinz Group. Interest paid by other members of the Heinz Group to HCC was deductible in non-unitary states, but HCC's interest income was not subject to state income tax.[4] Tr. 119-120, 149-152.

Beginning in the mid-1980's, however, several state tax authorities, including Heinz's home state of Pennsylvania, began to consider whether Delaware investment companies were mere shells with no real presence in Delaware. D. Ex. 44, p. 118-119. Heinz management considered HCC vulnerable to such an attack. Tr. 120-125, 196.

---

[3] On the New York Stock Exchange, "specialist" firms make a market for particular stocks and maintain as orderly a market as possible. This function includes buying when there are inadequate buy orders to match outstanding sell orders and selling when there are inadequate sell orders to match outstanding buy orders. Certain specialist functions are discussed at Tr. 93-94.

[4] In states with unitary tax systems, all the members of the Heinz Group are treated as a single corporation, and intercompany transactions are eliminated. In non-unitary states, however, each member is a separate taxpayer, and intercompany transactions are taken into account. The non-unitary system can result in a benefit where the member on the payment side of an intercompany transaction is in a non-unitary state where it can claim a deduction, but the member on the income side (HCC) is not subject to tax on that income in its state (Delaware). Tr. 149-152.

Initially, the Heinz Group responded in a modest manner. D. Ex. 44-46. HCC remained vulnerable to attack, however, on the ground that Heinz made the decisions affecting intercompany loans at its headquarters in Pennsylvania. In 1986 and again in 1987, consideration was given to HCC entering into a management contract with Heinz or paying Heinz a management fee (D. Ex. 55-56). In 1990, John C. Crowe, Vice President for Tax of Heinz, proposed that HCC hire an executive with a staff in Delaware. D. Ex. 63, 64. This proposal was implemented. Tr. 125.

By 1994, when the events relevant to this case began, the Delaware investment company strategy had come under increasing attack. D. Ex. 67, 70. For the Heinz Group, at stake were more than $20 million of state tax benefits from prior years still open to audit (D. Ex. 64, p. 166; Tr. 125-126), plus additional future state tax benefits of the intercompany lending program.

**C. Transactions Giving Rise to this Case**

**1. Purchases of Heinz Stock by HCC**

In July 1994, management decided that purchases of Heinz stock in the market should continue during fiscal 1995, but that HCC, not Heinz, should purchase the stock. Because Heinz stock owned by HCC would not be treated as outstanding for financial reporting purposes,[5] these shares would be excluded in computing Heinz's earnings per share. Thus, stock purchases by HCC would accomplish the principal objective of Heinz's stock purchase program by removing stock from the market. Tr. 102-103.

[5] Even though Heinz stock owned by HCC was outstanding stock under Pennsylvania law (Tr. 394), the stock was not treated as outstanding stock on Heinz's consolidated financial statements. CONSOLIDATED FINANCIAL STATEMENTS, Accounting Research Bulletin No. 51, §13 (AICPA Committee on Accounting Procedure 1959). This provision reads: "Shares of the parent held by a subsidiary should not be treated as outstanding stock in the consolidated balance sheets."

An investment in Heinz securities by HCC also would give HCC additional substance and thereby buttress its status as a Delaware investment company. Tr. 137-138. As described in part II.B.2., above, this status was important for state tax planning purposes, and Heinz had considered and undertaken measures to bolster HCC's status for many years. As an additional measure, Heinz and HCC believed that a significant investment in Heinz securities would help show that HCC had substance as a Delaware investment company. Tr. 137-138. The financial arrangements were particularly important. Investments in Heinz by HCC with its own funds and bank financing provided without a Heinz guarantee would be an objective commercial/financial demonstration of HCC's independent significance. *Id.*

Purchases of Heinz stock were also beneficial to HCC itself. HCC's business was to own securities of Heinz affiliates and to make intercompany loans. Jt. Stip. ¶¶ 12-13, Tr. 309. Investing in Heinz securities was consistent with that business and was an opportunity for HCC, viewed on its own, to make a good investment—which it proved to be.

During August through November 1994, pursuant to appropriate authorizations by the Boards of Directors of both HCC and Heinz, HCC purchased 3,500,000 shares of Heinz stock in the market. Jt. Stip. ¶¶ 23-24. HCC made the stock purchases for its own account (Jt. Stip. ¶ 25) and used its own funds, including the proceeds of a $40 million line of credit extended to HCC by Morgan Guaranty Trust Company of New York ("Morgan Guaranty"). Tr. 140-141; Jt. Ex. 2, 3. No funds used by HCC were provided, directly or indirectly, by Heinz, and Heinz provided no guarantee or other credit enhancement in connection with this line of credit. Tr. 142-143; Jt. Stip. ¶¶ 26-28. HCC's cost for the Heinz stock, including commissions and other expenses, was $131 million.[6] Jt. Stip. ¶¶ 23-24.

[6] The actual amount was $130,983,103. Most dollar amounts in this brief are rounded to the nearest $100,000.

Under Pennsylvania law, HCC could not vote its Heinz stock. Tr. 144. Otherwise, HCC had the full benefits of stock ownership, and there were no legal or contractual restrictions on HCC's use or enjoyment of the stock. Tr. 143-144. For example, from August 1994 through January 1995, HCC received $1.7 million dividends on its Heinz stock. Tr. 143.

Pursuant to the Securities Act of 1933, 15 U.S.C. §77a et seq., as amended, (the "Securities Act"), HCC could sell its Heinz stock in the public market only if the stock were registered. Heinz did not formally commit to register the stock for HCC, but HCC understood that Heinz would do so in its subsidiary's interest. Tr. 152, 406-411. Indeed, at about the same time as these transactions, Heinz registered more than 12 million shares of its stock at the request of a major shareholder, even though Heinz was not legally obligated to do so. Tr. 406-409; Pl. Ex. 11, 12. Thus, the unregistered status of the stock was not a meaningful consideration.

**2. Redemption of Stock by Heinz from HCC**

On January 18, 1995, Heinz redeemed 3,325,000 shares of its stock from HCC. Jt. Stip. ¶ 29.[7] The market value of the redeemed stock was approximately $130.5 million. Pl. Ex. 5, p. 3339.

As consideration for the redeemed stock, Heinz issued the Note to HCC. Jt. Stip. ¶ 29; Jt. Ex. 1. Heinz was the sole obligor on the Note, and the Note was not guaranteed by any person. Jt. Stip. ¶¶ 30-31. The salient terms of the Note were as follows:

[7] The Joint Stipulation does not use the terms "redeem" or "redemption," because one of Defendant's principal arguments is that the redemption should be disregarded as a sham. For the reasons discussed at length below, Plaintiff contends that the redemption was real and should be treated as such for tax purposes.

| | |
|---|---|
| Payable at maturity | $197,402,412.78 |
| Maturity date | January 18, 2002 (7 years after issuance) |
| Interest coupon | None (zero coupon) |
| Stated issue price | $130,506,250 at stated 6% yield |
| Conversion right | At holder's option, convertible into 3,510,000 shares of Heinz common stock (adjusted for splits, etc.)[8] |
| Timing of exercise | Conversion right exercisable at any time from January 18, 1998 (3 years after issuance), until maturity; no other conditions or contingencies |

A team from Goldman Sachs & Co. ("Goldman Sachs") led by Philip M. Darivoff, a partner in the firm's Capital Markets Group, developed the terms of the Note for HCC. Tr. 322-323. HCC chose Goldman Sachs for this task, because Goldman Sachs was (and is) one of the world's leading investment banking firms, with particular expertise in convertible debt. As Mr. Crowe testified, "We thought they were the best. I mean, maybe there were some as good, but there were certainly none better." Tr. 145. On this point everyone agrees. D. Ex. 124, p. 298; Tr. 450-451, 521.

The terms of the Note reflected specifications provided by HCC in July 1994: (a) that the Note be convertible into a number of shares of Heinz stock slightly greater than the number of shares redeemed; (b) that the conversion right be worth more than 10% but less than 50% of the total value of the Note; and (c) that the value of the Note be substantially equivalent to the value of the redeemed stock. Jt. Ex. 17, p. 165; Tr. 322-323.

To ensure dividend treatment of the redemption for Federal tax purposes, the Note was to be convertible into more shares of Heinz stock than the number of shares redeemed (specification (a)). Thus it was necessary to restrict conversion. Had the conversion right been exercisable immediately, it would have been an in-the-money option when issued. Having surrendered 3,325,000 shares for the Note, HCC could and would have exercised the conversion

[8] On November 9, 1995, a 3:2 split in Heinz stock occurred, and the Note became convertible into 5,625,000 shares. Jt. Stip. ¶ 57. In this brief, however, figures such as numbers of shares and per-share values and prices are stated in pre-split terms.

right immediately and received 3,510,000 shares. Thus, the debt portion of the Note would have had no substance, and the value of the Note necessarily would have been greater than the value of the 3,325,000 shares of redeemed stock. In other words, specifications (b) and (c) would not have been met.

Goldman Sachs prevented this result with a conversion right that could not be exercised until three years after the Note was issued. This three-year conversion "lockout" was essential to the design and valuation of the Note. Jt. Ex. 4, p. 3572; Tr. 359-360. Otherwise, the Note was quite similar to liquid yield option notes ("LYONs"), a type of zero-coupon convertible debt security which had been widely issued during the 1980s and 1990s.[9] Tr. 438-446. The non-economic terms of the Note were similar to those typically found in LYONs and other convertible debt. Tr. 400-401.

When issued on January 18, 1995, the Note was not registered under the Securities Act, and so, like the redeemed stock, the Note could not be sold in public markets unless it were registered. Jt. Stip. ¶ 32. As Goldman Sachs was fully aware, this fact had an effect on the liquidity and hence the value of the Note. Tr. 337, 348-349. This effect was minor, however, because public investors did not constitute a real market for the securities like the Note. Tr. 449-450. To account for this factor, in determining the present value of the cash due at maturity, Goldman Sachs increased the discount rate by a "yield premium" of 30-33 basis points. Tr. 337, 348-349. Based on its extensive experience, Goldman Sachs believed this premium properly accounted for the lack of registration. Tr. 349.

---

[9] LYONs generally are convertible at any time but are issued with significant conversion premiums. Tr. 444-445. This conversion premium and the three-year lockout on conversion of the Note had the same economic effect—to delay conversion and reduce the likelihood of conversion to a reasonable level.

Despite its unregistered status, the Note could have been sold and re-sold at any time in transactions exempt from the registration requirements of the Securities Act. Tr. 347-348, 445-446. For example, the Note could have been sold to an "accredited investor" pursuant to Securities and Exchange Commission Regulation D, which exempts non-public securities offerings from registration.[10] Tr. 347-348, 445-446. Generally, accredited investors are wealthy or sophisticated investors, including financial institutions like insurance companies, banks, brokerage firms and mutual funds. Regulation D, Rule 501(a), 17 C.F.R. §230.501(a); Tr. 347-348. Such financial institutions constituted the real market for large-denomination convertible debt like the Note. Tr. 446, 449-450.

After developing terms for the Note in accordance with HCC's specifications, Goldman Sachs concluded that the Note was "reasonably valued" at $130.5 million (the value of the stock to be redeemed)—approximately 84% in the debt portion and 16% in the conversion right. Pl. Ex. 4, p. 3568-3570; Tr. 337-338, 343, 345-346. The reasonable equivalence of values between the Note and the redeemed stock is what mattered to HCC and Heinz. Tr. 176-177, 333. According to Mr. Darivoff, Goldman Sachs's margin of error in its valuation of the Note was plus or minus 1-2 percentage points. Tr. 344-346.[11] Goldman Sachs valued the Note at "what we felt any other sophisticated participant, either another corporation or institutional investor, would pay for the note or what Goldman Sachs itself, if asked, would pay for the note." Tr. 354.

HCC and Heinz accepted the terms of the Note developed by Goldman Sachs (Jt. Ex. 13-14, Tr. 155), and relied on Goldman Sachs's opinion. Tr. 154. Although they were parent and

[10] 17 C.F.R. §230.501 et seq.. Regulation D is a regulation under §4(2) of the Securities Act.

[11] Goldman Sachs used various models to value the Note. One model, based on the value of the conversion right at maturity of the Note, seven years after issuance, reached a "floor" value of 98.7% of the value of the stock to be redeemed. Another model, based on the value of the conversion right when it became exercisable three years after issuance of the Note, reached a value of 101% of the value of such stock. Pl. Ex. 4, p. 3569.

subsidiary, Heinz and HCC wished to conduct the redemption on an arm's-length basis, as if they were not related. Tr. 162, 168, 169-170, 176, 400-401, 403. The Note reflects this intent.

Before the redemption, HCC's investment in Heinz had consisted of 3,500,000 shares of stock. Thereafter, HCC owned 175,000 shares of stock and the Note, which was convertible into 3,325,000 shares. Jt. Stip. ¶¶ 29, 39.

**3. Sale of Heinz Stock by HCC to AT&T**

In April 1995, Goldman Sachs arranged a private placement sale by HCC of its remaining 175,000 shares of Heinz stock to AT&T Investment Management Corp. ("AT&T"), a corporation unrelated to Heinz. The sale closed on May 2, 1995.

The sale price was $6.966 million cash, $39.81 per share ( Jt. Stip. ¶ 41), which reflected a 4.08% discount from the prevailing price of Heinz stock on the New York Stock Exchange. According to Leonard A. Cullo, then an in-house Heinz lawyer who participated in the sale (now Treasurer of Heinz), several factors contributed to the discount, including the following: (a) HCC was anxious to complete the sale before the end of its fiscal year 1995; (b) AT&T was anxious to prove that it took seriously its fiduciary duty to the retirement plans it managed by negotiating the best possible price; and (c) the stock was not registered, and AT&T's registration right might not take effect for as long as six months plus the time necessary to carry out the registration process. Tr. 416-417; Jt. Ex. 5.

