No. 03-2847 T
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

H.J. HEINZ COMPANY AND SUBSIDIARIES,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

# DEFENDANT'S POST-TRIAL BRIEF

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
STEVEN I. FRAHM
ROBERT STODDART
JACOB E. CHRISTENSEN
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Station
Washington, DC 20044
TEL: (202) 307-6445
FAX: (202) 514-9440

[Electronically filed on March 23, 2006]

# TABLE OF CONTENTS


*Page*

***I. The Facts*** . . . . . 2

*A. Heinz formed HCC to shelter interest income from state taxation* . . . . . 3

*B. Heinz formed H.J. Heinz Leasing Company (Leasing), HCC's primary shareholder, to shelter leasing income from state taxation* . . . . . 5

*C. Heinz imposed operating procedures upon HCC and Leasing that required them to pay all their unneeded cash to Heinz* . . . . . 8

*D. Heinz grew anxious about the state-tax status and mounting potential state-tax arrearages of HCC and Leasing* . . . . . 10

*E. To end its state-tax worries, Heinz stripped HCC of its lending business, the only business in which it needed cash* . . . . . 13

*F. The tax shelter before the Court and related transactions* . . . . . 14

*1. John Crowe conceived a basis-shifting tax shelter and had Heinz interpose HCC between itself and the shareholders in Heinz's stock-repurchase plan* . . . . . 15

*2. Heinz bought from HCC 3,325,000 of the shares that HCC had bought from the public* . . . . . 16

*3. HCC sold its remaining 175,000 shares to a third party for a small gain, and Heinz claimed a large loss* . . . . . 17

*4. Leasing soon merged into HCC, confirming HCC's new status as a passive holding company* . . . . . 18

*5. HCC converted the Note to Heinz shares and collected dividends, which it returned to Heinz under policies in effect when HCC accepted the Note* . . . . . 19

[Table of Contents, continued]

*Page*

***II. The applicable legal principles demonstrate that Heinz is entitled to no refund*** . . . . . 20

*A. Because Heinz used a controlled corporation to generate a loss in a transaction that had no business purpose, the loss is not deductible* . . . . . 23

*1. Under the step-transaction doctrine, Heinz's purchase from HCC must be ignored because Heinz cannot split the two purchases into separate transactions and claim separate business purposes for each one* . . . . . 25

*2. Heinz had no business purpose for including HCC in its repurchase plan; HCC's participation merely increased Heinz's costs* . . . . . 29

*3. HCC had no business purpose for buying the Heinz stock* . . . . . 33

*a. HCC did not buy Heinz stock to buttress its "substance"* . . . . . 33

*b. HCC did not buy Heinz stock to make a profit* . . . . . 34

*i. Because HCC's Heinz stock was unregistered, HCC knew it would have to sell the stock at a discount* . . . . . 34

*ii. Heinz stock had underperformed the market and was a "buy and hold" stock that HCC knew it could not hold* . . . . . 35

*iii. By acting in a commercially unreasonable manner, HCC demonstrated that it had no genuine profit motive* . . . . . 37

*c. The Court should not recognize HCC's claimed "business purposes" even if they actually existed, because they had little weight in motivating the transfer of assets between HCC and Heinz* . . . . . 42

[Table of Contents, continued]

*Page*

*B. When Heinz traded its Note for HCC's stock, the parties' economic situation remained the same; the purported "redemption" had no economic effect and was a sham* . . . . . 44

*1. HCC was a mere holding company when it accepted the Note* . . . . . 45

*2. When it accepted the Note, HCC's policy was to pay Heinz all of its unneeded cash–and as a mere holding company, it needed little cash* . . . . . 47

*3. Tax law refuses to recognize mere possibilities, like HCC's possible uses for money generated by the Note, especially when the possibilities are so unlikely* . . . . . 48

*4. HCC cannot shift the basis of its sold shares to its retained shares, because Heinz kept all the benefits of the Note and did not redeem HCC's shares within the meaning of Code § 317(b)* . . . . . 50

CONCLUSION . . . . . 50

## TABLE OF AUTHORITIES

Cases:

*ACM P'ship v. Comm'r*, 157 F.3d 231 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999) . . . . . 32

*ASA Investerings P'ship v. Comm'r*, 201 F.3d 505 (D.C. Cir. 2000) . . . . . 30

*Boca Investerings P'ship v. United States*, 314 F.3d 625 (D.C. Cir. 2003) . . . . . 30

*Falconwood Corp. v. United States*, 422 F.3d 1339 (Fed. Cir. 2005) . . . . . 29, 30

*Geoffrey, Inc., v. S.C. Tax Comm'n*, 437 S.E.2d 13 (S.C.), *cert. denied*, 510 U.S. 992 (1993) . . . . . 13, 34

*George E. Warren Corp. v. United States,* 141 F. Supp. 935 (Ct. Cl. 1956) . . . . . 37

*Gregory v. Helvering,* 293 U.S. 465 (1935) . . . . . 23-24, 50

*Haberman Farms, Inc. v. United States*, 182 F. Supp. 829 (D. Neb. 1960), *aff'd*, 305 F.2d 787 (8th Cir. 1962) . . . . . 48-49

*Higgins v. Smith*, 308 U.S. 473 (1940) . . . . . 22, 24, 42, 45, 50

*Investers Diversified Servs., Inc., v. Comm'r,* 325 F.2d 341 (8th Cir. 1963) . . . . . 41

[Table of Authorities, continued]

*Page*

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*,
599 N.W.2d 721 (Iowa 1999) . . . . . 38
*King Enterprises, Inc. v. United States*, 418 F.2d 511 (Ct. Cl. 1969) . . . . . 27-28, 36
*Local Oklahoma Bank, N.A., v. United States,* 59 Fed. Cl. 713 (2004) . . . . . 31
*Long Corp. v. United States*, 298 F.2d 450 (Ct. Cl. 1962) . . . . . 37
*National Lead Co. v. Commissioner*, 336 F.2d 134 (2d Cir. 1964),
*cert. denied,* 380 U.S. 908 (1965) . . . . . 37
*Northern Pacific Railway Co. v. United States*, 378 F.2d 686 (Ct. Cl. 1967) . . . . . 36, 42-43, 44
*Scully v. United States*, 840 F.2d 478 (7th Cir. 1988) . . . . . 41
*True v. United States*, 190 F.3d 1165 (10th Cir. 1999) . . . . . 28-29
*United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968),
*cert. denied,* 393 U.S. 1094 (1969) . . . . . 43

Statutes:

Internal Revenue Code (26 U.S.C.):
§ 165 . . . . . 21
§ 168 . . . . . 5
§ 243 . . . . . 22
§ 302 . . . . . 21
§ 316 . . . . . 23
§ 317 . . . . . 2, 21, 44, 50
§ 318 . . . . . 21
§ 368 . . . . . 27
§ 1011 . . . . . 21
§ 1059 . . . . . 21, 22
§ 7508 . . . . . 22

Session Laws:
Black Lung Benefits Revenue Act of 1981, Pub. L. No. 97-119,
95 Stat. 1635 . . . . . 6
Economic Recovery Tax Act of 1981, Pub. L. No. 97-34,
95 Stat. 172 (1982) . . . . . 5
Revenue Act of 1928, ch. 852, 45 Stat. 791 . . . . . 23
Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248,
96 Stat. 324 . . . . . 5

Delaware Code Annotated:
Tit. 30, § 1902 . . . . . 4

[Table of Contents, continued]

*Page*

Regulations:

Treasury Regulations (26 C.F.R.):

§ 1.165 . . . . . . . . . . 22

§ 1.302 . . . . . . . . . . 21

§ 1.1059 . . . . . . . . . . 22

§ 1.1502 . . . . . . . . . . 3

Miscellaneous:

Alvin C. Warren & Alan J. Auerbach, *Transferability of Tax Incentives and the Fiction of Safe Harbor Leasing*, 95 Harv. L. Rev. 1752 (1982) . . . . . . . . . . 6

John E. Gaggini, John A. Biek, Theodore R. Bots, *State Taxation of Passive Income Subsidiaries*, 447 PLI/Tax 489 (1999) . . . . . . . . . . 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 03-2847 T
(Judge Allegra)

H.J. HEINZ COMPANY AND SUBSIDIARIES,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

---

DEFENDANT'S POST-TRIAL BRIEF

---

Pursuant to the Court's Order of March 14, 2006, the defendant, the United States, presents this post-trial brief.

The plaintiff, H.J. Heinz Company (Heinz), demands a refund of $42,586,967 (*see* Compl. at 6) attributable to the carryback of an asserted 1995 capital loss of $124,134,139 (*id*., ¶¶ 7-8). The transaction that generated the claimed loss actually produced an economic profit of $6,372,111–by Heinz's own reckoning. (Pl. Ex. 9 at 3567.) The transaction proceeded like this: Heinz had a subsidiary buy Heinz common stock from the public for $130,983,103 (*ibid*.); Heinz "redeemed" almost all of that stock from the subsidiary (*see* Jt. Ex. 34, ¶ 29); finally Heinz had the subsidiary sell the few remaining shares to a third party, AT&T Investment Management Corp., for $6,966,120 (*id*., ¶ 41). Heinz now asserts that tax law transferred the basis of all the stock the subsidiary had purchased to the few shares it sold to AT&T.

Heinz had no business purpose for interposing a subsidiary between itself and the shareholders from whom it purchased its stock. The extra step cost Heinz $1.7 million and brought it no measurable benefit except the artificial loss the transaction was engineered to create. Tax law does not recognize pointless makework like Heinz's intervening purchase from the subsidiary. Furthermore, Heinz structured the second purchase as an "exchange [of the subsidiary's Heinz stock] for property" (Internal Revenue Code § 317(b) (Code)), but the subsidiary's circumstances and operating policies show that the exchange was essentially a pantomime, a shifting of papers from one corporate pocket to another. The subsidiary did not benefit from the property it appeared to receive; it returned every cent of its value to Heinz under policies that were in effect on the day of the exchange. Thus there was no redemption as the statute defines it, and Heinz is entitled to no refund.

To understand the transaction at issue, the Court must first understand the complex history of the subsidiary Heinz employed to buy and sell the stock, H.J. Heinz Credit Company (hereinafter HCC).

## ***I. The Facts***

Heinz is the parent of an affiliated group of corporations (the Heinz group). (Jt. Ex. 34, ¶ 1.) Before 1983, Heinz's practice was to borrow money itself and then lend its subsidiaries the working capital they needed. (Def. Ex. 43 at 114; Tr. at 182-83.) They paid interest to Heinz on their loans, and Heinz reported their payments as income. (Def. Ex. 43 at 114.) Because the Heinz group files a consolidated federal return (Jt. Ex. 34, ¶ 3), the intra-group payments did not affect the group's federal income-tax liability (*see, e.g.,* Tr. at 149). *See generally* 26 C.F.R.

(Treas. Reg.) § 1.1502-13(a)(6)(i) (consolidated-return regulations treat group members as divisions of a single corporation for purposes of taking intercompany transactions into account).

Certain states ("unitary" states) also permit consolidated filing.[1] Other states, however–the "non-unitary" states–do not permit consolidated returns; instead, if a group member does business in the state, that member must file a separate return. Heinz is based in Pennsylvania (Compl. ¶ 2), a non-unitary state (Tr. at 151), which does not exclude intra-corporate interest payments from the recipient's taxable income (*see* Def. Ex. 64 at 166). Accordingly, Heinz included its subsidiaries' interest payments in its own state taxable income, and the subsidiaries in non-unitary states deducted from their state taxable income the interest they paid to Heinz. (Def. Ex. 43 at 114.) During its 1982 fiscal year,[2] Heinz collected $24.5 million of interest from its subsidiaries, which increased its state tax liability by $874,650 for Pennsylvania alone. (*Ibid.*) The defendant has no data from other states.

