**IN THE UNITED STATES COURT**

**OF**

**FEDERAL CLAIMS**

**No. 03-2847 T**
**(Judge Allegra)**

**H.J. HEINZ COMPANY**
**AND SUBSIDIARIES,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

# PLAINTIFF'S POST-TRIAL REPLY BRIEF

Clifton B. Cates
Robert H. Wellen
Attorneys for Plaintiff

Ivins, Phillips & Barker Chartered
1700 Pennsylvania Avenue, N.W.
Sixth Floor
Washington, D.C. 20006
(202) 393-7600

[Electronically filed on April 24, 2006]

## TABLE OF CONTENTS


**Page**

I. Introduction ..... 1

II. Facts ..... 2

III. Business Purpose ..... 6

IV. *Alter Ego* ..... 7

V. Step Transaction ..... 9

A. Defendant Offers Changing, Inconsistent Step Transaction Recasts ..... 9

B. Defendant Should Be Precluded From Making Its New Argument ..... 10

C. The Step Transaction Doctrine Has No Role in This Case ..... 11

1. The Parent-Subsidiary Relationship Between Heinz and HCC Does Not Mean that the Step Transaction Doctrine Applies ..... 11

2. The Step Transaction Doctrine Depends on the Statute at Issue ..... 12

3. The Applicable Statutes Here Leave No Room for Step Transaction Analysis ..... 14

a. Redemptions of Stock Owned by Affiliated Corporations Are Exempt from Stock Basis Reduction ..... 14

b. The Objective Anti-Abuse Rules in §§243, 246 and 1059 Leave No Place for Subjective Step Transaction Analysis ..... 15

i. 45-Day Holding Period in §246 ..... 15

ii. Qualifying Dividends under §§243(b) and 1059(e)(2)(B) 16

iii. Other Restrictions in §1059 ..... 16

4. The Cases Cited by Defendant Arise Under Statutes That Invite or Require Use of Step Transaction Analysis ..... 17

D. Where the Statute Provides No Explicit Guidance, the Courts and the Service Have "Adopted a Cautious Approach" in Applying the Step Transaction Doctrine ..... 20

1. A Plan Is Not Enough to Invoke the Step Transaction Doctrine ..... 21

2. Application of the Step Transaction Should Explain Satisfactorily What Happened Without Inventing New Steps ..... 22

VI. Conclusion ..... 24

## TABLE OF AUTHORITIES

**Page**

**Internal Revenue Code of 1986 Provisions**

§243 .......... 2, 13, 15-16, 20-21
§246 .......... 2, 13, 15, 17, 20-21
§302 .......... 2, 13-15, 20-21
§304 .......... 13-14, 20-21
§333 .......... 19
§355 .......... 3
§368 .......... 3, 18-19
§1031 .......... 19-20
§1059 .......... 2, 7, 11, 13-17, 20-21

**Internal Revenue Code of 1939 Provision**

§112 .......... 13

**Treasury Regulations**

Treas. Reg. §1.246-5 .......... 15
Treas. Reg. §1.302-2 .......... 2, 14
Treas. Reg. §1.355-7 .......... 18
Treas. Reg. §1.1059(e)-1 .......... 14

**Superceded Treasury Regulation**

Treas. Reg. 111, §29.112(b)(6)-1, *et seq.* (1943) .......... 13

**Cases**

*Alabama Asphaltic Limestone Co., Helvering v.*, 315 U.S. 179 (1942) .......... 18
*American Potash and Chemical Corp. v. United States*, 399 F.2d 194 (Ct. Cl. 1968) .......... 18, 22
*ASA Investerings Partnership v. Commissioner*, 201 F.3d 505 (D.C. Cir. 2000) .......... 12
*Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517 (10th Cir. 1991) .......... 13, 21
*Behrend v. United States*, 31 AFTR 2d 73-406 (4th Cir. 1972) .......... 22
*Biggs v. Commissioner*, 632 F.2d 1171 (5th Cir. 1980) .......... 19
*Bolker v. Commissioner*, 760 F.2d 1039 (9th Cir. 1985) .......... 19
*Carrington v. Commissioner*, 467 F.2d 704 (5th Cir. 1973) .......... 22
*Day & Zimmerman, Inc., Commissioner v.*, 151 F.2d 517 (3d Cir. 1945) .......... 11
*Edenfield v. Commissioner*, 19 T.C. 13 (1952) .......... 21
*Esmark, Inc. & Affiliated Cos. v. Commissioner*, 90 T.C. 171 (1988), *aff'd* 886 F.2d 1318 (7th Cir. 1989) .......... 21-23
*Exxon Corp. v. United States*, 12 Cl. Ct. 434 (1987) .......... 10
*Falconwood Corporation v. United States*, 422 F.3d 1339 (Fed. Cir. 2005) .......... 11-14, 17, 21
*Garcia v. Commissioner*, 80 T.C. 491 (1983) .......... 19
*Granite Trust Co. v. United States*, 238 F.2d 670 (1st Cir. 1956) .......... 11, 13-14, 17
*Gregory v. Helvering*, 293 U.S. 465 (1935) .......... 3, 12, 14, 17-18
*Grove v. Commissioner*, 490 F.2d 241 (2d Cir. 1973) .......... 21, 22-23
*H.B. Zachry Co. v. United States*, 170 Ct. Cl. 115 (Ct. Cl. 1965) .......... 10
*Haberman Farms, Inc. v. United States*, 182 F. Supp. 829 (D. Neb. 1960), *aff'd*, 305 F.2d 787 (8th Cir. 1962) .......... 3

*Hegeman-Harris & Co. v. United States*, 194 Ct. Cl. 574 (1971) .............................................. 10
*Higgins v. Smith*, 308 U.S. 473 (1940) ........................................................................... 7
*Holsey v. Commissioner*, 258 F.2d 865 (3d Cir. 1958).................................................... 21
*Humacid Co. v. Commissioner*, 42 T.C. 894 (1964)......................................................... 22
*Ingalls, United States v.*, 399 F.2d 143 (5th Cir. 1968) ..................................................... 6
*J.E. Seagram Co. v. Commissioner*, 104 T.C. 75 (1995).................................................. 18
*John McShain, Inc. v. United States*, 179 Ct. Cl. 632 (1967) ........................................... 10
*King Enterprises, Inc. v. United States*, 418 F.2d 511 (Ct. Cl. 1969).................................17-18
*Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2d Cir. 1956)...................................... 7, 12
*Litton Industries, Inc. v. Commissioner*, 89 T.C. 1086 (1987) ......................................... 21
*Loftin and Woodward, Inc., K.C. v. United States*, 577 F.2d 1206 (5th Cir. 1978)..................... 10
*Long Term Capital Holdings, LP v. United States*, 330 F. Supp. 2d 122, (D. Conn. 2004), *aff'd*,
96 AFTR 2d 2005-6344 (2d Cir. 2005) ......................................................................... 23
*Magneson v. Commissioner*, 753 F.2d 1490 (9th Cir. 1985).............................................. 19
*Maloney v. Commissioner*, 93 T.C. 89 (1989).................................................................. 19
*McDonald's Restaurants of Illinois, Inc. v. Commissioner*, 688 F.2d 520 (7th Cir. 1982).......... 18
*Minnesota Tea Co. v. Helvering*, 302 U.S. 609 (1938) ..................................................... 18
*Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943)..........................................7-8
*Nassau Lens Co. v. Commissioner*, 308 F.2d 39 (2d Cir. 1962)............................... 12, 14, 17, 20
*National Investors Corp. v. Hoey*, 144 F.2d 466 (2d Cir. 1944) ............................................ 7
*Northern Indiana Public Service Corp. v. Commissioner*, 115 F.3d 506 (7th Cir. 1997)........ 8, 21
*Ogiony v. Commissioner*, 617 F.2d 14 (2d Cir. 1980)........................................................ 8
*Palmer v. Commissioner*, 62 T.C. 684 (1974), *aff'd on another issue*, 523 F.2d 1308
(8th Cir. 1975).........................................................................................................22
*Paymer v. Commissioner*, 150 F.2d 334 (2d Cir. 1945) ....................................................... 8
*Principal Life Insurance Co. v. United States*, 70 Fed. Cl. 144, 166 (2006)...................... 3, 10, 23
*Sheppard v. United States*, 176 Ct. Cl. 244, 361 F.2d 972 (1966)......................................... 22, 23
*Smith v. Blackburn*, 785 F.2d 545 (5th Cir. 1986)............................................................ 10
*Strong v. Commissioner*, 66 T.C. 12, (1976), *aff'd without opinion*, 553 F.2d 94 (2d Cir. 1977) . 8
*True v. United States*, 190 F.3d 1165 (10th Cir. 1999)................................................ 19, 20, 23
*TSN Liquidating Corp. v. United States*, 624 F.2d 1328 (5th Cir. 1980) ................................ 21
*Turner Broadcasting Inc. v. Commissioner*, 111 T.C. 315 (1998) ......................................... 23
*Uniroyal, Inc. v. Commissioner*, 65 T.C.M. 2690 (1993).................................................... 21
*Waterman Steamship Corp. v. Commissioner*, 430 F.2d 1185 (5th Cir. 1970) ........................ 21
*Zenz v. Quinliven*, 213 F.2d 914 (6th Cir. 1954) ............................................................... 22

