No. 03-2847 T
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

H.J. HEINZ COMPANY AND SUBSIDIARIES,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

# DEFENDANT'S POST-TRIAL REPLY BRIEF

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
STEVEN I. FRAHM
ROBERT STODDART
JACOB E. CHRISTENSEN
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Station
Washington, DC 20044
TEL: (202) 307-6445
FAX: (202) 514-9440

[Electronically filed on April 24, 2006]

## TABLE OF CONTENTS

*Page*

I. *The question before the Court and the defendant's basic positions.* . . . 1

II. *Heinz bases its case on the unproved assumption that the law must recognize HCC's participation in the stock repurchase plan.* . . . 2

III. *Heinz must ignore the step-transaction doctrine in order to assert that it redeemed 3,325,000 shares from HCC rather than from the public.* . . . 5

A. *Despite Heinz's assertions, Code § 304(a)(2) cannot prevent the step-transaction doctrine from recharacterizing HCC's purchases as purchases by Heinz.* . . . 6

B. *Despite Heinz's assertions, the Moline Properties case cannot prevent the step-transaction doctrine from recharacterizing HCC's purchases as purchases by Heinz.* . . . 7

IV. *Because Heinz lacked any non-tax business purpose for using HCC to buy its stock, Heinz asks the Court to abandon the business-purpose requirement.* . . . 8

A. *Heinz cites no case in which a court recognized a transaction for tax purposes if the transaction lacked any non-tax business purpose..* . . . 9

B. *Courts refuse to give tax effect to any transaction between related entities that lacks a non-tax business purpose..* . . . 11

C. *Because Heinz had no non-tax business purpose for interposing HCC between itself and the sellers of the stock Heinz repurchased, the law cannot give tax effect to HCC's role.* . . . 13

V. *A brief response to some of Heinz's other arguments.* . . . 16

A. *When they allowed Goldman, Sachs to stand on both sides of their purchase and sale, Heinz and HCC engaged in behavior that no third party would have accepted.* . . . 17

B. *HCC did not buy Heinz stock to buttress its "substance" in Delaware.* . . . 19

CONCLUSION. . . . 20

## TABLE OF AUTHORITIES

Cases:

*ASA Investerings P'ship v. Comm'r*, 201 F.3d 505 (D.C. Cir.),
*cert. denied*, 531 U.S. 871 (2000). . . . . 7, 14
*Avco Mfg. Co. v. Comm'r*, 25 T.C. 975 (1956), *vacated by stipulation as to amount of judgment and remanded*, 1957 WL 10899 (2d Cir. 1957). . . . . 10
*Basic, Inc. v. United States*, 549 F.2d 740 (Ct. Cl. 1977). . . . . 15-16
*Boca Investerings P'ship v. United States*, 314 F.3d 625 (D.C. Cir.),
*cert. denied*, 540 U.S. 826 (2003). . . . . 13-14
*Compaq Computer Corp. v. Comm'r*, 277 F.3d 778 (5th Cir. 2001). . . . . 9
*Del Commercial Properties, Inc. v. Comm'r*, 251 F.3d 210 (D.C. Cir. 2001),
*cert. denied*, 534 U.S. 1104 (2002). . . . . 5
*Falconwood Corp. v. United States*, 422 F.3d 1339 (Fed. Cir. 2005). . . . . 5
*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). . . . . 9
*Geoffrey, Inc., v. S.C. Tax Comm'n*, 437 S.E.2d 13 (S.C.),
*cert. denied*, 510 U.S. 992 (1993). . . . . 19
*Granite Trust Co. v. United States*, 238 F.2d 670 (1st Cir. 1956). . . . . 10
*Gregory v. Helvering,* 293 U.S. 465 (1935). . . . . 11, 16
*Gulf Life Ins. Co. v. United States*, 118 F.3d 1563 (Fed. Cir. 1997). . . . . 9
*Higgins v. Smith*, 308 U.S. 473 (1940). . . . . 11
*IES Indus., Inc. v. United States*, 253 F.3d 350 (8th Cir. 2001) . . . . . 9
*Investers Diversified Servs., Inc., v. Comm'r,* 325 F.2d 341 (8th Cir. 1963). . . . . 7, 12
*King Enterprises, Inc. v. United States*, 418 F.2d 511 (Ct. Cl. 1969). . . . . 8
*Moline Properties Inc. v. Comm'r,* 319 U.S. 436 (1943). . . . . 7, 16
*National Investors Corp. v. Hoey*, 144 F.2d 466 (2d Cir. 1944). . . . . 8, 16
*Northern Pacific Railway Co. v. United States*, 378 F.2d 686 (Ct. Cl. 1967). . . . . 10, 11-12
*Scully v. United States*, 840 F.2d 478 (7th Cir. 1988). . . . . 12
*Sun Properties, Inc. v. United States*, 220 F.2d 171 (5th Cir. 1955). . . . . 10
*United States v. Davis*, 397 U.S. 301 (1970). . . . . 3, 10
*Zmuda v. Comm'r*, 731 F.2d 1417 (9th Cir. 1984). . . . . 8

Statutes:

