IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 03-2847 T
(Judge Allegra)

H.J. HEINZ COMPANY AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S MEMORANDUM CONCERNING
*COLTEC INDUSTRIES, INC., v. UNITED STATES*

---

As the Court requested in its Order of July 17, 2006, the defendant, the United States, presents this memorandum discussing the effect on this case of the Federal Circuit's recent decision in *Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006).

Heinz demands a refund on the ground that a subsidiary suffered a capital loss when it sold some stock, and Heinz insists that it was able to raise the basis of that stock by arranging an intra-group swap of stock for debt. In *Coltec*, the Federal Circuit denied a refund to a plaintiff that claimed to have suffered a capital loss when a subsidiary sold some stock. Coltec, like Heinz, insisted that it was able to raise the basis of the stock by arranging an intra-group swap of stock for debt, but the Federal Circuit ignored the swap because it lacked any non-tax business purpose and thus lacked economic substance.

Heinz's briefs fail to allege any non-tax business purpose for its intra-group swap; and Heinz's witnesses and exhibits assert "business purposes" that other witnesses and exhibits

demonstrate to be illusory. Like Coltec, Heinz is entitled to no refund because its intra-group swap lacks economic substance.

*A. Coltec's transaction*

In 1996 Coltec sold a subsidiary and earned a capital gain of $240.9 million that it wished to offset. It then executed a pre-planned three-step transaction designed by Coltec's advisors to generate an offsetting capital loss for tax purposes without a corresponding economic loss. First, Coltec revived and capitalized a dormant subsidiary, which it renamed Garrison Litigation Management Group, Ltd. (Garrison). Second, it arranged an exchange between Garrison and another Coltec subsidiary, which had manufactured asbestos products and had been named as a defendant in asbestos litigation–Garlock, Inc. (Garlock's own subsidiary, Anchor Packing Company, was also involved in the litigation.) Garrison assumed Garlock's potential asbestos liabilities and the responsibility for managing Garlock's asbestos litigation in exchange for various types of property, including a $375 million promissory note from Stemco, another Garlock subsidiary. The note covered the estimated amount of Garlock's uninsured asbestos liabilities. Garrison then transferred to Garlock 100,000 shares of Garrison stock. Third, Garlock sold its 100,000 shares of Garrison stock to two banks for $500,000. *See Coltec*, 454 F.3d at 1343-45.

On the group's 1996 consolidated tax return, Coltec claimed that Garlock had a basis in the Garrison shares of $379.2 million–the basis of the promissory note and the other property Garlock exchanged for the shares–even though the shares had only nominal economic value. As a result, when Garlock sold those shares to the banks for $500,000, it claimed a $378.7 million capital loss. That asserted loss offset the $240.9 million capital gain, and Coltec carried the

excess loss forward to offset gains in future years. *See id*. at 1345. The Federal Circuit found it "[s]ignificant[ that] the loss was recognized only for tax purposes and not for book purposes, and [that] the loss was not reported on the taxpayer's public financial records."[1] *Ibid*.

The IRS disallowed the claimed loss and assessed additional taxes, which Coltec paid. Coltec then sued for a refund, which the Court of Federal Claims awarded. *Id*., 454 F.3d at 1346. The Court of Appeals for the Federal Circuit vacated that decision because Coltec's transaction lacked economic substance.

*B. The Federal Circuit's decision*

The Federal Circuit acknowledged that–seen in isolation–a complex scheme of interlocking statutes could be viewed as allowing Garlock to claim a basis in its Garrison stock equal to the basis of the property Garlock exchanged for it, unreduced by the liabilities that Garrison had assumed. *See id.* at 1347-51. It was on this ground–compliance with the supposed literal meaning of the statutory language–that the trial court had awarded Coltec a refund. *See Coltec Indus., Inc. v. United States*, 62 Fed. Cl. 716, 756 (2004) ("the use of the economic substance doctrine to trump mere compliance with the Code would violate the separation of powers") (quoted by the Federal Circuit, 454 F.3d at 1352).

---

[1] Similarly, on the sale at issue in this case Heinz computed a tax loss of $124,134,139 and a book gain of $6,372,111(Pl. Ex. 9 at 3567), but it reported the loss only for tax purposes; on its public financial statements it reported the gain. *Compare* Compl. ¶ 12 (Heinz reported its 1995 capital loss on an amended tax return), *with* Tr. at 158 (for financial accounting purposes Heinz reported a profit on the sale). Heinz's 1995 annual report does not alert shareholders to the asserted loss. *See* Jt. Ex. 25 at 226-244 (consolidated financial statements and notes).