**D. Additional Events**

**1. Project Turbo**

Shortly after the redemption, Heinz implemented a restructuring of its intercompany lending program, called "Project Turbo." D. Ex. 75. One major purpose was to put intercompany loans on a more arm's-length basis by adjusting debt-equity ratios and interest

rates. Tr. 126-127. The result would be to increase the amounts of intercompany interest and the resulting tax benefits—to "turbo-charge" them. Tr. 126-127, 131.

By this time, the Delaware investment company strategy had come under increasing scrutiny, and state tax authorities were inquiring about Delaware investment companies as a matter of routine. D. Ex. 75, p. 213; Jt. Ex. 14, p. 147. As described in part II.B.2., above, the Heinz Group had tried to deal with this issue by increasing HCC's Delaware presence and having HCC make additional financial investments. In connection with Project Turbo, a decision was made to deal with the issue by being able to answer "no" when state tax auditors asked if Heinz had a Delaware investment company. Tr. 205. Thus, HCC transferred most of its loan portfolio to a new, wholly-owned subsidiary, Heritage International, Inc. ("CMH/Heritage"),[12] an Idaho corporation with headquarters in Idaho, and CMH/Heritage became the principal intercompany lender. Tr. 130; Jt. Stip. ¶ 51. HCC became the parent of CMH/Heritage. Jt. Stip. ¶ 50.

After the implementation of Project Turbo, HCC remained a substantial corporation. Jt. Stip. ¶¶ 16-17. In addition to owning the stock of CMH/Heritage, which engaged in substantial intercompany lending, HCC retained direct ownership of some loans, including the Note, as well as the stock of Heinz's foreign subsidiaries. Jt. Stip. ¶ 12; Tr. 129, 131-132.

**2. Conversion of the Note into Heinz Stock in April 1998**

When the Note was issued in January 1995, based on its terms, on market conditions and on the historical performance of Heinz stock, conversion was not particularly likely. Tr. 431, 453-454, 456. Furthermore, at that time neither of the parties had any plan for the Note to be converted. HCC's plan was simply to act as a prudent investor. Tr. 162, 169-170. As issuer of

[12] The name of Heritage International, Inc. was changed to CMH, Inc. in November, 1995. Jt. Stip. ¶ 49.

the Note, Heinz could not determine what HCC would do with the Note. As HCC's parent, Heinz could, of course, cause HCC to convert the Note, hold it to maturity or sell it, but Heinz had no such agenda. Heinz also wanted HCC to act as a prudent investor. Tr. 168-170.

From the time of the redemption in January 1995 until the conversion right on the Note first became exercisable three years later, the price of Heinz stock more than doubled, from about $39 to $82 per share (both pre-split, *see* footnote 8, above). Pl. Ex. 5, p. 3354. This dramatic appreciation in Heinz stock, which may be seen graphically in Pl. Ex. 6, could not have been reasonably foreseen. Tr. 456. As a result thereof, the conversion right in the Note had become "in the money" by nearly $189 million. Further, HCC was not currently receiving interest income on the Note, and by converting HCC would begin receiving dividends. Tr. 167-168. Based on these facts, by early 1998 conversion had become a prudent investment decision. Pl. Ex. 23, p. 2185; Tr. 356.

Out of an abundance of caution, HCC retained Goldman Sachs again, this time to advise whether it should convert the Note. After analyzing the economics, Goldman Sachs concluded that HCC could realize the maximum value on its investment by converting the Note. Jt. Ex. 23; Tr. 356. Again, HCC followed Goldman Sachs's advice and, on April 18, 1998, HCC exercised its right to convert the Note. Jt. Stip. ¶ 58.

## III. Legal Analysis of Plaintiff's Case

### A. The Plain Language and Intent of the Code, the Regulations, and the Authorities Construing Them Support Plaintiff's Analysis of Each Transaction

The plain language and intent of the Code and the regulations dictate the outcome of this case. In particular, §§302, 304, 1011, 1012, and 1059 and related regulations precisely and unambiguously dictate the tax consequences of these transactions. So long as the transactions

were real and were what they purported to be, their tax consequences are clear. The evidence shows that the transactions were in fact real and were what they purported to be.

**1. Purchases of Heinz Stock by HCC**

HCC purchased 3,500,000 shares of Heinz stock in the market for $131 million. Under §304(a)(2), when a subsidiary buys stock of its parent corporation, the seller of the stock is to treat the price it receives for the stock "as a distribution in redemption of the stock" of the parent. The Service has ruled that, regardless of how the selling shareholder is treated, the subsidiary's basis in the parent stock it purchases in a §304(a)(2) transaction is its cost. Rev. Rul. 80-189, 1980-2 C.B. 106. This is the normal rule under §1012. Thus, HCC's basis in the stock it purchased in the market was its $131 million cost.

Under §304(a)(2), neither HCC's purchases of Heinz stock nor its ownership of such stock may be recharacterized in any other manner. For example, neither may be attributed to Heinz.[13] As discussed below, this is only one of several aspects of these transactions that Congress has addressed with specific rules.

**2. Redemption of Stock by Heinz from HCC**

Heinz redeemed 3,325,000 shares from HCC for the Note. This transaction perfectly fit the definition of "redemption" in §317(b):[14]

---

[13] The predecessor of §304(a)(2) was enacted to change the holding in *Rodman Wanamaker Trust v. Commissioner*, 11 T.C. 365 (1948) *nonacq*., *aff'd per curiam*, 178 F.2d 10 (3d Cir. 1949), that such a transaction was taxed as a sale of parent stock to the subsidiary and not, as the government had contended there, as a dividend by the parent. C. Goss & J. Doloboff, STOCK SALES SUBJECT TO SECTION 304, 768-2nd T.M., A-2.

[14] Defendant states in its Memorandum of Contentions of Fact and Law ("Defendant's Memorandum" or "D. Mem.") that there was no redemption at all. D. Mem. 23-24, 32. There is no doubt, however, that HCC transferred 3,325,000 shares of Heinz stock to Heinz and that, simultaneously and as part of the same transaction, Heinz issued the Note to HCC. Jt. Stip. ¶ 29. The Code defines such a transaction as a "redemption."

> . . . stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property,[15] whether or not the stock so acquired is cancelled, retired, or held as treasury stock.

After the redemption, HCC continued to own 175,000 shares and, under the constructive ownership rule of §318(a)(4), HCC was also deemed to own the 3,510,000 shares into which the Note was convertible. For tax purposes, then, the redemption increased HCC's stock ownership from 3,500,000 to 3,685,000 shares, and, under §302(d), the redemption was taxed to HCC as a dividend.

The authorities supporting this conclusion are detailed and specific. The principal authority is *United States v. Davis,* 397 U.S. 301 (1970). In *Davis* the Supreme Court held that a stock redemption is always taxed as a dividend unless, taking into account all the stock the redeeming shareholder owns, both actually and constructively under §318(a), the redemption results in "a meaningful reduction of the shareholder's proportionate interest in the corporation." 397 U.S. at 313. Other factors do not matter. The Court held specifically that the existence or non-existence of a business purpose for the redemption is not relevant to its tax treatment. 397 U.S. at 309-313.

Until recently, dividends have been taxed as ordinary income to individuals and so have yielded more tax revenue than capital gains. Thus, for many years the government has interpreted §302(d) and *Davis* broadly, to favor dividend treatment of redemptions.[16]

---

[15] "Property" is defined in §317(a) as "money, securities and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock)." Here, the "property" is the Note. Convertible debt instruments like the Note are "property," even though they encompass "rights to acquire stock." Rev. Rul. 85-119, 1985-2 C.B. 60; Rev. Rul. 68-601, 1968-2 C.B. 124; Rev. Rul. 67-269, 1967-2 C.B. 298. Defendant argues that the Note is not "property," because "the [N]ote's transfer had no economic substance and must be ignored for tax purposes." D. Mem. 33. This issue is discussed in part IV.C., below.

[16] Rev. Rul. 89-64, 1989-1 C.B. 91 (constructive stock ownership even though option may be exercised only after fixed time period); Rev. Rul. 85-106, 1985-2 C.B. 116 (trust constructively owned voting stock owned by beneficiary; redemption of nonvoting stock from trust treated as dividend); Rev. Rul. 81-289, 1981-2 C.B. 82 (self-tender treated as dividend to public shareholder whose proportionate interest slightly increased); Rev. Rul. 80-26,

Footnote continued on next page

The fact that HCC was a wholly-owned Heinz subsidiary does not affect the treatment of the redemption as a dividend. It is well-established in case law and revenue rulings that stock of a parent corporation owned by a subsidiary is subject to the same tax rules (including those relating to redemptions) as is stock owned by other shareholders and other property owned by the subsidiary.[17] When Congress departs from this principle, it does so by enacting specific Code provisions. These include §304(a)(2), discussed in part III.A.1., above, §1059(e)(2)(A), discussed in parts III.B. and IV.C.3., below, and §7874 (enacted in 2004 to deal with corporate inversion transactions and other expatriations of domestic corporations).

Even though it is a stock sale in form, a redemption of the type described in §302(d) is recast for tax purposes and is taxed as a dividend, regardless of whether the consequences favor

1980-1 C.B. 66 (stock owned by family members constructively owned even though there was family hostility); Rev. Rul. 68-601, 1968-2 C.B. 124 (warrants and conversion rights under convertible securities result in constructive stock ownership, even though exercisable against issuing corporation; in determining proportionate interest of holder of options, including warrants and conversion rights, warrants and conversion rights held by others disregarded: "there should be considered as issued and outstanding, on a shareholder by shareholder basis without regard to the rights of unrelated shareholders to acquire unissued stock, those shares which a given shareholder may acquire by exercising his warrants and converting his debentures and those shares which that shareholder would constructively own by reason of other shareholders exercising their warrants and converting their debentures.")

[17] *Rodman Wanamaker Trust v. Commissioner*, *supra*, footnote 13; Notice 94-93, 1994-2 C.B. 563 (tax on built-in gain in subsidiary stock owned by parent is not avoided in "inversion transaction" – transfer by parent shareholders of parent stock to subsidiary in exchange for subsidiary stock); *H.B. Zachry Company v. Commissioner*, 49 T.C. 73 (1967)) (§351 exchange of property for common stock of subsidiary separate from parent's later sale of its preferred stock to subsidiary); Rev. Rul. 80-189, 1980-2 C.B. 106; Rev. Rul. 80-101, 1980-1 C.B. 70 (liquidation of 70%-owned subsidiary that owned 25% of parent stock viewed as redemption by parent); Rev. Rul. 79-314, 1979-2 C.B. 132 (two corporations held small amounts of stock in each other; exchange of these minority interests viewed as redemptions by both corporations); Rev. Rul. 77-428. 1977-2 C.B. 117 (triangular merger of parent corporation into its second-tier subsidiary (S2) with parent shareholders receiving first-tier subsidiary (S1) stock qualifies as a tax-free reorganization, as does merger of S2 into parent where S1 receives parent stock); Rev. Rul. 70-305, 1970-1 C.B. 169, *modified*, Rev. Rul. 74-503, 1974-2 C.B. 117 (parent stock purchased and held by subsidiary not treasury stock; sale of such stock to third party results in gain or loss recognition to subsidiary) (*revoked on other grounds*, Rev. Rul. 2006-2, 2006-2 I.R.B. 1); Rev. Rul. 69-265, 1969-1 C.B. 109 (triangular §368(a)(1)(C) reorganization in which second-tier subsidiary (S2) acquires target assets, and target shareholders receive stock in first-tier subsidiary (S1) convertible into parent stock satisfies the "solely for voting stock" requirement under §368(a)(1)(C) where conversion involves actual transfer of parent stock by parent to S1). (Rev. Rul. 80-101 and Rev. Rul. 79-314 were declared obsolete by Rev. Rul. 2003-99, 2003-2 C.B. 388, but apparently because they rely on §311(a)(2), as in effect before 1987, to treat redemptions as tax-free to the redeeming corporation.)

the government or the taxpayer.[18] In this case, they favor the taxpayer, because corporate shareholders like HCC are taxed at lower rates on dividends than on capital gains. However, a redemption cannot be re-recast as something else or disregarded entirely whenever §302 produces a result the government does not like. Indeed, the Service itself has described the rules of §302 and §318 as "mechanical." Rev. Rul. 80-26, 1980-1 C.B. 66. As *Davis* makes clear, taxpayers must live with the mechanical rules of §302. The government must do so as well.

The force of §302(d) is illustrated by *Boise Cascade Corp. v. United States*, 82 AFTR 2d 98-7249 (D. Id. 1998), *aff'd*, 329 F.3d 751 (9th Cir. 2003). There, a corporation redeemed stock from its employee stock ownership plan ("ESOP"). The redemption was held to be a dividend under §302(d) because there was no meaningful reduction in the ESOP's equity interest in the corporation. As a result, the district court held and the Ninth Circuit affirmed that, under §404(k), the corporation could deduct the full amount of the redemption proceeds paid to the ESOP—even though it had previously deducted its contribution of the redeemed stock to the ESOP. In the district court, the government argued, *inter alia*, that the result was an impermissible double deduction. The district court rejected this argument, and the government did not even raise this point on appeal.[19]

In sum, with §302 Congress has preempted the field and dealt comprehensively with the character of stock redemptions, just as it has dealt with purchases of parent stock by subsidiaries

[18] In this respect, §302 is unlike provisions such as §§269 and 482, that the Service may invoke to prevent tax avoidance but taxpayers may not invoke to prevent over-taxation.