*A. Heinz formed HCC to shelter interest income from state taxation.*

As early as 1981, Coopers & Lybrand proposed that Heinz should finance its subsidiaries through a Delaware holding company. (Def. Ex. 63 at 163; Tr. at 182.) Delaware law exempts corporations from income tax if their–

---

[1] The defendant will refer to states as "unitary" if they permit affiliated corporations to file a single return and "non-unitary" if they require separate returns for individual group members. The defendant is adopting a shorthand definition sometimes used by Heinz's tax planners (*see, e.g.,* Tr. at 150), but the distinction can be more subtle. *See generally* John E. Gaggini, John A. Biek, Theodore R. Bots, *State Taxation of Passive Income Subsidiaries*, 447 PLI/Tax 489, 513-17 (1999) (listing and discussing state requirements).

[2] Heinz's taxable year comprises 52 or 53 weeks and ends on the Wednesday closest to April 30. (Jt. Ex. 34, ¶ 2.)

> activities within this State are confined to the maintenance and management of their intangible investments . . . and the collection and distribution of the income from such investments or from tangible property physically located outside this State. For purposes of this paragraph, "intangible investments" shall include, without limitation, investments in stocks, bonds, notes and other debt obligations (including debt obligations of affiliated corporations) . . . .

Del. Code Ann. tit. 30, § 1902(b)(8). Heinz's lawyers anticipated the following benefits: (1) the Delaware subsidiary's interest income would be exempt from Delaware tax; (2) the Delaware subsidiary could funnel money it collected to Heinz as a tax-free dividend because Pennsylvania law exempts intra-corporate dividends from tax; and (3) Heinz subsidiaries could continue to deduct their interest payments from their own state taxable income even though the Delaware subsidiary would include no corresponding income in its state return. (Def. Ex. 43 at 114.) The head of Heinz's tax department (Tr. at 116), John C. Crowe (Mr. Crowe), referred to this arrangement as "the quintessential double dip." (Def. Ex. 64 at 166; Tr. at 119-20.) His department estimated that Heinz would have saved about $1,132,880 in state income tax for its 1982 fiscal year if it had used a Delaware holding company to finance its subsidiaries' activities. (Def. Ex. 43 at 115.)

Accordingly, on September 15, 1983, Heinz formed HCC as a Delaware holding company; Heinz owned all 1,000 shares of HCC's outstanding stock. (Def. Ex. 47 at 124A.) Heinz capitalized HCC (*see, e.g.,* Def. Ex. 62 at 159); HCC itself did not borrow funds until 1994 (Tr. at 314). From 1983 until January of 1995, HCC engaged directly in lending money to members of the Heinz Consolidated Group and its foreign subsidiaries. (Jt. Ex. 34, ¶ 13). HCC lent predominantly to domestic subsidiaries; it made only "the occasional loan" to foreign

subsidiaries. (Tr. at 118.) In 1995, HCC also acquired the stock of various foreign subsidiaries. (*Id*. at 117-18.)

HCC, however, had no office or employees of its own. (Tr. at 120.) A Delaware corporate service company both provided an address and performed certain ministerial acts for HCC–and for hundreds of similar corporations. (*Id*. at 187.) Heinz did not commit the finances of the Heinz group to these rented employees in Delaware; instead, Heinz itself made every substantive decision for HCC in Pittsburgh. (*Id*. at 188.) As early as November 29, 1984, a Heinz tax lawyer warned her superiors that HCC lacked sufficient substance and nexus to Delaware to survive scrutiny by Pennsylvania tax authorities, who might attribute HCC's income to Heinz on the theory that the two corporations were essentially a single entity. (Def. Ex. 44 at 118-19.) On July 3, 1985, she repeated her warning and suggested that Heinz management should give HCC more substance. (Def. Ex. 46.) But instead of strengthening its existing Delaware holding company, Heinz formed another.

*B. Heinz formed H.J. Heinz Leasing Company (Leasing), HCC's primary shareholder, to shelter leasing income from state taxation.*

During its 1982 and 1983 fiscal years, Heinz entered 12 transactions as owner-lessor under the safe-harbor lease provisions that Congress enacted in the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, Title II, § 201(a), 95 Stat. 172, 203 (1982) (adding former § 168(f)(8) to the Code, for a short while).[3] (Def. Ex. 47 at 124B.) Under these arrangements, Heinz bought property from capital-intensive companies that needed cash and that had too little taxable income to profit from the credits and depreciation deductions to which ownership of the

[3] Congress repealed the safe-harbor-lease provisions in the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, Part II, § 209, 96 Stat. 324, 442.

property entitled them. (*See* Tr. at 133-34.) Among many other items, Heinz bought U.S. Steel's coke-battery facilities in Clairton, Pennsylvania. (Def. Ex. 54 at 140.) Heinz paid the purchase price with a negotiated amount of cash and an installment obligation. (*See* id. at 137.) Heinz then leased the property back to the original owner for rental payments that offset what Heinz owed on the note. (*See* id. at 135; *see also* Alvin C. Warren & Alan J. Auerbach, *Transferability of Tax Incentives and the Fiction of Safe Harbor Leasing*, 95 Harv. L. Rev. 1752, 1762-63 (1982) (in safe-harbor sale-leasebacks, the down payment was the only cash that changed hands).) Heinz was deemed to have paid the installment obligation "[s]olely for Federal income tax purposes and without recourse to [its] general assets or credit . . ." (*id*. at 137). Because the safe-harbor provisions recognized Heinz as the property's owner for tax purposes, Heinz was able to use any available credits and to deduct the depreciation and the interest "payments" due under the note.

The safe-harbor leases generated tax benefits for about the first five years, but in the sixth year (Heinz's 1987-88 fiscal years), the lessees' fictitious lease payments began to exceed Heinz's deductions. (Def. Ex. 47 at 124B; Tr. at 189-90, 192.) Heinz could not avoid recognizing the imputed income for federal purposes, because Congress had required both lessors and lessees to file informational returns disclosing the leases. *See* Black Lung Benefits Revenue Act of 1981, Pub. L. No. 97-119, § 112, 95 Stat. 1635, 1640-41. But Heinz had not disclosed the leases to the states; Heinz reported its claimed deductions and credits as totals on the state returns, without specifying the sources. (Tr. 190-91.) As of April 8, 1986, according to C.A. Caponi, only Ohio was aware of the safe harbor leases, which it may have discovered during an audit. (Def. Ex. 50 at 128; Tr. at 190.) Ms. Caponi was Heinz's manager of state taxes and was

responsible for state tax compliance, filing state returns, the related accounting, and questions of state tax law. (Tr. at 121-22.)

Heinz's tax lawyers wondered if HCC might be able to shelter the safe-harbor lease income from state taxation just as it had been sheltering interest income. If Heinz could transfer the leases to HCC, they estimated that Heinz would save about $9,700,000 in state taxes over its 1987-1991 fiscal years. (Def. Ex. 50 at 128-29.)

Heinz eventually decided not to contribute the leases to HCC, for several reasons: Heinz feared that HCC might become taxable by non-unitary states in which the leased property was located (Tr. at 192-93); and Heinz would have to recognize about $150 million in income if it transferred the leases because at the same time it would be transferring debt represented by the non-recourse notes (Def. Ex. 51 at 130). Heinz realized that it must transfer assets along with the leases, and that the assets would need a tax basis of at least $150 million. (*Ibid*.) Because the assets would lose their basis by offsetting the liability and would therefore bring a large taxable gain if sold, Heinz decided to transfer the only asset it knew it would never sell–stock in its financing subsidiary, HCC. (*Id*. at 130-31.)

Accordingly, on July 10, 1986, Heinz established a new Delaware holding company, Heinz Leasing Company (Leasing), to which it transferred both its 1982 safe harbor leases and 500 shares of HCC. (*See* Jt. Ex. 34, ¶ 8.) Heinz was Leasing's sole shareholder. (*Id*., ¶ 9.) On October 7, 1987, Heinz transferred to Leasing the 1983 leases and Heinz's remaining 500 shares of HCC. Leasing then became HCC's sole shareholder. (*See id*, ¶ 8.)

After this reorganization, however, HCC still needed capital contributions from Heinz to finance the subsidiaries' operations, and the intermediate corporation complicated the

accounting. (*See* Def. Ex. 58 at 144; *see also* Def. Ex. 62 at 159 (after the solution).) On November 4, 1987, Mr. Crowe addressed the difficulty in a memo to a subordinate (Def. Ex. 59 at 145):

> You raise a good question. To keep things clean, I will have HLC [Leasing] sell one share of HCC common stock to Heinz for par value. Future increases of loan balances (always supported by proper board action at HCC) could be reflected as an increase in the Heinz investment in this single share. Capital reductions must, however, be reflected on a per-share basis with Heinz receiving a small portion and the balance flowing through HLC.
>
> It is my ultimate hope to merge HCC and HLC but that must await, among other things, resolution of tax proposals currently before Congress.

Meanwhile, Heinz's tax lawyers continued to worry about the Delaware companies' lack of substance. (*See, e.g.,* Def. Ex. 55 at 141.) On March 18, 1987, Mr. Crowe told Heinz's treasurer, Paul F. Renne, that HCC should both be billed for the management services Heinz performed in its name. He "believed that a fee would help to give HCC more substance." (Def. Ex. 56 at 142.)

*C. Heinz imposed operating procedures upon HCC and Leasing that required them to pay all their unneeded cash to Heinz.*

Mr. Crowe also proposed that HCC and Leasing should follow written procedures of their own, and on October 19, 1988 (Def. Ex. 60 at 146), he circulated a draft captioned "H.J. HEINZ CREDIT COMPANY [/] H.J. HEINZ LEASING COMPANY [/] Operating Procedures" (*id*. at 147). One suggested procedure provided: "If the company has excess cash which is not expected to be *redeployed as a loan* in the near future, a dividend should be declared." (*Id*. at 150, emphasis added.) The company's assistant treasurer was to propose the dividend using a form attached to the draft procedures as Exhibit E, which provides (*id*. at 152):

EXHIBIT E

[Heinz Credit/Leasing Letterhead]

To: Board of Directors
From: Vice President
Subject: Cash Position

Based upon analysis of the Company's cash flow position, I estimate that there will be $_______ of uninvested cash on hand on _(date)_ which will not be needed to pay liabilities or to make loans. Accordingly, the Board should consider declaring a dividend of $__________ payable on ________.

On March 13, 1989 (Def. Ex. 62 at 156), Mr. Crowe circulated the final version of the operating procedures, which contains the same Exhibit E (*id* at 162); but the final version omits the sentence requiring HCC and Leasing to declare a dividend if the company had cash not expected to be redeployed as a loan (*compare* Def. Ex. 60 at 150 *with* Def. Ex. at 62 at 160). That sentence could not have applied to Leasing, which made no loans. But the policy survived though the language did not: Under the final version, which governed HCC and Leasing's operations from then on (Tr. at 307), Leasing always declared a dividend when it had cash not needed in its business–and Leasing never needed cash (*id*. at 307-08). Leasing and HCC followed identical procedures. Accordingly, HCC also declared a dividend if it had cash not needed in its business. (*Id*. at 308.)

HCC, however, seldom had much cash because it continued its active business of lending money to Heinz's subsidiaries. (*See* Jt. Ex. 34, ¶ 13. *Compare* Jt. Ex. 29 at 357 *and* Jt. Ex. 30 at 377 (annual reports of loans receivable), *with* Jt. Ex. 29 at 356 *and* Jt. Ex. 30 at 376 (annual reports of cash on hand).) In fact, Heinz contributed funds to support HCC's lending business.

(*See, e.g.,* Def. Ex. 62 at 159.) But around the time of the transactions before the Court, Heinz decided that HCC should abandon that business because of state-tax considerations.