**Administrative Decisions**

Rev. Rul. 69-608, 1969-2 C.B. 43 ..................................................................................... 21
Rev. Rul. 75-493, 1975-2 C.B. 108 ................................................................................... 21
Rev. Rul. 76-187, 1976-1 C.B. 97 ..................................................................................... 3
Rev. Rul. 77-297, 1977-2 C.B. 304 ................................................................................... 19
Rev. Rul. 77-337, 1977-2 C.B. 305 ................................................................................... 19
Rev. Rul. 78-197, 1978-1 C.B. 83 ..................................................................................... 22
Rev. Rul. 79-289, 1979-2 C.B. 145 ................................................................................... 3
Rev. Rul. 84-121, 1984-2 C.B. 168 ................................................................................... 19

**Secondary Sources**

B. Bittker & J. Eustice, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS (7th ed.) ¶ 11.09[2][a]....................3
M. Ginsburg & J. Levin, MERGERS, ACQUISITIONS AND BUYOUTS (January 2006 ed.) ¶ 1005....................3

**IN THE UNITED STATES COURT**

**OF**

**FEDERAL CLAIMS**

**No. 03-2847 T**
**(Judge Allegra)**

**H.J. HEINZ COMPANY**
**AND SUBSIDIARIES,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

# PLAINTIFF'S POST-TRIAL REPLY BRIEF

Pursuant to the Court's orders filed February 2 and March 14, 2006, Plaintiff H.J. Heinz Company and Subsidiaries respectfully submits its Post-Trial Reply Brief.

## I. Introduction

The central issue in this case is whether the redemption of stock by Heinz[1] from HCC should be given effect for tax purposes. If the redemption is given effect, the tax consequences

[1] The defined terms used in Plaintiff's Initial Post-Trial Brief are used herein. A glossary of defined terms appears in Appendix 1 to Plaintiff's Initial Post-Trial Brief.

of the transactions are inevitable: (1) under §302(d),[2] the redemption was taxed as a dividend; (2) under Treas. Reg. §1.302-2(c), HCC's basis in its redeemed stock was transferred to the stock HCC retained; and (3) as a direct consequence, HCC recognized a loss when it sold this stock.

Until its Post-Trial Brief, Defendant had advanced several alternative arguments for disregarding the redemption. Plaintiff responded to all these arguments in its Initial Post-Trial Brief. In its Post-Trial Brief, Defendant has offered for the first time a totally new argument under the step transaction doctrine—that the redemption should be disregarded because Heinz should be treated as purchasing the stock that HCC purchased from the public. Plaintiff believes that Defendant has raised this argument too late for the Court to consider it. Furthermore, the argument fails on the merits. The Code provisions that control here (including §§243, 246 and 1059(e)(2)(B)) are directly at odds with it, and the case law rejects it as well.

## II. Facts

In its Post-Trial Brief, Defendant discusses at length and in a disparaging manner the Heinz Group's tax planning, mainly its safe-harbor leasing and state tax planning. Def. Br. 3-8. This discussion has little relevance.[3] Safe-harbor leasing was a Congressionally-sanctioned program to transfer tax benefits from taxpayers that could not use them to those that could, and the Internal Revenue Service has ruled that reducing state tax is a legitimate business purpose

---

[2] Except as otherwise indicated, references to sections are to sections of the Code or to the regulations thereunder.

[3] One example of Defendant's effort to discredit Heinz's tax planning activities appears in its discussion of safe-harbor leases: "But Heinz had not disclosed the leases to the states; Heinz reported its claimed deductions and credits as totals on the state returns, without specifying the sources." Def. Br. 6. Defendant's implication is clear, but no evidence even suggests that Heinz reported these transactions other than correctly and completely on all of its tax returns. Another example is Defendant's description of what Mr. Crowe did after he thought of the transactions here: "The first person to whom he revealed his idea was not an employee of Heinz: he was Heinz's outside tax counsel." Def. Br. 15. Mr. Crowe was in charge of Heinz tax matters, and he had a tax idea. His call to outside tax counsel seems unremarkable.

under federal tax law.[4] More important, when it comes to determining the validity of a transaction for federal tax purposes, tax avoidance motive by itself is "largely irrelevant." "[W]hat instead is important is, in the words of *Gregory* [*v. Helvering*, 293 U.S. 465 (1935)], 'what was done.'" *Principal Life Insurance Co. v. United States*, 70 Fed. Cl. 144, 166 (2006).

Defendant also attempted to prove that HCC had no use for cash, and that, if it had held the Note to maturity, HCC would have had to return the cash proceeds to Heinz. In its Initial Post-Trial Brief, Plaintiff identified numerous facts brought out at trial that disprove these and other contentions. Here is a representative sample of inaccuracies in Defendant's factual assertions:

- **Contention**. "Heinz imposed operating procedures upon HCC and [Heinz] Leasing [Company] that required them to pay all their needed cash to Heinz." Def. Br. 8. "As of the day HCC accepted the Note, its status and operating procedures predetermined that it would return the payout if it held the Note to maturity. And if HCC converted the Note to stock, it knew that it would also return all products of the stock; it would possess only the bare ownership." Def. Br. 20, 47 ". . . HCC was not allowed to keep the dividends." Def. Br. 37.