Internal Revenue Code of 1986 (26 U.S.C.):
§ 243. . . . . 15
§ 301. . . . . 15
§ 302. . . . . 3, 4, 10
§ 304. . . . . 6
§ 317. . . . . 4, 17
§ 318. . . . . 4
§ 482. . . . . 18

[Table of Authorities, Internal Revenue Code of 1986, continued]

*Page*

§ 1032.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
§ 1059.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12

Internal Revenue Code of 1939:
§ 112.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Regulations:

Treasury Regulations (26 C.F.R.):
§ 1.302. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Miscellaneous:

G.C.M. 35,793 (Apr. 24, 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Rev. Rul. 66-37, 1966-1 C.B. 209. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 03-2847 T
(Judge Allegra)

H.J. HEINZ COMPANY AND SUBSIDIARIES,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

---

DEFENDANT'S POST-TRIAL REPLY BRIEF

---

Pursuant to the Court's Order of March 14, 2006, the defendant, the United States, replies to Plaintiff's Initial Post-Trial Brief, filed on March 23, 2006 (hereinafter Pl. Post-Trial Brief). Although the plaintiff's post-trial brief makes many assertions, this reply brief addresses only a few items that warrant a response. The defendant has anticipated and answered most of the plaintiff's arguments in its own post-trial brief (Def. Post-Trial Brief), which states the defendant's position on any point not mentioned in this reply.

*I. The question before the Court and the defendant's basic positions*

The plaintiff, H.J. Heinz Company (Heinz), has often repurchased its stock directly from the public to keep the number of outstanding shares more or less constant. In 1994, however, Heinz decided to buy some shares indirectly through a subsidiary, Heinz Credit Company (HCC). HCC's participation cost Heinz $1.7 million in dividends it would not have had to pay if it had bought the stock for itself. Once HCC had purchased 3,500,000 shares, Heinz claims to have

redeemed 3,325,000 of them from HCC with a convertible note (the Note) on January 18, 1995. HCC paid Goldman, Sachs & Co. $1.5 million to design the Note, which would not have been needed had Heinz bought the 3,325,000 shares directly. One day before the 1995 fiscal year ended, HCC sold its remaining 175,000 shares to a third party for a profit.

Heinz now insists that certain statutes and regulations "mechanically" transferred the tax basis of all 3,500,000 shares to the 175,000 shares HCC sold, and that the sale resulted in a large capital loss that entitles Heinz to a refund. As the defendant demonstrated in its post-trial brief, however, those authorities apply only if there was a "redemption" that tax law can recognize (*see* Def. Brief at 21-22), and tax law cannot recognize Heinz's asserted redemption for at least three reasons, any one of which defeats its claim: (1) The step-transaction doctrine treats Heinz as having done for itself what it used HCC to do on its behalf; (2) neither Heinz nor HCC had a non-tax business purpose for engaging in this indirect and wasteful form of a stock-repurchase plan; and (3) the alleged redemption did not vary control or change the flow of benefits from the Note.

In its post-trial brief, Heinz builds its own case upon a begged question. To attack the defendant's case, Heinz ignores a vital argument (the step-transaction doctrine), denies the existence of a well-known legal principle (the business-purpose requirement), and seems to forget facts that it once knew.

*II. Heinz bases its case on the unproved assumption that the law must recognize HCC's participation in the stock repurchase plan.*

From pages 14 through 25 of its post-trial brief, Heinz argues that its "redemption" of HCC's 3,325,000 shares must be treated as a dividend, and that the basis of those shares must

accordingly shift to the 175,000 shares HCC retained. Whenever a redemption does not reduce a shareholder's proportionate interest in the corporation, Code § 302 treats the redemption as a dividend, and, Heinz insists, the parties' lack of business purpose cannot affect the result. (Pl. Post-Trial Brief at 15, citing *United States v. Davis*, 397 U.S. 301, 309-13 (1970)). When a redemption is treated as a dividend rather than a sale, the basis of redeemed stock must be transferred to any stock of the redeeming corporation that the shareholder retains; otherwise the basis would disappear, and that would be unfair, as the IRS itself has stated. (*Id*. at 18-19 & 19 n. 21 (citing Treas. Reg. 1.302-2(c)(Ex. (1) & (3)); G.C.M. 35,793 (Apr. 24, 1974)).[1]

Heinz continues its argument by asserting that: The basis of the redeemed stock must shift to any retained stock even if the parties are a corporate parent and its subsidiary. (*Id*. at 19, citing Rev. Rul. 66-37, 1966-1 C.B. 209). In fact, Congress specifically intended to preserve the basis of stock held by an affiliate of the redeeming corporation, as it demonstrated by enacting Code § 1059(e)(2)(A). (*See* Pl. Post-Trial Brief at 20-24.) Under that section, if a corporation redeems its stock in a transaction treated as a dividend, the basis of any retained stock is reduced by the non-taxed amount of the dividend–except when the redeeming corporation and the redeemed shareholder are affiliates. Heinz and HCC are affiliates. Congress gave the Treasury Department power to change this result by regulation, and Treasury did change the result–but the regulation postdates Heinz's transaction. (*Id*. at 22-23.) Some members of Congress introduced legislation that would have treated such redemptions as sales rather than as dividends, but "[r]eaction to the bills was adverse . . . ." (*Id*. at 23.)