It is also generally on this ground–ostensible technical compliance with the applicable statutes–that Heinz demands a refund.[2] But in response to the *Coltec* trial court's assertion that "mere compliance" with the Code can generate tax benefits absent economic substance, the Federal Circuit stated, "That holding is untenable." 454 F.3d at 1352. The Federal Circuit explained that the economic substance doctrine is a tool that courts must use when construing statutes (*id*. at 1353-54), and it listed five general principles of the economic substance doctrine:

> (1) A taxpayer may reap no tax benefits from a transaction that lacks economic reality–a principle that emerged in *Gregory v. Helvering*, in which "the Supreme Court disregarded intermediate transfers of stocks . . . because the transfers had '*no business or corporate purpose*' and performed no '*function*' other than to reduce taxes." *Coltec*, 454 F.3d at 1355 (quoting *Gregory*, 293 U.S. 465, 469 (1935); emphasis added).
>
> (2) The taxpayer must bear the burden of proving that the transaction has economic substance. As the Court noted, "*Gregory v. Helvering* requires that a taxpayer carry an unusually heavy burden when he attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction *that would never occur* absent the motive of tax avoidance." 454 F.3d at 1355-56 (emphasis added; citations omitted).
>
> (3) The economic substance of a transaction must be viewed objectively rather than subjectively. *Id*. at 1356.
>
> (4) The transaction to be analyzed is the one that gave rise to the alleged tax benefit. *Ibid*.
>
> (5) "[A]rrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny." *Id*. at 1357.

The Court then demonstrated how these principles should be applied. For example, Coltec, like Heinz, arranged a multi-step transaction that included both an intra-group swap of

---

[2] *See, e.g.,* Pl. Memo. of Contentions of Fact and Law at 32 ("Defendant's economic sham and recharacterization arguments are efforts to use just such doctrines to 'trump' Plaintiff's compliance with the Code") (quoting *Coltec*, 62 Fed. Cl. at 756).

debt for stock and a sale of stock to outsiders. The Court focused solely upon Coltec's intra-group swap, because that was the transaction that is supposed to have produced the claimed tax benefit–the inflated basis of the Garrison stock.

The Federal Circuit also illuminated what it means by "economic substance." For example, the Court expressly rejected the notion that a transaction has economic substance unless the transaction *both* lacks economic effect *and* is motivated solely by tax avoidance. *See Coltec*, 454 F.3d at 1355 n.14 (citing *Black & Decker Corp. v. United States*, 436 F.3d 431 (4th Cir. 2006)). Similarly, if other courts have sometimes seemed willing to find economic substance in any transaction that changes the financial position of the parties, even if the transaction had no business purpose (s*ee, e.g., Nassau Lens Co. v. Comm'r*, 308 F.2d 39, 45 (2d Cir. 1962)), that view is untenable here after *Coltec*. The Federal Circuit even opined that "the [economic substance] doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance." *Coltec*, 454 F.3d at 1355.

In any event, the Court began its economic-substance analysis with an objective examination of Coltec's "first asserted *business purpose.*" *Id*. at 1358 (emphasis added). And it continued its analysis by examining the objective facts behind what Coltec claimed to be "[t]he principal *motive* [of the Garrison transaction]." *Id*. at 1359. Heinz therefore can no longer argue–as it has argued throughout this case–that no business purpose is required for a sale or redemption of stock, including HCC's exchange of stock for debt. *See, e.g.,* Pl. Initial Post-Trial Brief at 27; Pl. Post-Trial Reply Brief at 6. Heinz must also abandon the argument that the general business purpose of its stock-repurchase plan–reducing the number of Heinz shares held by the public–somehow gives economic substance to every step of the transaction, including

Heinz's purchase of shares from HCC. *See, e.g.*, Pl. Memo. of Contentions of Fact and Law at 10-11. In the Federal Circuit, the relevant transaction is Heinz's purchase of shares from HCC–not HCC's purchase of shares from the public. *See Coltec*, 454 F.3d at 1356-57.