[19] The courts also rejected the government's argument, set forth in Rev. Rul. 2001-6, 2001-1 C.B. 491, that the deduction was barred under §162(k) (no deduction for "any amount paid or incurred by a corporation in connection with the reacquisition of its stock"). *Compare Chrysler Corp v. Commissioner*, 97 AFTR 2d 2006-937 (6th Cir. 2006) (amounts paid to redeem stock from ESOP in non-dividend redemption not deductible as business expense under §162(a)). *See also* Proposed Treas. Reg. §1.162(k)-1, REG-133578-05, 70 Fed. Reg. 49,897 (Aug. 25, 2005), which would bar deductions like those in *Boise Cascade* prospectively from the date of adoption.

with §304(a)(2). Under §302(d), Heinz's redemption of stock from HCC was taxed as a dividend from Heinz to HCC.

When a redemption is taxed as a dividend, the amount of the dividend is the full amount the redeeming corporation pays for the stock—unreduced by the redeemed shareholder's basis in the redeemed stock. Here, for example, the amount of the dividend was the full fair market value of the Note. IRC §301(b)(1); Treas. Reg. §1.301-1(d)(1)(ii). Even though the redeemed stock ceased to exist in the redemption, HCC's basis in that stock did not reduce the amount of the dividend.

If a redeemed shareholder's basis were not taken into account in some way, it would disappear.[20] As a result, when the redeemed shareholder sells its remaining stock, its taxable gain would increase (or its loss decrease) by the amount of the disappearing basis. The redeemed shareholder would be taxed on the return of its capital investment, an obvious inequity. If the redeemed shareholder is an individual, the effect would be to tax him or her twice on the dividend. If the shareholder is a corporation, the effect would be to tax it on the full amount of the dividend, notwithstanding §243. Either way, the result would be a triple or more tax on corporate income. This triple-tax issue is discussed further in part III.B., below.

To prevent this result, the regulations provide that the redeemed shareholder's basis in the redeemed stock is transferred to other stock in the redeeming corporation that the redeemed shareholder still owns. Treas. Reg. §1.302-2(c), especially *Examples (1)* and *(3)*. The Service and the Treasury Department have long considered this transfer of stock basis as an inherent and

[20] This "disappearing basis" is discussed in B. Bittker & J. Eustice, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS (7th ed.) ("Bittker & Eustice") ¶ 9.22.

necessary part of the system for taxing stock redemptions as dividends.[21] Stock basis is transferred in every dividend redemption. A parent-subsidiary relationship, like the one between Heinz and HCC, does not change this treatment. Rev. Rul. 66-37, 1966-1 C.B. 209 (stock basis transfer applies in dividend redemption of stock of one consolidated group member by another).

Therefore, HCC's basis in the 175,000 shares of stock it continued to own after the redemption was increased by its basis in the redeemed stock, to $131 million.

**3. Sale of Heinz Stock by HCC to AT&T**

In May 1995, HCC sold its remaining 175,000 shares of Heinz stock to AT&T for $7 million.

Again, the law is clear. This sale was taxed like any other sale. Under §1001(a), the loss realized by HCC was $124 million, the excess of HCC's basis in the stock sold ($131 million) over the amount realized ($7 million). Under §1001(c), the full amount of the loss was recognized, and under §165(a) it was allowed as a deduction. For Federal tax purposes, HCC recognized a short-term capital loss of $124 million ($7 million amount realized less $131 million basis). Under §1212(a) and Treas. Reg. §1.1502-21A, the Heinz Group carried this loss back against its net capital gains in 1992, 1993 and 1994, and these carrybacks produced the

---

[21] In G.C.M. 35793 (Apr. 24, 1974), the Service's Chief Counsel explained the importance of stock basis transfers:

> It is our opinion that the regulation [Treas. Reg. §1.302-2(c)]] was intended to require an allocation which would directly or indirectly grant the redeemed shareholder the full benefit of his basis in the redeemed stock. It is thus our view that the regulation should be interpreted to require a reasonable allocation of basis in dividend equivalency cases *so that basis will not disappear*.

(emphasis added). In fact, the Chief Counsel expressed a preference for transferring basis from redeemed stock to stock owned by the same shareholder in a related corporation (not the redeeming corporation), as opposed to transferring basis to stock of the redeeming corporation owned by a related shareholder. The concern was that the courts may find it inequitable to deprive the redeemed shareholder of its basis and transfer it to another person and so "may become reluctant to find no 'meaningful reduction' in these redemption cases." This issue is not present here, because HCC, the redeemed shareholder, continued to own stock of Heinz, the redeemed corporation. (G.C.M. 35793 is not cited as precedent. §6110(k)(3). Plaintiff respectfully brings it to the attention of the Court as a description of the Service's view of the purpose of stock basis transfers under Treas. Reg. §1.302-2(c).)

refunds sought by Plaintiff in this case. No provision of the Code, regulation or judicial doctrine disallowed this loss deduction.[22]

**B. Section 1059 Is of Special Significance to Plaintiff's Case**

At the heart of this case lies the legislative design for the tax treatment of dividends and stock basis. The Code provisions and regulations on which Plaintiff relies represent policy determinations carefully developed by the Legislative and Executive Branches within the intricate and comprehensive system of taxing the income of corporations and their shareholders.

Under our "classical" corporate tax system, corporate income is subject to two levels of tax. A corporation is taxed on its income as earned, and the shareholders are taxed again on the same income when they receive it as a dividend or sell stock at a price reflecting the accumulated income. To the extent a shareholder that is itself a corporation is taxed (or its stock basis is reduced) when it receives a dividend, the same income is taxed three times. To prevent such a triple tax, corporate shareholders are entitled to a dividends-received deduction under §243 or an exclusion of dividends from taxable income under the consolidated return regulations.[23]

For this reason, in general corporate shareholders pay little or no tax on their dividend income, and the dividends they receive do not reduce the basis of the stock they own. Because such dividends do reduce the value of the stock, however, a tax-free dividend a corporate shareholder receives can reduce its gain or increase its loss on a sale of the stock—exactly what

[22] Under §1032, no gain or loss is recognized to a corporation upon issuance of its own stock. This rule does not apply, however, to a sale by a subsidiary of stock of its parent. Rev. Rul. 70-305, 1970-1 C.B. 169, discussed in footnote 17, above. Section 267(a)(1) disallows losses on sales of property between certain related persons. Because HCC and AT&T were unrelated, this provision did not apply. Treas. Reg. §1.1502-13(f)(6)(i)(A) now disallows a consolidated subsidiary's loss on a sale of parent stock. This regulation, however, became effective only for transactions in taxable years beginning on or after July 12, 1995. Treas. Reg. §1.1502-13(l)(1).

[23] Treas. Reg. §1.1502-14(a) (in effect at the time of these transactions); Treas. Reg. §1.1502-13(f)(2)(ii) (currently in effect).

happened here.[24] Congress has long been aware of the tax advantages of such "dividend stripping," but Congress has had to balance this concern against the policy of preventing income from being subjected to triple taxation.

Over the years, Congress has legislated repeatedly but selectively to eliminate specific types of tax benefits for corporate shareholders while still limiting triple tax. In this legislation, Congress has created a carefully articulated system for taxing the dividends that corporate shareholders receive.[25]

Most important here, Congress has enacted §1059 to restrict tax benefits from specific kinds of corporate dividend stripping. Under §1059, a corporate shareholder's basis in stock may be reduced by the untaxed portion of "extraordinary dividends." In the original version of §1059, enacted in 1984, these "extraordinary dividends" were unusually large dividends and certain dividends paid on preferred stock. IRC §§1059(c), (f). In 1986, Congress added the rule that, if stock is redeemed from a corporate shareholder, and if the redemption is taxed as a dividend but is not *pro rata* among all shareholders, the dividend is an "extraordinary dividend" resulting in stock basis reduction. IRC §1059(e)(1). At the same time, however, Congress added an important exception in §1059(e)(2)(A):

> Except as provided in regulations, the term "extraordinary dividend" does not include any qualifying dividend (within the meaning of section 243).

---

[24] *Litton Industries Inc. v. Commissioner*, 89 T.C. 1086 (1987) (*acq. in result*); *Uniroyal Inc. v. Commissioner*, T.C. Memo. 1993-214 (1993); Rev. Rul. 75-493, 1975-2 C.B. 108. A dividend by a subsidiary preceding a sale of its stock may be disregarded, if the subsidiary is a conduit for a portion of the sale price. *Waterman Steamship Corp. v. Commissioner*, 430 F.2d 1185 (5th Cir. 1970), *cert. denied*, 401 U.S. 939 (1971). But this principle applies only in such conduit situations. *TSN Liquidating Corp. v. United States*, 624 F.2d 1328 (5th Cir. 1980) (dividend of portfolio securities by subsidiary to parent, followed by sale of subsidiary stock and cash contribution by stock purchaser, treated as separate dividend).

[25] This legislation has taken a variety of forms, including changes in the amount of the dividends-received deduction, restrictions on the availability of the deduction, restrictions on deductions for interest on debt related to stock that generates dividends subject to the dividends-received deduction and reductions in stock basis. For a complete history of legislative activities in this area until the late 1980s, *see* G. Mundstock, "Taxation of Intercorporate Dividends Under an Unintegrated Regime," 44 Tax L. Rev. 1 (1988).

Such a "qualifying dividend" is one received by a corporation that, at the close of the taxable year, is a member of the same affiliated group as the dividend-paying corporation.

The exception in §1059(e)(2)(A) applies here. As parent and wholly-owned subsidiary, Heinz and HCC were members of the same affiliated corporate group, and any dividend paid by Heinz to HCC was a "qualifying dividend" under §243(b)(1). Section 1059(e)(2) was enacted at the same time as §1059(e)(1), relating specifically to non *pro rata* dividend redemptions. Thus, there can be no doubt that Congress intended the exception carved out by §1059(e)(2)(A) to apply to redemptions taxed as dividends under §302. Undoubtedly too, Congress was aware that, under Treas. Reg. §1.302-2(c) (in effect since 1955), a redeemed shareholder's basis in its redeemed stock would be transferred to stock it retained. Thus, the redemption did not cause any reduction to HCC's basis in its Heinz stock, and the full basis of its redeemed stock was transferred to HCC's remaining stock.

The §1059(e)(2)(A) exception is available *only* to a corporate shareholder that is affiliated with the redeeming corporation. If Heinz and HCC had not been affiliated, HCC's basis in its Heinz stock would have been reduced under §1059(e)(1). Consequently, their parent-subsidiary relationship cannot be a reason to deny HCC the benefit of this unreduced stock basis or the resulting loss on the sale of its retained Heinz stock. Yet, as discussed in part IV.C., below, that is what Defendant argues should happen.

Section 1059(e) became effective in July 1986. At that time, Congress realized that other types of dividends could and perhaps should result in stock basis reduction, and that the matter required further study. The introductory language of §1059(e)(2)—"except as provided in regulations"—gave the Treasury Department power to expand the coverage of §1059(e)(2), *i.e.*, to apply stock basis reduction to other transactions *but only by adopting regulations*.

The redemption occurred in January 1995, 8½ years after §1059(e) became effective. At that time, no regulations under §1059(e)(2) had yet been issued or even proposed. It was not until 17 months later, on June 17, 1996, that Treasury proposed regulations to exercise its authority under §1059(e)(2) and expand the coverage of §1059. Proposed Treas. Reg. §1.1059(e)-1(a), read in part:

> . . . if a redemption of stock is not pro rata as to all shareholders, any amount treated as a dividend under section 301 is treated as an extraordinary dividend regardless of whether the dividend is a qualifying dividend.

The final regulation (Treas. Reg. §1.1059(e)-1) was adopted on July 15, 1997, with an effective date that was retroactive, but only to June 17, 1996.

Congress continued to legislate in the corporate dividend-stripping area but made no changes either to §302 or to §1059(e)(2). In May 1995, the Chairmen and Ranking Minority Members of the Senate Finance Committee and the House Ways and Means Committee introduced bills that would have amended §302 to tax as sales, rather than as dividends, redemptions of stock from corporate shareholders that are "not pro rata as to all shareholders." These bills also would have repealed §1059(e) as no longer necessary.[26]

Reaction to the bills was adverse for several reasons, including the concern that sale treatment of redemptions could make more tax losses available.[27] As a result, §302 was not amended, and §1059(e) was retained. Instead, in 1997 Congress amended §§1059(d) and 1059(e)(1) but made no changes to either §302 or §1059(e)(2). In adopting this legislation, Congress undoubtedly was aware of the recent regulations in the closely-related area of

---

[26] S. 750 and H.R. 1551, 104th Cong., 1st Sess. (May 3, 1995).

[27] *See*, *e.g.*, Ltr from D. Walker, AICPA to Hon. Bill Archer, July 12, 1995, 95 TNT 142-24. The proposed legislation is criticized in Bittker & Eustice ¶ 9.03[b]:

> Almost lost in the surrounding debate was the fundamental point that corporations are subject to the double tax regime of subchapter C, but are not supposed to be a component of a multiple triple-tier tax engine—hence the §243 dividends-received deduction.

§1059(e)(2), including their effective date, and Congress did nothing to disturb the Treasury Department's determinations.

Along with §302 and Treas. Reg. §1.302-2(c), §1059(e)(2) and Treas. Reg. §1.1059(e)-1 (particularly its effective date) specify in detail the tax treatment of the transactions at issue in this case. As the history makes clear, these provisions reflect the considered judgments of Congress and the Treasury Department in a complex area of the tax law where policy trade-offs are necessary and common.