*D. Heinz grew anxious about the state-tax status and mounting potential state-tax arrearages of HCC and Leasing.*

On March 2, 1989, Cathy Caponi, the manager of Heinz's state-tax group (Tr. at 121-22), reported that the Pennsylvania Department of Revenue was about to audit the tax returns for Heinz's 1987 fiscal year (Def. Ex. 61 at 153). She worried that the auditors might either: (1) treat HCC, Leasing, and Heinz as a single entity; or (2) treat HCC and Leasing as conducting all their business in Pennsylvania because they lacked sufficient substance and nexus with Delaware. (*Id*. at 154.) She estimated the tax arrearages for 1987 alone to be: (1) for Leasing–$205,000 if the auditors treated Heinz and Leasing as a single entity, or $587,000 if they assumed that Leasing did all its business in Pennsylvania; and (2) for HCC–$322,000 if the auditors treated Heinz and HCC as a single entity, or $920,000 if they treated HCC as conducing all its business in Pennsylvania. (*Ibid*.) Mr. Crowe has no reason to think her calculations were erroneous. (Tr. at 195-96.) She warned that the auditors would make similar adjustments for fiscal year 1988 if they questioned the 1987 returns. (Def. Ex. 61 at 155.)

On April 10, 1990, Mr. Crowe sent a memorandum to Heinz's treasurer insisting that Heinz should hire a person qualified to make important decisions for HCC and Leasing in Delaware rather than "a person who merely parrots instructions from Pittsburgh and copies accounting reports prepared here . . . ." (Def. Ex. 63 at 163-64.) He estimated that Heinz had a potential tax exposure of $20 million. (*Id*. at 163.) He noted that since 1981 he had been insisting "on the necessity of having a company of real substance. *Substance* in this context

means that the holding company *should be headed by a person with real authority*." (*Ibid*., emphasis added.) During the same month, Mr. Crowe gave a presentation, perhaps to the Executive Committee (Tr. at 124-25), that summarized in these words the tax difficulties faced by HCC and Leasing (Def. Ex. 64 at 166-67):

> [F]rom inception to the end of FY89 $100 million of income has been sheltered from Pennsylvania tax. We estimate that as of the end of FY90 the total exposure to state tax, interest, and penalties is $20 million. (This is also a rough measure of the benefit that the Company has derived from this structure.)
>
> In order to collect this tax Pennsylvania would have to successfully assert either
>
> (a) that HCC is a sham company that should be treated as part of Heinz, or
>
> (b) that HCC is doing business in Pennsylvania.
>
> Because of the lack of substance in HCC it is highly likely that the state would win such an argument. Because of the fact that HCC does not file tax returns in Pennsylvania, the statute of limitations will never expire.
>
> Nothing can be done about the lack of substance in prior years. We must simply hope that our luck holds.
>
> If the Company is not willing to take the steps required to create substance, then it is my strong recommendation that HCC and HLC [Leasing] be liquidated.

Heinz accepted Mr. Crowe's recommendation, and Heinz hired an employee with real authority who managed and equipped an office in Delaware, where he ran both HCC and Leasing. (Tr. at 200.) The two companies also had identical boards of directors. (*Compare* Jt. Ex. 34, ¶ 18 *with* Supplemental Jt. Stip.[4] ¶ 60.) If "substance" was HCC's problem, the new full-time employee was the primary solution. (Tr. at 120-21, 124-25.)

---

4 The parties filed a supplemental joint stipulation on January 13, 2006.

Despite this infusion of what Heinz considered to be substance, state auditors began to notice the infirmities of HCC and Leasing. On May 17, 1993, a member of the Heinz tax department reported that Connecticut proposed to combine HCC and Leasing with Heinz on the ground that the Delaware corporations had no payroll or operating expenses during the fiscal years 1988 through 1990. (Def. Ex. 67 at 173.) On November 10, 1993, Massachusetts proposed to add Leasing's income to Heinz's for fiscal years 1988 through 1991 on the ground that the lease assignments lacked economic substance. (Def. Ex. 68 at 176.) On February 11, 1994, New York proposed adjustments to Heinz's return arising from the treatment of HCC and Leasing. (Def. Ex. 69 at 178.) And on August 24, 1994, a member of the Heinz tax department reported her suspicion that North Carolina auditors would include Heinz, HCC, and Leasing in combined returns for fiscal years 1989 through 1992. (Def. Ex. 70 at 181.)

Related tax difficulties also affected Heinz's corporate structure. On June 23, 1992, Heinz's tax department began to research the state-tax effects of merging Leasing with HCC. (Def. Ex. 65 at 168.) On August 17, 1992, Cathy Caponi, Heinz's manager of state taxation, advised against the merger because several non-unitary states "take the position that the ownership of SHL [safe-harbor lease] property creates sufficient nexus with the state so as to subject the lessor (owner) to tax." (Def. Ex. 66[a] at 172.) Heinz did not want to risk making HCC taxable, so it kept Leasing separate from HCC despite the inconvenience. (*See* Tr. at 192-93.) Nevertheless, Mr. Crowe hoped to merge Leasing into HCC. (*Id.* at 194; Def. Ex. 59 at 145.)

*E. To end its state-tax worries, Heinz stripped HCC of its lending business, the only business in which it needed cash.*

While Heinz was preparing and executing the federal tax-planning contrivance that it has brought before this Court, it was also considering ways to shield HCC from state attack. (*See* Tr. at 210-11; Def. Ex. 72[5] at 204.) The Supreme Court of South Carolina had recently approved imposing taxes on a Delaware holding company that lacked any conventional connection with South Carolina. *See Geoffrey, Inc., v. S.C. Tax Comm'n*, 437 S.E.2d 13 (S.C.), *cert. denied*, 510 U.S. 992 (1993) (Delaware trademark subsidiary had taxable nexus wherever the licensee parent used a trademark and paid a royalty). Afterwards, state auditors routinely asked corporations if they had Delaware holding companies as subsidiaries. (Tr. at 205.) In fact, state auditors asked Heinz that question (*id*. at 206), and Heinz decided that "No" would be the safest answer (*id*. at 205). Accordingly, Heinz determined that it could no longer use HCC to shelter intra-group interest payments from tax in non-unitary states; instead, Heinz would establish a new, taxable financing subsidiary based in a unitary state. (Def. Ex. 75 at 213.)

In late 1994 and early 1995, Heinz developed "Project Turbo," a complex re-financing of Heinz affiliates that had two purposes: (1) to protect Heinz's intercompany loans from state-tax attack by adjusting their interest rates (*ibid*.; Tr. at 126-27); and (2) to extricate HCC from its lending business, because such Delaware holding companies "were coming under fire" (Def. Ex. 75 at 213). The final plan, in its basic outline, was as follows: (1) Heinz and HCC form a new

---

[5] Defendant's Exhibit 72 comprises notes made by John Kraus, a senior tax attorney at Heinz who worked on the plan to reorganize HCC (Project Turbo); making the notes was within the scope of his employment. (Tr. at 209-10.)

corporation, Heritage International, Inc. (Heritage), in Idaho[6]; (2) Heinz advances to its subsidiaries enough credit to repay existing loans from HCC; (3) HCC contributes to Heritage all of the funds it collects; (4) Heritage makes new loans to the subsidiaries at current market rates; (5) The subsidiaries use the loans to repay the advances from Heinz; and (6) Heinz contributes about $900 million to Heritage's capital, which Heritage then lends to Heinz subsidiaries. (*See* Def. Ex. 74 at 211-12.) In a memorandum dated January 27, 1995, Heinz summarized the expected result in this way (*id.* at 212, emphasis added):

> At the end of the day, [Heinz] and HCC will own 100% of [Heritage], an Idaho corporation, which holds receivables from affiliates of approximately $2.4 billion. . . . HCC *will be out of the lending business and will, henceforth, operate merely as an investment holding company* owning some [Heinz] common stock, a[ Heinz] convertible note and the common shares of several foreign affiliates . . . .

On January 10, 1995, HCC's board resolved to "discontinue the Company's lending activities as soon as reasonably possible with the officers of the Company taking any and all necessary actions to terminate lending activities in a timely and efficient manner." (Jt. Ex. 14 at 147-48.) On January 18, 1995, Heinz and HCC carried out the stock "redemption" at the heart of this case. (*See* Jt. Ex. 34, ¶ 29.)

*F. The tax shelter before the Court and related transactions:*

Heinz has often repurchased large amounts of its own stock from the public. (*See, e.g.,* Tr. at 95-96; Pl. Ex. 10 at 3675.) On June 9, 1993, David R. Williams, Heinz's chief financial officer (Jt. Ex. 34, ¶ 6.e), asked the board of directors to authorize the repurchase of another

---

[6] Heinz had planned to name HCC's Idaho lending subsidiary "Bristol, Inc." When Heinz discovered that the name was unavailable, it used the name "Heritage International, Inc." (Jt. Ex. 34, ¶¶ 46-47.)

10,000,000 shares of Heinz common stock, and he gave the following reason for the repurchase program (Jt. Ex. 6 at 75, emphasis added):

> Mr. Williams stated that though as of April 30, 1993 the Company held approximately 33,026,008 shares of Common Stock in the Treasury which were *purchased for the purpose of* issuing shares under the Company's Stock Option Plans, as contributions to the Trustee of the Company's Employees Retirement and Savings Plan, and to those holders of the Company's Third Cumulative Preferred Stock, $1.70 First Series, who convert their shares into the Common Stock of the Company, *additional shares will be needed in connection with other corporate purposes*.
>
> Moreover, Mr. Williams, in commenting upon the advantages of a stock repurchase program, noted that the purchases of the Company's Common Stock would increase current and future levels of earnings per share; improve return on equity; and enhance the intrinsic value and appreciation potential of shares of Common Stock outstanding.

The board authorized the new repurchase program. (*See id*. at 75-76.)

*1. John Crowe conceived a basis-shifting tax shelter and had Heinz interpose HCC between itself and the shareholders in Heinz's stock-repurchase plan.*

Sometime before July 1, 1994 (Tr. at 313), while Heinz was still making the purchases authorized the year before, Mr. Crowe, the director of the tax department, had an idea. (*See* Tr. at 136, 312.) The first person to whom he revealed his idea was not an employee of Heinz: he was Heinz's outside tax counsel. (Tr. at 313.) Only after discussing the idea with tax counsel did Mr. Crowe explain it to Heinz officials. (*Ibid*.) He suggested that HCC should participate in Heinz's stock repurchase plan: once HCC had purchased over 3 million shares, Heinz would buy 95% of those shares from HCC for a convertible note (*see* Jt. Ex. 17 at 164), transfer the basis of that 95% to the shares HCC continued to hold, have HCC sell the remaining shares to a third party before the end of the 1995 fiscal year, and then claim a large tax loss that could be carried back to three years in which Heinz had large amounts of capital gain to offset (*see* Tr. at 138). The idea

presented difficulties from the beginning, and at every stage HCC's participation appeared awkward and tax-driven.

On July 13, 1994, Heinz's board of directors authorized HCC to participate in the 1993 stock-repurchase plan; it also authorized HCC to borrow up to $40 million to finance the purchases. (Jt. Ex. 7 at 92-93.) On August 2, 1994, the HCC board resolved to have HCC purchase up to 1,100,000 shares of Heinz common stock (the amount remaining to be purchased under the 1993 authorization). (Jt. Ex. 8 at 98.) The board also authorized HCC to borrow up to $40 million. (*Id*. at 99.) On September 13, 1994, the Heinz board authorized both Heinz and HCC to purchase up to another 10,000,000 shares for the same purposes claimed in Heinz's resolution of June 9, 1993; and Heinz authorized HCC to borrow an additional $30 million to finance the purchases. (Jt. Ex. 11 at 119-21.) On September 20, 1994, the HCC board amended its earlier resolution to permit HCC to purchase up to 3,500,000 shares of Heinz stock and to borrow up to $70 million. (Jt. Ex. 12 at 134.)

*2. Heinz bought from HCC 3,325,000 of the shares that HCC had bought from the public.*

HCC had purchased its 3,500,000 shares of Heinz common stock by November 15, 1994. (Pl. Ex. 8 at 3566.) On January 10, 1995, Heinz's treasurer made the following proposal to the Heinz executive committee (Jt. Ex. 13 at 138, emphasis added):

> Mr. Williams indicated HCC had repurchased 3,500,000 shares under the program. He recommended that the Company at this time offer to purchase 3,325,000 shares from HCC. Mr. Williams said that the purchase would *move the shares into the Company's treasury* where they would be available for stock option exercises and other transactions requiring shares and would also *enable the Company to discontinue paying dividends* on the shares that it purchases from HCC.