  **Response**. Had HCC held the Note to maturity and received cash, there were many ways for HCC to employ that cash. Pl. Br. 43.[5] No "operating procedures" existed to require any distribution of cash. Pl. Br. 41. In fact, Defendant's theory depends completely on Heinz's

[4] Rev. Rul. 79-289, 1979-2 C.B. 145 (reorganization under §§368(a)(1)(D) and (a)(1)(F)); Rev. Rul. 76-187, 1976-1 C.B. 97 (§355 distribution). *See* B. Bittker & J. Eustice, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS (7th ed.) ¶ 11.09[2][a]; M. Ginsburg & J. Levin, MERGERS, ACQUISITIONS AND BUYOUTS (January 2006 ed.) ¶ 1005.

[5] Defendant characterizes as "speculation" Plaintiff's statement that HCC could have used the cash it would have received in 2002, if it had the held the Note to maturity. Defendant cites *Haberman Farms, Inc. v. United States*, 182 F. Supp. 829 (D. Neb. 1960), *aff'd*, 305 F.2d 787 (8th Cir. 1962), in support of the proposition that speculation is not a proper basis for decision. Def. Br. 48. Plaintiff agrees with the reasoning and the result in *Haberman Farms* but notes that Defendant is the party speculating about what might have happened seven years after the redemption. Plaintiff has done no more than respond to Defendant's speculation.

control over HCC as a wholly-owned subsidiary. But the parent-subsidiary relationship does not justify disregarding a transaction between Heinz and HCC, so long as the transaction had economic substance and was conducted on arm's-length terms. Pl. Br. 43-46. If Defendant's argument were valid, every parent-subsidiary transaction would be disregarded, because a parent can always extract any economic benefit it wishes from its subsidiary.

- **Contention**. "To end its state tax worries, Heinz stripped HCC of its lending business, the only business in which it needed cash." Def. Br. 13, 45.

  **Response**. HCC continued its lending business indirectly through its new wholly-owned subsidiary, Heritage/CMH, and retained some of its loan portfolio, including the Note. Jt. Ex. 30, p. 1340-43. More generally, the proposition that HCC, a $2 billion corporation, had no use for cash is absurd on its face. Pl. Br. 42-43.

- **Contention**. Heinz stock was a "uniquely unsuitable investment" for HCC, for two reasons: (1) when HCC purchased Heinz stock, the stock became unregistered. Before the stock could be sold to the public, Heinz would have to register it, and Heinz did not commit to do so. (2) "Heinz underperformed the market even after HCC bought the stock, despite the unprecedented rise in all equity values at the time. . . ." Def. Br. 34-35.

  **Response**. The unregistered status of the Heinz stock in HCC's hands was not important, because Heinz would have registered the stock if doing so were to its subsidiary's advantage. Tr. 152, 406-411. At about the same time as these transactions, Heinz voluntarily registered more than 12 million shares at the request of a major shareholder. Tr. 406-409; Pl. Ex. 11, 12. As to Heinz stock underperforming the market, HCC probably should have followed Will Rodgers' advice: "Buy only those stocks that go up; if they don't go up, don't buy them." In fact, HCC did well on its investment. By the time HCC converted the Note in

April 1998, HCC had made more than $166 million[6]—substantially more than doubling its investment in 3½ years. Property need not be turned into cash to be valuable.

- **Contention**. "In this case, Heinz dealt with HCC in ways no third party would accept." Def. Br. 38. The development of terms and the pricing of the Note by Goldman Sachs was "a classic conflict of interest." Def. Br. 38-39 "Similarly, no actual buyer and seller would forego negotiations, abandon their own interests, and ask Goldman, Sachs to draft a note for both parties according to its own best judgment." Def. Br. 39.

  **Response**. HCC and Heinz did their best to conduct the redemption on arm's-length terms. Tr. 145-147. To that end, HCC engaged Goldman Sachs to develop terms for a Note with a value substantially equivalent to the value of the stock to be redeemed. Jt. Ex. 16, p. 165; Tr. 322-323. Neither Goldman Sachs, nor Heinz nor HCC had any incentive to price the Note other than correctly. There was no conflict in Goldman Sachs's role, and Defendant's suggestion that Heinz and HCC should have obtained separate representation is impractical. Related parties transact business all the time without separate representation. Any rule requiring separate representation in such transactions would impose immense, unnecessary costs on everyday business operations. Most important, based on its unsurpassed experience with the securities market, particularly in convertible debt, Goldman Sachs concluded that the Note was fairly priced at "what we felt any other sophisticated participant, either another corporation or institutional investor, would pay for the note or what Goldman Sachs itself, if asked, would pay for the note." Tr. 354.

---

[6] $1.7 million (dividends) + $288.6 million (value of stock at conversion) + $7.0 million (proceeds of stock sale to AT&T) - $131 million (cost) = $166.3 million.

## III. Business Purpose

Under the tax law, no business purpose is required for a purchase, sale or redemption of stock. Pl. Br. 27. Further, as Defendant has stipulated, Heinz had legitimate non-tax reasons to buy its own stock, principally to take stock off the market for financial accounting purposes. Jt. Stip. ¶ 19; Tr. 89-90.[7] Nonetheless, Defendant argues that Heinz had no business purpose for including HCC in the stock purchases (Def. Br. 29, 43) and that HCC itself had no business purpose in buying Heinz stock (Def. Br. 33, 42). Both arguments are wrong. *See* Pl. Br. 26-33.

Defendant cites *United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968), for the proposition that Heinz's admitted business purposes for purchasing its own stock do not apply to HCC's stock purchases. Def. Br. 43. In *Ingalls*, an individual tried to defer tax by converting a cancellation of his debt to his employer into installments payable over 10 years. The scheme was devoid of economic substance, because it involved no more than swapping of identical checks. The Court held that the individual could not use the employer's legitimate desire to settle its dispute with him as justification for such an empty transaction. By contrast, the economic consequences of HCC's purchases of Heinz stock are obvious, and HCC had non-tax reasons to buy Heinz stock. Investing in Heinz stock was consistent with HCC's business, and HCC's investments in Heinz stock and the Note proved very profitable for HCC. Increasing HCC's activities and assets by means of these investments also added substance to HCC as a Delaware investment company.

---

[7] Defendant tries to make something of the fact that various Heinz employees advanced other reasons for HCC's purchases of Heinz stock. Def. Br. 25-26. John Mazur was and is the most knowledgeable person regarding Heinz's stock purchase program. His testimony is entirely convincing. Heinz's purpose was to take stock off the market and maintain a reasonably constant equity base. Tr. 89-90. That other Heinz employees cited other reasons is hardly surprising; they had different perspectives, and there were multiple reasons for the stock purchases.

**IV. *Alter Ego***

Defendant argues that, because the redemption was not conducted on arm's-length terms, and because HCC was obliged to return any cash proceeds of the Note to Heinz, HCC was no more than an *alter ego* of Heinz. Def. Br. 41.

Plaintiff has already responded to this argument. Pl. Br. 43-46. Because neither of Defendant's factual contentions is correct (*see* part II., above), Defendant's only basis for treating HCC as an *alter ego* of Heinz is the fact that HCC was a wholly-owned Heinz subsidiary. Extrapolating from subsidiary status to *alter ego* status, however, is flatly contrary to §1059(e)(2) (discussed in part V.C.3, below) and the case law. In particular, *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), and its progeny limit the application of *Higgins v. Smith*, 308 U.S. 473 (1940), the case on which Defendant principally relies in this area. Explicit authorities on this point include *National Investors Corp. v. Hoey*, 144 F.2d 466 (2d Cir. 1944), and *Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2d Cir. 1956). Pl. Br. 31-33.

*Moline Properties* establishes a very high standard for disregarding a corporation as an *alter ego* of its shareholders:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.