---

[1] When Heinz buys its own stock directly, however, the basis always disappears: a corporation has no basis in its treasury stock. *See* Code § 1032(a) (a corporation realizes no gain or loss on the sale of its own stock, including treasury stock).

Heinz concludes by urging the Court to apply the plain meaning of the statutes (*id*. at 24-25, citing cases). And in Heinz's view, the statutes and regulations require the Court to award the refund Heinz demands. (*Id*. at 25.)

Heinz has built this entire argument on sand. Heinz simply assumes that tax law will recognize HCC's purchase and sale of the 3,325,000 shares as a redemption. Whether or not the rest of its argument follows "mechanically" from this assumption, Heinz cannot prove the initial assumption mechanically. Heinz exposes its *petitio principii* in this assertion (Pl. Post-Trial Brief at 17, emphasis added):

> However, a *redemption* cannot be re-recast [*sic*] as something else or disregarded entirely whenever § 302 produces a result the government does not like. Indeed, the Service itself has described the rules of § 302 and § 318 as 'mechanical.' . . . As *Davis* makes clear, taxpayers must live with the mechanical rules of § 302. The government must do so as well.

Code § 302 treats a redemption as a dividend if the taxpayer's proportional interest in the redeeming corporation remains unchanged. Section 318 (constructive ownership of stock) treats HCC's Note as if it were the stock into which it could be converted. Appealing to these statutes, Heinz argues that HCC received a dividend and can transfer the basis of the 3,325,000 shares to its 175,000 retained shares because HCC lost none of its pre-existing equity interest in Heinz when it accepted the Note for the "redeemed" shares. But however clear and mechanical these statutes may be, they neither give HCC a pre-existing equity interest in Heinz nor create a redemption that tax law must recognize. The step-transaction and business-purpose doctrines view Heinz as having bought its 3,325,000 shares directly from the public–not from HCC; and under the economic-substance doctrine, the exchange was not a "redemption" as defined by Code § 317 because Heinz retained control of the Note's benefits.

*III. Heinz must ignore the step-transaction doctrine in order to assert that it redeemed 3,325,000 shares from HCC rather than from the public*

When it drafted its post-trial brief, Heinz had a copy of the defendant's Memorandum of Contentions of Fact and Law (Def. Pre-Trial Memo), which was filed on November 28, 2005. At page 35 of its pre-trial memo, the defendant stated:

> Heinz had injected HCC into its stock repurchase program for only one purpose–to generate a tax loss. Heinz could have achieved its object more directly if it had bought the shares from the public for itself. This Court should therefore ignore the intermediate step by which Heinz indirectly "repurchased" 3,500,000[[2]] shares from the public through HCC because Heinz had no genuine business purpose for such a repurchase.

The defendant supported this argument by citing *Del Commercial Properties, Inc. v. Commissioner*, 251 F.3d 210, 213 (D.C. Cir. 2001): "Under the step-transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step *for no other purpose* than to avoid U.S. taxes" (*quoted and emphasized in Falconwood Corp. v. United States*, 422 F.3d 1339, 1350 (Fed. Cir. 2005)), *cert. denied*, 534 U.S. 1104 (2002). (*See* Def. Pre-Trial Memo at 35.)

Heinz's post-trial brief never mentions *Del Commercial Properties* or *Falconwood Corp.*, and the phrase "step transaction" appears on none of its 47 pages. The step-transaction doctrine, however, defeats Heinz's case because it treats Heinz as having bought 3,325,000 shares directly from the public rather than through HCC, the transitory holder. Thus Heinz never redeemed the shares from HCC, there was no basis shift or capital loss, and there can be no refund. (*See* Def. Post-Trial Brief at 25-33.)

---

[2] This is an error; the correct number is 3,325,000.

Though Heinz sidesteps the defendant's step-transaction argument (and the authority of the Federal Circuit), it does offer some indirect responses.

*A. Despite Heinz's assertions, Code § 304(a)(2) cannot prevent the step-transaction doctrine from recharacterizing HCC's purchases as purchases by Heinz*

Heinz first tries to nullify the step-transaction doctrine with a statute: "Under [Code] § 304(a)(2), neither HCC's purchases of Heinz stock nor its ownership of such stock may be recharacterized in any other manner. For example, neither may be attributed to Heinz." (Pl. Post-Trial Brief at 14.) The statute, however, fails to support Heinz's conclusion. It provides:

> **§ 304. Redemption through use of related corporations**
>
> (a) Treatment of certain stock purchases.–
>
> . . . .
>
> (2) Acquisition by subsidiary.–For purposes of sections 302 and 303, if–
>
> (A) in return for property, one corporation acquires from a shareholder of another corporation stock in such other corporation, and
>
> (B) the issuing corporation controls the acquiring corporation,
>
> then such property shall be treated as a distribution in redemption of the stock of the issuing corporation.

HCC bought Heinz stock from the public; this statute treats HCC's purchase (for certain purposes) as if it were a purchase by Heinz. Now Heinz seems to argue that the statute prevents the step-transaction doctrine from treating HCC's purchase as a purchase by Heinz. The argument is a glaring *non sequitur*.