*C. Because Heinz had no objective business purpose for buying its stock from HCC, the transaction lacks economic substance and must be ignored.*

In the present case, Heinz induced a subsidiary, HCC, to purchase Heinz stock from the public; Heinz then purported to redeem 95% of that stock from HCC with a convertible note. Heinz insists that the basis of the redeemed 95% shifted to the 5% that HCC retained, and it is the shifted basis that gives rise to the refund Heinz demands. Therefore, this Court must focus upon Heinz's purchase from HCC when it considers the economic substance of the transaction. This portion of the transaction affected the economic interests of no third party, and it deserves particularly close scrutiny.

To establish economic substance under *Coltec*, Heinz must demonstrate an objective, non-tax business purpose for buying its stock from HCC with a note. Heinz's briefs fail to allege any such purpose. Heinz's witnesses and documents, however, suggest three possible purposes: (1) to move extra shares into Heinz's treasury (Jt. Ex. 13 at 138); (2) to end Heinz's obligation to pay dividends to HCC (*ibid.*); and (3) to deduct the note's accruing interest from Heinz's Pennsylvania state taxable income–a deduction that would not be offset by HCC's receipt of interest income in Delaware (Tr. at 148-49, testimony of John Crowe). Seen objectively, as *Coltec* requires (454 F.3d at 1356), none of these asserted purposes could have motivated the purchase. Heinz had only one objectively credible reason for buying its shares from HCC–the desire for tax benefits.

*1. When it bought HCC's shares, Heinz needed no extra shares and could have obtained them more cheaply and efficiently had it needed them.*

Before the transaction at issue Heinz had often purchased its shares directly from the public and held them in its treasury "for the purpose of issuing shares under the Company's Stock Option Plans" and for related reasons; and its board would authorize new purchase programs on the ground that "additional shares will be needed in connection with other corporate purposes." *E.g.*, Jt. Ex. 6 at 75 (minutes of June 9, 1993). On July 13, 1994, however, the board authorized HCC "to purchase shares of the Company's stock under the Company's stock repurchase program which was authorized by the Board of Directors in June 1993" (Jt. Ex. 7 at 92), even though the ostensible purpose of the June 1993 program was to increase the number of shares in *Heinz's* treasury. Moving the shares to HCC's treasury would thwart that purpose.

To avoid that difficulty, Heinz's witnesses proposed at trial that the real motive for its repurchase program was not to increase the number of shares in its treasury: the real motive was to reduce the number of shares held by the public (Tr. at 108, 110)–and for that purpose, it made no difference whether the shares were in HCC's treasury or in Heinz's (*id.* at 102, 393-94). In fact, they insisted, Heinz did not need more shares; it always had more than enough shares in its treasury to cover all outstanding options (*id*. at 106; *see also id.* at 395, 418-19), and if it had needed more, it could have used its "authorized but unissued" shares (*id*. at 106).

If Heinz wished to buy more shares rather than to issue them, it could have bought them from the public, which would have furthered the purpose of managing Heinz's equity base by reducing the number of outstanding shares. Instead, Heinz chose to buy 3,325,000 shares from HCC. The purchase did not reduce the number of shares outstanding, and it cost Heinz the value

of its convertible note, which it claims to have been $130,506,000. *See* Tr. at 358. It also cost the Heinz Group $1.5 million in fees that HCC paid Goldman, Sachs to design the note Heinz swapped for HCC's shares; and HCC's participation cost Heinz itself $1.7 million in dividends paid to HCC while HCC held the shares. Heinz had only one purpose for buying 3,325,000 shares of its stock from HCC rather than issuing new shares or buying shares from the public–Heinz wanted to shift the basis of those shares to the 175,000 shares HCC retained. Nothing else explains the Heinz Group's willingness to pay twice for the same shares and to incur $3.2 million of unnecessary transaction costs. *See, e.g., Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 181 (D. Conn. 2004) (disapproving a transaction "antithetical to rational profit-oriented thinking"), *aff'd,* 150 Fed. App. 40 (2d Cir. 2005).