In these circumstances, as the courts (including the Supreme Court, the Court of Federal Claims and this Court) have recognized in numerous cases, the judiciary must apply the plain meaning of the statute. *See*, *e.g.*, *Gitlitz v. Commissioner*, 531 U.S. 206, 220 (2001) ("Because the Code's plain text permits the taxpayers here to receive these ['double windfall'] benefits, we need not address this policy concern."(footnote omitted)); *United States v. Davis*, 397 U.S. 301, 306 (1970), discussed in part III.A.2., above (following "the plain language of the statute" to hold that constructive stock ownership rules of §318 apply under §302(b)(1)); *Hanover Bank v. Commissioner*, 369 U.S. 672, 688 (1962) (". . . the Government now urges this Court to do what the legislative branch of the Government failed or elected not to do. This, of course, is not within our province." (footnote omitted)); *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463, 1468-1470 (Fed. Cir. 1997) ("Where the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' [citations omitted] . . . '[A]bsent a clear showing of contrary legislative intent, the plain meaning analysis of the statutory language begins and ends the judicial inquiry.' [citations omitted]"); *Yocum v. United States*, 66 Fed. Cl. 579, 588 (2005) (". . . the objective here must be to effectuate, rather than defeat, the obvious

intent of the Congress. And, in the case *sub judice*, the court need do nothing to the words of the relevant statutes, but to accept them . . .").

The law applicable to the transactions at issue is clear. HCC's basis in the stock sold to AT&T was $131 million. When HCC sold the stock for $7 million, it recognized a $124 million capital loss, and, because of the carryback of that loss, Plaintiff is entitled to the refund it seeks.

**IV. Responses to Defendant's Arguments**

Defendant does not challenge HCC's purchases of Heinz stock in the market or HCC's sale of stock to AT&T. Not liking the tax consequences of the redemption as prescribed in the Code and in its own regulations, however, Defendant asks this Court to disregard the redemption by denominating it a sham.[28] D. Mem. 34. Defendant makes three arguments to support this position:

A. Heinz and HCC had insufficient non-Federal tax business purposes for the transactions.

B. The redemption was not conducted on arm's-length terms, *i.e.*, the value of the Note was less than that of the redeemed stock.

C. In the redemption, Heinz did not transfer the economic benefit of the Note to HCC, because HCC was obligated to return any cash proceeds of the Note to Heinz as a dividend.

---

[28] An "economic sham," sometimes referred to as a "sham in substance," is one which has no practical economic consequences, or "economic substance," other than the creation of income tax losses or deductions. *Knetsch v. United States*, 364 U.S. 361 (1960); *United Parcel Service of America, Inc. v. Commissioner*, 254 F.3d 1014 (11th Cir. 2001); *Casebeer v. Commissioner*, 909 F.2d 1360 (9th Cir. 1990); *Kirchman v. Commissioner*, 862 F.2d 1486 (11th Cir. 1989). Sham transactions are disregarded for tax purposes. *Knetsch v. United States, supra*.

The test for "economic substance" in *ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998) is as good as any: "whether the transaction has any practical economic effects other than the creation of income tax losses. . . ." 157 F.3d 231, 248 (citation and internal quotation omitted). Another formulation of the test is whether there was a "reasonable possibility of profit . . . apart from tax benefits." *IES Industries v. United States*, 253 F.3d 350, 354 (citation and internal quotation omitted) (8th Cir. 2001). *Accord*, *Shriver v. Commissioner*, 899 F.2d 724 (8th Cir. 1990); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985).

For the reasons discussed below, Plaintiff believes that none of these arguments is valid.

**A. The Business Purpose Doctrine Cannot Invalidate the Redemption**

Defendant argues that the redemption should be disregarded, and HCC's loss on its sale of Heinz stock disallowed, because Heinz and HCC did not have sufficient non-Federal tax business purposes for the transactions that led to the loss. In Plaintiff's view, however, the law is clear that a taxpayer's motivation for entering into a transaction (especially a stock redemption or sale) is irrelevant to its tax treatment, so long as the transaction has real economic substance. In any event, Heinz's and HCC's purposes were sufficient under any reasonable standard.

**1. Tax-Avoidance Motive Is Irrelevant Because the Transactions Had Economic Substance**

Plaintiff acknowledges that the form of the transactions here was determined in large measure by the anticipated tax benefits. But this fact makes no difference.

The courts have consistently rejected attacks on real transactions that resulted in non-tax changes in a taxpayer's economic position, even if tax-avoidance was the principal or even the sole motivating factor. *See, e.g., Frank Lyon Co. v. United States*, 435 U.S. 561 (1978);[29] *Gulf Life Ins. Co. v. United States*, 118 F.3d 1563 (Fed. Cir. 1997);[30] *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001); *IES Industries, Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001). Even *ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998), a notable government victory in the economic sham area, recognizes this principle.[31]

---

[29] "The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences. [footnote omitted] We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction. [citation omitted]" 435 U.S. at 580.

[30] "Tax planning is not a disapproved activity. . . . A 'major motive' to reduce taxes is not grounds of illegality." 118 F.3d at 1566.

[31] "While it is clear that a transaction such as ACM's that has neither objective non-tax economic effects nor subjective non-tax purposes constitutes an economic sham whose tax consequences must be disregarded, and equally clear that a transaction that has both objective non-tax economic significance and subjective non-tax purposes constitutes an economically substantive transaction whose tax consequences must be respected, it is also well

Footnote continued on next page

The authorities also support the specific proposition that no non-Federal tax business purpose is required to validate a purchase, sale or redemption of stock. Only economic substance and a transfer of the benefits and burdens of ownership are required. *See*, *e.g.*, *United States v. Davis*, 397 U.S. 301 (1970) (discussed in part III.A.2., above); *Sun Properties, Inc. v. United States*, 220 F.2d 171 (5th Cir. 1955); *Granite Trust Co. v. United States*, 238 F.2d 670 (1st Cir. 1956); *Avco Mfg. Corp. v. Commissioner*, 25 T.C. 975 (1956), *vacated on other grounds*, 1957 U.S. App. LEXIS 5009, 52 A.F.T.R. 1215 (2d Cir. 1957).

That the redemption possessed substantial economic substance is undeniable. Both Heinz as issuer and HCC as holder of the Note had economic risk of loss and opportunity for gain. These risks and opportunities were significantly different from Heinz's and HCC's risks and opportunities before the redemption.

The redemption changed HCC's predominant position from shareholder to creditor with contingent equity rights. By changing its position, HCC protected the value of its investment while retaining upside potential via the conversion right.

On the other side, Heinz became obligated to pay a fixed cash amount at a fixed future date, or, if the holder chose to convert, to issue a fixed number of shares of stock. Also, by substituting its zero-coupon debt for equity, Heinz eliminated—for at least three years and perhaps forever—its obligation to pay dividends on the redeemed stock. Heinz also acquired stock for immediate use in its stock option programs or as acquisition currency.

---

established that where a transaction objectively affects the taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations." 157 F.3d at 248 n.31 (citations omitted). Consequently, said the court, the economic consequences of ACM's transactions were ". . . *essential* to assessing whether the transaction's tax consequences may be disregarded. . . ." 157 F.3d at 249 n.33 (emphasis added).

The fact that Heinz and HCC were parent and subsidiary does not prevent the transaction from having economic substance and so having full effect for Federal tax purposes. This issue is discussed in parts IV.A.3. and IV.C.3., below.

**2. Taxpayers May Choose the Manner of Carrying Out Transactions So Long as They Have Economic Substance**

Defendant admits that Heinz had legitimate non-tax business purposes for purchasing its own stock but denies that there was a non-Federal tax purpose for HCC to purchase Heinz stock. According to Defendant, Heinz could have achieved its business purposes more easily by purchasing its own stock directly from the public. Defendant argues that, because Heinz *could* have purchased its own stock directly, it *should* have done so.

Nothing in the tax law requires a real transaction to be accomplished in the simplest possible manner or in the manner that yields the most tax revenue. The most famous expression of this principle appears in Judge Learned Hand's opinion in *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd*, 293 U.S. 465 (1935):

> Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.

(citations omitted) In *Sun Properties, Inc. v. United States*, 220 F.2d 171, 174 (5th Cir. 1955), the Fifth Circuit dealt with Defendant's argument in the same way:

> Likewise, the argument that the transaction was not done in the customary manner must go by the board. We know of no general requirement that transactions be entered into in a conventional way for them to be recognized as having the usual tax result.

More recently, in *United Parcel Service of America, Inc. v. Commissioner*, 254 F.3d 1014, 1019 (11th Cir. 2001), the Eleventh Circuit put it this way:

> The Code treats lots of categories of economically similar behavior differently. For instance, two ways to infuse capital into a corporation, borrowing and sale of equity, have different tax consequences; interest is usually deductible and distributions to equity holders are not. There may be no tax-independent reason for a taxpayer to choose between these different ways of financing the business, but it does not mean that the taxpayer lacks of "business purpose." To conclude otherwise would prohibit tax planning.

The law on this score could not be clearer. Heinz was not obliged to accomplish its business purpose the way the government would have preferred.

### 3. Defendant Misinterprets *Gregory v. Helvering* and *Higgins v. Smith*

The legal analysis of the business purpose issue in Defendant's Memorandum focuses on *Gregory v. Helvering*, 293 U.S. 465 (1935), and *Higgins v. Smith*, 308 U.S. 473 (1940). D. Mem. 25-26. Defendant interprets these cases as imposing a strict business purpose requirement on all transactions between related parties, but neither case supports this interpretation.

Defendant's own quotation from *Gregory* shows that Defendant's interpretation is faulty:

> It is quite true that if a reorganization in reality was effected within the meaning of subdivision (B), *the ulterior purpose mentioned will be disregarded*. The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. [citations omitted] But the question for determination is whether what was done, *apart from the tax motive*, was the thing which the statute intended.

293 U.S. at 469 (emphasis added), quoted, D. Mem. 26. In *Gregory*, then, the Court considered, not whether the taxpayer's motivation was proper, but whether her actions were those Congress intended to govern with the relevant statute—there, the reorganization provisions of the Code. The Second Circuit has explained this distinction in *Nassau Lens Co. v. Commissioner*, 308 F.2d 39 (2d Cir. 1962):

> In the absence of statutory language or legislative history to the contrary, the desire to save taxes is not by itself sufficient cause to disregard the form adopted by the taxpayer, for "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596. While the taxpayer may of course show he had a motive other than tax saving in adopting a particular form, his case may also be based upon a demonstration "that his treatment of the transaction does not conflict with the meaning Congress had in mind when it formulated the section *sub judice*." *Gilbert v. Commissioner*, 248 F.2d 399, 406 (2nd Cir. 1957). In short, the courts have not attributed to Congress a general purpose underlying the entire Code to deprive the taxpayer in each case of freedom to choose between legal forms similar in a broad economic sense but having disparate tax consequences. [footnote omitted] *Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2nd Cir. 1956). They have, instead, when confronted with a statutory provision not explicitly turning on the relationship between parties to a transaction [footnote omitted] or requiring an underlying business purpose, adopted a cautious approach and asked merely whether the form superimposed upon the transaction has a result similar to the one Congress had in mind when it drafted the section involved.

308 F.2d at 44-45.

The redemption of Heinz stock from HCC was precisely, in the words of *Gregory*, "the thing which the statute intended" as a redemption and as a dividend. As discussed in parts III.A.2. and III.B., above, in light of §§302 and 1059, this conclusion is irrefutable. *Gregory* supports Plaintiff, not Defendant.

Defendant cites *Higgins* for the proposition that the Supreme Court has "expanded the holding of Gregory to every transfer of assets to or from a controlled corporation." D. Mem. 26. In *Higgins*, a shareholder sold securities at a loss to a wholly-owned corporation that he had formed and operated to allow him to claim tax losses by engaging in such purchases.[32] While the Court disallowed the loss, *Higgins* has never stood for the broad proposition that otherwise real transactions between shareholders and their wholly-owned corporations generally lack

[32] Several cases cited in Defendant's Memorandum of Contentions of Fact and Law deal with sales of property at a loss between related parties. *Scully v. United States*, 840 F.2d 478 (7th Cir. 1988); *Northern Pacific Railway Co. v. United States*, 180 Ct. Cl. 388 (1967); *Investors Diversified Services, Inc. v. Commissioner*, 325 F.2d 341 (8th Cir. 1963). These taxpayers tried to shoehorn tax benefits intended for transactions between unrelated taxpayers into related-party transactions. Here, the tax benefit sought by Plaintiff—an unreduced stock basis after a stock redemption—is available under §1059(e)(2)(A) *only* in redemptions between related corporations. For this reason alone, in Plaintiff's view none of the cases is apposite. Each of these cases is also distinguishable on specific factual bases.

*Scully* involved a sale of land between two related trusts. The court held that there was no actual separation in the operation of the trusts, and that the beneficiaries were similar. Consequently, the "sale" was not a sale for tax purposes, and no loss could be deducted. By relying on *Scully*, Defendant in effect contends that HCC should be disregarded as an *alter ego* of Heinz, a contention that, as discussed below, is not supportable in light of *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), and §1059(e)(2)(A). *See also* part IV.C.3., below.

In *Northern Pacific Railway*, a publicly-traded parent corporation had a subsidiary, NWI, which had a subsidiary, Cuyuna. NWI owned parent stock at a loss. While in the process of liquidating, NWI sold parent stock to Cuyuna. The court disallowed the loss on this sale. The court noted that Cuyuna "did not have the money to pay for the stock; it had to receive an advance of $500,000 from Northern Pacific (or some other source) before it could pay NWI $525,000 for the shares in December 1957." 180 Ct. Cl. at 395. The court also noted that Cuyuna's return on its investment was limited to $227,100 in dividends. Here, the parties had ample financial resources—HCC to purchase the Heinz stock and Heinz to satisfy its obligations under the Note—and HCC's investment in Heinz stock and the Note was highly profitable. In addition, HCC was not liquidating at the time of the transactions. Indeed, HCC still exists as a substantial member of the Heinz Group.