Mr. Williams suggested that the purchase price should be the January 13, 1995, closing price of Heinz stock on the New York Stock Exchange, and that the price should be paid using a zero coupon convertible debt instrument (hereinafter the Note). The Note would bear interest at about 6%, would mature in seven years, and could be converted after three years into about 3.5 million shares of Heinz common stock–more shares than HCC would exchange for the Note. The executive committee accepted the proposal. (*Id*. at 138-39.) On the same day, HCC agreed to sell 3,325,000 of its 3,500,000 shares for the Note. (Jt. Ex. 14 at 146-47.) The exchange took place on January 18, 1995. (Jt. Ex. 34, ¶ 29.)

*3. HCC sold its remaining 175,000 shares to a third party for a small gain, and Heinz claimed a large loss.*

On April 12, 1995, Heinz's treasurer asked the board to approve HCC's plan to sell its remaining 175,000 Heinz shares to a third party in a private placement (Jt. Ex. 15 at 156, emphasis added.):

> Mr. Williams said that the shares would be sold at current market price *less a discount to be negotiated because the shares would not initially be registered under the Securities Act of 1933*. The Company would agree to register the shares within 180 days either as part of a larger debt/equity shelf registration statement or a separate registration statement.

The board approved the sale and the agreement to register the shares. (*Id*. at 156-59.) HCC had purchased those 175,000 shares for $6,778,098 and it incurred disposal costs of $117,156. (*See* Pl. Ex. 9 at 3567.) On May 2, 1995, just one day before the 1995 fiscal year ended, HCC sold the shares for $6,966,120 (Jt. Ex. 34, ¶ 41), a 4.08% discount from the current market price of $41.50 per share (Pl. Ex. 5 at 3340).[7]

[7] $41.50 x 175,000 = $7,262,500 (current market price). $7,262,500 - $6,966,120 (sales price) = $296,380 (discount). $296,380/$7,262,500 = .0408.

In the eyes of the world, HCC made a profit of $70,866. In the eyes of the Heinz tax department, HCC suffered a loss of $124,134,139. (*See* Pl. Ex. 9 at 3567.)

*4. Leasing soon merged into HCC, confirming HCC's new status as a passive holding company.*

On August 8, 1995, Mr. Crowe asked his subordinates to arrange something he had desired since 1987–the merger of Leasing into HCC. (*See* Def. Ex. 59 at 145; Def. Ex. 76 at 215.) Now that HCC had abandoned its active lending business, it had less to fear from Leasing's taxable nexus with so many states. (*See* Tr. at 214-16; *cf. also id.* at 192-93 (Heinz assigned its safe-harbor leases to Leasing, not to HCC, because it feared giving HCC a taxable nexus with states where there was leased property)). The merger became final on November 29, 1995. (Jt. Ex. 34, ¶ 11.)

HCC now had the taxable nexus Heinz once feared to give it, and it could not have reentered the lending business without inviting the scrutiny of state tax auditors.[8] HCC has never filed Pennsylvania returns (Tr. at 199), the statute of limitations will never run on HCC's possible Pennsylvania liabilities (*ibid*.; Def. Ex. 64 at 167), and–as Mr. Crowe noted in April of 1990–if Pennsylvania were to argue that HCC did business and owed taxes there, Pennsylvania would win (*ibid*.). Heinz knew that Pennsylvania charges interest and penalties on tax deficiencies. (*See id.* at 166, Tr. at 198.)

---

[8] At trial Mr. Crowe speculated, because he did not have the schedules, that a significant portion of Leasing's safe-harbor leases would have terminated by 1995. (Tr. at 216.) But HCC was still reporting revenue from leases in the third quarter of its 2002 fiscal year, the quarter in which the Note would have matured. (*See* Def. Ex. 127 at 411.)

5. *HCC converted the Note to Heinz shares and collected dividends, which it returned to Heinz under policies in effect when HCC accepted the Note.*

HCC could convert the Note to stock at any time after January 17, 1998. (*See* Jt. Ex. 1 at 2.) By January 28, 1998, Goldman, Sachs had already prepared an elaborate draft opinion recommending conversion, complete with charts, a diagram, and consideration of 19 comparable securities. (Def. Ex. 110.) Goldman, Sachs had no contract to prepare such an opinion until February 17, 1998. (*See* Jt. Ex. 22 at 183.) Goldman, Sachs printed "March 4, 1998 " on the final version of its opinion, which seems to be identical to the earlier draft–the one prepared before Goldman, Sachs had a contract to prepare it.[9] (*See* Jt. Ex. 23 at 186.) On April 28, 1998, HCC formally elected to convert the Note. (*See* Def. Ex. 116; Jt. Ex. 34, ¶ 58.) Accordingly, Heinz's treasurer instructed Heinz's agent to "transfer 5,265,000 shares from H.J. Heinz Company treasury stock into the name of H.J. Heinz Credit Company." (Def. Ex. 117 at 266.) These shares were the equivalent of 185,000 more shares than Heinz had bought from HCC.[10] The treasurer later told the agent: "[T]hese shares are to be considered non-voting shares and should not receive a proxy statement. They should, however, receive quarterly dividend payments." (Def. Ex. 118 at

---

[9] On May 6, 1998, Mr. Crowe indirectly demonstrated why HCC and Goldman, Sachs generated paperwork requesting an opinion that HCC had already requested and received (emphasis added): "The originals [of HCC's notice converting the Note] have been put in Len's files which are presently in Tax Department custody *pending the IRS audit of the original transaction*." (Def. Ex. 115 at 263.)

[10] The Heinz board had declared a three-for-two split of its common stock, effective at the close of business on October 3, 1995. (*See* Def. Ex. 109 at 251; Jt. Ex. 34, ¶ 57.) Thus HCC received 5,265,000 shares rather than the 3,510,000 shares originally promised in Jt. Ex. 1 at 2 ($197,402,412.78 payment at maturity multiplied by conversion rate of 17.7809337 shares per $1,000 at maturity equals 3,510,000 shares). HCC had sold 3,325,000 shares to Heinz.

267, original emphasis.) Pennsylvania law prevents a subsidiary from voting the shares of its parent. (*See* Tr. at 394.)

As of the day HCC accepted the Note, its status and operating procedures predetermined that it would return the payout if it held the Note to maturity. And if HCC converted the Note to stock, it knew it would also return all products of the stock; it would possess only the bare ownership. That is what HCC had to expect when it accepted the Note–and that is also what happened: HCC converted the Note on April 28, 1998, and held the stock until November 12, 2002. (*See* Def. Ex. 121 at 279.) During that time, Heinz paid HCC dividends of more than $14,676,187 on the 5,265,000 shares of Heinz common stock HCC received by converting the Note,[11] and HCC returned every penny of the dividends to Heinz, along with all the dividends HCC received from other sources and much of its earnings and profits from earlier years.[12]

## *II. The applicable legal principles demonstrate that Heinz is entitled to no refund.*

Heinz is not the first taxpayer to demand a refund after forcing a controlled corporation to produce a tax loss. Like most similar litigants, Heinz stresses the form of its transaction, glosses over the substance, and claims to have followed all applicable statutes and regulations to the

---

[11] HCC held 5,265,000 shares of Heinz stock from April 18, 1998 (Jt Ex. 34, ¶ 58), through November 12, 2000 (Def. Ex. 121 at 279). Plaintiff's Exhibit 7, page 3356, shows that Heinz declared eight dividends from record dates 6/22/1998 through 3/8/2000, the last entry on the exhibit. The total of those dividends (per share) is $2.7875; the product of that amount and 5,265,000 is $14,676,187.

[12] The defendant bases its argument upon HCC's status as of January 18, 1995; but later events demonstrate that the defendant's view of that status is correct. Between the time HCC accepted the Note and the date on which the Note would have matured, HCC collected $1,837,034,292.23 in dividends from all sources, including dividends Heinz paid on the stock HCC held after converting the Note. During the same period HCC paid Heinz $2,597,109,587.35 in dividends. (*See* Def. Ex. 128 at 412). Whatever came to HCC went to Heinz, as anyone could have predicted on January 18, 1995.

letter. Unlike most others, however, Heinz also glosses over the statute on which it must base its argument, Code § 317. The words of that statute, understood in their plain English meaning, defeat Heinz's argument.

Heinz's capital loss is deductible, if at all, under Code § 165, which provides in pertinent part:

> SEC. 165. LOSSES.
>
> (a) General Rule.–There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
>
> (b) Amount of Deduction.–For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

Under Code § 1011, an item's basis generally equals its cost, and the 3,325,000 shares Heinz obtained with the Note had cost HCC $124.2 million; that was their basis. At this point, however, Heinz's reasoning fails: Heinz asserts that it "redeemed" the shares with the Note. As the defendant will demonstrate, Heinz did not redeem the shares within the meaning of § 317(b). After assuming what it fails to prove–a genuine redemption–Heinz proceeds to argue that HCC would have owned both the Note and–constructively–the 3,510,000 shares of Heinz stock into which the Note would be convertible. *See* Code § 318(a)(4). Because the asserted redemption would not have changed HCC's equity position in Heinz, the redemption would be treated as a dividend under § 302(d), and the basis of the 3,325,000 redeemed shares would shift to HCC's remaining 175,000 shares.[13] *See* Treas. Reg. § 1.302-2(c) (Exs. 1 & 3). Thus, Heinz concludes,

---

[13] Code § 1059(a) & (e)(1)(A) reduces the basis of stock by the amount of any "extraordinary dividend" a corporation receives in a redemption that is not pro rata as to all shareholders. If this rule applied to Heinz's transaction, [footnote continues on next page]

when HCC sold those shares to AT&T, HCC would recognize a tax loss attributable to the shifted basis.

These provisions, however, apply to reality, not to mere appearances–and, despite Heinz's arguments to the contrary,[14] it is not just judicial doctrines that require the Court to look behind the appearances Heinz has arranged. Congress authorized the Treasury Department to interpret the revenue statutes (*see* Code § 7805(a)), and the Secretary provided the relevant guidance in Treas. Reg. § 1.165-1(b), which states, in part (emphasis added)–

> Nature of loss allowable.–To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and except as otherwise provided in section 165(h) and § 1.165-11, relating to disaster losses, actually sustained during the taxable year. *Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.*

The defendant will now set out some of the tests courts have devised to carry out the will of Congress, as implemented by the Executive Branch.

---

it would prevent the basis shift. HCC, however, received a "qualifying dividend" (one eligible for the dividends-received deduction allowed by § 243). The term "extraordinary dividend" does not include any qualifying dividend. § 1059(e)(2)(A).

Treas. Reg. § 1.1059(e)-1(a) would now treat Heinz's payment to HCC as an extraordinary dividend despite the qualifying-dividend exception, but § 1.1059(e)-1(c) limits the regulation's effect to dividends announced on or after June 17, 1996. HCC received its dividend in January of 1995. Of course, it does not follow that Heinz is entitled to a basis shift because its transaction preceded the regulation's effective date. *See, e.g., Higgins v. Smith*, 308 U.S. 473, 479-80 (1940).

[14] See pages 27-28 and 31-32 of Plaintiff's Memorandum of Contentions of Fact and Law, filed on October 28, 2005 (Pl. Memo).