319 U.S. at 438-439 (footnotes and citations omitted). The reasons for HCC's organization and the extent of its activities were more than sufficient to treat HCC as a separate corporation, not as the *alter ego* of Heinz. HCC was incorporated to finance intercompany investments and secure tax benefits under Delaware law. D. Ex. 43; Tr. 117-120. HCC owned operating subsidiaries in Europe, Canada and New Zealand. Tr. 117-118; Jt. Stip. 12. From 1983 until March 1995, HCC also made substantial loans to Heinz affiliates. Jt. Stip. 14; D. Ex. 74. At the end of fiscal 1994,

HCC held more than $1.5 billion of loans receivable (Jt. Ex. 29, p. 1320-21). Beginning in March 1995, HCC conducted most of its intercompany lending through its new subsidiary, CMH/Heritage (D. Ex. 74), but, at the end of fiscal 1995, HCC's holdings included the Note, more than $9 million in other affiliate debt and equity investments with $1.8 billion book value. Jt. Ex. 30, p. 1340-43. *Cf.*, *e.g.*, *Ogiony v. Commissioner*, 617 F.2d 14 (2d Cir. 1980); *Paymer v. Commissioner*, 150 F.2d 334 (2d Cir. 1945); *Strong v. Commissioner*, 66 T.C. 12, (1976), *aff'd without opinion*, 553 F.2d 94 (2d Cir. 1977).

*Northern Indiana Public Service Corp. v. Commissioner*, 115 F.3d 506 (7th Cir. 1997), is of particular relevance. There, a U.S. parent corporation formed a foreign subsidiary (Finance) to borrow from foreign lenders and lend the proceeds to the parent at a slightly higher interest rate. The sole purpose was to avoid U.S. withholding tax on interest paid by the parent. The Seventh Circuit gave tax effect to Finance and its role. The Court held that tax avoidance motive was irrelevant, because the interest rate spread gave the transactions economic substance: "Each time an interest transaction occurred, Finance made money and Taxpayer lost money." 115 F.3d at 514.

*Northern Indiana* is also a good response to Defendant's argument that HCC's dividends to Heinz suggest that HCC was an *alter ego* of Heinz. Def. Br. 20, 41. Less than five years after it was formed, Finance was liquidated and distributed all its assets to its parent. If this prompt liquidation did not suggest *alter ego* status in *Northern Indiana*, dividends paid by HCC do not do so here. More generally, if *alter ego* status were to result from dividends to a controlling shareholder—an act a controlling shareholder can always compel—every controlled corporation would be its shareholder's *alter ego*. *Moline Properties*, of course, says otherwise.

## V. Step Transaction

### A. Defendant Offers Changing, Inconsistent Step Transaction Recasts

Until its Post-Trial Brief, Defendant had argued that the redemption should be disregarded as a sham and recharacterized in either of two ways.

First, Defendant asserted that the redemption should be bifurcated and recast as a contribution of the Note by Heinz to HCC's capital and a dividend of stock by HCC to Heinz. Def. Mem. 34-35; Def. Br. 29. As discussed in part V.D.2, below, this use of the step transaction doctrine is an impermissible invention of new steps. In addition, such a recast is not consistent with the law governing corporate distributions. *See* Pl. Br. 14-19; Pl. Mem. 23-25.

Second, Defendant asserted that HCC should be treated as purchasing and retaining the stock on the theory that HCC was not entitled to the economic benefits of the Note. Def. Mem. 2, 22; Def. Br. 44-47. This recast cannot be reconciled with the facts surrounding the redemption and the conversion of the Note or with HCC's rights as holder of the Note. Pl. Br. 27; part II., above. Nor is this theory consistent with Defendant's first recast.

In its Post-Trial Brief, Defendant argues for the first time that, under the step transaction doctrine, the redemption should be disregarded, because Heinz should be treated as having purchased the stock that HCC purchased from the public. Def. Br. 26. Defendant has continued to embrace its two earlier theories as well. That makes three inconsistent recasts. It is unclear which one reflects Defendant's view of the substance of the transactions or even whether Defendant prefers one over the others.

As a matter of procedure, Defendant should be precluded from making its new argument. As a matter of substance, regardless of which step transaction arguments Defendant advances, the step transaction doctrine does not apply to this case.

**B. Defendant Should Be Precluded From Making Its New Argument**

Defendant's new argument is that Heinz, not HCC, purchased Heinz stock from the public. This argument is inconsistent with Defendant's expressed pre-trial position. In its responses to Plaintiff's contention interrogatories, Defendant explicitly denied its intent to advocate any such position.[8] Plaintiff presented its case and wrote its Initial Post-Trial Brief based on that statement.

Moreover, the parties have stipulated: "During the period August 11 through November 15, 1994, HCC purchased 3,500,000 shares of Heinz common stock in the public market."[9] Jt. Stip. ¶ 21. In the Court of Federal Claims, a "stipulation is a judicial admission binding on the parties making it absent special considerations."[10] Defendant has not even alleged that there are any such considerations here. In fact, there are none.

Finally, because the record is closed, Plaintiff will have no opportunity to offer further proof that HCC really was the purchaser of Heinz stock, as Plaintiff thought the stipulation says.

For these reasons, Plaintiff respectfully objects to any consideration by the Court of Defendant's new fact-based argument. *Principal Life Insurance Co.*, *supra*, at 166.

---

[8] Plaintiff's Exhibit 23 (Defendant's Response to Plaintiff's Third Interrogatories, ¶ 27, p. 3537); Plaintiff's Exhibit 25 (Defendant's Response to Plaintiff's Fourth Interrogatories, ¶ 30, p. 3551). Other correspondence on this point is described in Plaintiff's Memorandum of Contentions of Fact and Law, p. 18, n. 20.

In its Memorandum of Contentions of Fact and Law, Defendant introduced its step transaction argument as follows: "In the transactions before the Court, independent parties engaged in only two events, and only [sic] those events are the only ones that had genuine effect: (1) HCC bought Heinz shares from the public; and (2) HCC sold Heinz shares to AT&T." Def. Mem. 34.

[9] This unambiguous factual stipulation was not the product of imprecise drafting. When Defendant wished to argue that the redemption was not what it appeared to be, Defendant insisted on stipulation language consistent with its position. *See* Jt. Stip. ¶ 29.

[10] *Hegeman-Harris & Co. v. United States*, 194 Ct. Cl. 574, 581 (1971); *John McShain, Inc. v. United States*, 179 Ct. Cl. 632, 635 (1967). Stipulations will be disregarded only if contrary to substantial evidence or if necessary to prevent an injustice. *H.B. Zachry Co. v. United States*, 170 Ct. Cl. 115, 123 (Ct. Cl. 1965). *See also Exxon Corp. v. United States*, 12 Cl. Ct. 434, 440 (1987), *citing Smith v. Blackburn*, 785 F.2d 545, 549 (5th Cir. 1986), and *Loftin and Woodward, Inc., K.C. v. United States*, 577 F.2d 1206, 1232-33 (5th Cir. 1978).

### C. The Step Transaction Doctrine Has No Role in This Case

The statutes applicable to the transactions in this case leave no room for step transaction analysis. Moreover, even if such statutes had permitted step transaction analysis, the transactions here would survive any step transaction challenge. *See* part V.D., below.