*B. Despite Heinz's assertions, the Moline Properties case cannot prevent the step-transaction doctrine from recharacterizing HCC's purchases as purchases by Heinz*

Heinz also seems to argue that the Court must recognize HCC's role in Heinz's repurchase plan because the Court may not view HCC as Heinz's agent or *alter ego*. In Heinz's words, "In *Moline Properties* [*Inc. v. Commissioner,* 319 U.S. 436 (1943)], the Supreme Court held that, except in extraordinary circumstances, a shareholder and its wholly-owned corporation are separate taxpayers. Defendant bears a particularly heavy burden if it is to show that HCC is to be disregarded as a separate entity and treated as an *alter ego* of Heinz." (Pl. Post-Trial Brief at 45, footnote omitted.)

Heinz misperceives an argument the defendant raised at page 31 of its pre-trial memo (citing *Investers Diversified Servs., Inc., v. Comm'r,* 325 F.2d 341, 352 (8th Cir. 1963)): "By failing to treat HCC as it would have been obliged to treat a separate entity, Heinz showed that HCC was acting as its *alter ego*." The defendant's memo asked the Court to ignore HCC's *role* in Heinz's stock-repurchase plan; it was not suggesting that HCC had no existence separate from Heinz. But this distinction makes little difference in the present case.

In *Moline Properties*, the Court held that a corporation remains a separate entity for tax purposes "so long as [its] purpose is the equivalent of business activity . . . ." 319 U.S. at 439. And "courts have understood the 'business activity' reference in *Moline* to exclude activity whose sole purpose is tax avoidance. This reading treats 'sham entity' cases the same way the law treats 'sham transaction' cases, in which the existence of formal business activity is a given but the inquiry turns on the existence of a nontax business motive." *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 512 (D.C. Cir.), *cert. denied*, 531 U.S. 871 (2000). Because Heinz had

no nontax business motive for using HCC to repurchase its stock, Heinz engaged in a sham transaction, and HCC's role cannot be recognized. In effect, HCC can be treated as if it were a sham entity to the extent that it participated in the sham transaction, despite its existence for all other purposes. *Cf. National Investors Corp. v. Hoey*, 144 F.2d 466, 468 (2d Cir. 1944) (L. Hand, J.) (refusing to recognize the existence of a corporation for tax purposes during a period when its only activity was tax avoidance, and reading *Moline* to say that "the term 'corporation' will be interpreted to mean a corporation which does some 'business' in the ordinary meaning, and that escaping taxation is not 'business' in the ordinary meaning").

Whatever Heinz may mean by citing *Moline Properties*, Heinz can hardly suggest that HCC's corporate status makes it immune from the step-transaction doctrine. *See, e.g., King Enters., Inc. v. United States*, 418 F.2d 511, 519 (Ct. Cl. 1969) (refusing to give tax effect to a sale of stock by one corporation to another).

*IV. Because Heinz lacked any non-tax business purpose for using HCC to buy its stock, Heinz asks the Court to abandon the business-purpose requirement*

Elsewhere Heinz asserts another novel legal proposition: The IRS must recognize a transaction that lacks any non-tax business purpose if it is economically "real." Heinz seems to believe that economic substance and business purpose are separate features, either one of which can validate a transaction for tax purposes; but "[t]here is no real difference between the business purpose and the economic substance rules. Both simply state that the Commissioner may look beyond the form of an action to discover its substance." *Zmuda v. Comm'r*, 731 F.2d 1417, 1420 (9th Cir. 1984). In substance, Heinz bought 3,325,000 shares from the public for itself. Tax law

cannot recognize HCC's insertion into the purchase–even if it were as economically real as Heinz asserts–because Heinz had no non-tax business reason for buying its stock through HCC.[3]

*A. Heinz cites no case in which a court recognized a transaction for tax purposes if the transaction lacked any non-tax business purpose*

Heinz insists that "[t]he courts have consistently rejected attacks on real transactions that resulted in non-tax changes in a taxpayer's economic position, even if tax-avoidance was the principal *or even the sole* motivating factor." (Pl. Post-Trial Brief at 26, emphasis added.) Heinz cites four cases, but none of them supports the proposition for which Heinz cites it–that courts give tax effect to transactions that lack any non-tax business purpose. In fact, they all suggest the opposite: *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978) (emphasis added) (Government should respect parties' allocation of rights and duties if "there is a genuine multi-party transaction . . . *not* shaped solely by tax-avoidance features . . . "); *Gulf Life Ins. Co. v. United States*, 118 F.3d 1563, 1566 (Fed. Cir. 1997) (emphasis added) ("The government stipulated that Taxpayer's reinsurance agreement was entered into *for valid business purposes* . . . "); *Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 787 (5th Cir. 2001) (emphasis added) ("evidence in the record does *not* show that Compaq's choice to engage in the ADR transaction was solely motivated by the tax consequences of the transaction"); *IES Indus., Inc. v. United States*, 253 F.3d 350, 356 (8th Cir. 2001) (emphasis added) ("We hold . . . that the ADR trades in which IES engaged did *not*, as a matter of law, lack business purpose or economic substance").