*2. Heinz did not buy 3,325,000 shares from HCC with a note worth more than the dividends payable on the shares in order to stop paying dividends.*

Heinz certainly did not buy HCC's 3,325,000 shares in order to stop paying dividends on them, despite what the executive committee's minutes assert. *See* Jt. Ex. 13 at 138. Heinz bought the shares with a note that would pay $197,402,413 if held for seven years. *See* Jt. Ex. 1 at 1. Goldman, Sachs designed the note to have a present value equal to the current market value of the shares (Tr. at 358), and the note would accrete 6%, compounded semi-annually (Jt. Ex. 1 at 1). During the three years before 1995, when the note was issued, the total performance of Heinz common stock–appreciation plus dividend–was only 1.5% annually. When the note was issued, no one could reasonably have expected that the appreciated value of HCC's shares *plus* seven years' worth of dividends would equal the note's value at maturity. Tr. at 454. Therefore, by purchasing HCC's stock with the note, Heinz obliged itself to pay much more than the dividends

it claims to have wished to save.[3] The note could also be converted to 3,510,000 shares–185,000 more shares than Heinz bought from HCC. *See* Jt. Ex. 1 at 2, ¶ 3. Of course, Heinz would pay more dividends on 3,510,000 shares than on 3,325,000 shares.

*3. HCC could receive interest tax-free only in Delaware, but it was planning to leave Delaware before it accepted the note.*

Finally, Heinz did not buy HCC's shares for the note in order to deduct interest that HCC would not have to report as income, as John Crowe suggested. Tr. at 148-49. So far, Heinz's attorneys have not raised this argument, and the evidence demonstrates that it has no merit. As a Delaware holding company, HCC could collect interest tax-free only as long as its "activities *within this State*" constituted the management of intangibles. *See* Del. Code Ann. tit. 30, § 1902(b)(8) (emphasis added). But while Heinz was engaged in the transactions before the Court, it was also planning a reorganization of its subsidiaries called "Project Turbo." Tr. at 210. In connection with Project Turbo, Heinz planned to move HCC out of its lending business and also out of Delaware, because state tax examiners were auditing corporate lending subsidiaries (like HCC) that were structured as Delaware holding companies. Heinz's internal memoranda speak of "the HCC *relocation issue*" as part of Project Turbo (Def. Ex. 74 at 211, emphasis added); and Heinz's tax attorneys were planning to tell inquisitive tax examiners that HCC had moved out of Delaware (Def. Ex. 72 at 199; *see also id.* at 197, 200, 207, 208, 209).

---

[3] The defendant does not rely only on retrospective data. The highest quarterly dividend listed in Plaintiff's Exhibit 7, page 3356, is $.55125 per share (adjusted for splits). It was not Heinz's policy to raise its dividends quickly. *See* Tr. at 94-95. If Heinz had paid this dividend on HCC's 3,325,000 shares in every quarter of the seven years during which the note would have accreted value, the entire dividend payment would have been $51,321,375 ($.55125 x 4 x 7 x 3,325,000). Those dividends plus the purchase price of the shares, $130,506,000, total $181,827,375, which is $15,575,038 less than the note's value at maturity.

HCC accepted the note on January 18, 1995, a week after its board of directors had resolved to have HCC abandon its lending business pursuant to Project Turbo. *See* Jt. Ex. 14 at 147-48. HCC also addressed Project Turbo's "relocation issue." For its 1995 taxable year (which ended on May 3, 1995) HCC filed a Delaware corporate income tax form reporting its address as P.O. Box 1949, Boise, Idaho. Pl. Ex. 3 at 1641. Idaho is a unitary state (Def. Ex. 75 at 213), and HCC would be taxable in a unitary state once it had a nexus there (*see* Tr. at 151) .

Heinz knew or should have known that HCC would be in no position to collect interest on the note tax-free in Delaware. When Mr. Crowe suggested otherwise, he was either forgetting or overlooking the facts. Heinz did not purchase HCC's stock in order to generate a state-tax deduction that would not be offset by HCC's receipt of state-tax income.

The record suggests no other non-tax business purpose for Heinz's intra-group swap of stock for debt. Under the reasoning of *Coltec*, the transaction has no economic substance.

WHEREFORE the defendant asks the Court to dismiss the complaint with prejudice.

Respectfully submitted,

s/ Robert Stoddart
ROBERT STODDART
U.S. Justice Department (Tax)
Court of Federal Claims Section
P. O. Box 26, Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-6445
FAX: (202) 514-9440

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief

s/ Steven I. Frahm
Of counsel

August 31, 2006