In *Investors Diversified*, the taxpayer sold mortgages to a subsidiary at prices resulting from what the court called an "artificial formula [that] guaranteed a loss . . ." 325 F.2d at 353. Here, as discussed in part IV.B.2., below, all the transactions were intended to be and were in fact conducted on arm's-length terms.

economic substance, or even that such transactions must pass some type of benign motive test. The language of the *Higgins* opinion makes this point clear:

> The Government urges that the principle underlying *Gregory v. Helvering* [footnote omitted] finds expression in the rule calling for a realistic approach to tax situations. As so broad and unchallenged a principle furnishes only a general direction, it is of little value in the solution of tax problems. If, on the other hand, the *Gregory* case is viewed as a precedent for the disregard of a transfer of assets without a business purpose but solely to reduce tax liability, it gives support to the natural conclusion that *transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration.*

308 U.S. at 476 (emphasis added).

Later court decisions make clear that *Higgins* does not justify disregarding a shareholder-corporate transaction unless the transaction lacks economic substance on its own facts. In *Moline Properties Inc. v. Commissioner*, 319 U.S. 436 (1943), the Court held that a corporation has a "tax identity" separate from that of its sole shareholder. 319 U.S. at 440. In *National Investors Corp. v. Hoey*, 144 F.2d 466 (2d Cir. 1944), decided shortly after *Moline Properties*, the Second Circuit (Learned Hand, J.) made clear the significance of *Moline Properties*, especially in relation to *Higgins*:

> The gloss then put upon *Higgins v. Smith*, *supra*, was deliberate and is authoritative: it was that, whatever the purpose of organizing the corporation, "so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity." 319 U.S. 439, 63 S.Ct. 1134, 87 L. Ed. 1499. That, as we understand it, is the same interpretation which was placed upon corporate reorganizations in *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L. Ed. 596, 97 A.L.R. 1355, and which has sometimes been understood to contradict the doctrine that the motive to avoid taxation is never, as such, relevant. In fact it does not trench upon that doctrine; it merely declares that to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, that the term "corporation" will be interpreted to mean a corporation which does some "business" in the ordinary meaning; and that escaping taxation is not "business" in the ordinary meaning.

144 F.2d at 467-468. In *National Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949), the Court explained *Moline* further and held that a subsidiary is not to be disregarded as a separate taxpayer from its parent under an "agency" theory, just because it is a subsidiary. Citing *Moline*, the Court stated: "Complete ownership of the corporation, and the control primarily dependent

upon such ownership . . . are no longer of significance in determining taxability." 336 U.S. at 429.

Thus, *Moline Properties*, as interpreted in *National Investors*, reaffirms the *Gregory* rule: a transaction between parent and subsidiary is given effect for Federal tax purposes under the Code, and an examination of the taxpayer's motives for engaging is unnecessary, so long as the transaction is economically real and is "what the statute intended."

Another leading authority on this point is *Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2d Cir. 1956). There, a wholly-owned subsidiary distributed a note to its parent as a dividend. The principal purpose of the dividend was to generate interest deductions for the subsidiary that, under a pending change in the law, would no longer be allowed to file consolidated returns with the parent. The government argued that the subsidiary's interest deductions should be disallowed, because the dividend was an economic sham. The Second Circuit allowed the interest deductions:

> However, it is one thing to say that transactions between affiliates should be carefully scrutinized and sham transactions disregarded, and quite a different thing to say that a genuine transaction affecting legal relations should be disregarded for tax purposes merely because it is a transaction between affiliated corporations. [footnote omitted] We think that to strike down a genuine transaction because of the parent-subsidiary relation would violate the scheme of the statute and depart from the rules of law heretofore governing intercompany transactions. . . . [A]ll legitimate and genuine corporation-stockholder arrangements have legal and hence economic significance, and must be respected in so far as the rights of third parties, including the tax collector, are concerned.
>
> * * * *
>
> We do not think that these [substance-over-form] cases hold that tax minimization is an improper objective of corporate management; they hold that transactions, even though real, may be disregarded if they are a sham or masquerade or if they take place between taxable entities which have no real existence. The inquiry is not what the purpose of the taxpayer is, but whether what is claimed to be, is in fact.

232 F.2d at 124, 128.

In other cases even more similar to this one, courts have approved transactions with subsidiaries to obtain tax advantages. *See, e.g., Northern Indiana Public Service Co. v. Commissioner*, 115 F.3d 506 (7th Cir. 1997) (financing through Netherlands Antilles subsidiary respected even though purpose was tax avoidance); *United Parcel Service of America Inc. v.*

*Commissioner*, 254 F.3d 1014 (11th Cir. 2001) (reinsurance arrangement with foreign subsidiary respected even though subsidiary's insurance risk was small, and arrangement was tax motivated). In these cases too, what mattered was that the transactions in question had real economic consequences, not that the taxpayers undertook them to reduce taxes.

Here again, the taxpayer's motivation for engaging in or structuring the transaction is not the issue. Rather, the issue is the substance of what occurred. Did the transaction "vary control or change the flow of economic benefits"? As discussed in part IV.C., below, the redemption satisfies this requirement.

#### 4. Although Not Required, Heinz and HCC Had Substantial Business Reasons for the Transactions

Defendant admits that Heinz had a non-tax reason for withdrawing its own stock from the market (Jt. Stip. ¶ 19) but argues that there were no legitimate business reasons for HCC to purchase Heinz stock. As discussed above, no such business purpose was necessary here, but in fact there were non-tax business purposes.

For many years Heinz had pursued a program of buying its own stock in the market. This program was aimed at maximizing the value of Heinz stock by stabilizing outstanding equity and buying stock when the market undervalued it. For financial reporting purposes, Heinz stock held by HCC was not treated as outstanding. Thus, for the purpose that mattered most—controlling the number of outstanding shares of Heinz stock—it was just as effective for HCC to purchase the stock as it was for Heinz to do so. Given these facts, Heinz was entitled to achieve its objective in a tax-advantageous manner.

The evidence also demonstrates that there were legitimate non-Federal tax reasons for HCC to finance, purchase and own Heinz stock and the Note.

First, HCC made an investment that was fully consistent with its business of owning affiliate securities and one that proved very profitable.

Second, since the 1980s, Heinz had tried several ways to preserve the state tax benefits of HCC's status as a Delaware investment company. The protection of state tax benefits is a recognized business purpose.[33] By borrowing funds without a Heinz guarantee and acquiring investments in Heinz securities of more than $130 million, HCC intended to strengthen its Delaware investment company status. In addition, the agreement of Morgan Guaranty to extend its line of credit to HCC with no guarantee from Heinz was a significant, objective recognition of HCC's independent financial strength.

At about the same time as the transactions involved here, the Heinz Group implemented Project Turbo as the latest step in the Heinz Group's continuing efforts to protect the intercompany lending program and, indeed, to expand or "turbo-charge" it. Buttressing HCC's Delaware investment company status was entirely consistent with the Project Turbo restructuring, even though thereafter most of the intercompany lending was conducted indirectly by HCC through its subsidiary CMH/Heritage. HCC's status was still critical to protecting the $20 million of state tax benefits that the intercompany lending program had created in earlier tax years still open to audit.

**B. The Redemption Was Effected on Arm's-Length Terms**

Defendant argues that the Note issued by Heinz was worth slightly less than the redeemed stock and that, as a result, the redemption should be disregarded entirely. Plaintiff believes the value of the Note was intended to be and in fact was reasonably equal to the value of

[33] Rev. Rul. 79-289, 1979-2 C.B. 145; Rev. Rul. 76-187, 1976-1 C.B. 97.

the stock. Even if the value of the Note had been less than the value of the stock, this fact would not justify disregarding the redemption.

HCC retained Goldman Sachs to advise it on the redemption. After developing the terms of the Note, Goldman Sachs advised HCC that the Note would be reasonably valued at $130.5 million, the same as the value of the stock Heinz would redeem from HCC.

Defendant's expert, Professor Gregg A. Jarrell, however, concluded that the value of the conversion right in the Note was less than the value determined by Goldman Sachs. As a result, he valued the Note at $121.8 million, 6.7% less than Goldman Sachs's determination. D. Ex. 124, ¶ 2.

**1. HCC and Heinz Intended That the Terms of the Redemption Be Arm's-Length**

HCC and Heinz made every effort to ensure that the redemption would be conducted on arms'-length terms, and that the stock would be redeemed from HCC at fair market value. Tr. 146-147. HCC retained Goldman Sachs and Mr. Darivoff to develop terms for the Note and advise as to its value, because they were "the best." Tr. 145. Moreover, neither HCC, nor Heinz nor Goldman Sachs had any incentive to value the Note incorrectly. There is no evidence to the contrary, and, to Plaintiff's knowledge, Defendant has not disputed these facts.

**2. Even if a Small Discrepancy in Value Had Existed, It Would Not Justify Disregarding the Redemption**

The parties' valuations differ by 6.7%. Even if Defendant's expert were correct, such a small discrepancy in value would not justify disregarding the entire redemption.[34] At most, if

[34] The Court recognized this issue at the December 16, 2005, pre-trial hearing:

> The fact that there would be that variation would not necessarily suggest at all that the deal is not bona fide, but on the other hand if you had a situation in which the variation in values were significant for some reason, namely a proper valuation of something would put it in the realm of a deal that nobody would take, for example, now you're in a different realm.

Pre-trial hearing Tr. 29-30.

such a discrepancy existed, it might be appropriate to rearrange the tax consequences of 6.7% of the redemption.

Defendant cites *Long Corp. v. United States*, 156 Ct. Cl. 197 (1962), but this case does not help Defendant. In *Long*, a parent corporation deducted cost overruns it had incurred in performing a construction contract with its subsidiary. In allowing the deduction, the court stated:

> Our approach has been to ascertain whether the transaction was 'one that could have reasonably been made between parties dealing at arm's length,' and if it were, a business loss would be deductible.' [citation omitted] . . . Plaintiff and its subsidiary have dealt with each other as if they were entirely unrelated corporations.

156 Ct. Cl. at 203. Thus, *Long* explains what happens if a related-party transaction is done entirely on arm's-length terms but not what happens otherwise.

If Professor Jarrell were correct and the Note were worth 6.7% less than the redeemed stock, the worst that can be said is that, despite their best efforts, the parties failed to achieve arm's-length pricing. *Long* does not address such a situation, but the Code and the regulations do. Such a transaction is not disregarded. Instead, at most the *difference* in values is recharacterized as something else. Section 482 exists for the very purpose of correcting pricing errors in transactions between related parties. It allows the Service to reallocate income, deductions and credits between related entities to reflect their income clearly.

One example of this approach is *Baldwin Bros., Inc. v. Commissioner*, 361 F.2d 668 (3d Cir. 1966). There, the Third Circuit upheld the Service's use of §482 and denied a loss incurred by a parent corporation on a sweetheart lease to its subsidiary. While the loss resulting from the bargain was denied, the lease itself was not disregarded.

Similarly, Treas. Reg. §1.301-1(j) [35] provides that, if a corporation transfers property to a shareholder for consideration worth less than the property's fair market value, the *difference* is treated as a dividend. The balance of the transaction remains an exchange. The Service has ruled that this is the proper approach.[36] This regulation is particularly relevant where, as here, the transaction involved is taxed as a dividend.

In an effort to refute this argument, Defendant cites *National Lead Co. v. Commissioner*, 336 F.2d 134 (2d Cir. 1964), *cert. denied*, 380 U.S. 908 (1965):

> In such a case, Heinz insists that the courts must recognize the transfer; at most they may adjust the claimed amounts of gain or loss under code §482 or Treas. Reg. §1.301-1(j). See Pl. Memo. at 20-21. Heinz has excessively narrowed its research. For example, in *National Lead Co. v. Commissioner*, 336 F.2d 134 (2d Cir. 1964), *cert. denied*, 380 U.S. 908 (1965), the Second Circuit Court of Appeals affirmed an assessment against a parent corporation that had used a subsidiary to generate a capital loss for tax purposes even though the net effect of the transaction was a profit, not a loss. The sales were solely at the parent's instigation. The court found "not only that there was no arm's length deal between the parties, but also that the transaction was not one that would be entered into by parties dealing at arm's length. Id. At 141. The opinion mentions neither Code §482 nor Treas. Reg. §1.301-1(j).

D. Mem. 30-31. *National Lead,* however, provides no guidance on the applicability of §482 or Treas. Reg. §1.301-1(j), because *National Lead* did not involve a pricing discrepancy. In fact, the court specifically noted that the sale price in the transaction at issue there was equal to the fair market value of the property sold. 336 F.2d at 139.

Thus, even if Professor Jarrell were right and the Note were worth slightly less than the redeemed stock, this fact would not justify disregarding the redemption.

---

[35] Under the literal language of Treas. Reg. §1.301-1(j), individual and corporate shareholders are treated differently. This regulation was adopted, however, before §301(b) was amended to eliminate the difference in treatment between corporate and individual shareholders, and it has not been updated. In any case, neither an individual nor a corporate shareholder has ever been forced to treat the entire amount of property received from a corporation as a §301 distribution (unless it pays nothing for the property).

[36] *See, e.g.,* Rev. Rul. 78-83, 1978-1 C.B. 79 (no constructive distribution to parent to the extent payment from one subsidiary to another subsidiary constituted reasonable compensation); Rev. Rul. 69-630, 1969-2 C.B. 112 (same for intercompany sale of property).

### 3. The Value of the Note Was Reasonably Equal to the Value of the Redeemed Stock

Plaintiff has introduced substantial evidence, particularly the first Goldman Sachs opinion (Pl. Ex. 4) and the trial testimony of Philip Darivoff, that the Note and the stock redeemed were of reasonably equal value—approximately $130.5 million. Defendant has offered the testimony of its expert, Professor Gregg Jarrell, that the Note was worth "only" $121.8 million.

Especially in view of the small difference between the two valuations, Plaintiff believes that the precise value of the Note is irrelevant. If, however, the Court deems Professor Jarrell's testimony relevant, Plaintiff believes the Court should treat his conclusion with considerable skepticism.