*A. Because Heinz used a controlled corporation to generate a loss in a transaction that had no business purpose, the loss is not deductible.*

In *Gregory v. Helvering,* 293 U.S. 465 (1935), one of the earliest and best-known tax cases involving the manipulation of a controlled corporation, the Supreme Court ignored a corporate reorganization the taxpayer had structured in strict conformity with the applicable statute, the Revenue Act of 1928, ch. 852, § 112(g), 45 Stat. 791, 818. The taxpayer was the sole owner of a corporation, United Mortgage Corp., that held shares of the Monitor Securities Corp.–stock the taxpayer wished to sell. If United Mortgage had transferred the Monitor shares to her, they would have constituted a dividend, taxable at the ordinary rate. Instead, she had United Mortgage transfer the Monitor shares to a new corporation she had recently formed, Averill Corp. The transfer was meant to qualify as a tax-free reorganization. Three days later, Averill dissolved and transferred its assets, the Monitor shares, to its sole shareholder, the taxpayer. Averill had transacted no other business and had no earnings and profits that could be distributed as a dividend. *See* Code § 316(a). The taxpayer then sold the Monitor shares and reported a capital gain. The Commissioner ignored the reorganization–the transfer of shares between the controlled corporations–and characterized the taxpayer's receipt of Monitor shares as a dividend paid to her by United Mortgage. He assessed a deficiency, which the Court upheld.

The applicable statute allowed one controlled corporation to transfer assets to another controlled corporation tax-free if the distribution was made "in pursuit of a plan of reorganization" (*id.* at 468). United Mortgage's distribution to Averill met every requirement of the statute, read mechanically; but the Commissioner objected that the transaction had only one

purpose–tax reduction. The Court described the problem in this way (*id*. at 469, emphasis added, citations omitted):

> It is quite true that if a reorganization in reality was effected within the meaning of [the statute], the ulterior purpose mentioned will be disregarded. The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. . . . . But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute *intended*.

Ignoring the taxpayer's characterization of the transfer and "fixing the character of the proceeding by what actually occurred," the Court found "an operation having no business or corporate purpose," a mere contrivance to get the Monitor shares into the hands of the taxpayer who controlled the corporate actors. *See ibid.*

The Court later expanded the holding of *Gregory* to every transfer of assets to or from a controlled corporation. In *Higgins v. Smith*, 308 U.S. 473 (1940), the Court disallowed a capital loss claimed by a shareholder who had sold stock to his wholly-owned corporation (at the current market price) both because the sale had no non-tax business purpose and because the taxpayer effectively retained control of the stock. The Court viewed *Gregory v. Helvering* as "precedent for the disregard of a transfer of assets *without a business purpose* but solely to reduce tax liability," and it concluded that "*transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration*." *Id*. at 476 (emphasis added).

As the defendant has already shown, when Heinz purported to trade the Note for HCC's stock, the trade did not vary control of the Note or change the flow of its benefits. The defendant will detail the legal consequences of the trade later in this brief. But the defendant has also shown that neither Heinz nor HCC had any genuine business purpose for the transfer.

1. *Under the step-transaction doctrine, Heinz's purchase from HCC must be ignored because Heinz cannot split the two purchases into separate transactions and claim separate business purposes for each one.*

Heinz has asserted at least three inconsistent reasons for inserting HCC into its share repurchase plan:

(a) David R. Williams, the chief financial officer, generally asked the Heinz board of directors or the executive committee to authorize share repurchases from the public (either directly or through HCC) on the ground that Heinz needed the shares in its treasury for corporate purposes that required shares, like redeeming stock options. (Jt. Ex. 6 at 75 (direct repurchase); Jt. Ex. 10 at 105; Jt. Ex. 11 at 119-20 (repurchases through HCC).) If HCC were to buy Heinz stock from the public, however, Heinz could not use the stock for the corporate purposes that had justified the earlier repurchase plans. At most, HCC's purchases would improve earnings per share, but Mr. Williams listed this as "one of the *advantages* of a share repurchase program," not as one of the purposes (*ibid.*, emphasis added). If Mr. Williams correctly stated the purpose of the repurchase program, HCC's participation frustrated that purpose, and the law cannot recognize it.

(b) According to John Mazur, the assistant treasurer (Tr. at 88), Heinz repurchased its shares primarily to manage the company's equity base by removing the shares from circulation (*See* Tr. at 89, 110). Although the corporate minutes do state that the purpose of the plan was to move shares into Heinz's treasury, that was only the "legal" purpose–verbiage required by an unspecified state law. (Tr. at 110.) The primary business purpose was to increase earnings per share, which the corporate minutes list as a mere advantage of a repurchase program. (*Ibid.*) The chairman of the board knew the real purpose (Tr. at 111), but Mr. Mazur is not sure if the rest of

the board members knew it (Tr. at 112), though they had voted to authorize the repurchases at least ostensibly in order to move shares into the Heinz treasury.

But if HCC had accomplished only the primary business purpose of Heinz's repurchase plan (Tr. at 108) and left the secondary "legal" purpose undone, Heinz needed another step to accomplish all of its purposes. It could have avoided the second step had it purchased the shares itself. If Mr. Mazur's view is correct, the law cannot recognize HCC's participation in the plan.

(c) Finally, John Crowe testified that HCC's purchase accomplished "*all* the goals relating to share repurchase." (Tr. at 137, emphasis added.) It follows that Heinz "was not furthering *any* purpose in connection with the stock repurchase plan" when it bought the stock from HCC. (Tr. at 174, emphasis added.) Mr. Crowe's views may not be as definite as these quotations suggest. Elsewhere he concedes that "[n]o *important* purpose" of Heinz's repurchase plan remained to be accomplished once the shares were in HCC's treasury. (Tr. at 173, emphasis added.)

For the sake of argument the defendant will assume that Mr. Crowe's more extreme formulation is correct: HCC accomplished all the purposes of Heinz's repurchase plan when it bought Heinz shares from the public. When Heinz later bought 3,325,000 of those shares from HCC, Heinz accomplished two other purposes that were completely separate from Heinz's repurchase program: (a) Heinz moved shares into its treasury; and (b) Heinz was able to stop paying dividends on the shares. (*See* Tr. at 175-76.) But even if this assumption were correct–and the facts are against it–Heinz had planned from the beginning to be the final holder of the 3,325,000 shares it purchased through HCC, and the step-transaction doctrine regards Heinz as having bought the shares directly from the public.

The Court of Claims stated and applied the step-transaction doctrine in an instructive case, *King Enterprises, Inc. v. United States*, 418 F.2d 511 (Ct. Cl. 1969). The operative facts are these: On September 3, 1959, the Minute Maid Corporation purchased all the shares of Tenco in exchange for cash, promissory notes, and Minute Maid stock. On December 10, 1959, the Minute Maid board voted to merge the new subsidiary Tenco into the parent company. After obtaining a favorable ruling from the Commissioner, Minute Maid merged with Tenco and some other subsidiaries on April 30 and May 2, 1960. King Enterprises, a Tenco shareholder, did not report its receipt of Minute Maid stock as taxable income, and the Commissioner assessed a deficiency, which King Enterprises paid. It then sued for a refund, arguing that it had received the stock in a tax-free reorganization governed by Code § 368(a)(1)(A), a statute similar to the one at issue in *Gregory (quoted in King Enters.*, 418 F.2d at 515):

> No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of a plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

The IRS argued that King Enterprises had sold the Tenco stock to Minute Maid in a sales transaction separate from the merger that occurred eight months later, because "there was no binding commitment for the merger of Tenco to follow the acquisition of its stock." *King Enters.*, 418 F.2d at 517. The Court, however, rejected that argument (*id* at 518, original emphasis):

> Clearly, the step transaction doctrine would be a dead letter if restricted to situations where the parties were *bound* to take certain steps.
>
> The doctrine derives vitality, rather, from its application where the form of a transaction *does not require* a particular further step be taken; but, once taken, the substance of the transaction reveals that the ultimate result was intended from the outset.

The Court found no "express intention on the part of Minute Maid to effect a merger of Tenco" before the stock purchase (*id*. at 519), but the Court inferred that intention from the record (*see id*. at 518-19). Accordingly, the Court held that the sale of Tenco stock was not an event that could be given a separate effect under tax law; instead it was a step in a unified transaction qualifying as a corporate reorganization. *Id*. at 519.

In the present case, HCC bought 3,500,000 shares from the public; Heinz then bought 3,325,000 shares from HCC; and HCC sold the remaining 175,000 shares to a third party. Heinz views each of these three sales as a "free-standing transaction" (Tr. at 139) and asserts that "none of them had to be undertaken" (*id*. at 138). Because there was no binding commitment to proceed from one transaction to the next, Heinz wants to treat its purchase from HCC as a separate transaction with its own effect under tax law–a shift in basis.

As *King Enterprises* demonstrates, however, the step-transaction doctrine requires no binding commitment; it ignores transitory steps in a series and gives tax effect only to the intended result. But unlike *King Enterprises*, the present case does not require the Court to infer from silence what "ultimate result was intended from the outset." Months before it bought its first share of Heinz stock, HCC was already designing the Note Heinz would use to buy the stock from HCC. (*Compare* Jt. Ex. 16 at 162 (Goldman Sachs sends terms of the Note to John Crowe on July 1, 1994) *with* Pl. Ex. 8 at 3559 (HCC buys first shares on August 11, 1994)). As Mr. Crowe admitted, "We expected all the steps of the transaction to be carried out." (Tr. at 181.) The intended result was that Heinz would hold 3,325,000 shares. HCC's purchase and possession of those shares was a transitory step toward that result, not an intended result in itself. Therefore, HCC's purchase and sale can be given no independent tax effect. *See, e.g., True v. United States*,

190 F.3d 1165, 1175 n.9 (10th Cir. 1999) (citation omitted) ("[I]f a taxpayer engages in a series of steps that achieve a particular result, he cannot request independent tax recognition of the individual steps unless he shows that at the time he engaged in the individual step, its result was the intended result in and of itself. If this is not what the taxpayer intended, then we collapse the series of steps and only give tax consideration to the intended end result").

In the present case, the parties intended and effected these end results: Heinz moved 3,325,000 shares from the public into its treasury, and HCC bought and sold 175,000 shares. The step-transaction doctrine reveals the intervening "redemption" to be an intra-group asset shift with no tax consequences. In legal effect, Heinz transferred the Note to HCC's capital, and HCC distributed the stock to Heinz as a tax-free, intra-group dividend. There was no redemption, no shift in basis, and no capital loss. The Court's consideration of this case could end here. But the transaction has more than one flaw, and the defendant will set out some of the others.

*2. Heinz had no business purpose for including HCC in its repurchase plan; HCC's participation merely increased Heinz's costs.*

Some courts have refused to apply the step-transaction doctrine to a series of steps if each step has a real business purpose and economic effect in addition to a tax effect; but as the Federal Circuit has pointed out, these courts may have grafted the "sham-transaction doctrine" onto the step-transaction doctrine. *See Falconwood Corp. v. United States*, 422 F.3d 1339, 1350-51 (Fed. Cir. 2005). This circuit cannot be among those that impose the extra requirements: for example, the Court of Claims gave no independent effect to King Enterprises's sale of Tenco stock to Minute Maid even though that sale had a genuine business purpose and a real economic effect.[15]

---

[15] *Cf. Falconwood*, 422 F.3d at 1351 (Court will not ignore an intervening step that has a non-tax business purpose *if* legislative regulations require [footnote continues on next page]

But even if a more stringent test applied to the present case, the step-transaction doctrine would require the Court to ignore Heinz's purchase of shares through HCC because Heinz had no nontax business purpose for interposing HCC between itself and the public, and "absence of a nontax business purpose is fatal." *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 512 (D.C. Cir. 2000).