#### 1. The Parent-Subsidiary Relationship Between Heinz and HCC Does Not Mean that the Step Transaction Doctrine Applies

As discussed in part IV., above, in arguing that the transactions involved here should be recast, Defendant depends on the parent-subsidiary relationship between Heinz and HCC. This relationship provides no assistance to Defendant, however. Indeed, in one critical respect, it is actually a foundation of Plaintiff's case. *See* §1059(e)(2), discussed in part V.C.3., below. Moreover, in numerous cases the courts have respected the form of transactions against step transaction or similar attack, even though the transactions involved parent and subsidiary or between other related persons.

As one example, the courts have refused to disregard a transfer of subsidiary stock by a parent corporation, even though the only purpose was to reduce the parent's stock ownership to below 80% and so allow the parent to recognize a loss on the liquidation of the subsidiary. *Commissioner v. Day & Zimmerman, Inc.*, 151 F.2d 517 (3d Cir. 1945); *Granite Trust Co. v. United States*, 238 F.2d 670 (1st Cir. 1956). In both cases, the courts held that it was sufficient for the pre-liquidation sale to be bona fide and unconditional. The fact that, in each case, the liquidation was pre-arranged at the time of the stock sale (and the further fact in *Day & Zimmerman* that the stock was sold to an officer of the parent) did not change the result.

More recently, in *Falconwood Corporation v. United States*, 422 F.3d 1339 (Fed. Cir. 2005), the Federal Circuit rejected a step transaction attack on a "downstream" merger of a parent corporation into its wholly-owned subsidiary followed by sales of lower-tier subsidiaries

to shareholders of the parent. All the parties were related, and all the transactions were prearranged and occurred within a matter of hours, but these facts did not affect the Court's conclusion. In an attempt to avoid *Falconwood,* Defendant argues:

> Heinz had no nontax business purpose for interposing HCC between itself and the public, and "absence of a nontax business purpose is fatal." *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 512 (D.C. Cir. 2000).

Def. Br. 30. It is true that, in *Falconwood*, the Court found a business purpose for *the downstream direction* of the merger. Otherwise, however, the sole purpose of the transactions, including the combination of parent and subsidiary, was tax avoidance—conversion from C to S corporation status. By contrast, Heinz and HCC both had significant non-tax business purposes for participating in the transactions.

**2. The Step Transaction Doctrine Depends on the Statute at Issue**

The step transaction doctrine is enunciated in *Gregory v. Helvering*, 293 U.S. 465 (1935). There, as both Plaintiff and Defendant note (Pl. Br. 29, Def. Br. 24), the Supreme Court stated:

> It is quite true that if a reorganization in reality was effected within the meaning of subdivision (B), the ulterior purpose mentioned will be disregarded. The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. [citations omitted] But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended.

293 U.S. at 469. Thus, step transaction analysis is applied not in a vacuum but in light of the statute applicable to each case. It is a tool to implement the statutory purpose—to determine "whether what was done, apart from the tax motive, was the thing which the statute intended."

In *Nassau Lens Co. v. Commissioner*, 308 F.2d 39 (2d Cir. 1962), the Second Circuit explained the relationship of the substance-over-form doctrine to specific Code provisions, as enunciated in *Gregory*:

> . . . the courts have not attributed to Congress a general purpose underlying the entire Code to deprive the taxpayer in each case of freedom to choose between legal forms similar in a broad economic sense but having disparate tax consequences. [footnote omitted] *Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2nd Cir. 1956). They have, instead, when confronted with a statutory provision not explicitly turning on the relationship between parties to a transaction

> [footnote omitted] or requiring an underlying business purpose, adopted a cautious approach and asked merely whether the form superimposed upon the transaction has a result similar to the one Congress had in mind when it drafted the section involved.

308 F.2d at 44-45. *See* Pl. Br. 29. Plaintiff believes this explanation applies equally to the step transaction doctrine, one manifestation of the broader substance-over-form doctrine. *Falconwood Corporation, supra* at 1349.

The courts have rejected step transaction attacks where the statutes directly governing the attacked transactions were incompatible with step transaction analysis. For example, in *Granite Trust Co. v. United States*, *supra*, a parent corporation sold and donated stock of a subsidiary, to reduce its stock ownership to less than 80% and so recognize a loss when the subsidiary liquidated. The First Circuit focused on §112(b)(6) of the Internal Revenue Code of 1939 (the predecessor of §332) and characterized the statute as follows:

> As for the Commissioner's "end-result" argument, the very terms of § 112(b)(6) make it evident that it is not an "end-result" provision, but rather one which prescribes specific conditions for the nonrecognition of realized gains or losses, conditions which, if not strictly met, make the section inapplicable. In fact, the Commissioner's own regulations (Reg. 111, § 29.112(b)(6)) emphasize the rigid requirements of the section and make no allowance for the type of "step transaction" theory advanced in this case.

238 F.2d at 675.[11] Similarly, in this case §§243, 246, 302, 304 and 1059 leave no room for a recast under the step transaction doctrine.

The Federal Circuit's view, set forth recently in *Falconwood Corporation v. United States*, *supra*, is consistent with this analysis. According to the Court there, the consolidated return regulations governed the transactions and left no room for subjective step transaction analysis. 422 F.3d at 1351-1353.

---

[11] *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517 (10th Cir. 1991), involved two pre-arranged transactions. A parent corporation caused its subsidiary to sell its assets at a loss and then the parent repurchased all the assets except the stock of a lower-tier subsidiary. Applying the step transaction doctrine, the Tenth Circuit treated the transactions as a §332 liquidation and disallowed the loss. The Court discussed *Granite Trust* but held that the step transaction doctrine applied, because "the legal relations" created by the asset sale were "entirely contingent on" the repurchase of the assets (927 F.2d at 1528). There was no such contingency here.

*Gregory*, *Nassau Lens*, *Granite Trust*, and *Falconwood* establish that different statutes and regulations require different applications of the step transaction doctrine. Some statutes and regulations preclude or discourage step transaction analysis; others require or encourage such analysis; and still others are neutral. As discussed below, the statutes and regulations involved in this case preclude or discourage step transaction analysis, whereas the cases cited by Defendant in support of step transaction analysis involve statutes that require or encourage such analysis.

**3. The Applicable Statutes Here Leave No Room for Step Transaction Analysis**

A comprehensive statutory scheme dictates the tax treatment of HCC's stock purchase (§304(a)(2)) and the redemption (§302(d), Treas. Reg. §1.302-2(c), §1059(e)(2) and Treas. Reg. §1.1059(e)-1)—both individually and in relation to each other. In its Initial Post-Trial Brief, Plaintiff described these provisions of the Code and the Regulations and how they fit together. Pl. Br. 13-25. As a response to Defendant's new step transaction argument, Plaintiff wishes to amplify its discussion to show that, in light of this carefully woven tapestry, it would be inappropriate to use the step transaction doctrine to treat Heinz as the purchaser of stock actually purchased by HCC.

**a. Redemptions of Stock Owned by Affiliated Corporations Are Exempt from Stock Basis Reduction**

Under Treas. Reg. §1.302-2(c) (in effect since 1955), whenever a stock redemption is taxed as a dividend, the basis of the redeemed stock is transferred to stock the redeemed shareholder retains. Unless the amount of stock redeemed is small in relation to the shareholder's total stock holding, or the retained stock appreciates significantly, the shareholder will recognize a loss when the retained stock is sold. This result is neither obscure nor mysterious. It is an immediate, automatic and obvious consequence of a redemption being treated as a dividend under §302. These rules apply to both corporate and individual

shareholders, even though, due to the dividends-received deduction, corporations often are taxed more favorably on dividends than on stock sales. It is this feature of the law that is responsible for the controversy here. If HCC had been an individual and had been taxed on the redemption, Defendant doubtless would not object to the capital loss on a sale of the remaining stock.