---

3 Although the following discussion considers only Heinz's lack of business purpose for using HCC in its stock-buyback program, the defendant does not concede that HCC's participation was economically "real" in any sense. (*See* Def. Post-Trial Brief at 44-50.)

Heinz also cites four cases to support the proposition that "no non-Federal tax business purpose is required to validate a purchase, sale or redemption of stock." (Pl. Post-Trial Brief at 27.) Heinz overlooks *Northern Pacific Railway Co. v. United States*, 378 F.2d 686, 691 (Ct. Cl. 1967) (denying tax effect to an intra-group stock sale for lack of a non-tax business purpose). Heinz also exaggerates the breadth of the cases it cites: *United States v. Davis*, 397 U.S. at 312 (*if a redemption has occurred* and the taxpayer's interest in the redeeming corporation is unchanged, Code § 302 treats the redemption as a dividend regardless of business purpose); *Avco Mfg. Co. v. Comm'r*, 25 T.C. 975, 980-81(under the wording of 1939 Code § 112(b)(6), a distribution in complete liquidation of a corporation was tax free to another corporation "only if" the recipient owned 80% of the liquidating corporation's voting power from the time the plan was adopted until receipt of the property; therefore the recipient corporation could recognize a loss on the distribution if it reduced its ownership of the liquidating corporations's stock below 80% during that period, whether or not it had a business purpose), *vacated by stipulation as to amount of judgment and remanded*, 1957 WL 10899 (2d Cir. 1957); *accord, Granite Trust Co. v. United States*, 238 F.2d 670, 675 (1st Cir. 1956).[4]

---

[4] Heinz cites one more case to assert that tax law must recognize the purchase and sale of stock absent any non-tax business purpose–but the case does not concern stock, though it includes language that might please Heinz: *Sun Properties, Inc. v. United States*, 220 F.2d 171, 175 (5th Cir. 1955) ("No cases require that a sale have any business purpose beyond that of realizing a capital gain"). But even if *Sun Properties* could trump *Northern Pacific Railway* in this circuit, Heinz cannot argue that it needed no business purpose for including HCC in its stock repurchase plan simply because HCC needed no business purpose for selling its stock to Heinz.

*B. Courts refuse to give tax effect to any transaction between related entities that lacks a non-tax business purpose*

Heinz tries to show that the courts have never imposed "a strict business purpose requirement on all transactions between related parties," but Heinz has done little more than assert irrelevant factual distinctions between its own case and the cases the defendant has cited. For example, Heinz argues that the defendant is wrong to find a business-purpose requirement in *Gregory v. Helvering*, 293 U.S. 465 (1935) and *Higgins v. Smith*, 308 U.S. 473 (1940). (*See* Pl. Post-Trial Brief at 29, discussing pages 25-26 of Def. Pre-Trial Memo.) If the defendant is wrong about *Gregory* and *Higgins*, it is in good company: The Court of Claims understood the cases in the same way. Citing *Higgins*, that Court stated (*Northern Pacific*, 378 F.2d at 691 (emphasis added, footnote omitted)–

> Various tests have been suggested for gauging the reality of a loss said to have been suffered in a transaction by one corporation with its wholly owned subsidiary. Some of these have been challenged as incorrect, but *everyone agrees* that, at the least, *the transaction must have been motivated by a "business purpose"* before the loss can be accepted as substantive and bona fide.

In *Northern Pacific*, one subsidiary (NWI) sold the parent company's stock to another subsidiary (Cuyuna), and the corporate group claimed a capital loss and a refund. The Court denied the refund because it did not view the taxpayer's alleged non-tax business purposes "as proper and substantial business purposes which the Internal Revenue Service and the court would have to recognize." *Ibid*.

To distinguish *Northern Pacific* from its own case, Heinz notes that Cuyuna had to borrow money to buy the parent's stock. (*See* Pl. Post-Trial Brief at 30 n.32.) But HCC also had to borrow money to buy its parent's stock. (*See, e.g.,* Trial Transcript (Tr.) at 140.) HCC was

able to repay the loans from its own revenue (*ibid*.), but nothing suggests that Cuyuna was unable to repay its loans: the opinion refers to them as "advances," not as "gifts." *See Northern Pacific*, 378 F.2d at 691. Heinz also notes that Cuyuna received only $227,100 in dividends on its parent's stock, while in alleged contrast, "HCC's investment in Heinz stock and the Note was highly profitable. In addition, HCC was not liquidating at the time of the transactions." (Pl. Post-Trial Brief at 30 n.32). But it is not clear whether HCC profited by its investment (*see* Def. Post-Trial Brief at 36-37), and the Court based none of its legal reasoning on NWI's liquidation.

Even if Heinz had found more compelling distinctions, however, it fails to explain why the factual differences between *Northern Pacific* and this case require a different legal result, or why the Court of Claims would have misstated a general legal principle in a published opinion.[5] That Court refused to recognize an intra-group stock transfer that had no genuine business purpose. Heinz had no genuine business purpose for its own intra-group stock transfer. That is the connection between Heinz's case and *Northern Pacific*, and on this point the cases cannot be distinguished.