Professor Jarrell was hired to testify on behalf of the government long after the events in this case occurred. When Goldman Sachs designed and priced the Note in January 1995, however, there were no sides to take. The only objective was to get it right, and Goldman Sachs's reputation for getting it right is well-established. Tr. 145, 450-451, 521. In fact, Goldman Sachs had preeminent knowledge of and experience with capital market securities, particularly convertible debt. As Mr. Crowe testified:

> We felt that by engaging specifically Mr. Darivoff of Goldman Sachs, who had unmatched experience in capital markets transactions, we would have – we would have the best possibility that we could that the resulting note would be clearly arm's length.

Tr. 145. In rendering its opinion, Goldman Sachs could draw on its extensive experience and take the actual market into consideration. Tr. 343-344.

By contrast, before this trial Professor Jarrell had no experience with the market for such securities. Tr. 481-482; D. Ex. 124, Ex. A. Although he claimed general familiarity with the market for convertible debt in January 1995 (Tr. 481), his report does not even mention the subject. D. Ex. 124; Tr. 533.

Further, Professor Jarrell's valuation methodology was based on a fundamental factual error. According to him, because the Note could not have been sold to retail investors, it had "significant liquidity restrictions." D. Ex. 124, p. 306; Tr. 492, 529-530, 532. This conclusion, however, was flatly contradicted by two witnesses who knew the market for such securities well, Mr. Darivoff and Plaintiff's expert, Aiden E. Hatton, Jr. Notwithstanding its unregistered status, the Note could be bought and sold freely among the accredited investors that constituted the real market for this kind of security. Tr. 347-348, 445-446, 449.

Professor Jarrell applied a 42% discount to the conversion right in the Note to account for perceived illiquidity. His justification for such a discount included the results of studies on the marketability of restricted stock (listed in Exhibit C to his report) and certain types of non-publicly traded options. Tr. 494-496, 512, 535, 555, 622. Professor Jarrell ignored the fact that, because the conversion right was inseparable from the rest of the Note, the conversion right could not be any less liquid than the Note as a whole.[37] Again, the Note was highly liquid, because the real market for such securities was composed of accredited investors. Professor Jarrell's reliance on studies of restricted stock and non-publicly traded options—two things the Note certainly was not—is another good reason to question his conclusion.[38]

**C. Heinz Transferred the Full Economic Value of the Note to HCC**

Defendant also argues that the redemption had no economic substance, because Heinz did not transfer the economic benefit of the Note to HCC. As Plaintiff understands it, Defendant bases this argument on its belief that HCC would not have had any use for the $197.4 million cash it would have received at the maturity of the Note, and that HCC therefore would have been

[37] In cross examination, Professor Jarrell admitted this to be the case. Tr. 531-532.

[38] But by no means the only reason. In addition to questioning the relevance of these studies, Plaintiff takes issue with the soundness of a number of them. *See* Tr. 585-596.

obligated to distribute the cash back to Heinz as a dividend. Thus, Defendant argues, for HCC to derive any benefit from the Note, it had to convert, and so conversion was predetermined.

**1. Conversion of the Note Was Not Predetermined**

HCC's conversion of the Note in 1998 was a separate transaction with no relevance to this case.

The terms of the Note certainly did not make conversion especially likely when the Note was issued in January 1995. As of that time, the historical rate of appreciation of Heinz stock had been modest and its volatility low. Pl. Ex. 6. Heinz stock traded at about $39 per share. The expected conversion price when the Note's conversion right became exercisable three years later was over $44 per share and would continue to increase over time. The conversion right was an option that was "out of the money." Goldman Sachs so believed and so communicated to HCC. Defendant has not argued to the contrary.

After the Note was issued, however, there was an unprecedented bull market, and by January 1998 Heinz stock had more than doubled in value to about $82 per share. As a result, the conversion right in the Note had become "in the money" by nearly $189 million, and the value of the stock HCC would receive by converting was close to $289 million—46% more than the amount of cash payable when the Note would mature *four years later*. Tr. 166-167. Immediate conversion also would enable HCC to begin receiving cash dividends. At the very least, conversion was an eminently sensible investment decision for HCC, as it would have been for any other holder of the Note. Goldman Sachs so advised HCC, and HCC converted the Note. According to Mr. Hatton, who has considerable experience with convertible debt, "the economics of the situation almost made it mandatory to convert at that point." Tr. 457.

### 2. Had HCC Held the Note to Maturity, It Would Have Had Many Ways to Employ $197.4 Million Cash Other Than Returning It to Heinz

As another reason to disregard the redemption, Defendant argues that, had the Note been repaid at maturity, HCC could not have used the cash proceeds and would have been obligated to return the cash to Heinz as a dividend. As a result, Defendant argues, HCC never enjoyed the economic benefit of the Note. In Plaintiff's view, this argument consists of mere speculation. The idea that HCC, a $2 billion corporation, could not find use for $197.4 million cash defies common sense.

More specifically, the evidence shows that such an idea is contrary to fact. To support its theory, Defendant argues that there was in effect a corporate policy requiring HCC to distribute "all unneeded cash" as a dividend. D. Mem., pp. 7-8. Leaving aside the obvious—that "unneeded" cash means only cash the corporation cannot use—the evidence does not support this contention.

Defendant introduced as evidence a draft operating procedure for HCC that would have provided for distributions of excess cash. D. Ex. 60. Even this draft mentioned only "unneeded" cash. Moreover, as Defendant acknowledges, the draft was never adopted. The operating procedures that eventually were adopted (D. Ex. 62) contained no such provision. As Mr. Crowe testified: "So there is no legal, there is no legal, no moral, no tax, no obligation of any sort for Heinz Credit Company to pay anything to the Heinz Company." Tr. 132. In short, Defendant has nothing to support its contention that any distribution of cash, excess or otherwise, was required or even expected.

In another attempt to justify its argument, Defendant claims that, as a result of Project Turbo, HCC "abandoned" its intercompany lending business in 1995. Presumably, Defendant believes that, without such a business, HCC had no need for cash. D. Mem. pp. 11-12. At trial,

Defendant's counsel argued with Mr. Crowe about whether HCC was still engaged in a lending "business" after Project Turbo. Tr. 178-180, 211-214. Leaving aside an unproductive argument that depends on how the term "business" is defined, the undisputed facts are these. A major purpose of Project Turbo was to put intercompany loans on an arm's-length basis and so increase the amounts of intercompany interest and the state tax benefits. Tr. 126. HCC transferred most of its loan portfolio to its new subsidiary, CMH/Heritage, an Idaho corporation, which became the intercompany lender. Tr. 130; Jt. Stip. ¶¶ 50, 51. By that time, state tax authorities were raising inquiries about Delaware investment companies as a matter of routine. D. Ex. 75, p. 213; Jt. Ex. 14, p. 147. Transferring intercompany lending from HCC, a Delaware corporation, to CMH/Heritage, an Idaho corporation with headquarters in Idaho, allowed the Heinz Group to put itself outside the scope of these inquiries. Tr. 205. Project Turbo was a culmination of the Heinz Group's efforts to cure the Delaware substance problem.

HCC continued its intercompany lending business, however, through its subsidiary. In addition, HCC retained direct ownership of some loans, including the Note (Tr. 129), and it continued to own stock of Heinz's foreign subsidiaries doing business in the United Kingdom, Canada, Italy, the Netherlands, Spain, Greece, Ireland and New Zealand. Jt. Stip. ¶ 12. Tr. 131-132. Following Project Turbo, then, there was no reason to believe that HCC would have less use for cash in the future. Unlike a utility, a regulated investment company, a REIT or other special-purpose corporation, HCC was not restricted in the kind of assets it could hold or business it could conduct. Nor was HCC under any compulsion—legal, contractual, administrative or economic—to engage in any particular business, hold any particular kind of assets or distribute any cash it might receive in the future. Tr. 132.

In 1995 there was no way of knowing what HCC might do with $197.4 million cash it might receive seven years later. Tr. 170-171, 308. What matters is that HCC had a broad variety of choices. Tr. 132-133, 170-141, 309-310. As Mr. Crowe testified, HCC could have used such cash to make loans, make equity investments, purchase T-bills or avail itself of other investment opportunities. *Id.* As one example, had the Heinz Group wished to expand its foreign operations, a logical vehicle was HCC, and HCC could have financed the expansion with this cash. As another example, had Heritage/CMH needed more cash to lend to members of the Heinz Group, a logical source would have been its parent, HCC. The possibilities are endless.

Defendant's theory is contrary to both the evidence and common sense. After the redemption in January 1995, HCC held the Note and, like any other investor, it had the right to sell the Note, convert the Note into stock or take cash at maturity. It also had the right to retain and use the proceeds (cash or stock). In making its decision to convert the Note in 1998, HCC acted as any independent, rational investor would have done. Speculation about what HCC might or might not have done had it held the Note to maturity is no reason to disregard the redemption in which the Note was issued.

### 3. Defendant's Argument that HCC Was an *Alter Ego* of Heinz Is Barred by §1059 and by Case Law

By contending that HCC was obligated to return any cash proceeds of the Note to Heinz, Defendant changes the essential nature of its argument. As Defendant's Memorandum shows, what began as an argument that *the redemption* should be disregarded became an argument that HCC itself should be disregarded as an *alter ego* of Heinz:

> The defendant does not ask the Court to ignore Heinz's purchase of HCC's stock simply because the parties did not deal at arm's length; no parent corporation can ever deal with its subsidiaries at arm's length. In this case, however, Heinz dealt with HCC in ways no third party would accept. By failing to treat HCC as it would have been obliged to treat a separate entity, Heinz showed that HCC was acting as its *alter ego*. *See, e.g., Investors Diversified Servs., Inc. v. Comm'r.*, 325 F2d 341, 352 (8th Cir. 1963). This fact, and Heinz's retention of the Note's benefit, shows that Heinz merely transferred assets "from one pocket to another." *See generally, e.g.*,

> *Scully v. United States*, 840 F.2d 478, 485-86 (7th Cir. 1988) (citing authorities) (commonly owned separate entities can claim no tax loss on intra-group sales that do not change the flow of economic benefits).

D. Mem. 31.[39]

Defendant bases its *alter ego* analysis on two contentions: that "Heinz dealt with HCC in ways no third party would accept," and that Heinz retained "the Note's benefit." As described in parts II.C.2. and II.D.2., above, Heinz and HCC made every effort to deal with each other at arm's length, both in the redemption and in HCC's decision to convert the Note. In fact, Plaintiff believes they not only tried; they succeeded.

As described in part IV.C.2., above, there is no evidence to support Defendant's theory that, if the Note had been paid at maturity, HCC would have been obligated to distribute the cash proceeds back to Heinz. Thus, Defendant's argument that HCC did not receive "the Note's benefit" depends entirely on the parent-subsidiary relationship between Heinz and HCC. If HCC were not a Heinz subsidiary, there could be no dividend of cash proceeds from HCC to Heinz and thus no argument that HCC did not receive "the Note's benefit."

Such an argument cannot be reconciled with §1059(e)(2)(A). As discussed in part III.B., above, under the general rule in §1059(e)(1), if stock is redeemed non *pro rata* from a corporate shareholder, and the redemption is taxed as a dividend, the shareholder's stock basis is reduced. The exception in §1059(e)(2)(A) provides that the shareholder may keep its full stock basis *only*

---

[39] Recently, the Fourth Circuit described the important distinction between disregarding a transaction ("a sham under *Rice's Toyota*") and disregarding a corporation altogether ("a sham under *Moline*"), as follows:

> Shams under *Rice's Toyota* [*World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. (1985)] are distinct from shams under *Moline* [*Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943)]. In particular, a shareholder's transaction with a controlled corporation may be a sham under *Rice's Toyota* even if the corporation is entitled to regard its income as distinct from its shareholder's because the corporation is not itself a sham under *Moline*.

*Black & Decker Corp. v. United States*, 97 AFTR 2d 2006-841, 2006-850 (4th Cir. 2006). *See also* footnote 32, above.

*if* the redeeming corporation and the shareholder are affiliated. To qualify for the benefit of §1059(e)(2), affiliation between Heinz and HCC was required. If HCC were treated as an *alter ego* of Heinz, affiliation would defeat the very same benefit.

In §1059(e)(2)(A), Congress made clear its intent to allow this tax benefit only in the specific circumstance where the payer and recipient of the dividend are affiliated, unless and until Treasury issued regulations to the contrary. In the words of *Gregory v. Helvering, supra*, then, "what was done" here "was the thing the statute intended." 293 U.S. at 469. Defendant's argument that the parent-subsidiary relationship turns HCC into an *alter ego* of Heinz is utterly inconsistent with the statute and what it intended.

Defendant's position is also inconsistent with long-standing case law. As discussed in part IV.A.3., above, the most important cases on this point are *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), and *Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2d Cir. 1956). In *Moline Properties*, the Supreme Court held that, except in extraordinary circumstances, a shareholder and its wholly-owned corporation are separate taxpayers. Defendant bears a particularly heavy burden if it is to show that HCC is to be disregarded as a separate entity and treated as an *alter ego* of Heinz.[40] In *Kraft Foods*, the Second Circuit held that parent-subsidiary transactions deserve careful scrutiny, but that they may not be disregarded because of the parent-subsidiary relationship itself. 232 F.2d at 124.

In a broad economic sense, any transaction between a parent and its subsidiary or between corporate affiliates can be characterized in the way that Defendant's Memorandum characterizes the redemption here: "a pantomime, a shifting of papers from one corporate pocket to another." D. Mem. 2. As *Moline Properties* and *Kraft Foods* make clear, much more is

[40] *See also* Bittker & Eustice ¶ 1.05[1][b].

required before such a transaction or one of the parties to it can be disregarded for tax purposes. Plaintiff has introduced considerable evidence that Heinz and HCC, both substantial corporations in their own right, dealt with each other on arm's-length terms. There is no evidence to support Defendant's assertion that HCC should be disregarded as an *alter ego* of Heinz. Without such evidence, Defendant's argument that HCC did not receive the economic benefit of the Note (in addition to being factually incorrect) is unwarranted as a matter of law.