HCC began buying Heinz shares on August 11, 1994, and it held 1,431,300 shares by the close of business on September 23, 1994. (Pl. Ex. 8 at 3559, 3562.) On October 10, 1994, Heinz paid a dividend of $.36 per share to stockholders of record as of September 23, 1994. (Pl. Ex. 7 at 3355.) Accordingly, Heinz was obliged to pay HCC $515,268. By November 15, 1994, HCC had completed its part of the repurchase plan and held 3,500,000 shares. (Pl. Ex. 8 at 3566.) On January 10, 1995, Heinz paid a dividend of $.36 per share to shareholders of record as of December 21, 1994. (Jt. Ex. 7 at 3355.) Accordingly, Heinz had to pay HCC $1,197,000 on the 3,325,000 shares Heinz would receive from HCC just eight days later. HCC's participation cost Heinz a total of $1,712,268 in dividends it would not have paid had it bought those 3,325,000 shares directly from the public. (*See also* Tr. at 143.) HCC's participation in the stock-repurchase plan made no economic sense, and the Court should ignore it. *See, e.g., Boca Investerings P'ship v. United States*, 314 F.3d 625, 631 (D.C. Cir. 2003) (ignoring a partnership interposed between the buyer and the seller of securities: "AHPs' participation in the partnership defies common

---

further steps: "We hold on the facts of this case that the regulations at issue leave no room for an application of the step-transaction doctrine . . ."); *cf. also id*. at 1352 ("In this context, we thus place great weight on the existence of a business purpose independent of the associated tax consequences, for pursuit of that purpose led Falconwood down a regulatory path from which there were no exits").

sense from an economic standpoint since it could have purchased the . . . notes directly and avoided millions in transaction costs . . .").

At trial–for the first time in these proceedings–Heinz suggested that it included HCC in its repurchase plan in order to gain state-tax benefits. (*Compare* Tr. at 314 (deposition testimony) *with id.* at 313 (new assertion)). Heinz seems to argue that it was able to deduct from its Pennsylvania taxable income the interest that accrued on the Note it had issued to HCC, and HCC was not obliged to report the interest as income in Delaware. (*See id.* at 148-49; *see also id*. at 168.) Heinz will find no help in this argument.[16]

Heinz may have gained some Pennsylvania tax benefit by deducting interest that accrued on the Note, but Heinz gained no *net* benefit by including HCC in the stock repurchase program unless the state-tax savings exceeded $1,712,268–the cost of the dividends Heinz had to pay to HCC while it held the stock Heinz later repurchased. The record permits no calculation of the state-tax benefit because Heinz failed to offer its state tax forms as exhibits. Heinz cannot calculate the tax benefit simply by multiplying the interest accruals by the Pennsylvania corporate-tax rate, because Heinz may not have owed Pennsylvania enough tax to profit from the entire deduction. *See, e.g., Local Oklahoma Bank, N.A., v. United States,* 59 Fed. Cl. 713, 717 (2004) (benefit of a tax deduction should be determined by comparing the tax calculated with and without the deduction). During the time HCC held the Note, Heinz may have owed Pennsylvania no more than $100 before deducting the accrued interest. Of course, it would be foolish to

---

[16] The defendant will assume for now that state-tax planning can constitute a non-tax business purpose for an otherwise tax-motivated transaction. The defendant hopes, however, that Heinz will offer some support for this paradoxical proposition if Heinz relies upon it.

assume that Heinz owed Pennsylvania only $100 before the deduction, but in the evidentiary void Heinz has left on this question, it would be just as foolish to assume any other amount.[17]

Heinz has proved one thing beyond doubt, however: It did not include HCC in its 1994 repurchase program in order to reduce its Pennsylvania tax bill. If it had, Heinz would have known about this argument before trial and would have offered the exhibits needed to support it. This argument is an *ex post facto* business purpose conceived long after the transaction it is supposed to have motivated, and conceived too late to be proved. It should be ignored. *See, e.g., ACM P'ship v. Comm'r*, 157 F.3d 231, 257 n.51 (3d Cir. 1998) (courts properly ignore benefit computations prepared during litigation that the taxpayer did not consider at the outset of the transaction), *cert. denied*, 526 U.S. 1017 (1999).

Heinz alleges two other reasons for buying HCC's shares, but neither is credible, and both undercut Heinz's alleged purpose for including HCC in the repurchase program. First: Heinz speculates that it might have needed HCC's shares in the future. (*See* Tr. at 395.) But according to Heinz's witnesses, it did not need HCC's shares for any purpose when it bought them (*see, e.g.,* Tr. at 106, 419); and if Heinz itself had bought the shares from the public, it would have had them already. Furthermore, if Heinz ever did need additional shares, it could have bought them from the public rather than from HCC. A public purchase would not only bring in additional shares; it would also increase earnings per share and help to manage the equity base. Second: if Heinz bought HCC's shares to stop paying dividends on them (*see* Tr. at 176), then Heinz was

---

[17] This analysis respects the separate existence of Heinz and HCC. Heinz may reply, however, that the intra-group dividend cost the Heinz group nothing, but the reduction of Heinz's state taxes gained the group a net benefit. Heinz would then have to prove that the benefit exceeded the $1.5 million that the group (though HCC) had to pay Goldman, Sachs for designing the Note used in the transaction. (*See* Jt. Ex. 19 at 169.)

only repairing damage it had inflicted on itself by including HCC in its repurchase program. But Heinz need not have worried about paying the dividends: HCC returned them all.

Whether the Court applies the step-transaction doctrine or the sham-transaction doctrine, it can give no effect to Heinz's purchase from HCC. Furthermore, the facts show that HCC's own participation had no real business purpose.

*3. HCC had no business purpose for buying the Heinz stock.*

HCC itself asserts that it borrowed money and bought Heinz stock in 1994 for two non-tax reasons: (a) to enhance its "substance" as a Delaware holding company (Tr. at 137-38, 171); and (b) to make a profit (*id*. at 171). Both of these motives are suspect.

*a. HCC did not buy Heinz stock to buttress its "substance."*

From March of 1987 through April of 1990, when Heinz's tax division agonized about HCC's lack of substance and made various proposals, no one suggested that HCC could achieve substance by borrowing money and buying Heinz stock. Before the 1994 repurchase transaction HCC had never borrowed money, and it never borrowed money afterwards. (Tr. at 314.) At one time HCC had invested some of its own funds in an unrelated company, the Wharton Fund (Tr. at 189; Def. Ex. 44 at 117), and according to Mr. Crowe, that investment was "something that was done under the general heading of 'adding substance.'" (Tr. at 189.) But that investment seems to have had no effect on substance that was worth preserving, because HCC no longer held it on April 27, 1994, the end of the quarter before HCC began planning to buy Heinz stock. (*See* Jt. Ex. 29 at 359, a summary of HCC's "other investments"). And after HCC purchased the Heinz shares, it never again sought to buttress its substance by purchasing stock. (Tr. at 315.)

Furthermore, in its 1993 *Geoffrey* decision, the Supreme Court of South Carolina had upheld taxation of a Delaware holding company–regardless of its "substance" in Delaware–if it had financial dealings in the taxing state. HCC had financial dealings and intangible property (debt) wherever it had borrowers. Of course, Heinz knew about *Geoffrey* and considered it while planning HCC's future. (*See* Def. Ex. 72 at 207.) By the time HCC joined the repurchase program, the question of substance in Delaware seems to have become less pressing; in fact, as part of Project Turbo, HCC planned to leave Delaware altogether and run its operations in Idaho. (*Id*. at 197.) HCC followed this plan. (*See* Jt. Ex. 34, ¶ 48.) HCC would hardly have wished to sink its roots deeper in Delaware while planning to pull them out.

*b. HCC did not buy Heinz stock to make a profit.*

If HCC bought Heinz stock to make a profit, it chose a uniquely unsuitable investment.

*i. Because HCC's Heinz stock was unregistered, HCC knew it would have to sell the stock at a discount.*

When HCC's board first considered buying Heinz common stock "for investment purposes," one of the members noted that HCC was an affiliate of Heinz, and thus "the purchase of Heinz Common Stock must be done in compliance with all laws and regulations which are applicable to repurchases of stock by Heinz [itself] . . . ." (Jt. Ex. 8 at 98; *see also* Tr. at 315.) Under securities law, when Heinz or any of its affiliates buys Heinz shares, those shares become unregistered securities and cannot be sold publicly. (Tr. at 396.) Furthermore, to qualify for the purchaser's "safe harbor" under securities law, a corporation must buy its own shares through a broker and on the open market–not through a private placement. (*See id.* at 97.) Heinz advised HCC of its duties under the securities laws, specifically the rules governing an issuer's purchase

of its own stock. (*Id*. at 390.) Therefore HCC knew that it would have to buy the Heinz stock on public exchanges at the current market price, but it also knew that it could not sell the stock on public exchanges at the current market price. As Mr. Crowe admitted, it is only common sense that unregistered shares should sell at a discount because there is a restricted universe of potential buyers. (*Id.* at 316.) If HCC wished to sell the shares at the market price, Heinz would first have to register a new issuance of its stock with the Securities and Exchange Commission. Heinz offered no guarantee that it would register the shares, and HCC insisted on no guarantee; like other Heinz affiliates it relied on its relationship with the parent company and its understanding that Heinz would register the shares if asked. (*See id.* at 407.) Heinz often insists that it dealt with HCC at arm's length. (*See id.* at 145, 147, 355, 400, 410.) Heinz, however, did have a registration rights agreement for the restricted stock of a third party with which it actually did have to deal at arm's length. (*See id.* at 409.)

*ii. Heinz stock had underperformed the market and was a "buy and hold" stock that HCC knew it could not hold.*

HCC also knew or should have known that Heinz stock had drastically underperformed the market during the three years before HCC decided to buy the stock "for investment purposes." Heinz stock had delivered a total return–including dividends–of just 1.5% per year while the broader market was rising at about 6% per year. (Tr. at 454.) Heinz underperformed the market even after HCC bought the stock, despite the unprecedented rise in all equity values at the time: Heinz rose 26% per year, but the S&P 500 rose about 30% per year. (*Id.* at 455.) As a Heinz affiliate, HCC surely knew that Heinz is an income stock, a long-term investment that no one would have expected to appreciate quickly (*see id.* at 455-56); it was a stock that a sensible

investor would "buy and hold" (*see id.* at 417-18). But HCC also knew that it would be forced to sell the stock just months after buying it because Heinz wanted a capital loss to offset the capital gains it had reported in 1992. The carryback period would expire at the end of the 1995 fiscal year, May 3, 1995. (*See id.* at 138; Jt. Ex. 25 at 226.) HCC finished buying its Heinz stock by November 15, 1994, only five and a half months before the stock had to be sold. (*See* Pl. Ex. 8 at 3566.) Heinz could not register HCC's sale because the end of the fiscal year was approaching. (*See* Tr. at 412.) In the end, the rush to sell may even have induced HCC to accept a discount it would not have accepted otherwise. (*See id.* at 416.) These are not conditions under which a reasonable corporation would have chosen to buy Heinz stock "for investment purposes." *Cf., e.g., King Enters.*, 418 F.2d at 518 (a "record of financial success" is a factor that makes a company "an attractive investment"); *N. Pac. Ry. Co. v. United States*, 378 F.2d 686, 690 (Ct. Cl. 1967) (questioning business purpose behind acquisition of stock that paid low dividends after acquisition). But HCC had no choice.

Heinz, however, not only insists that HCC had a profit motive; it even asserts that HCC's investment was profitable. (Tr. at 171.) The assertion is demonstrably false. HCC converted the Note to 5,265,000 shares of Heinz stock when the price was $59.125 per share–a value of $311,293,125; and HCC's investment in the Note was about $122 million. (*See* id.166-67.) Thus HCC had a potential profit of about $189 million. But HCC never sold its 5,265,000 shares; and according to the best of the knowledgeable Mr. Crowe's knowledge, HCC never even considered selling the shares, despite the remarkable run-up in their price. (*Id.* at 316-17.) This is not surprising: Heinz went into the market to buy shares, not to issue them, because it wished to raise earnings per share and to keep the share price in equilibrium. (*See generally id.* at 89-97 (purpose

of the Heinz stock-repurchase program)). But Heinz also made stock options a major component of executive compensation, and it granted the options generously. (*Id*. at 89.) The holders exercised their options when the share price rose, thus putting more shares into the market (*id.* at 93); and the price had reached near record highs in April of 1998, when HCC converted the Note (*see* Pl. Ex 5 at 3354A). Heinz would not have welcomed a sale by HCC at a market peak, just when Heinz's management would be exercising their options: that would have sabotaged the share-repurchase program HCC claims to have assisted when it bought its original shares.