As originally enacted, §1059 contained no special rules relating to dividends that resulted from the application of §302. In 1986, §1059 was amended to add rules directed specifically at redemptions. Under §1059(e)(1), if a non pro rata redemption from a corporate shareholder is taxed as a dividend, stock basis reduction under §1059 results, without regard to the size of the dividend, the length of time the redeemed stock is held or any other facts—with one important exception. Under §1059(e)(2), all "qualifying dividends"— those paid between members of affiliated corporate groups—including redemptions, are exempt from stock basis reduction, "[e]xcept as provided in regulations . . ." These were the only dividends so exempted.

**b. The Objective Anti-Abuse Rules in §§243, 246 and 1059 Leave No Place for Subjective Step Transaction Analysis**

Sections 243, 246 and 1059 include several anti-abuse rules relating to intercorporate dividends—holding periods for stock and tests based on the length of time a corporate shareholder receiving dividends is affiliated with the distributing corporation. These per se rules define which steps should be disregarded and which should be respected. There is therefore no place for the step-transaction doctrine, which seeks the same general objective but operates in an ad hoc, subjective manner.

**i. 45-Day Holding Period in §246**

Section 246(c)(1)(A) allows a dividends-received deduction only if the shareholder holds its stock for more than 45 days before or after the stock becomes ex-dividend. Sections 246(c)(1)(B) and 246(c)(4), interpreted by Treas. Reg. §1.246-5, reinforce this requirement with

strict rules to prevent shareholders from diminishing their risk of loss on the stock during the holding period.[12] Thus, stock ownership of 45 days or less is too transitory for the dividends-received deduction. Stock ownership lasting more than 45 days is sufficient, so long as the ownership is "real" under §246(c). The statute is clear. Other facts do not matter.

**ii. Qualifying Dividends under §§243(b) and 1059(e)(2)(B)**

Section 243(b) imposes an additional requirement for a dividend to be a "qualifying dividend," eligible for the 100% dividends-received deduction. Under this rule, the dividend must be "distributed out of the earnings and profits of a taxable year of the distributing corporation . . . on each day of which the distributing corporation and the corporation receiving the dividend were members of such affiliated group."

Section 1059(e)(2)(B) imposes an even tougher rule. To be eligible for the §1059(e)(2) exemption from stock basis reduction, a dividend must be a "qualifying dividend," and, it must be *not* attributable to either "earnings and profits . . . earned . . . during a period it was not a member of the affiliated group, or . . . to gain on property which accrued during a period the corporation holding the property was not a member of the affiliated group."

Under §§243, 246 and 1059(e)(2)(B), then, neither the 100% dividends-received deduction nor the exemption from §1059 is available unless there is a longstanding and substantial relationship between the distributing corporation and the shareholder. In the redemption here, all these provisions applied, and all of the rules were satisfied.

**iii. Other Restrictions in §1059**

Section 1059 contains two more anti-abuse rules with step transaction-like functions. Under §1059(a), stock basis reduction is generally required for "extraordinary" dividends paid

[12] If the dividends-received deduction were available without regard to holding period, corporations could buy stock, receive a low-taxed dividend and sell the stock at a loss right after the ex-dividend date.

on stock held for two years or less. Under §1059(c)(3), in determining whether a dividend is "extraordinary," dividends paid within 85 days are aggregated. Because Congress decided to exempt qualifying dividends from §1059 entirely, neither of these rules applies here. Nevertheless, they emphasize further Congress's intent to use objective, per se rules, instead of the subjective, ad hoc step transaction doctrine, to determine the type of stock ownership a corporate shareholder must have, if it is to qualify for all the tax benefits of receiving dividends.

When viewed together, the per se, objective anti-abuse rules in §§243, 246 and 1059 leave no place for the kind of ad hoc, subjective step transaction analysis that may be appropriate for transactions not singled out by Congress in this manner That is the lesson of *Gregory*, *Nassau Lens*, *Granite Trust* and *Falconwood*.

In this case, the 45-day holding period in §246 alone is determinative, because it focuses on the relationship between the two specific transactions involved here—acquisitions of stock like HCC's stock purchases and dividends like the redemption. If the requirements of §246 are satisfied, as they were here, no other test—especially not an ad hoc test like the step transaction doctrine—may be interposed to disregard either the stock purchase or the dividend.

**4. The Cases Cited by Defendant Arise Under Statutes That Invite or Require Use of Step Transaction Analysis**

Defendant cites two cases to support its new step transaction analysis. The statutory scheme applicable here, however, is markedly different from the statutes involved in those cases. These statutes invite or even require subjective step transaction analysis.

In *King Enterprises, Inc. v. United States*, 418 F.2d 511 (Ct. Cl. 1969) (Def. Br. 27-28), a corporation acquired the stock of a target corporation for 50% cash and 50% acquiring corporation stock, and the target then was merged "upstream" into the acquiring corporation. The question was whether, under the step transaction doctrine, the exchange of the target stock

for cash and stock should be treated as part of the merger, so that both steps together would constitute a tax-free reorganization under §368(a)(1)(A). The Court held that both steps were parts of a single "plan of reorganization" under the Code. This type of question, whether two or more transactions are parts of a "plan of reorganization," is necessarily based on intentions of the parties—their "plan." The reorganization provisions of the Code contain no objective test for making this determination.[13] Thus, the "plan of reorganization" test under §368(a) is a perfect example of a statutory requirement that invites or even requires facts-and-circumstances step transaction analysis.

*American Potash and Chemical Corp. v. United States*, 399 F.2d 194 (Ct. Cl. 1968), reinforces this interpretation of *King Enterprises*. There, a corporation acquired all the stock of a target corporation over a 14-month period, in exchange for its stock and some cash, and then caused the target to liquidate. Invoking the step transaction doctrine, the government argued that the steps should be combined as an assets-for-stock reorganization under §368(a)(1)(C). The Court rejected the proposed recast largely because, under §368(a)(1)(C), "[t]he acquisition of assets in a C reorganization should be accomplished in a *single* exchange transaction." 399 F.2d at 202 (emphasis added). Thus, an objective requirement of a "single exchange" of assets for stock under §368(a)(1)(C) blocked step transaction analysis.

---

[13] *See also, e.g., Helvering v. Alabama Asphaltic Limestone Co.*, 315 U.S. 179, 185-186 (1942) ("transitory phases of an arrangement frequently are disregarded . . . where they add nothing of substance to the completed affair"); *Minnesota Tea Co. v. Helvering*, 302 U.S. 609 (1938) (11th-hour corporate debt assumption and immediate payment by shareholders before acquisition disregarded as "a meaningless and unnecessary incident in the transmission of the fund to the creditors . . . so transparently artificial that further discussion would be a needless waste of time"); *Gregory v. Helvering*, *supra*; *McDonald's Restaurants of Illinois, Inc. v. Commissioner*, 688 F.2d 520 (7th Cir. 1982) (continuity-of-interest requirement for reorganization not met because of post-acquisition sales of acquiring corporation stock); *J.E. Seagram Co. v. Commissioner*, 104 T.C. 75 (1995) (two-step acquisition treated as one reorganization). For an extensive effort to determine the existence of a "plan" in another reorganization context, *see* Treas. Reg. §1.355-7.