---

[5] The defendant also cited cases from other circuits that denied losses on sales between related entities. (*See* Def. Post-Trial Brief at 41, citing *Investers Diversified Servs.* and *Scully v. United States*, 840 F.2d 478 (7th Cir. 1988).) Heinz attempts to distinguish them on the ground that the taxpayers "tried to shoehorn tax benefits intended for transactions between unrelated taxpayers into related-party transactions." (Pl. Post-Trial Brief at 30 n.32.) Heinz, however, stresses that it seeks "an unreduced stock basis after a stock redemption–[which] is available under [Code] § 1059(e)(2)(A) *only* in redemptions between related corporations." *Ibid*. (original emphasis).

Yet again, Heinz builds an argument on an assumption it has failed to prove–that tax law must recognize its alleged redemption of HCC's stock.

*C. Because Heinz had no non-tax business purpose for interposing HCC between itself and the sellers of the stock Heinz repurchased, the law cannot give tax effect to HCC's role.*

The defendant has never questioned Heinz's use of HCC because tax avoidance was the principal motive. Rather, the defendant has insisted that Heinz lacked any non-tax purpose whatsoever for inserting HCC between itself and the public. (*See* Def. Pre-Trial Memo at 34-35; Tr. at 74-75.) The extra step cost Heinz $1.7 million in dividends paid to HCC, and it cost HCC $1.5 million in fees paid to Goldman, Sachs; but in exchange for that extra money and trouble Heinz gained nothing more that it would have had by purchasing the shares directly. In fact, thanks to HCC's participation, Heinz had to buy the stock a second time to gain the benefits that a single direct purchase would have brought it. (*See* Def. Post-Trial Brief at 29-33.)

Heinz insists that "[n]othing in the tax law requires a real transaction to be accomplished in the simplest possible manner or in the manner that yields the most tax revenue." (Pl. Post-Trial Brief at 28.) Heinz cites several cases to support that uncontroversial proposition (*see ibid.*), but that is not what it needs to prove. Instead, it must show that this Court is obliged to recognize any tax-driven Rube-Goldberg contrivance by which Heinz could accomplish the purpose of buying back its own stock–no matter how imperfect the accomplishment, no matter how indirect and wasteful the transaction. Heinz has done its best to find a case supporting that proposition, but it has failed. It is easier to find cases to the contrary.

An example is *Boca Investerings Partnership v. United States*, 314 F.3d 625 (D.C. Cir.), *cert. denied,* 540 U.S. 826 (2003). In the transaction at issue in *Boca*, American Home Products (AHP), like Heinz, wanted to generate a capital loss and carry it back to three earlier tax years in order to offset large capital gains. Using one of its subsidiaries and two foreign entities, AHP

created an investment partnership to purchase debt instruments that it very soon sold. Under a regulation not applicable to Heinz's case, the partnership claimed large tax losses on the sales. The Commissioner denied the losses, but a district court upheld the transaction. The D.C. Circuit reversed, in large part because AHP had no non-tax business purpose for buying the securities through the partnership rather than for itself. In the court's words: "AHP's participation in the partnership defies common sense from an economic standpoint, since it could have purchased the . . . notes directly, and avoided millions in transaction costs. . . . Without a finding on the business need for the partnership from AHP's standpoint in this transaction, the judgment under review cannot stand." *Id.* at 631.

Heinz has failed even to allege that it had a non-tax reason for buying its stock through HCC. Heinz merely asserts that "for the purpose that mattered most–controlling the number of outstanding shares of Heinz stock–it was just as effective for HCC to purchase the stock as it was for Heinz to do so." (Pl. Post-Trial Brief at 33.) Even if that assertion is true, HCC's participation imposed at least $1.7 million of unnecessary costs and "defies common sense from an economic standpoint."

This economic waste demonstrates why courts refuse to encourage with tax-refunds the sort of transaction–however "real" it may be–that has no purpose but to manufacture tax benefits. The D.C. Circuit explained the business-purpose doctrine well in *ASA Investerings*, 201 F.3d at 513. Though the passage is long, it is worth quoting in full:

> We note that the "business purpose" doctrine is hazardous. It is uniformly recognized that taxpayers are entitled to structure their transactions in such a way as to minimize tax. When the business purpose doctrine is violated, such structuring is deemed to have gotten out of hand, to have been carried to such extreme lengths that the business purpose is no more than a facade. But there is

> no absolutely clear line between the two. Yet the doctrine seems essential. A tax system of rather high rates gives a multitude of clever individuals in the private sector powerful incentives to game the system. Even the smartest drafters of legislation and regulation cannot be expected to anticipate every device. The business purpose doctrine reduces the incentive to engage in such essentially wasteful activity, and in addition helps achieve reasonable equity among taxpayers who are similarly situated–in every respect except for differing investments in tax avoidance.

Like the D.C. Circuit, this circuit recognizes the business-purpose requirement, and binding precedent shows (despite Heinz's contrary argument) that "real" transfers among related entities can have no tax effect absent a genuine non-tax business purpose. For example, in *Basic, Inc. v. United States*, 549 F.2d 740 (Ct. Cl. 1977), a subsidiary (Falls) transferred the stock of its own subsidiary (Carbon) to the group's parent (Basic), and the parent sold the Carbon stock to a third party along with the stock of Falls. Basic treated Falls's transfer of the Carbon stock as an intra-group dividend (the taxable amount of which was reduced by the dividends-received deduction of former Code § 243(a)(1)), and Basic claimed a carry-over basis under former § 301(d)(2)(B).[6] Basic then reduced its taxable gain by subtracting the basis of the Carbon stock from the sales price. Basic itself had no basis in the Carbon shares while they were in the hands of Falls.