## V. Conclusion

In an attempt to defeat Plaintiff's refund claim, Defendant asserts that the redemption was a sham. However, the evidence presented at trial proves the contrary—that, as a result of the redemption, both Heinz and HCC significantly altered their respective economic positions, their rights and obligations and their opportunities for gain or loss. Far from being pre-determined, HCC's decision to convert the Note more than three years after it was issued was a prudent investment decision made at that time as a result of a dramatically changed market. Contrary to Defendant's assertion, HCC had unfettered discretion in its use and enjoyment of the Note and the fruits thereof, whether stock or cash. Thus, notwithstanding Defendant's argument, HCC enjoyed the full economic benefits of the Note.

Defendant asks the Court to disregard the redemption, because it occurred between parent and subsidiary, and because, under the law then in effect, it produced a favorable tax result that Defendant does not like. But these facts do not justify either pretending that the redemption lacked economic substance or re-writing the law on parent-subsidiary transactions and stock redemptions. Defendant may not achieve through litigation a tax result that Congress authorized it to achieve only by issuing regulations.

The Court should allow Plaintiff's claim in full.

Respectfully submitted,

s/ Clifton B. Cates________________

Clifton B. Cates
Attorney for Plaintiff

1700 Pennsylvania Avenue, N.W.
Sixth Floor
Washington, D.C. 20006
(202) 393-7600

Date: March 23, 2006

Of Counsel:

Ivins, Phillips & Barker Chartered
1700 Pennsylvania Avenue, N.W.
Sixth Floor
Washington, D.C. 20006
(202) 393-7600

# APPENDIX 1

## DEFINED TERMS

**Term** **Page**

AT&T....................11
Bittker & Eustice....................18
CMH/Heritage....................12
Code....................1
Defendant's Memorandum....................14
ESOP....................17
Goldman Sachs....................8
HCC....................1
Heinz....................1
Heinz Group....................2
LYONs....................9
Morgan Guaranty....................6
Note....................1
Securities Act....................7

# APPENDIX 2

## INTERNAL REVENUE CODE PROVISIONS AND ONE REGULATION (THAT WERE IN EFFECT AT THE TIME OF THE TRANSACTIONS AT ISSUE BUT SUBSEQUENTLY HAVE CHANGED)[41] AND ONE ADMINISTRATIVE DECISION

### TABLE OF CONTENTS

**Internal Revenue Code Provisions**
IRC §304
IRC §1059

**Treasury Regulation**
Treas. Reg. §1.1502-14(a)(1)

**Administrative Decision**
G.C.M. 35793 (Apr. 24, 1974)

[41] *See* footnote 2, above.

## [¶ 15,275] REDEMPTION THROUGH USE OF RELATED CORPORATIONS

'86 Code

Sec. 304 [1986 Code]. (a) TREATMENT OF CERTAIN STOCK PURCHASES.—

(1) ACQUISITION BY RELATED CORPORATION (OTHER THAN SUBSIDIARY).—For purposes of sections 302 and 303, if—

(A) one or more persons are in control of each of two corporations, and

(B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control,

then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. To the extent that such distribution is treated as a distribution to which section 301 applies, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation.

(2) ACQUISITION BY SUBSIDIARY.—For purposes of sections 302 and 303, if—

(A) in return for property, one corporation acquires from a shareholder of another corporation stock in such other corporation, and

(B) the issuing corporation controls the acquiring corporation,

then such property shall be treated as a distribution in redemption of the stock of the issuing corporation.

(b) SPECIAL RULES FOR APPLICATION OF SUBSECTION (a).—

(1) RULE FOR DETERMINATIONS UNDER SECTION 302(b).—In the case of any acquisition of stock to which subsection (a) of this section applies, determinations as to whether the acquisition is, by reason of section 302(b), to be treated as a distribution in part or full payment in exchange for the stock shall be made by reference to the stock of the issuing corporation. In applying section 318(a) (relating to constructive ownership of stock) with respect to section 302(b) for purposes of this paragraph, sections 318(a)(2)(C) and 318(a)(3)(C) shall be applied without regard to the 50 percent limitation contained therein.

(2) AMOUNT CONSTITUTING DIVIDEND.—In the case of any acquisition of stock to which subsection (a) applies, the determination of the amount which is a dividend (and the source thereof) shall be made as if the property were distributed—

(A) by the acquiring corporation to the extent of its earnings and profits, and

(B) then by the issuing corporation to the extent of its earnings and profits.

(3) COORDINATION WITH SECTION 351.—

(A) PROPERTY TREATED AS RECEIVED IN REDEMPTION.—Except as otherwise provided in this paragraph, subsection (a) (and not section 351 and not so much of sections 357 and 358 as relates to section 351) shall apply to any property received in a distribution described in subsection (a).

(B) CERTAIN ASSUMPTIONS OF LIABILITY, ETC.—

(i) IN GENERAL.—In the case of an acquisition described in section 351, subsection (a) shall not apply to any liability—

(I) assumed by the acquiring corporation, or

(II) to which the stock is subject,

if such liability was incurred by the transferor to acquire the stock. For purposes of the preceding sentence, the term "stock" means stock referred to in paragraph (1)(B) or (2)(A) of subsection (a).

(ii) EXTENSION OF OBLIGATIONS, ETC.—For purposes of clause (i), an extension, renewal, or refinancing of a liability which meets the requirements of clause (i) shall be treated as meeting such requirements.

(iii) CLAUSE (i) DOES NOT APPLY TO STOCK ACQUIRED FROM RELATED PERSON EXCEPT WHERE COMPLETE TERMINATION.—Clause (i) shall apply only to stock acquired by the transferor from a person—

'86 Code

(I) none of whose stock is attributable to the transferor under section 318(a) (other than paragraph (4) thereof), or

(II) who satisfies rules similar to the rules of section 302(c)(2) with respect to both the acquiring and the issuing corporations (determined as if such person were a distributee of each such corporation).

(C) DISTRIBUTIONS INCIDENT TO FORMATION OF BANK HOLDING COMPANIES.—If—

(i) pursuant to a plan, control of a bank is acquired and within 2 years after the date on which such control is acquired, stock constituting control of such bank is transferred to a BHC in connection with its formation,

(ii) incident to the formation of the BHC there is a distribution of property described in subsection (a), and

(iii) the shareholders of the BHC who receive distributions of such property do not have control of such BHC,

then, subsection (a) shall not apply to any securities received by a qualified minority shareholder incident to the formation of such BHC. For purposes of this subparagraph, any assumption of (or acquisition of stock subject to) a liability under subparagraph (B) shall not be treated as a distribution of property.

(D) DEFINITIONS AND SPECIAL RULE.—For purposes of subparagraph (C) and this subparagraph—

(i) QUALIFIED MINORITY SHAREHOLDER.—The term "qualified minority shareholder" means any shareholder who owns less than 10 percent (in value) of the stock of the BHC. For purposes of the preceding sentence, the rules of paragraph (3) of subsection (c) shall apply.

(ii) BHC.—The term "BHC" means a bank holding company (within the meaning of section 2(a) of the Bank Holding Company Act of 1956).

(iii) SPECIAL RULE IN CASE OF BHC'S FORMED BEFORE 1985.—In the case of a BHC which is formed before 1985, clause (i) of subparagraph (C) shall not apply.

(4) TREATMENT OF CERTAIN INTRAGROUP TRANSACTIONS.—

 ©1994, Commerce Clearing House, Inc.

'86 Code

(A) IN GENERAL.—In the case of any transfer described in subsection (a) of stock from 1 member of an affiliated group to another member of such group, proper adjustments shall be made to—

(i) the adjusted basis of any intragroup stock, and

(ii) the earnings and profits of any member of such group,

to the extent necessary to carry out the purposes of this section.

(B) DEFINITIONS.—For purposes of this paragraph—

(i) AFFILIATED GROUP.—The term "affiliated group" has the meaning given such term by section 1504(a).

(ii) INTRAGROUP STOCK.—The term "intragroup stock" means any stock which —

(I) is in a corporation which is a member of an affiliated group, and

(II) is held by another member of such group.

(c) CONTROL.—

(1) IN GENERAL.—For purposes of this section, control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of shares of all classes of stock. If a person (or persons) is in control (within the meaning of the preceding sentence) of a corporation which in turn owns at least 50 percent of the total combined voting power of all stock entitled to vote of another corporation, or owns at least 50 percent of the total value of the shares of all classes of stock of another corporation, then such person (or persons) shall be treated as in control of such other corporation.

(2) STOCK ACQUIRED IN THE TRANSACTION.—For purposes of subsection (a)(1)—

(A) GENERAL RULE.—When 1 or more persons in control of the issuing corporation transfer stock of such corporation in exchange for stock of the acquiring corporation, the stock of the acquiring corporation received shall be taken into account in determining whether such person or persons are in control of the acquiring corporation.

(B) DEFINITION OF CONTROL GROUP.—Where 2 or more persons in control of the issuing corporation transfer stock of such corporation to the acquiring corporation and, after the transfer, the transferors are in control of the acquiring corporation, the person or persons in control of each corporation shall include each of the persons who so transfer stock.

(3) CONSTRUCTIVE OWNERSHIP.—

(A) IN GENERAL.—Section 318(a) (relating to constructive ownership of stock) shall apply for purposes of determining control under this section.

(B) MODIFICATION OF 50-PERCENT LIMITATIONS IN SECTION 318.—For purposes of subparagraph (A)—

(i) paragraph (2)(C) of section 318(a) shall be applied by substituting "5 percent" for "50 percent", and

(ii) paragraph (3)(C) of section 318(a) shall be applied—

(I) by substituting "5 percent" for "50 percent", and

(II) in any case where such paragraph would not apply but for subclause (I), by considering a corporation as owning the stock (other than stock in such corporation) owned by or for any shareholder of such corporation in that proportion which the value of the stock which such shareholder owned in such corporation bears to the value of all stock in such corporation.

## [¶ 31,920] CORPORATE SHAREHOLDER'S BASIS IN STOCK REDUCED BY NONTAXED PORTION OF EXTRAORDINARY DIVIDENDS

'86 Code

Sec. 1059 [1986 Code]. (a) GENERAL RULE.—If any corporation receives any extraordinary dividend with respect to any share of stock and such corporation has not held such stock for more than 2 years before the dividend announcement date—

(1) REDUCTION IN BASIS.—The basis of such corporation in such stock shall be reduced (but not below zero) by the nontaxed portion of such dividends.

(2) RECOGNITION UPON SALE OR DISPOSITION IN CERTAIN CASES.—In addition to any gain recognized under this chapter, there shall be treated as gain from the sale or exchange of any stock for the taxable year in which the sale or disposition of such stock occurs an amount equal to the aggregate nontaxed portions of any extraordinary

dividends with respect to such stock which did not reduce the basis of such stock by reason of the limitation on reducing basis below zero.

(b) NONTAXED PORTION.—For purposes of this section—

(1) IN GENERAL.—The nontaxed portion of any dividend is the excess (if any) of—

(A) the amount of such dividend, over

(B) the taxable portion of such dividend.

(2) TAXABLE PORTION.—The taxable portion of any dividend is—

(A) the portion of such dividend includible in gross income, reduced by

(B) the amount of any deduction allowable with respect to such dividend under section 243, 244, or 245.

(c) EXTRAORDINARY DIVIDEND DEFINED.—For purposes of this section—

(1) IN GENERAL.—The term "extraordinary dividend" means any dividend with respect to a share of stock if the amount of such dividend equals or exceeds the threshold percentage of the taxpayer's adjusted basis in such share of stock.

(2) THRESHOLD PERCENTAGE.—The term "threshold percentage" means—

(A) 5 percent in the case of stock which is preferred as to dividends, and

(B) 10 percent in the case of any other stock.

(3) AGGREGATION OF DIVIDENDS.—

(A) AGGREGATION WITHIN 85-DAY PERIOD.—All dividends—

(i) which are received by the taxpayer (or a person described in subparagraph (C)) with respect to any share of stock, and

(ii) which have ex-dividend dates within the same period of 85 consecutive days,

shall be treated as 1 dividend.

(B) AGGREGATION WITHIN 1 YEAR WHERE DIVIDENDS EXCEED 20 PERCENT OF ADJUSTED BASIS.—All dividends—

(i) which are received by the taxpayer (or a person described in subparagraph (C)) with respect to any share of stock, and

(ii) which have ex-dividend dates during the same period of 365 consecutive days,

shall be treated as extraordinary dividends if the aggregate of such dividends exceeds 20 percent of the taxpayer's adjusted basis in such stock (determined without regard to this section).

(C) SUBSTITUTED BASIS TRANSACTIONS.—In the case of any stock, a person is described in this subparagraph if—

(i) the basis of such stock in the hands of such person is determined in whole or in part by reference to the basis of such stock in the hands of the taxpayer, or

(ii) the basis of such stock in the hands of the taxpayer is determined in whole or in part by reference to the basis of such stock in the hands of such person.

(4) FAIR MARKET VALUE DETERMINATION.—If the taxpayer establishes to the satisfaction of the Secretary the fair market value of any share of stock as of the day before the ex-dividend date, the taxpayer may elect to apply paragraphs (1) and (3) by substituting such value for the taxpayer's adjusted basis.

(d) SPECIAL RULES.—For purposes of this section—

(1) TIME FOR REDUCTION.—

(A) IN GENERAL.—Except as provided in subparagraph (B), any reduction in basis under subsection (a)(1) shall occur immediately before any sale or disposition of the stock.