Mr. Crowe also notes that HCC began collecting dividends after it converted the Note (Tr. at 167-68); but HCC was not allowed to keep the dividends. HCC never gained a penny from its "profitable investment."

*iii. By acting in a commercially unreasonable manner, HCC demonstrated that it had no genuine profit motive.*

This Court's predecessor developed a test that other courts have also employed to examine the substance of transfers between entities under common control:

> In determining whether or not the form used was one of substance, and not a sham, this court has closely scrutinized those transactions in which a common ownership factor was present. Our approach has been to ascertain whether the transaction was "one that could have reasonably been made between parties dealing at arm's length," and if it were, a business loss would be deductible.

*Long Corp. v. United States*, 298 F.2d 450, 453 (Ct. Cl. 1962) (*quoting George E. Warren Corp. v. United States,* 141 F. Supp. 935, 939 (Ct. Cl. 1956)); *see also National Lead Co. v. Commissioner*, 336 F.2d 134, 141 (2d Cir. 1964) (refusing to recognize a controlled corporation's tax loss from a sale that generated an actual profit: not only was there "no arm's length deal

between the parties, but also . . . the transaction was not one that would be entered into by parties dealing at arm's length"), *cert. denied,* 380 U.S. 908 (1965).

In this case, Heinz dealt with HCC in ways no third party would accept.

Heinz claims to have redeemed 3,250,000 shares of its stock from HCC with a convertible note (the Note). HCC hired Goldman, Sachs & Co. to assist it in purchasing the stock. (*See* Jt. Ex. 19 at 169.) It was Heinz, however, that agreed to indemnify Goldman, Sachs in case of any loss caused by the transaction. (*See* Jt. Ex. 18 at 166.) And Goldman, Sachs designed the Note to Heinz's specifications. (*See, e.g,* Jt. Ex. 16 at 162, a letter from Goldman, Sachs to Heinz, setting out terms of a note "which the H.J. Heinz Company may consider issuing"). Goldman, Sachs also considered written suggestions by Heinz's outside tax counsel "indicating certain parameters that would be helpful to the H.J. Heinz Company." (Tr. at 322; Jt. Ex. 17 at 164-65.) Tax counsel seems to have believed, naturally, that Goldman, Sachs was working for Heinz. (*See id.* at 165, emphasis added: "Based on the terms of the Convertible Notes, *Parent's* investment banker has advised . . . ").

After designing the Note to be "helpful to the H.J. Heinz Company," Goldman, Sachs told HCC, its ostensible client, that the Note was worth exactly what Heinz wanted it to be worth–the current market price of the shares Heinz wished to buy. (*See* Pl. Ex. 4 at 3568, 3571; Tr. at 333, 343, 358.) This is a classic conflict of interest.[18] Like a law student assigned to argue both sides

[18] A lawyer would face sanctions for allowing this sort of conflict. *See*, *e.g.*, *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*, 599 N.W.2d 721, 726 (Iowa 1999) (imposing three-month suspension, despite lawyer's limited disclosure of conflict) ("[T]he differing interests between buyer and seller are obvious, and price is only one of many areas in which those interests differ: The process by which a buyer and seller of property transact their business is fraught with conflicts of interests. Indeed, a lawyer's simultaneous representation of a buyer and a seller in the same transaction is a paradigm of a conflict of interest").

of a case, Goldman, Sachs stood on both sides of a purchase and sale. However successful the law student might be, no actual litigants would ask him to represent opposite sides in court. Similarly, no actual buyer and seller would forego negotiations, abandon their own interests, and ask Goldman, Sachs to draft a note for both parties according to its own best judgment.

Philip Darivoff was the Goldman, Sachs partner who was responsible for advising HCC. (*See* Tr. at 323.) At trial he explained that Goldman, Sachs often brings buyers and sellers together, but they are adversarial parties who know and insist upon their own interests. In his words, "Someone wants a higher price. Someone wants a lower price. We're trying to find a price where both parties are willing to execute or transact." (*Id.* at 369.) Goldman, Sachs may sometimes design an instrument for one side of a transaction that accomplishes the other side's goals, but in those cases "[t]here commonly are negotiations." (*See id.* at 370-71.) In this case, however, there were no negotiations: Mr. Darivoff considered himself to be working for HCC (*id.* at 365), but he does not even know if anyone represented Heinz (*ibid.*).

Leonard Cullo was a senior attorney at Heinz (Tr. at 388) who drafted the non-financial portions of the Note, generally by copying terms from notes Heinz had issued earlier (*see id.* at 400). Mr. Cullo believes that he represented Heinz in the transaction (*id.* at 419), though his advocacy made no impression on Mr. Darivoff. Heinz was the seller of the Note (*see id.* at 420); but like Mr. Darivoff, Mr. Cullo divided his loyalties: he included terms that a general buyer would like to see (*ibid.*). He included no terms that reflected HCC's own needs. (*Ibid.*)

Because the Note's designers aimed at fairness in the abstract, HCC had no advocate to insist that the Note and its products should be sellable in the open market at the market price–like the stock HCC had to buy on the open market at the market price. Both the Note and the stock

into which it was convertible were unregistered securities that could be sold only in a private placement or other transaction exempt from registration requirements. (Jt. Ex. 34, ¶¶ 32-36.) They would have to be sold at a discount (*see, e.g.,* Tr. at 316), as Mr. Darivoff realized (*see id.* at 337); but no one pressed Goldman, Sachs to account fully for that discount. Accordingly, it did not.

The Note, like all convertible notes, comprised both a debt component and an equity component. (*See, e.g.,* Pl. Ex. 4 at 3568. *See generally* Def. Ex. 124 at 295-97 (characteristics of convertible debt).) Mr. Darivoff did not discount the equity portion for illiquidity (Tr. at 362); he discounted only the debt portion by adding a small premium to the yield, and the discount was something less than 33 basis points. (*See id.* at 349.) That discount had to account for three features of the Note that made it less valuable than Heinz's publicly-issued debt: the Note's subordination and its lack of a coupon as well as its illiquidity. (*Id*. at 336-37.)

To value the option, Mr. Darivoff used a binomial method (Tr. at 361), which produces results similar to those produced by the Black-Scholes formula (*Id*. at 363, 526-27). Such valuation models assume that the option and the underlying security are both traded in efficient, liquid markets (*id*. at 488), and the option portion of the Note was just as illiquid as the debt portion. Mr. Darivoff valued the Note at $130.506 million, exactly equal to the price of the stock Heinz bought from HCC. (*See* Pl. Ex. 4 at 3571.) By applying a proper discount to the option, however, Prof. Gregg Jarrell, the defendant's expert witness, was able to value the Note more accurately. He valued the Note at $121.82 million (*see* Def. Ex. 124 at 288, Tr. at 483)–which is less than HCC paid for the 3,325,000 Heinz shares that it exchanged for the Note, $124.205 million. (*See* Pl. Ex. 8 at 3566). No independent third party would have accepted this deal.

It is true that the parties' valuations of the Note differ by only 6.7% (Tr. at 522); and by varying the inputs of the valuation formula one can reduce the difference even more (*see id*. at 603 *et seq*.). But it is less important to know how much the valuations differ than to know why: Prof. Jarrell's valuation is lower than Mr. Darivoff's because Prof. Jarrell realized that the Note's equity feature had to be discounted and Mr. Darivoff did not. This discount was a point that an advocate for HCC would have insisted upon.[19]

By failing to treat HCC as it would have been obliged to treat a separate entity, Heinz showed that HCC was acting as its *alter ego*. *See, e.g., Investers Diversified Servs., Inc., v. Comm'r,* 325 F.2d 341, 352 (8th Cir. 1963). This fact, and Heinz's retention of the Note's benefits, shows that Heinz merely transferred assets "from one pocket to another." *See generally, e.g., Scully v. United States*, 840 F.2d 478, 485-86 (7th Cir. 1988) (citing authorities) (commonly-owned separate entities can claim no tax loss on intra-group sales that do not change the flow of economic benefits).

---

[19] Heinz itself might have accounted for the discount if it had assigned anyone to consider HCC's own interests and the effect of HCC's inability to trade the Note on a public exchange. Later events show that Heinz understood the effect of illiquidity and that it would have accounted for it had anyone raised the question. On April 28, 1998, soon after conversion became possible, HCC converted the Note to Heinz common stock (Jt. Ex. 34, ¶ 58), which it held until November 12, 2002 (*see* Def. 121 at 279). HCC then exchanged the common stock for shares of Heinz's Third Convertible Preferred Stock, Third Series, which Heinz issued solely to redeem Heinz common stock held by certain subsidiaries. (*See* Def. Ex. 119 at 268-271; Def. Ex. 120 at 273-74). Heinz's board of directors asked a Pricing Committee to set the dividend at market rates (Def. Ex. 122 at 280); and Leonard Cullo suggested adding ***60*** basis points to the stock's yield to account for just one of its features, "the fact that the Preferred Stock is *privately held and illiquid as opposed to trading publicly on a national exchange*" (*id*. at 281, emphasis added).

*c. The Court should not recognize HCC's claimed "business purposes" even if they actually existed, because they had little weight in motivating the transfer of assets between HCC and Heinz.*

Heinz admits that the transaction's primary purpose was to generate a capital loss. (*See* Tr. at 137.) Under these circumstances, the Court cannot accept HCC's asserted business purposes at face value.

For example, in *Northern Pacific Railway Co. v. United States*, 378 F.2d 686 (Ct. Cl. 1967), this Court's predecessor denied a capital loss claimed when one controlled corporation (NWI) sold the parent's stock to another controlled corporation (Cuyuna). Cuyuna decided to buy the Northern Pacific stock from NWI, which was about to be liquidated, but the "decision . . . was dictated by Mr. McFarlane, President of Northern Pacific, who . . . also was President of NWI and Cuyuna." *Id*. at 689. The sale resulted in a loss. Cuyuna's ostensible reason for buying the shares was that it "needed the shares as earning assets . . . in order to build up much needed working capital." *Ibid*. Another reason was to keep the shares out of Northern Pacific's treasury, to which they would have passed upon NWI's liquidation. The Cuyuna board received advice from tax counsel, and the Court assumed that the participants had tax advantages in mind as well. *See id.* at 690.

Citing *Higgins v. Smith*, the Court stated that an intra-group transfer could produce no recognizable tax loss unless a business purpose motivated it (*id*. at 691), and the Court refused to accept the purposes Cuyuna alleged. The desire to hold the stock as an investment could "be given very little weight as a motivating force" because Cuyuna had to borrow money to buy the stock, and in eight years the total dividends did not amount to even half of what the stock had

cost. Cuyuna would have been better off if Northern Pacific or NWI had simply contributed the stock to it. *Ibid*.

The Court also refused to accept the other alleged business purpose–Northern Pacific's wish to keep the stock out of its own treasury while keeping control of the stock. The Court found Northern Pacific's reasons suspect, and it also refused to attribute the parent's business purpose to the subsidiaries. *See id.* at 692. The requirement of a business purpose for an intra-group transfer–

> was developed primarily to assure that a transaction sought to be recognized for tax purpose would have some substantial basis other than a hoped-for tax saving. But it is not every non-tax use of a subsidiary (or related corporation) which can properly be called a "business purpose". Some non-tax aims, though they are present, must be disregarded.

*Ibid*. The Court determined to disregard Northern Pacific's stated purposes, because they could not be attributed to the business of Cuyuna. *See ibid.*

The defendant agrees that Heinz's stock-repurchase plans had a non-tax business purpose (though Heinz had only tax motives for involving HCC in the plans). (*See* Jt. Ex. 34, ¶ 19.) But no non-tax business purpose motivated HCC either to buy Heinz stock from the public or to sell that stock to Heinz for a Note that would give it no benefits. Heinz's non-tax purposes could not give tax effect to HCC's actions even if HCC had furthered those purposes rather than frustrating them. *Cf., e.g., United States v. Ingalls*, 399 F.2d 143, 146 (5th Cir. 1968) (for its own non-tax purposes, controlled corporation agreed to pay a settlement amount that taxpayer demanded in installments rather than as a lump sum, to defer recognition of income; the court ignored the company's non-tax purpose for entering the agreement and treated the payment to the taxpayer as a lump sum), *cert. denied,* 393 U.S. 1094 (1969).