Like the "plan of reorganization" language in §368(a), §1031, the statute involved in *True v. United States*, 190 F.3d 1165 (10th Cir. 1999) (discussed in Def. Br. 28-29) invites and even requires step transaction analysis. This conclusion is evident in the language of §1031(a):

> No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment, if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

The requirement that the property be "held for productive use in a trade or business or for investment" is inherently subjective. It demands that the facts and circumstances surrounding the exchange be examined, especially acquisitions and dispositions of the exchanged property, to determine if the property was "held" for the proper purpose.[14]

In *True*, a family partnership called True Ranches wished to acquire certain ranches. True Ranches bought only the personal property used in the ranches, however, and Smokey Oil, a corporation owned by the same family, bought the ranch land. Then, in a purported §1031 exchange, Smokey Oil transferred the ranch land to another family partnership, True Oil, in exchange for fully-depleted oil and gas leases. The purpose was to give Smokey Oil new cost basis in the leases under §1031(d) so it could claim cost depletion. True Oil then distributed the ranch land to its partners, who contributed it to True Ranches. Applying the step transaction doctrine, the Tenth Circuit affirmed summary judgment for the government. In so doing, the Court treated True Ranches as the purchaser of the ranch land and disregarded Smokey Oil's

---

[14] Rev. Rul. 77-297, 1977-2 C.B. 304; Rev. Rul. 84-121, 1984-2 C.B. 168 (property to be exchanged acquired by purchase); Rev. Rul. 77-337, 1977-2 C.B. 305; *Bolker v. Commissioner*, 760 F.2d 1039 (9th Cir. 1985) (property to be exchanged received in §333 liquidation); *Magneson v. Commissioner*, 753 F.2d 1490 (9th Cir. 1985) (property received in exchange contributed to partnership); *Maloney v. Commissioner*, 93 T.C. 89 (1989) (property received in exchange distributed in §333 liquidation). *See also Biggs v. Commissioner*, 632 F.2d 1171 (5th Cir. 1980), and *Garcia v. Commissioner*, 80 T.C. 491 (1983) (where integrated plan conceived and implemented, and taxpayer received property in exchange for like-kind property, interim steps taken to accomplish exchange do not deny tax-free treatment under §1031).

purchase of the land, the purported §1031 exchange of the land for the oil and gas lease, the distribution to the partners and the contribution to True Ranches. [15]

Although the Court in the *True* case did not discuss §1031 in detail, its step transaction analysis constitutes an inquiry into whether the ranch land was "held" for the purposes required by the statute. Such an inquiry was necessary in *True*, but a similar inquiry would have no place in a case, like this one, that involves transactions governed by the detailed, objective rules of §§243, 246, 302, 304 and 1059.[16]

**D. Where the Statute Provides No Explicit Guidance, the Courts and the Service Have "Adopted a Cautious Approach" in Applying the Step Transaction Doctrine**

Many Code provisions neither preclude nor especially invite step transaction analysis. When this type of statute is involved, the courts have, in the words of *Nassau Lens Co. v. Commissioner*, *supra*, "adopted a cautious approach and asked merely whether the form superimposed upon the transaction has a result similar to the one Congress had in mind when it drafted the section involved." 308 F.2d at 45. In revenue rulings, the Service has adopted a similar approach. Some of these cases and rulings are discussed below. Under this approach, even if general step transaction analysis were appropriate under the statutes involved in this case, Plaintiff would prevail.

[15] There are significant differences between the transactions in *True* and those involved here. In *True*, the Court concluded that there was no non-tax reason for Smokey Oil to buy ranch land, and that Smokey Oil and True Oil, neither of which was in the ranching business, acted only as conduits. HCC was no Smokey Oil. HCC's stock purchases carried out the principal objective of the Heinz stock purchase program, and ownership of stock and debt of Heinz affiliates was the business HCC was already in. Indeed, the Tenth Circuit in *True* reversed summary judgment on other transactions where the acquirer of property was engaged in the relevant business.

[16] No such inquiry would be necessary today, because Congress enacted §1031(f), a per se rule, in 1989 and amended it in 1990. Under §1031(f), if, within two years after an exchange between related parties, either party disposes of the exchanged property, nonrecognition under §1031(a) (and with it basis transfer under §1031(d)) is cancelled.

### 1. A Plan Is Not Enough to Invoke the Step Transaction Doctrine

The essence of Defendant's new argument is contained in one sentence:

> . . . Heinz had planned from the beginning to be the final holder of the 3,325,000 shares it purchased through HCC, and the step-transaction doctrine regards Heinz as having bought the shares directly from the public.

Def. Br. 26. Even if the step transaction doctrine had a place here notwithstanding §§243, 246, 302, 304 and 1059, this allegation would be utterly insufficient to invoke it. "The existence of an overall plan does not alone, however, justify application of the step transaction doctrine." *Esmark, Inc. v. Commissioner*, 90 T.C. 171, 195 (1988), *aff'd*, 886 F.2d 1318 (7th Cir. 1989). The courts have held consistently that pre-planned transactions are to be respected so long as they are real.[17]

One such line of authorities holds that a sale of stock and a dividend to the seller just before the sale are viewed as independent transactions. *Litton Industries, Inc. v. Commissioner*, 89 T.C. 1086 (1987); *TSN Liquidating Corp. v. United States*, 624 F.2d 1328 (5th Cir. 1980); *Uniroyal, Inc. v. Commissioner*, 65 T.C.M. 2690 (1993).[18]

The same result obtains for "bootstrap acquisitions," in which a buyer buys some stock in a corporation, and the corporation thereafter redeems the rest of the seller's stock. The courts and the Service both have concluded that the separate steps generally should be respected. *Holsey v. Commissioner*, 258 F.2d 865 (3d Cir. 1958); *Edenfield v. Commissioner*, 19 T.C. 13

---

[17] *Falconwood Corporation v. United States*, *supra*; *Northern Indiana Public Service Co. v. Commissioner*, *supra*; *Associated Wholesale Grocers, Inc. v. United States*, *supra* at 1528-1529 (10th Cir. 1991) ("In giving effect to the substance of the overall transaction, we ignore acts taken in intermediate steps which the taxpayer has itself undone with subsequent steps."); *Grove v. Commissioner*, 490 F.2d 241, 246 (2d Cir. 1973) (the proper inquiry is whether the steps under scrutiny had independent significance or "should be regarded as meaningless intervening steps in a single, integrated transaction designed to avoid tax liability by the use of mere formalisms"); *Esmark, Inc. v. Commissioner*, *supra*.

[18] In *Waterman Steamship Corp. v. Commissioner*, 430 F.2d 1185 (5th Cir. 1970), such a dividend was treated as part of a stock sale where the dividend could be paid only out of the purchaser's assets. *See also* Rev. Rul. 75-493, 1975-2 C.B. 108; Pl. Br. 21, n. 24.

(1952); Rev. Rul. 69-608, 1969-2 C.B. 43. *See also Zenz v. Quinliven*, 213 F.2d 914 (6th Cir. 1954).

Likewise, the courts and the Service respect transactions in which a taxpayer contributes stock of a controlled corporation to a charity, and the corporation redeems the stock from the charity. *Grove v. Commissioner*, 490 F.2d 241, 247-48 (2d Cir. 1973); *Carrington v. Commissioner*, 467 F.2d 704 (5th Cir. 1973); *Behrend v. United States*, 31 AFTR 2d 73-406 (4th Cir. 1972); *Palmer v. Commissioner*, 62 T.C. 684 (1974), *aff'd on another issue*, 523 F.2d 1308 (8th Cir. 1975); *Humacid Co. v. Commissioner*, 42 T.C. 894 (1964); Rev. Rul. 78-197, 1978-1 C.B. 83.