The IRS ignored the intra-group transfer, treated Basic as having sold the Carbon shares directly, and assessed a deficiency, which Basic paid and sued to recover. The transfer was

---

[6] That section provided: "The basis of property received in a distribution to which subsection (a) applies shall be– . . . (2) . . . If the shareholder is a corporation, whichever of the following is the lesser: . . . (B) the adjusted basis (in the hands of the distributing corporation immediately before the distribution) of such property, increased in the amount of gain to the distributing corporation which is recognized under subsection (b) or (c) of section 311 . . . ."

The *Basic* opinion, 549 F.2d at 744, actually refers to Code § 301(d)(3), but the reference is an error. That section governed distributions by foreign corporations.

economically "real," because it reduced the net worth of Falls by stripping away an asset; and the transaction fit within the words of every applicable statute. Nevertheless, the Court's majority denied Basic a refund because "plaintiff has not shown that there was a *reason* for the transfer of the Carbon stock from Falls to Basic aside from the tax consequences attributable to that move." *Id*. at 749 (emphasis added).[7] One judge dissented on the ground that Basic did have a non-tax purpose for selling the Carbon stock as it did, but he agreed with the majority about the law (*id.* at 750 (dissent)):

> The touchstone, therefore, that distinguishes a transaction worthy of being recognized as it appears from one deserving to be disregarded is the presence of a "good business purpose" rather than the absence of any desire on the taxpayer's part to save taxes.

Heinz has shown no good business purpose for including HCC in its stock-repurchase plan aside from the tax consequences. Like Basic, Heinz can collect no refund.

*V. A brief response to Heinz's other arguments*

So far, this brief has replied to Heinz's attacks on two related arguments that the defendant has raised–(1) the step-transaction doctrine views Heinz as having purchased the 3,325,000 shares directly from the public rather than from HCC; and (2) tax law cannot

---

[7] In the face of all this authority, Heinz cannot continue to posit the existence of what it calls "the *Gregory* rule." At page 32 of its post-trial brief, Heinz somehow derives its new rule from *Moline Properties* and *National Investors Corp.*–

> Thus, *Moline Properties*, as interpreted in *National Investors*, reaffirms the *Gregory* rule: a transaction between parent and subsidiary is given effect for Federal tax purposes under the Code, and an examination of the taxpayer's motives for engaging is unnecessary, so long as the transaction is economically real and is "what the statute intended."

No court has ever recognized Heinz's alleged "*Gregory* rule," and many have held to the contrary, as the defendant has demonstrated.

recognize HCC's participation in the transaction because Heinz had no non-tax business purpose for buying its shares through HCC. In its post-trial brief, the defendant also advanced two other arguments–(1) that HCC had no genuine business purpose for participating in Heinz's stock-repurchase program (pages 33-41); and (2) that Heinz did not redeem its stock from HCC within the meaning of Code § 317(b) when it traded the Note for its stock because the alleged redemption did not vary control of the Note or change the flow of its benefits (pages 44-50).

Because the defendant believes that its post-trial brief answers Heinz's attacks on these arguments, the defendant will not reply to the attacks in detail. The defendant will merely point out some of Heinz's errors.

*A. When they allowed Goldman, Sachs to stand on both sides of their purchase and sale, Heinz and HCC engaged in behavior that no third party would have accepted*

Like Heinz, HCC had no genuine business purpose for participating in the transaction before the Court. First, despite its assertions, HCC did not buy Heinz stock to make a profit. The defendant demonstrated this point at pages 34-41 of its post-trial brief and will not repeat its arguments, but it wishes to clarify one of them.

Heinz argues that HCC made a profit when it exchanged its Heinz stock for the Note because Goldman, Sachs designed the Note to have the value the stock would have had on the market just before the exchange. By contrast, the defendant's expert witness, Prof. Jarrell, showed that the Note was worth $2.385 million less than HCC had paid for the stock. (*See* Def. Post-Trial Brief at 40.) According to Heinz, Prof. Jarrell cannot be trusted because he–

> was hired to testify on behalf of the government long after the events in this case occurred. When Goldman, Sachs designed and priced the Note in January 1995,

> however, there were no sides to take. The only objective was to get it right, and Goldman, Sachs's reputation for getting it right is well established.

(Pl. Post-Trial Brief at 38.) And even if the Note was worth less than the stock, Heinz says that the IRS was obliged to recognize the transaction; at most it could have adjusted the amount of profit or loss under Code § 482. (*See* Pl. Post-Trial Brief at 35-37.)