(B) SPECIAL RULE FOR COMPUTING EXTRAORDINARY DIVIDEND.—In determining a taxpayer's adjusted basis for purposes of subsection (c)(1), any reduction in basis under subsection (a)(1) by reason of a prior distribution which was an extraordinary

'86 Code

 ©1994, Commerce Clearing House, Inc.

dividend shall be treated as occurring at the beginning of the ex-dividend date for such distribution.

(2) DISTRIBUTIONS IN KIND.—To the extent any dividend consists of property other than cash, the amount of such dividend shall be treated as the fair market value of such property (as of the date of the distribution) reduced as provided in section 301(b)(2).

(3) DETERMINATION OF HOLDING PERIOD.—For purposes of determining the holding period of stock under subsection (a)(2), rules similar to the rules of paragraphs (3) and (4) of section 246(c) shall apply; except that "2 years" shall be substituted for the number of days specified in subparagraph (B) of section 246(c)(3).

(4) EX-DIVIDEND DATE.—The term "ex-dividend date" means the date on which the share of stock becomes ex-dividend.

(5) DIVIDEND ANNOUNCEMENT DATE.—The term "dividend announcement date" means, with respect to any dividend, the date on which the corporation declares, announces, or agrees to, the amount or payment of such dividend, whichever is the earliest.

(6) EXCEPTION WHERE STOCK HELD DURING ENTIRE EXISTENCE OF CORPORATION.—

(A) IN GENERAL.—Subsection (a) shall not apply to any extraordinary dividend with respect to any share of stock of a corporation if—

(i) such stock was held by the taxpayer during the entire period such corporation was in existence, and

(ii) except as provided in regulations, no earnings and profits of such corporation were attributable to transfers of property from (or earnings and profits of) a corporation which is not a qualified corporation.

(B) QUALIFIED CORPORATION.—For purposes of subparagraph (A), the term "qualified corporation" means any corporation (including a predecessor corporation) —

'86 Code

(i) with respect to which the taxpayer holds directly or indirectly during the entire period of such corporation's existence at least the same ownership interest as the taxpayer holds in the corporation distributing the extraordinary dividend, and

(ii) which has no earnings and profits—

(I) which were earned by, or

(II) which are attributable to gain on property which accrued during a period the corporation holding the property was,

a corporation not described in clause (i).

(C) APPLICATION OF PARAGRAPH.—This paragraph shall not apply to any extraordinary dividend to the extent such application is inconsistent with the purposes of this section.

(e) SPECIAL RULES FOR CERTAIN DISTRIBUTIONS.—

(1) TREATMENT OF PARTIAL LIQUIDATIONS AND NON-PRO RATA REDEMPTIONS.—Except as otherwise provided in regulations, in the case of any redemption of stock which is—

(A) part of a partial liquidation (within the meaning of section 302(e)) of the redeeming corporation, or

(B) not pro rata as to all shareholders,

any amount treated as a dividend under section 301 with respect to such redemption shall be treated as an extraordinary dividend to which paragraphs (1) and (2) of subsection (a) apply without regard to the period the taxpayer held such stock.

(2) QUALIFYING DIVIDENDS.—

(A) IN GENERAL.—Except as provided in regulations, the term "extraordinary dividend" does not include any qualifying dividend (within the meaning of section 243).

(B) EXCEPTION.—Subparagraph (A) shall not apply to any portion of a dividend which is attributable to earnings and profits which—

(i) were earned by a corporation during a period it was not a member of the affiliated group, or

(ii) are attributable to gain on property which accrued during a period the corporation holding the property was not a member of the affiliated group.

(3) QUALIFIED PREFERRED DIVIDENDS.—

(A) IN GENERAL.—In the case of 1 or more qualified preferred dividends with respect to any share of stock—

(i) this section shall not apply to such dividends if the taxpayer holds such stock for more than 5 years, and

(ii) if the taxpayer disposes of such stock before it has been held for more than 5 years, the aggregate reduction under subsection (a)(1) with respect to such dividends shall not be greater than the excess (if any) of—

(I) the qualified preferred dividends paid with respect to such stock during the period the taxpayer held such stock, over

(II) the qualified preferred dividends which would have been paid during such period on the basis of the stated rate of return.

(B) RATE OF RETURN.—For the purposes of this paragraph—

(i) ACTUAL RATE OF RETURN.—The actual rate of return shall be the rate of return for the period for which the taxpayer held the stock, determined—

(I) by only taking into account dividends during such period, and

(II) by using the lesser of the adjusted basis of the taxpayer in such stock or the liquidation preference of such stock.

(ii) STATED RATE OF RETURN.—The stated rate of return shall be the annual rate of the qualified preferred dividend payable with respect to any share of stock (expressed as a percentage of the amount described in clause (i)(II) ).

'86 Code

(C) DEFINITIONS AND SPECIAL RULES.—For purposes of this paragraph—

(i) QUALIFIED PREFERRED DIVIDEND.—The term "qualified preferred dividend" means any fixed dividend payable with respect to any share of stock which —

(I) provides for fixed preferred dividends payable not less frequently than annually, and

(II) is not in arrears as to dividends at the time the taxpayer acquires the stock.

Such term shall not include any dividend payable with respect to any share of stock if the actual rate of return on such stock exceeds 15 percent.

(f) TREATMENT OF DIVIDENDS ON CERTAIN PREFERRED STOCK.—

(1) IN GENERAL.—Any dividend with respect to disqualified preferred stock shall be treated as an extraordinary dividend to which paragraphs (1) and (2) of subsection (a) apply without regard to the period the taxpayer held the stock.

(2) DISQUALIFIED PREFERRED STOCK.—For purposes of this subsection, the term "disqualified preferred stock" means any stock which is preferred as to dividends if—

(A) when issued, such stock has a dividend rate which declines (or can reasonably be expected to decline) in the future,

(B) the issue price of such stock exceeds its liquidation rights or its stated redemption price, or

(C) such stock is otherwise structured—

(i) to avoid the other provisions of this section, and

(ii) to enable corporate shareholders to reduce tax through a combination of dividend received deductions and loss on the disposition of the stock.

(g) REGULATIONS.—The Secretary shall prescribe such regulations as may be appropriate to carry out the purposes of this section, including regulations—



©1994, Commerce Clearing House, Inc.

(1) providing for the application of this section in the case of stock dividends, stock splits, reorganizations, and other similar transactions and in the case of stock held by pass-thru entities, and

(2) providing that the rules of subsection (f) shall apply in the case of stock which is not preferred as to dividends in cases where stock is structured to avoid the purposes of this section.

● ***Regulations***

[¶ 34,260] § 1.1502-14. **Stock, bonds, and other obligations of members.**—(a) *Intercompany distributions with respect to stock*—(1) *Dividends.* A dividend distributed by one member to another member during a consolidated return year shall be eliminated. For purposes of this paragraph, the term "dividend" means a distribution which is described in section 301(c)(1) other than a distribution described in section 243(c)(1).

**General Counsel Memorandum 35793**
**UIL No.** 0302.01-06

CC:I-181-74
Br2:AJWeiner
April 24, 1974

Memorandum to: LAWRENCE B. GIBBS
Assistant Commissioner (Technical)
Attention: Director, Income Tax Division

We recently considered the proper tax treatment of basis in an Int. Rev. Code of 1954, § 302(b)(1) redemption in connection with the Tax Ct. R. 155 computation in John D. Gray, 56 T.C. 1032 (1971). The issue was whether the basis of S redeemed preferred stock owned by the Grays should be added to their bases in P common stock, of which they owned 90.4 percent, the attributive link through which the court found a dividend equivalent redemption, or to P's 100 percent interest in S common stock, the only remaining stock of the redeeming corporation. It was our view that the basis should be added to the *** bases in P stock to avoid jeopardizing the Service's success in litigating cases under *United States v. Davis*, 397 U.S. 301 (1970), *rehearing denied*, 397 U.S. 1071 (1970). We believe Treas. Reg. § 1.302-2(c) was intended to require an allocation which would directly or indirectly grant the redeemed shareholder the full benefit of his basis in the redeemed stock.

We recommend that this position be published after the period for filing an appeal in Gray has run.

MEADE WHITAKER
Chief Counsel
By:
RONALD M. BARRON
Assistant Chief, Branch No. 2
Interpretative Division

**Attachment:**

O.M. to Tax Ct. Litigation Division
O.M. NO 18028
CC:I-181-74
Br2:AJWeiner
April 23, 1974
to: Acting Director, Tax Court Litigation Division
from: Director, Interpretative Division

**Subject: *John D. Gray*, 56 T.C. 1032 (1971)-Rule 155 Computation**

The Tax Court Litigation Division (CC:TC:VJC) requested our comments on a proposed brief for the above-captioned case in a memorandum dated April 11, 1974.

**ISSUE**

Should the basis of redeemed preferred stock owned by the Grays be added to their bases for Omark common stock, the attributive link resulting in the dividend equivalent redemption, or to Omark's 100 percent interest in Omark 1960 (1960) common stock, the only remaining stock of the redeeming corporation.

**CONCLUSION**

We believe the proper treatment is to allocate the basis of the redeemed preferred stock to the Grays' bases for their Omark common stock. We believe the proposed position that the basis should be allocated to Omark's basis in its 1960 common stock may jeopardize the success of litigation in future Int. Rev. Code of 1954 , § 302(b)(1) [hereinafter cited as Code] cases determined under *United States v. Davis*, 397 U.S. 301 (1970), *rehearing denied*, 397 U.S. 1071 (1970). We agree with your proposed arguments that taxpayers are not entitled to a Code § 165(g) loss with respect to the basis of the redeemed stock.

**FACTS**

The Tax Court held in *John D. Gray*, 56 T.C. 1032 (1971), that a redemption of all of the Grays' preferred stock in 1960 was essentially equivalent to a dividend. The court found that the Grays' 90.4 percent common stock ownership of Omark, which owned 100 percent of 1960's common stock, both before and after the preferred stock redemption prevented a meaningful reduction of their interests in 1960 because of the attribution rules under Code § 318. *See United States v. Davis*, 397 U.S. 301 (1970). The *** now claim that their basis in the preferred stock became worthless in after the redemption. Therefore, they are entitled to a Code § 165(g) loss to offset part of their deficiency. Alternatively, they claim their bases in *** common stock should be increased by an allocable share of the basis of the redeemed preferred. These claims were made in connection with the Tax Ct. R. 155 computation.

You have proposed that Congress did not intend taxpayers to recognize any loss when Code §§ 302, 318 result in dividend treatment. In addition, Treas. Reg. § 1.302-2(c) is specifically applicable. It requires that a proper adjustment be made to the basis of the remaining stock of the redeeming corporation. Since, under Code § 318(a)(2)(C), Omark's 100 percent common stock interest in 1960 was attributed to the Grays and this stock was the only stock remaining after the redemption, the proposed brief argues that the basis of the redeemed preferred stock is properly added to basis in the 1960 common. Example 2 of the Treas. Reg. § 1.302-2(c) is further support for this position. Taxpayers argue that adding the basis of the redeemed stock to *** basis in the *** common stock will result in an unintended loss to the *** at least to the extent of the minority interest in *** .

At a conference held March 4, 1974, between representatives of the Tax Court Litigation Division, Interpretative Division, and Income Tax Division, it was agreed that your proposed brief would be submitted to us for review since the problem is novel.

**ANALYSIS**

Although we informally agreed with your proposed position as indicated at the conference held March 4, 1974, we now believe the proper adjustment with respect to the Grays' basis of the redeemed preferred stock is to increase their respective bases in their Omark common stock. This allocation more clearly reflects the actual economic impact of the Tax Court's holding. To treat the basis otherwise may jeopardize the success of future litigation in Code § 302(b)(1) cases

determined under *United States v. Davis*, 397 U.S. 301 (1970), *rehearing denied*, 397 U.S. 1071 (1970). If our position with respect to the allocation of basis is unreasonable, the courts may become reluctant to find no "meaningful reduction" in these redemption cases.

We do not believe our position is inconsistent with Treas. Reg. § 1.302-2(c). The regulation is subject to several interpretations, none of which has any statutory or historical basis.[a1] For instance, the "remaining stock" may be any class of stock of the redeeming corporation remaining after the redemption, as you propose to argue; it may be only stock held by the redeemed shareholder after the redemption; or it may be only stock remaining of the same class as the stock redeemed. The examples set out in the regulation concern situations in which family attribution under Code § 318(a)(1) was applicable. Perhaps other types of attribution were not considered when these regulations were proposed. It is our opinion that the regulation was intended to require an allocation which would directly or indirectly grant the redeemed shareholder the full benefit of his basis in the redeemed stock. It is thus our view that the regulation should be interpreted to require a reasonable allocation of basis in dividend equivalency cases so that basis will not disappear.

Because of these possible interpretations, we recommend you concede that the basis of the redeemed preferred should be added to the taxpayers' basis for Omark common. In conjunction with this action, we are recommending that this treatment of the disappearing basis problem be published in a revenue ruling.

We do agree with your proposed arguments against recognizing a Code § 165(g) loss for the basis of the redeemed stock. Recognizing a loss at the time of a Code §§ 302, 318 dividend equivalent redemption is inconsistent with Congressional intent in such cases.

You also informally requested our views as to the advisability of arguing that the loss should be precluded since the redemption proceeds received exceeded the basis of the redeemed stock. We do not believe this is an appropriate argument. If the redemption proceeds are less than the basis of the redeemed stock, this argument would support the recognition of a loss. Basis has no effect upon the determination of the amount of dividend income.

By:
RONALD M. BARRON
Assistant Chief, Branch No. 2
Interpretative Division

Attachment:
G.C.M. to Director, Income Tax Division

[a1] Indeed, the regulation was promulgated in 1955 as a result of the confusion under the 1939 Code. See O.M. 14783, *** I-1575 (Feb. 17, 1965).