As the Court of Claims showed in *Northern Pacific*, this Court cannot accept HCC's asserted business purposes without scepticism. The claimed desires to bolster its substance and to make a profit both seem to be excuses for HCC's involvement in the plan rather than motives for it. These grounds "can be given very little weight as a motivating force." *Northern Pacific*, 378 F.2d at 691.

*B. When Heinz traded its Note for HCC's stock, the parties' economic situation remained the same; the purported "redemption" had no economic effect and was a sham.*

Even if Heinz could demonstrate a genuine business purpose for the transactions, its refund claim would fail because the transactions lacked economic effect.

Heinz sets out its statutory argument at pages 14 through 18 of Pl. Memo. The analysis begins with a flawed factual assertion: "Heinz *redeemed* 3,325,000 shares from HCC for the Note." Heinz spends several pages insisting that the claimed redemption must be treated as a dividend, with a resulting shift in basis. *See* Pl. Memo at 15-17 (listing cases and many other authorities). But Heinz does not trouble to prove the first step of the argument–that Heinz redeemed the shares. It merely states a conclusion: "As a matter of tax law, the redemption perfectly fit the definition of 'redemption' in § 317(b)." Pl. Memo at 24.

Heinz's entire argument depends upon the application of Code § 317, which provides (emphasis added):

> (a) Property.--For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).
>
> (b) Redemption of stock.--For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder

> *in exchange for property*, whether or not the stock so acquired is cancelled, retired, or held as treasury stock.

If Heinz hopes to transmute HCC's capital gain into an even more profitable capital loss, Heinz must prove that it *exchanged property* for HCC's 3,325,000 shares of Heinz stock. And the property cannot be the 5,265,000 Heinz shares HCC held when the transaction ended.

Heinz took HCC's 3,325,000 shares and put the Note in their place. Under ordinary circumstances, this would seem to be an exchange of property for stock. Under its operating procedures, however, HCC paid all its unneeded cash to Heinz; and HCC had recently abandoned the only business for which it needed cash. Behind the form of an exchange stands the reality that HCC had become a mere cash-conduit to Heinz. In such a situation, the courts have never recognized an exchange. "[T]ransactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." *Higgins*, 308 U.S. at 476.

*1. HCC was a mere holding company when it accepted the Note.*

On January 10, 1995, HCC's board of directors accepted Heinz's offer to buy HCC's stock with the Note. (*See* Jt. Ex. 14 at 146-47.) At the same meeting, by a remarkable coincidence, one of HCC's directors stated (*id.* at 147)–

> that due to changing views among the states regarding the treatment of Delaware holding companies, the directors of the Company have decided to demand repayment of all affiliate loans, and discontinue all Delaware holding company lending activities as soon as reasonably possible.

HCC accordingly resolved to "discontinue the Company's lending activities as soon as reasonably possible . . . ." (*Ibid*.)

On January 18, 1995, HCC accepted the Note and transferred 3,325,000 of its 3,500,000 shares to Heinz. (*See* Jt. Ex. 34, ¶ 39.) HCC had been destined to be a passive holding company

for over a week; it would have no active business. Its only function would be to hold the stock of Heritage, the Heinz group's new financing company, the stock of certain foreign Heinz subsidiaries, and the Note. (*See* Def. Ex. 74 at 212, ¶ 9.)

At trial, Mr. Crowe insisted that the reorganized HCC could have used money from the Note to make loans, to make equity investments, or to contribute to the capital of its new lending subsidiary, Heritage (later CMH); in his view, HCC could have done anything with the money. (*See*. Tr. at 133, 170-71; *see also* Def. Ex. 126 at 341 (Heritage changes its name to CMH, Inc.).) At his earlier deposition, however, he said only that HCC would have deployed the funds in its business, which was to make loans to Heinz subsidiaries and to hold certain equities. (Tr. at 309.)

The defendant cannot refute Mr. Crowe's speculation that HCC might have used the money from the Note for any of these purposes. There was no law against them, and one can imagine them without self-contradiction. They are logical possibilities–like unicorns. But speculation aside, Heinz executed Project Turbo so that HCC could "exit the lending business and leave the lending activities to a separate new company . . . ." (Def. Ex. 75 at 213.) Tax worries drove HCC out of the lending business (*see* Jt. Ex. 14 at 147), and if HCC had begun to make new loans after Project Turbo, its tax worries would have revived (*see* Tr. at 218-19). HCC could have made new loans only by sabotaging Project Turbo and by exposing itself to attack by state tax auditors.[20] Though making new loans was a logical possibility, it was as likely as finding a unicorn in HCC's offices.

---

[20] Mr. Crowe insisted that HCC never abandoned the lending business because it retained several debt instruments that continued to generate interest, including the Note. HCC was also the sole shareholder of a subsidiary that made loans. (*See* Tr. at 129-30, 179.) But HCC did not make the loans made by a separate corporation, and the Note was not an active lending business in which HCC could deploy funds, as Mr. Crowe admitted. (*See* Tr. at 179-80.)

Similarly, HCC might have invested money from the Note in other equities or in its new subsidiary, which carried on its old lending business. But those possibilities were just as unlikely as the making of new loans, because HCC's policy was to return its unneeded cash to Heinz. The proof is in the facts: HCC bought no more stock. (Tr. at 315.) And after Heinz and HCC capitalized the new lending subsidiary in early 1995, HCC made no net investment in the subsidiary during the time the Note would have been outstanding. (*See* Def. Ex. 129 at 413.)[21]

*2. When it accepted the Note, HCC's policy was to pay Heinz all of its unneeded cash–and as a mere holding company, it needed little cash.*

After January 10, 1995, HCC could never again expect to deploy cash as a loan. It would receive dividends from its own subsidiaries, and under its corporate policies it would pay all its unneeded cash to its shareholders–ultimately to Heinz. (Leasing was HCC's majority shareholder, but whatever money Leasing received it passed directly to Heinz in one form or another. Leasing had no need for cash. (*See* Tr. at 307-08.)) Even before HCC accepted the Note and abandoned its lending business, it owned more than enough sources of income to pay its modest bills. (*See, e.g.,* Jt. Ex.30 at 365 (in the quarter before HCC accepted the Note, its year-to-date dividend income was $67,891,608.73, and its operating expenses were $75,832.78; total expenses were $357,910.08).) Therefore, when HCC accepted the Note, it was likely to pay Heinz any cash the Note would generate: Heinz would collect the payout if HCC held the Note to maturity; Heinz would collect the capital gain if HCC sold the Note or the stock issued upon conversion; and

---

[21] HCC's investment did fluctuate; the largest increase was .5% (from $1,563,406,722.60 to $1,571,611,841.60 between 5/3/1995 and 8/2/1995). But HCC's net investment shrank between 5/3/1995 and 8/2/2000. (*See* Def. Ex. 129 at 413.) The defendant cannot trace the investment to 1/18/2002, when the Note would have matured, because HCC transferred ownership of CMH during the 2001 fiscal year–apparently during a reorganization of Heinz into separate financing and operating entities. (*See* Def. Ex. 123 at 285.)

Heinz would collect the dividends paid on the stock. In economic effect, Heinz never parted with the Note.

*3. Tax law refuses to recognize mere possibilities, like HCC's possible uses for money generated by the Note, especially when the possibilities are so unlikely.*

Heinz cannot argue that HCC actually retained the benefits of the Note simply because it might have retained them if things had not been as they were. HCC did return all of the Note's benefits to Heinz; and in tax law, facts mean more than possibilities, especially when the possibilities are as unlikely as the ones Heinz asserts. The defendant will consider a similar case in which the plaintiffs demanded tax benefits arising from their manipulation of a controlled corporation on the ground that the transaction had potential economic effects and business purposes: *Haberman Farms, Inc. v. United States*, 182 F. Supp. 829 (D. Neb. 1960), *aff'd*, 305 F.2d 787 (8th Cir. 1962).

In *Haberman Farms*, a father and two sons owned a corporation that had losses on its books from an earlier failed business and that had defaulted on loans they made to it. They also owned farms, which they generally leased to farmers. After consulting a lawyer and an accountant, the owners leased their farms to the corporation for fixed payments and had the corporation collect the rent paid by the farmers. The corporation reported the rent it collected as income, and it deducted the payments to its owners as expenses. The owners reported the corporation's payments as income, and they deducted taxes, interest, and depreciation paid on the farm buildings and machinery. The owners could also collect money from their accounts tax-free as repayments of the loans they had made to the corporation. The corporation did nothing but collect the rent, and it kept the money in separate accounts, one for each owner.

The Commissioner attributed all of the corporation's income to the owners and assessed a deficiency on the ground that the corporation had no business purpose and existed only for tax avoidance. The owners paid the deficiency and sued for a refund, alleging that (1) they wanted to get the corporation on its feet; (2) they preferred a fixed cash income from the corporation to the risky share rentals they collected from the farmers; and (3) they wanted to arrange for joint management of their land by a single entity. They admitted that they also wanted to salvage the tax loss the corporation had suffered in its earlier business.

The court pointed out that the evidence did not support the asserted business purposes. The corporation might be able to pay its owners a fixed income, but it had recently been insolvent. The court could not deny "the *possibility* that the transactions involved might have provided taxpayers with a means for a guaranteed income, but this Court concludes from the evidence that the transactions were neither intended for nor served this purpose." *Id*. at 833 (emphasis added). In the present case it might not have been impossible for HCC to revive its active lending business; but after Project Turbo, HCC could hardly have intended to revive it. Project Turbo also transformed HCC into a "*mere*[ ] . . . investment *holding* company." (Def. Ex. 74 at 212, emphasis added.) Its function was to hold the securities it held in 1995 (*ibid.*), not to buy new ones. Accordingly, it bought none. (*See* Tr. at 315.)

The court in *Haberman Farms* also doubted whether the owners really wanted the corporation to manage their land, because it never did manage their land. That was the purpose that the owners asserted, but the assertion was "a mere *possibility*, and its reality is not indicated by the evidence. The methods and means of management were not changed by the transactions. All that is of substance to this assertion is the assertion itself, and it has come too late." *Ibid*.

(emphasis added). Similarly, Heinz asserts that HCC need not have followed its past policy of transferring all its unneeded cash to Heinz; the board might have refused to declare a dividend. (*See* Tr. at 132.) But the board never did refuse. (*See* Def. Ex. 128 at 412.) Heinz's assertion is a mere possibility, and its reality is not indicated by the evidence.

*4. HCC cannot shift the basis of its sold shares to its retained shares, because Heinz kept all the benefits of the Note and did not redeem HCC's shares within the meaning of Code § 317(b).*

The claimed redemption did not change the flow of economic benefits expected from ownership of the Note, and "it is command of income and its benefits which marks the real owner of property." *Higgins*, 308 U.S. at 478. Heinz remained the Note's owner in everything but name. Thus, the purported exchange is not the "exchange" that the statute intended (*see Gregory,* 293 U.S. at 469), and Heinz never redeemed the stock within the meaning of Code § 317(b). Without this foundation, the whole tax-planning edifice falls to the ground.

CONCLUSION

For the reasons given, the defendant asks the Court to dismiss Heinz's complaint with prejudice.

Respectfully submitted,

s/ Robert Stoddart
ROBERT STODDART
Justice Department (Tax)
P. O. Box 26; Ben Franklin Station
Washington, D.C. 20044
(202) 307-6445; FAX: (202) 514-9440

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Acting Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section
JACOB E. CHRISTENSEN
Trial Attorney

March 23, 2006

Of Counsel