**2. Application of the Step Transaction Should Explain Satisfactorily What Happened Without Inventing New Steps**

The step transaction doctrine permits steps to be disregarded, but a step transaction recast should explain satisfactorily what happened without inventing new steps. A number of courts, including the Court of Claims, have held that steps may not be invented under the step transaction doctrine. *Sheppard v. United States,* 361 F.2d 972 (Ct. Cl. 1966);[19] *American Potash and Chemical Corp. v. United States, supra*;[20] *Grove v. Commissioner, supra*;[21] *Esmark, Inc. v. Commissioner, supra*.[22]

---

[19] "Useful as the step transaction doctrine may be in the interpretation of equivocal contracts and ambiguous events, it cannot generate events which never took place just so an additional tax liability might be asserted." 361 F.2d at 978.

[20] "Defendant [United States] contends that the liquidation should be denied any significance because it was an interim transitory step in the overall scheme. Its argument is that the liquidation and the stock for stock exchange should be combined, and that the only transaction which should be given tax significance is the one which did not in fact occur, a transfer of stock for assets. This is a misuse of the step-transaction doctrine which was promulgated to deny the independent tax validity of an interim step in a transaction which is not otherwise disturbed." 399 F.2d at 204.

[21] "We are not so naive as to believe that tax considerations played no role in Grove's planning. But foresight and planning do not transform a non-taxable event into one that is taxable. Were we to adopt the Commissioner's view, we would be required to recast two actual transactions—a gift by Grove to RPI and a redemption from RPI by the Corporation—into two completely fictional transactions—a redemption from Grove by the Corporation and a gift by

Footnote continued on next page

In *Turner Broadcasting Inc. v. Commissioner*, 111 T.C. 315 (1998), the Tax Court took this rule one step farther by rejecting use of the step transaction doctrine where the only way to account for what actually occurred would be to introduce new hypothetical steps:

> In order to recharacterize the transaction, respondent must have a logically plausible alternative explanation that accounts for ALL the results of the transaction. The explanation may combine steps, but if it invents new ones, "Courts have refused to apply the step-transaction doctrine in this manner." *Esmark, Inc. & Affiliated Cos. v. Commissioner*, *supra*. "'Useful as the step transaction doctrine may be … it cannot generate events which never took place just so an additional tax liability might be asserted.'" *Grove v. Commissioner*, 490 F.2d 241, 247-248 (2d Cir. 1973), *aff'g*. T.C. Memo. 1972-98 (quoting *Sheppard v. United States*, 176 Ct. Cl. 244, 361 F.2d 972 (1966)).

111 T.C. at 327. While not all courts are so exacting,[23] the approach to the step transaction doctrine in *Turner Broadcasting* makes sense, because a theory is useful only if it explains known or observable facts. To invoke the step transaction doctrine, Defendant should be required to show that its recast is solidly grounded in the facts. *Principal Life Insurance Co.*, *supra* at 166.

Defendant's new step transaction argument—"Heinz moved 3,325,000 shares from the public into its treasury, and HCC bought and sold 175,000 shares" (Def. Br. 29)—does not account for most of the indisputable economic results of the transactions in this case: HCC used its own cash and credit to purchase all the stock; HCC later exchanged most of that stock for the Note, a financial instrument wholly different from the stock; and, after the Note was converted,

---

Grove to RPI. Based upon the facts as found by the Tax Court, we can discover no basis for elevating the Commissioner's 'form' over that employed by the taxpayer in good faith." 490 F.2d at 247-248.

[22] In *Esmark*, the taxpayer wished to sell its energy subsidiary, Vickers. Mobil purchased Esmark stock in the market. Esmark then redeemed that stock from Mobil in exchange for the Vickers stock, in a transaction not taxable to Esmark. The Commissioner proposed to treat the transactions as a taxable sale of Vickers for cash and a redemption of stock by Esmark from the public. The Tax Court refused to "invent" a redemption by Esmark from the public: "Respondent proposes to recharacterize the tender offer/redemption as a sale of the Vickers shares to Mobil followed by a self-tender. This recharacterization does not simply combine steps; it invents new ones. Courts have refused to apply the step-transaction doctrine in this manner." 90 T.C. at 196. Here, Defendant similarly proposes to invent a purchase by Heinz of its stock from the public. Plaintiff respectfully submits that this Court should reject Defendant's proposal, as the Tax Court rejected the same proposal in *Esmark*.

[23] *See, e.g.*, *Long Term Capital Holdings, LP v. United States*, 330 F. Supp. 2d 122, 193-194 (D. Conn. 2004), *aff'd*, 96 AFTR 2d 2005-6344 (2d Cir. 2005), *citing, inter alia, True v. United States*, *supra*.

HCC held 3,510,000 shares of Heinz stock. Defendant's proposed recast also fails to account for the fact that the stock which Defendant says *Heinz* bought from the public appreciated in value while it was owned by HCC. Thus, according to Defendant's theory, the public sold the stock to Heinz at one price, and Heinz bought the stock at a different price.

## VI. Conclusion

Defendant has pulled out all the stops to find some basis to avoid a tax result mandated by the explicit language of the Code and the regulations. Defendant has argued that the redemption was a sham because HCC had no use for cash and was obliged to distribute it to Heinz, an assertion which is belied by the facts and is, indeed, inherently absurd. Defendant has also argued that the redemption was a sham because it was not done on arm's-length terms. This argument fails in the face of the evidence, especially the efforts of Goldman Sachs, one of the "best in the business," to make the Note fair consideration for the redeemed stock, and the very small difference between the value of the Note determined by Goldman Sachs and the value determined by Defendant's expert. In addition, to avoid the stipulated fact that Heinz had a legitimate business purpose for purchasing its own stock, Defendant has argued that there was no legitimate reason for HCC to do so. Defendant so argues even though HCC's stock purchases, whose economic effect cannot be denied, fully accomplished Heinz's overall business objective, as well as its own.

Until recently, Defendant had challenged only the redemption with inconsistent arguments that it was either a sham or a simultaneous distribution and contribution to capital. In its Post-Trial Brief, invoking the step transaction doctrine, Defendant argues for the first time that Heinz, not HCC, should be regarded as purchasing stock from the public. Even if the Court permits Defendant to raise this new matter (which Plaintiff believes would be unfair and

prejudicial), the step transaction doctrine does not take Defendant where it wishes to go. The tax consequences of the transactions at issue are prescribed by a detailed, comprehensive statutory scheme. In such a situation, application of the step transaction doctrine would have the effect of thwarting Congressional intent, the very opposite of what the doctrine is supposed to do. Plaintiff's refund claim is based on a straightforward application of that statutory and regulatory scheme, and it should be allowed in full.

Respectfully submitted,

s/ Clifton B. Cates

Clifton B. Cates
Attorney for Plaintiff

1700 Pennsylvania Avenue, N.W.
Sixth Floor
Washington, D.C. 20006
(202) 393-7600

Date: April 24, 2006

Of Counsel:
Ivins, Phillips & Barker Chartered
1700 Pennsylvania Avenue, N.W.
Sixth Floor
Washington, D.C. 20006
(202) 393-7600