Heinz misunderstands the defendant's argument. This case is not a battle over numbers–it is a search for the substance of Heinz's transactions. By asserting that "there were no sides to take" in valuing the Note, Heinz betrays the substance beneath what it wants the Court to see as an exchange between two separate parties: Heinz was the only real participant, and there were no "sides" in the purported purchase and sale. Heinz did not even imagine that Goldman, Sachs might have a conflict of interest if it tried to design a note for both a buyer and a seller, but independent parties would never have entrusted their opposing interests to a single representative, even if that representative was Goldman, Sachs. (*See* Def. Post-Trial Brief at 37-40.)[8]

---

[8] Although this argument does not depend on the Note's exact value, the defendant has shown that Goldman, Sachs overvalued the Note because it failed to account fully for the Note's lack of liquidity. (*See* Def. Post-Trial Brief at 40-41.) Heinz now asserts that "the Note was *highly liquid* because the real market for such securities was composed of accredited investors." (Pl. Post-Trial Brief at 39, emphasis added.)

As Heinz knows, however, accredited investors are part of the "smaller universe of potential buyers" of unregistered securities, who naturally demand a discount. (*See* Tr. at 316.) Unregistered securities are therefore illiquid, as Heinz also knows and was once willing to admit. By 2002, HCC had exchanged the Note for Heinz common stock, which it later exchanged for a new series of preferred stock. When Heinz valued that stock, it acknowledged that "the Preferred Stock is privately held and *illiquid* as opposed to trading publicly on a national exchange." (*See* Def. Post-Trial Brief at 41 n.19, quoting an exhibit, emphasis added.) Heinz accordingly adjusted the value of the preferred stock by adding 60 basis points to its yield–a larger effective discount than Goldman, Sachs applied to account for the illiquidity of the Note, which also could not be traded on a public exchange. *See ibid.*

*B. HCC did not buy Heinz stock to buttress its "substance" in Delaware*

HCC also argues that it borrowed money and bought Heinz stock to show that it had a genuine presence in Delaware and functioned as a Delaware holding company. That presence and business activity (which HCC calls "substance") was supposed to safeguard HCC from attack by state tax examiners.

But HCC began buying Heinz stock a year after the South Carolina Supreme Court had decided *Geoffrey, Inc., v. South Carolina Tax Commission,* 437 S.E.2d 13 (S.C.), *cert. denied*, 510 U.S. 992 (1993) (Delaware trademark subsidiary had taxable nexus wherever the licensee parent used a trademark and paid a royalty). After *Geoffrey*, any state could tax a portion of HCC's income if a Heinz-group member in that state did business with HCC–regardless of HCC's "substance" in Delaware. The defendant concluded (Def. Post-Trial Brief at 34, citations omitted):

> By the time HCC joined the repurchase program, the question of substance in Delaware seems to have become less pressing; in fact, as part of Project Turbo, HCC planned to leave Delaware altogether and run its operations in Idaho. . . . HCC followed this plan. . . . HCC would hardly have wished to sink its roots deeper in Delaware while planning to pull them out.

Heinz has responded to this argument by ignoring the record. Heinz seems to concede that HCC's Delaware "substance" could have no importance after it moved to Idaho, but Heinz insists that "HCC's status was still critical to protecting the $20 million of state tax benefits that the intercompany lending program had created in earlier tax years still open to audit." (Pl. Post-Trial Brief at 34.)

HCC bought Heinz stock in 1994, but the "earlier tax years still open to audit," the years that caused HCC so much anxiety, were the taxable years 1983 through 1990. (HCC was

incorporated in 1983 (*see* Jt. Ex. 34, ¶ 7).) The 1994 transaction could not affect those earlier years, as Heinz once acknowledged. The defendant refers the Court to defendant's exhibit 64 at 166-67 (emphasis added), a document in which John Crowe describes HCC's tax difficulties:

> [F]rom inception to the end of FY89 $100 million of income has been sheltered from Pennsylvania tax. We estimate that as of the end of FY90 the total exposure to state tax, interest, and penalties is $20 million. (This is also a rough measure of the benefit that the Company has derived from this structure.)
>
> . . . .
>
> *Nothing can be done about the lack of substance in prior years. We must simply hope that our luck holds.*
>
> . . . .

Heinz's post-trial brief is simply wrong. HCC's 1994 stock purchases could not cure the lack of substance in prior years. By the time the Heinz stock-repurchase transaction ended, HCC had determined to move to Idaho and would need no substance in Delaware. The defendant's proof stands: HCC did not buy Heinz stock to buttress its substance in Delaware.

## CONCLUSION

Despite its assertions (*e.g.*, Pl. Post-Trial Brief at 28-29), Heinz did not simply structure a business deal to avoid taxes that it might have incurred otherwise. Instead, Heinz complicated a share-repurchase program that had never resulted in taxes and loaded it with unnecessary costs to change a real profit into a tax loss and to spin a $43 million refund claim out of words and thin air. This is not smart business–it is gamesmanship carried to the point of economic waste. It should not be encouraged.

For the reasons given, the defendant asks the Court to dismiss Heinz's complaint with prejudice.

Respectfully submitted,

s/Robert Stoddart
ROBERT STODDART
Attorney of Record
U.S. Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-6445
FAX: (202) 514-9440
E-MAIL: Robert.C.Stoddart@usdoj.gov

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Acting Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief
JACOB E. CHRISTENSEN
Trial Attorney

Of Counsel

April 24, 2006