# In The United States Court of Federal Claims

No. 03-2847T

(Filed:  May 25, 2007)
_____

| | |
|---|---|
| H.J. HEINZ COMPANY AND SUBSIDIARIES,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | \* Trial; Tax refund suit; Whether a subsidiary's<br>\* acquisition of its parent's stock, followed by<br>\* the parent's apparent redemption of the<br>\* majority of that stock, increased the tax basis<br>\* in the stock retained by the subsidiary, such<br>\* that capital losses were produced upon the<br>\* retained stock's sale to an unrelated third<br>\* party; Loss under section 165 of the Code;<br>\* Basis; Redemption under section 317(b) of<br>\* the Code; Substance over form; Burdens and<br>\* benefits of ownership; Sham transaction<br>\* doctrine – lack of business purpose; Step<br>\* transaction doctrine – end result and<br>\* interdependence tests; No true redemption<br>\* under section 317(b) of the Code; Loss<br>\* carryback deductions denied. |

_____

## OPINION
_____

*Clifton Bledsoe Cates, III* and *Robert H. Wellen*, Ivins, Phillips & Barker, Washington, D.C., for plaintiffs.

*Robert Charles Stoddart*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Eileen J. O'Connor*, for defendant.

**ALLEGRA, Judge:**

"A given result at the end of a straight path is not made a different result because reached by following a devious path."[1]

All tax students are familiar with the concept of "basis," which, in the income tax law, is the touchstone for measuring income and loss.  Generally speaking, it is basis that prevents the double taxation of income reflected in a property's cost, by allowing that cost to be recovered, tax-free, upon the asset's disposition.  And it is basis, again, that measures the loss realized if the

_____

[1] *Minn. Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938).

seller recovers less than its investment in property. Sometimes, the process for determining basis is straight-forward, with the amount readily traceable, for example, to specific costs incurred by the taxpayer with respect to the asset being sold. Other times, however, the origins of basis are more obscure, particularly, when the tax law attributes costs previously incurred by a taxpayer to the sold asset. Those attribution rules are fairly complicated, providing opportunities both for *bona fide* tax planning and undue manipulation of the tax system. Sometimes it falls to a court to discern which of these has occurred.

This tax refund case is before the court following a three-day trial in Washington, D.C. Plaintiffs seek a refund of $42,586,967. At issue is whether H.J. Heinz Credit Company (HCC), a subsidiary of the H.J. Heinz Company (Heinz), may deduct a capital loss of $124,134,189 on a sale of 175,000 shares of Heinz stock in May 1995. In 1994, HCC purchased 3,500,000 shares of Heinz stock, 3,325,000 shares of which were transferred to Heinz in January of 1995 in exchange for a convertible note issued by Heinz. Heinz asserts that this was a redemption which should be taxed as a dividend, and that HCC's basis in the redeemed stock should be added to its basis in the 175,000 shares it retained. HCC sold the latter stock in May of 1995 and, in plaintiff's view, recognized a capital loss arising from the increase in basis that occurred upon the earlier redemption. That loss, plaintiffs argue, should then be carried back to reduce their taxes in their 1994, 1993 and 1992 taxable years.

Not so, defendant argues, asserting that Heinz did not, in fact, effectuate a redemption of stock from HCC. In this regard, it asseverates that a redemption did not occur because HCC's ownership of the 3,325,000 shares of Heinz stock was transitory and should be disregarded. It further claims that no redemption occurred because Heinz had no business purpose for interposing a subsidiary between itself and the shareholders from whom HCC purchased stock, save to engineer an artificial tax loss. And, finally, it contends that while Heinz structured the second purchase as an exchange for property under section 317(b) of the Internal Revenue Code of 1986,[2] the steps of the transaction should be collapsed under the so-called "step transaction doctrine," with Heinz again viewed as having repurchased its stock directly from the outside investors. As such, defendant contends, the basis in the 3,325,000 shares allegedly "redeemed" by Heinz should not be added to the 175,000 shares that HCC retained, with the effect that no capital loss was produced upon the sale of the latter shares.

I.    **FINDINGS OF FACT**

Based on the record, including the parties' joint stipulations, the court finds as follows:

A.

Heinz, a Pennsylvania corporation, is the common parent of the affiliated group of corporations known as the Heinz Consolidated Group (Heinz Consolidated Group), which

---

[2] All references herein are to the Internal Revenue Code of 1986 (26 U.S.C.), as amended and in force during the years in question.

corporations filed consolidated income tax returns for the years in question.  The successor to a food business founded in 1869 by Henry J. Heinz, Heinz manufactures and markets processed food products worldwide, directly and through subsidiaries.

Until the early 1980s, Heinz maintained a corporate policy of directly financing its domestic subsidiaries' working capital needs because it could borrow at more favorable interest rates than its subsidiaries.  This policy, however, had what Heinz perceived as negative state tax implications in certain states – although the subsidiaries could deduct interest payments made to Heinz, the latter was required to treat those payments as taxable income.[3]  In 1983, Heinz began studying a proposal to establish a Delaware-based financing company that would assume Heinz's financing activities.  Under this plan, all of Heinz's subsidiaries would obtain financing from, and make all payments (including interest) to, this Delaware-based financing company, with interest income from the financing company being "repatriated" to Heinz by means of intercorporate dividends.  Under this scenario, the Delaware subsidiary's income would be exempt from Delaware tax, *see* Del. Code Ann. tit. 30, § 1902(b)(8); in most states, the subsidiaries would continue to take deductions for interest payments made to the new financing company; and Heinz would not experience a corresponding increase in its taxable income because many states – including Heinz's home state of Pennsylvania – did not tax intercorporate dividends.

Ultimately deciding to effectuate this plan, on September 15, 1983, Heinz established the H.J. Heinz Credit Company (HCC), a wholly-owned Delaware corporation with 1,000 shares of stock.  That same year HCC began lending money to the members of the Heinz Consolidated Group, as well as several Heinz foreign subsidiaries.  HCC, however, had no office or employees of its own, with Heinz essentially making decisions for its subsidiary at its corporate offices in Pittsburgh.  By the mid-1980s, several state taxing authorities, including Pennsylvania, began questioning the use of Delaware investment companies as a tax planning strategy.  Concerned with this trend, in a memorandum dated November 29, 1984, Catherine A. Caponi, Heinz's Manager for State Taxes, warned:

> While [the establishment of an independent financing company] is an excellent tax planning strategy, in order to insure its viability, the Delaware sub must have sufficient substance and nexus in Delaware.  If there is little or no substance and all activities are actually directed from and take place in Pennsylvania, the Delaware entity may not sustain itself under scrutiny by the Commonwealth of Pennsylvania.  The two companies could be collapsed and treated as one company for Pennsylvania tax purposes.

---

[3]  In so-called "unitary states," affiliated groups are allowed to file consolidated returns, thereby effectively allowing a parent to exclude from income interest received from a subsidiary.  Other states, among them Pennsylvania, are "non-unitary states" that do not allow for the filing of consolidated returns and instead require a parent to include, as income, interest payments received from subsidiaries.  During its 1982 fiscal year, Heinz collected $24.5 million of interest from its subsidiaries, which increased its state tax liability by $874,650 for Pennsylvania alone.

(Emphasis in original).  Although Ms. Caponi was optimistic that HCC had established a
sufficient nexus with Delaware to create a "'taxable' situation in the state," she indicated that
Heinz had some exposure on this issue because "the majority, if not all, of [HCC's] corporate
activity/accounting takes place at [Heinz] World Headquarters in Pennsylvania" and "HCC pays
no management fee to World Headquarters for the services provided."  She noted that Heinz's
Pennsylvania tax counsel had suggested that it draft a service agreement "detailing the services
to be performed by World Headquarters personnel for HCC," and stipulate an "arm's length fee"
which HCC would pay in return for these services.  But, for reasons unexplained, company
officials did not heed her advice.  Heinz's legal and tax counsel remained concerned and
periodically repeated their warnings regarding HCC's status.

B.

In late 1985, John C. Crowe, Vice President for Tax of Heinz, considered transferring to
HCC twelve "safe harbor" leases[4] Heinz had entered into in 1982 and 1983, in order to shield
future income generated by these leases from taxation in Pennsylvania.  Mr. Crowe asked Ms.
Caponi to investigate the state tax implications of this proposal.  In April of 1986, she estimated
that the transfer of the leases to HCC would reduce Heinz's state taxes by approximately $9.7
million over the fiscal years ending 1987-1991, with HCC paying no state tax on the leases in all
states but Delaware and Ohio (where the leased property existed).

In a memorandum dated May 12, 1986, Mr. Crowe described how the transfer of the
leases should occur.  He noted that while Heinz had a tax basis in the leased property of zero, the
property was subject to nonrecourse debt of approximately $150 million.  This was a bad
combination, he indicated, for if Heinz were to transfer the property to HCC, it would experience

---

[4] "Safe harbor" leases were authorized by former section 168(f)(8) of the Code, which
was enacted as part of the Economic Tax Recovery Act of 1981 (ERTA).  As described by the
Internal Revenue Service (IRS):

> The ERTA safe harbor leasing provisions were intended to permit owners of
> property to transfer the tax benefits of ownership (depreciation and the investment
> credit) to other persons.  The ERTA safe harbor leasing provisions operate by
> guaranteeing that, (i) a transaction meeting certain stated
> qualifications (a qualifying transaction) will be treated as a lease even though the
> qualifying transaction otherwise would not be considered a lease, and (ii) the
> nominal lessor will be treated as the owner of the property even though the
> nominal lessee is in substance the owner of the property.

See, e.g., Uniform Capitalization of Interest Expense in Safe Harbor Sale and Leaseback
Transactions, 2004-1 C.B. 1046 (2004).  Using such arrangements, Heinz bought property from
capital-intensive companies that needed cash and that had too little taxable income to profit from
the credits and depreciation deductions to which ownership of the property entitled them.

-4-

a gain of $150 million.[5]  Although this gain would be deferred under the federal income tax laws, it would be immediately taxable in Pennsylvania.  Instead, Mr. Crowe recommended that Heinz simultaneously transfer an asset to HCC in which Heinz had a tax basis of more than $150 million, thereby preventing any gain from being realized upon the transfer of the leases.  First considering whether Heinz should transfer to HCC its holdings in a subsidiary, he quickly concluded that this would not work because it would create future tax problems.[6]  Instead, he advised that "an asset other than stock of an operating company must be used," ultimately concluding that the stock of HCC itself was a "perfect candidate."[7]  He observed that, as of March 31, 1986, Heinz had a tax basis of roughly $385 million in HCC.  He suggested that Heinz form a new subsidiary in Delaware and "as soon as possible" transfer its interests in the 1982 safe harbor leases and "a portion of [Heinz's] ownership in HCC" to the new company, in return for stock of the new company and, most importantly, the assumption of the safe harbor lease liabilities.  Mr. Crowe further concluded that in May 1987, the 1983 safe harbor leases should be transferred to the new subsidiary, along with the balance of HCC stock in return for the assumption of liabilities on the 1983 leases.

On July 10, 1986, Heinz formed Heinz Leasing Company (Heinz Leasing), a Delaware corporation, as a wholly-owned, first-tier subsidiary.  On July 14, 1986, Heinz transferred to Heinz Leasing ten of the aforementioned "safe harbor" leases, as well as 50 percent of the issued and outstanding stock of HCC.  On October 7, 1987, Heinz transferred to Heinz Leasing the two remaining safe harbor leases and the remaining 50 percent of the issued an outstanding stock of HCC.  On January 21, 1988, Heinz Leasing sold one share of HCC back to Heinz for par value.

HCC continued to lend money to members of the Heinz Consolidated Group and associated foreign subsidiaries.  After the transfer of the leases and stock to Heinz Leasing,

---

[5]  Under the tax law, HCC's assumption of Heinz's $150 million debt is viewed as the economic equivalent of Heinz receiving $150 million in cash from HCC.  *See* 26 U.S.C. § 357(c).

[6]  Specifically, he observed that "the net result is that the portion of the liabilities that is deemed to be assumed in exchange for stock will be a dividend from the company (Ore-Ida, for example) whose stock is contributed to the finance company."  He continued: "Under the consolidated return rules, a dividend reduces the shareholder's tax basis in the subsidiary.  This would, in turn, increase the tax liability if the stock of the subsidiary was ever sold."  Even though it was unlikely that a subsidiary like Ore-Ida or Star-Kist would ever be sold, "it would be foolish to accept a huge potential tax (a $100 million basis reduction would result in increased gains tax of $28 million under current law) in return for a $7 million reduction in state taxes . . . which would be realized $500,000 annually over 15 years."

[7]  As noted, Heinz realized that it must transfer assets along with the leases, and that the assets would need a tax basis of at least $150 million.  Because the assets would lose their basis by offsetting the liability and would therefore bring a large taxable gain if sold, Heinz decided to transfer the only asset it knew it would never sell – stock in its financing subsidiary, HCC.

counsel at Heinz remained concerned that HCC would be viewed by state taxing authorities as lacking substance.  In late 1986, Ms. Caponi sent yet another memorandum to Mr. Crowe warning that HCC still had not put in place the recommended management contract, thereby, in her view, exposing Heinz to potential tax liability in Pennsylvania.  In early 1987, Paul F. Renne, Vice President and Treasurer of Heinz,[8] made similar warnings to Mr. Crowe.  He too recommended that Heinz Leasing pay a management fee to Heinz.

In October 1988, Mr. Crowe distributed a draft set of operating procedures to be used with respect to HCC and Heinz Leasing, similar to those suggested by Ms. Caponi in 1984.  The draft operating procedures required HCC to pay an annual "service fee" of $30,000 to Heinz for certain services rendered by Heinz World Headquarters.  Another notable provision in this draft addressed the issue of corporate dividends, stating – "If the company [HCC or Heinz Leasing] has excess cash which is not expected to be redeployed as a loan in the near future, a dividend should be declared."  In March of 1989, Mr. Crowe distributed a finalized copy of the "operating procedures," which included the service fee, but deleted the "excess cash" provision above. Nonetheless, it appears that both HCC and Leasing always declared a dividend when they had cash not needed in their businesses.

On March 2, 1989, Ms. Caponi reported that the Pennsylvania Department of Revenue was about to audit Heinz's tax returns for its fiscal year 1987.  She expressed concern that considerable taxes would be asserted if the state auditors either treated Heinz, Heinz Leasing and HCC as a single entity, or treated Heinz Leasing and HCC as doing all their business in Pennsylvania (rather than Delaware).  In April 1990, Mr. Crowe sent a memorandum to Mr. Renne reiterating the need for Heinz to "convert HCC/[Heinz Leasing] into companies of real substance."  He recounted the advice received by Heinz dating back to 1981, and cautioned that "the Company has never responded to the concerns expressed by every tax advisor who has looked at the situation."  "To be respected as a separate company which is not doing business in Pennsylvania," he asserted, "it is absolutely essential that HCC (and [Heinz Leasing]) employ at least one person who is qualified to and actually does originate transactions and the accounting therefore," rather than "a qualified person who merely parrots instructions from Pittsburgh and copies accounting reports prepared here."  Relying on information provided by Ms. Caponi, he estimated that Heinz had a potential tax exposure of $20 million.[9]

---

[8]  Mr. Renne was also one of the three directors of HCC, one of the three directors of Heinz Leasing, and a Vice President of Heinz Leasing.

[9]  In a later presentation, Mr. Crowe summarized his concerns, stating that "[i]n order to collect this tax Pennsylvania would have to successfully assert either (a) that HCC is a sham company that should be treated as part of Heinz, or (b) that HCC is doing business in Pennsylvania."  "Because of the lack of substance in HCC," he continued, " it is highly likely that the state would win such an argument."  Noting that "the statute of limitations will never expire" because "HCC does not file tax returns in Pennsylvania," he concluded that "[n]othing can be done about the lack of substance in prior years," adding that "[w]e must simply hope that our luck holds."

These concerns proved valid.  At various points between 1992 and 1994, Connecticut, Massachusetts, New York and North Carolina all took steps challenging whether Heinz Leasing and HCC were separate taxable entities from Heinz.  For example, a May 17, 1993, Heinz memorandum indicates that a Connecticut auditor had combined Heinz Leasing and HCC with Heinz, stating that "[d]ue to the fact that these companies had no payroll or operating expenses, the auditor's position is that the effective control of these assets rests with the parent corporation."

C.

Meanwhile, like many public companies, Heinz engaged regularly in the purchase of its own stock, spending an average of more than $170 million per year on such stock primarily to manage its earnings per share.  In October of 1991, the Heinz board of directors announced a program (the 1991 repurchase program), under which the company would repurchase 10,000,000 shares of its common stock on the open market.  This stock was to be deposited into Heinz's treasury to support employee retirement and savings plans, certain cumulative preferred stock holders, and for other corporate purposes.  This program proved highly successful – at a Heinz board meeting held on June 9, 1993, David R. Williams, Senior Vice President-Chief Financial Officer, announced that 9,736,200 shares had been repurchased under the 1991 repurchase program and that the program likely would be completed prior to the September 1993 board meeting.  Mr. Williams further reported that, based on this success, the Heinz executive committee had recommended that the company repurchase an additional 10,000,000 shares of common stock to be used for various corporate purposes.  The Heinz board of directors ratified this proposal, and the new repurchase program went into effect (the 1993 repurchase program).  At a subsequent meeting of the Heinz board of directors on July 13, 1994, Mr. Williams advised that the executive committee had recommended that HCC participate in the 1993 repurchase program by repurchasing Heinz stock, an arrangement that, according to the minutes, Mr. Williams asserted "would result in a more efficient use of certain intercompany cash flows."  The Heinz board of directors ratified this proposal and authorized HCC to borrow up to $40 million to finance the purchases.

The HCC board of directors met on August 2, 1994.  According to the minutes, Mr. Renne, acting in his role as one of the three HCC directors, advised the board that "[HCC had] been considering purchasing shares of the Common Stock of [Heinz] for investment purposes."  After a brief discussion, the three directors authorized HCC to purchase up to 1,100,000 shares of Heinz common stock for a maximum price of $37 per share.  To help finance this purchase, on August 9, 1994, HCC, without assistance or backing from Heinz, entered into a credit agreement with the Morgan Guaranty Trust Company of New York (Morgan Guaranty) for an unsecured loan of $40,000,000.  In response to a reported "recent increase in the [Heinz] stock price," the HCC board of directors voted on August 11, 1994, to increase their maximum purchase price to $40 per share, and HCC began purchasing Heinz common stock in the public market (through the same Heinz employee who made such repurchases for Heinz).

The Heinz executive committee met on September 12, 1994, at which meeting Mr. Williams reported that the 1993 repurchase program had been completed. Mr. Williams recommended that Heinz again renew the repurchase program, with the stock to be purchased either by Heinz or HCC. The executive committee agreed and the next day, September 13, 1994, the Heinz board of directors ratified the proposal, creating a third repurchase program (the 1994 repurchase program). Shortly thereafter, on September 20, 1994, the HCC board of directors held a meeting, at which they discussed HCC's role in the new program. According to the minutes, at that meeting, Mr. Renne stated that "in light of [Heinz's] recent adoption of a new 10,000,000 share repurchase program, [HCC's board] is considering increasing the number of shares of [Heinz] to be purchased by the Company from 1,100,000 shares as authorized by the Board on August 2, 1994 to 3,500,000 shares." HCC's board approved this proposal, and authorized HCC to borrow up to $70 million, as necessary, to acquire the Heinz shares.

D.

Between August 11, 1994, and November 15, 1994, HCC purchased 3,500,000 shares of Heinz common stock in the public market for $129,175,400, including commissions, and paid an additional $1,807,703 in investment banking and legal fees in connection with the stock purchase. Throughout the repurchase process, HCC kept Heinz appraised of its stock purchases and the status of its Morgan Guaranty loans. At the January 10, 1995, Heinz executive committee meeting, Mr. Williams informed the committee that HCC had purchased 3,500,000 shares of Heinz common stock pursuant to the 1994 repurchase program, and recommended that Heinz offer to purchase 3,325,000 of those shares from HCC. According to the minutes (as well as presentation slides used at the meeting), the purpose of this transaction ostensibly was to "move the shares into the Company's treasury where they would be available for stock option exercises and other transactions requiring shares and would also enable the Company to discontinue paying dividends on the shares that it purchases from HCC." Mr. Williams set forth a detailed statement of the proposed transaction, recommending that the shares be transferred on January 17, 1995, at a price equal to the January 13, 1995, closing price of Heinz common stock on the New York Stock Exchange, and that the purchase be funded by Heinz issuing to HCC a "zero coupon convertible debt instrument." In his presentation to the board, Mr. Williams also indicated that "due to the method of accounting presently applied to [HCC's] shares, the purchase from [HCC] would have no impact on reported results and would require no public disclosures." The Heinz executive committee approved this recommendation.

That same day, January 10, 1995, the HCC board of directors met. Mr. Renne stated that the company had received an offer from Heinz to purchase 3,325,000 shares of Heinz common stock in return for a zero coupon note issued by Heinz. On a separate matter, Mr. Renne also stated that "due to changing views among the states regarding the treatment of Delaware holding companies, the directors of the Company have decided to demand repayment of all affiliate loans, and discontinue all Delaware holding company lending activities as soon as reasonably possible."

The board agreed to both proposals.[10]  HCC accepted Heinz's offer, and transferred 3,325,000 shares of Heinz common stock to Heinz on January 18, 1995.  From the time it acquired the Heinz stock through January 18, 1995, HCC received approximately $1.7 million in dividends on the Heinz stock.

In consideration for the transfer, Heinz issued to HCC a subordinated convertible note, zero percent coupon, due January 18, 2002, paying $197,402,412.78 at maturity (the Note).[11]  At the option of the holder, the Note could be converted into 3,510,000 shares of Heinz common stock at any time from January 18, 1998 (three years after issuance) until maturity.[12]  Heinz was the sole obligor and guarantor on the Note.  The Note gave the holder no right to registration of the Heinz stock into which the Note was convertible.  Neither the Note itself, nor the stock issued upon its conversion, was registered under Federal or state securities laws; from the time it issued, the Note was considered a "restricted security" within the meaning of 17 C.F.R. § 230.144(a)(3) (1995), as its holder could have sold it only in a private placement or in a transaction that otherwise qualified as exempt from the registration requirements of Federal and state securities laws.  In an opinion secured by HCC on January 16, 1995, Goldman Sachs confirmed that the Note was "reasonably valued" at $130.5 million, which was the value of the stock to be redeemed.  According to Goldman Sachs, approximately, 84 percent of the value was in the debt

---

[10]  Beginning in 1994, at about the same time that it began planning the HCC acquisition of its shares, Heinz developed what became known as "Project Turbo," a complex refinancing of Heinz affiliates.  The purposes of the project were two-fold: (i) to increase the volume of Heinz' lending business, and to some degree, increase the interest rates on debtors it assessed as having low credit worthiness; (ii) to have HCC exit the lending business because Delaware holding companies engaging in lending activities were coming under fire.  The January 10, 1995, HCC board resolution began the process of implementing this project.

[11]  The parties have disputed the value of the Note as of the date of issuance – plaintiffs contend that it was $130,506,000, equal to the value of the 3,325,000 shares of common stock for which Note was exchanged on January 18, 1995, while defendant asserts that the value was $121.82 million.  For reasons that will become obvious, the court need not resolve this factual dispute.

[12]  A team from Goldman Sachs & Co. (Goldman Sachs) developed the terms of the Note for HCC.  Goldman Sachs was chosen because it had particular expertise in convertible debt.  The record indicates that Goldman Sachs was tasked by HCC with creating the note before HCC began to purchase the shares of Heinz stock.  Thus, on July 1, 1994, Philip M. Darivoff sent a letter to Mr. Crowe in which he provided a "summary of indicative terms for a zero coupon convertible note which the H.J. Heinz Company may consider issuing."  Mr. Crowe responded to this letter on July 5, 1994, indicating that he "would like to talk about the new design of the convertible note."  On August 24, 1994, Goldman Sachs sent a further letter to Mr. Backo, stating that it was "pleased to confirm the arrangements under which [Goldman Sachs] is exclusively engaged by [HCC] as financial advisor in connection with the Company's potential investment in shares of common stock of [Heinz]."

portion of the Note, with the remaining value in the conversion feature.  The Note ultimately was issued by Mr. Renne, acting for Heinz, to HCC.[13]

Following the redemption, HCC retained 175,000 shares of Heinz stock.  At a meeting of the Heinz board of directors held on April 12, 1995, Mr. Williams advised that the Heinz executive committee was recommending approval of a proposed sale by HCC of the 175,000 shares to an unrelated third party.  The minutes indicate that Mr. Williams reported that "the shares would be sold at current market price less a discount to be negotiated because the shares would not initially be registered under the Securities Act of 1933."  At the end of its taxable year ended April 27, 1995, HCC's net worth (the excess of asset book value over liabilities) was nearly $2 billion, with net income of approximately $277 million.  In a sale that closed on May 2, 1995, HCC sold the remaining 175,000 shares to AT&T Investment Management Corp. (AT&T), an unrelated third party, in a private placement for a discounted rate of $39.8064 per share, or $6,966,120, in cash.[14]  Heinz incurred $117,156 in costs as a result of this transaction; HCC also received and paid a variety of legal and management fees to Heinz in connection with the transfer.  By the end of its fiscal year on August 2, 1995, HCC's balance sheet reflected no loans receivable, with the Note being listed as the only notes receivable.[15]  On November 29, 1995,

---

[13]  According to various testimony, it appears that the note was designed so that: (i) it would be convertible into a number of shares of Heinz stock slightly greater than the number of shares redeemed; (ii) the conversion right would be worth more than ten percent, but less than fifty percent of the total value of the Note; and (iii) the value of the Note would be substantially equivalent to the value of the redeemed stock.  In addition, restrictions on the timing of the conversion were included to ensure that the conversion right would not be immediately exercised.  Had that not been true, HCC would have surrendered 3,325,000 shares for the right to receive 3,510,000 shares, thereby leaving the Note with a value necessarily greater than the value of the shares redeemed.  The note also could not be sold in public markets, unless it were registered, a factor that also limited its liquidity and, hence, its value.

[14]  The price reflected a 4.08 percent discount from the prevailing price of Heinz stock on the New York Stock Exchange, primarily because the shares were unregistered.  This discount was applied even though on May 2, 1995, Heinz and AT&T entered into an agreement under which Heinz agreed to offer to effect the registration of the stock within 180 days.  In a separate agreement between Heinz and HCC, Heinz agreed to file a registration statement with the SEC. HCC paid Heinz a fee of $25,000 and agreed to reimburse Heinz for all costs incurred with respect to the filing.

[15]  On March 2, 1995, HCC incorporated an Idaho subsidiary, named "Heritage International, Inc." (Heritage).  Later, in 1995, HCC effectively transferred all its outstanding loans, except the Note, to Heritage through a complex series of steps: (i) Heinz advanced funds to HCC's debtors – Heinz's subsidiaries – sufficient to allow them to repay existing loans from HCC (which totaled, roughly, $1.5 billion); (ii) HCC then capitalized Heritage by contributing to it all of the funds HCC had collected from those outstanding loans; (iii) Heritage used the inflow of capital to make new loans to Heinz's subsidiaries; and (iv) Heinz's subsidiaries used the proceeds of their Heritage loans to repay the advances from Heinz.  Heinz also contributed an

Heinz Leasing was merged into HCC, leaving Heinz the sole owner of the issued and outstanding stock of HCC.  On April 18, 1998, after receiving advice from Goldman Sachs, HCC exercised its right to convert the Note and received 5,265,000 shares of Heinz stock.[16]  From the time of the redemption in January 1995 until the conversion right on the Note first became exercisable three years later, the price of Heinz stock more than doubled, from about $39 to $83 per share.

E.

The Heinz Consolidated Group filed a consolidated federal income tax return for its 1995 taxable year, on which it reported a capital loss of $165,531,902.  The Heinz Consolidated Group then carried back $129,050,505 of the capital loss to its 1992 taxable year, $873,329 to its 1993 taxable year, and $37,780,068 to its 1994 taxable year.  The capital losses carried back to 1992 and 1993 equaled the Heinz group's capital gain in each of those years, and the capital loss carried back to 1994 was the residual amount of the 1995 net capital loss.  On October 31, 1997, the Heinz Consolidated Group filed refund claims for the 1992, 1993, and 1994 taxable years of $43,979,379, $300,491, and $12,490,598, respectively, plus statutory interest, based on the carryback of the capital loss incurred in 1995.  On October 18, 2002, it filed an amended return for 1995 increasing its net capital loss by $2,172,000, which, in turn, increased the Heinz group's net capital loss carryback from 1995 to $167,703,902.  It carried this amended net capital loss back to the 1992, 1993, and 1994 taxable years, and increased the refunds claimed to $29,063,452, $300,491, and $13,223,024, respectively.

The parties apparently no longer dispute $43,569,763 of Heinz's amended 1995 net capital loss, which was carried back to the 1992 taxable year.  The IRS, however, has disallowed the remaining $124,134,139 of the 1995 net capital loss, arguing, *inter alia*, that the transaction at issue lacked economic substance and a business purpose.  It allowed only a capital loss carryback of $43,569,763 to 1992, and nothing to 1993 or 1994.  On December 23, 2003, plaintiff filed the instant action.  The case was originally assigned to Judge Sypolt, but on December 15, 2004, it was reassigned to the undersigned.  Trial was held on January 4 and 5, 2006, and post-trial briefing and closing arguments followed.

## II.   DISCUSSION

If plaintiff is correct, transactions that, for financial accounting purposes, produced more than a $6 million profit, yielded, for tax purposes, a loss of over $124 million.  Understanding

---

additional $900 million to Heritage's capital, enabling Heritage to expand its loan portfolio to receivables of approximately $2.4 billion.  Following Project Turbo, HCC owned 100 percent of Heritage's outstanding stock, the note from Heinz, and the common shares of several foreign affiliates.

[16]  The Heinz board had declared a three-for-two split of its common stock, effective at the close of business on October 3, 1995.  Thus, HCC received 5,265,000 shares rather than the 3,510,000 shares originally promised.

how this might be the case requires a review of how the Code treats some intercorporate transactions.

Heinz's capital loss is deductible, if at all, under section 165 of the Code, which provides in pertinent part:

**SEC. 165. LOSSES.**

(a) General Rule.– There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) Amount of Deduction.– For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

Under sections 1011 and 1012 of the Code, a taxpayer's basis in an item is generally its cost. *See United States v. Chicago, B. & Q. R. Co.*, 412 U.S. 401, 406 n.7 (1973). The parties agree that the 3,325,000 shares that Heinz obtained from HCC had a basis in HCC's hands of $124.2 million. Heinz asserts that it "redeemed" these shares with the Note within the meaning of section 317(b) of the Code, which provides that "stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock." Defendant admits that *if* a true redemption occurred, it would be treated as a dividend under section 302(d) of the Code.[17] It further admits that *if* a true redemption occurred, and a dividend arose under section 302(d), the transfer of stock from HCC to Heinz did not reduce the former's equity position in the latter, so that the basis HCC had in the 3,325,000 shares would shift to HCC's remaining 175,000 shares.[18] And defendant acknowledges that *if* this shifting in basis occurred,

---

[17] Section 302(d) provides: "Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies."

[18] In this regard, Treas. Reg. §1.302-2(c) provides:

"(c) In any case in which an amount received in redemption of stock is treated as a distribution of a dividend, proper adjustment of the basis of the remaining stock will be made with respect to the stock redeemed . . . .

Example (1). A, an individual, purchased all of the stock of Corporation X for $100,000. In 1955 the corporation redeems half of the stock for $150,000, and it is determined that this amount constitutes a dividend. The remaining stock of Corporation X held by A has a basis of $100,000.

HCC was entitled to deduct a huge capital loss upon the subsequent sale of those 175,000 shares to AT&T.

In the tax law, "if" is a colossal word.  Should the transaction in which Heinz acquired the 3,325,000 shares actually be considered a redemption within the meaning of section 317(b)?  If it is not, plaintiffs essentially concede that HCC's basis in the 3,325,000 shares did not shift to its remaining stock and that the subsequent sale of the latter stock did not produce a loss.  In arguing for this result, defendant makes several points.  First, it contends that no redemption occurred under section 317(b) because Heinz did not exchange property for the stock within the meaning of that section.  Second, defendant asseverates that even if the transaction technically qualified as a "redemption" within the meaning of section 317(b), the transaction should not be treated as such because it lacked economic substance and had *no bona* fide business purpose other than to produce tax benefits; it was, in a word, a sham.  Finally, it asserts that under the so-called "step transaction doctrine," the purchase of the stock by HCC and the exchange of the stock for the Note should be merged together and viewed as a direct purchase of the stock by Heinz.

As will be seen, in some ways it is difficult to differentiate these claims, all of which are different manifestations of the more general "substance over form" concept.  *See* Marvin A. Chirelstein, "Learned Hand's Contribution to the Law of Tax Avoidance," 77 Yale L. J. 440, 472 (1968); Lewis R. Steinberg, "Form, Substance and Directionality in Subchapter C," 52 Tax Law. 457, 458 n.8, 499 (1999); *see generally*, Ernest J. Brown, "The Growing 'Common Law' of Taxation," 34 S. Cal. L. Rev. 235 (1961).  Yet, while these various doctrines overlap, they also have different criteria that bring into relief the nuances of various transactions, as well as the

---

Example (2).  H and W, husband and wife, each own half of the stock of Corporation X.  All of the stock was purchased by H for $100,000 cash. In 1950 H gave one-half of the stock to W, the stock transferred having a value in excess of $50,000.  In 1955 all of the stock of H is redeemed for $150,000, and it is determined that the distribution to H in redemption of his shares constitutes the distribution of a dividend.  Immediately after the transaction, W holds the remaining stock of Corporation X with a basis of $100,000.

Example (3).  The facts are the same as in Example (2) with the additional facts that the outstanding stock of Corporation X consists of 1,000 shares and all but 10 shares of the stock of H is redeemed.  Immediately after the transaction, H holds 10 shares of the stock of Corporation X with a basis of $50,000, and W holds 500 shares with a basis of $50,000.

If a redemption occurred here, Heinz clearly would fit under Examples 1 and 3 of this regulation – and defendant does not seriously contend otherwise.

importance of particular features therein.[19]  Because of this, the court will consider defendant's theories and plaintiffs' responses thereto *seriatim*.

> **A.   Did HCC possess the benefits and burdens of the ownership of the Heinz stock?**

Stock is redeemed under section 317(b) if the corporation acquires it in exchange for property.  *See Frontier Chevrolet Co. v. Comm'r of Internal Revenue*, 116 T.C. 289, 294 & 294 n.9 (2001), *aff'd*, 329 F.3d 1131 (9th Cir. 2003); *Boyle v. Comm'r of Internal Revenue*, 14 T.C. 1382, 1390 n.7 (1950), *aff'd*, 187 F.2d 557 (3d Cir.), *cert. denied*, 342 U.S. 817 (1951).  As noted, some redemptions are treated as sales under section 302, while others are treated as a payment of dividends.  Distributions characterized in the latter fashion are commonly called "section 301 distributions," taking their name from the controlling Code provision.  *See Hurst v. Comm'r of Internal Revenue*, 124 T.C. 16, 21 (2005).

Section 317(b) presupposes that the individual or corporation receiving property from the redeeming corporation, in fact, possesses the stock being redeemed.  In arguing that this requirement was not met here, defendant asserts that HCC had a transitory interest in the Heinz shares that should not be respected for tax purposes because it did not have the benefits and burdens of that ownership.  In analogous situations, courts have held that requirements of the reorganization provisions of the Code that require the continued possession of stock were not met where ownership of stock by a party "was transitory and without real substance."  *Helvering v. Bashford*, 302 U.S. 454, 458 (1938); *see also Idol v. Comm'r of Internal Revenue*, 38 T.C. 444, (1962), *aff'd*, 319 F.2d 647 (8th Cir. 1963).[20]  In making the latter determination, courts often

---

[19]  More than eighty years ago, Dean Roscoe Pound wrote in his book *The Interpretations of Legal History* that "[a]ll interpretations go on analogies.  We seek to understand one thing by comparing it with another.  We construct a theory of process by comparing it with another."  Roscoe Pound, Interpretations of Legal History 151 (1932).

[20]  In *Bashford*, Atlas Powder Company participated in a reorganization, by which three of its competitors became a single subsidiary.  Under the plan, Atlas formed a new corporation. The holders of stock in the three companies then exchanged their stock for some common stock in the new company, some Atlas stock, and some cash which Atlas supplied.  Bashford was one of the stockholders in one of the competitors and, in exchange for his stock received shares in the new corporation, cash and various shares in Atlas.  Bashford claimed that he was not required to include the value of the Atlas stock on his return because Atlas was a "party to the reorganization" under section 112(1)(2) of the Revenue Act of 1928.  302 U.S. at 455-56.  The Supreme Court, however, held otherwise, stating that "[a]ny direct ownership by Atlas of [its competitors] was transitory and without real substance; it was part of a plan which contemplated the immediate transfer of the stock or the assets or both of the three reorganized companies to the new Atlas subsidiary."  *Id.* at 458; *see also Groman v. Comm'r of Internal Revenue*, 302 U.S. 82, 90 (1937).

have focused on whether the entity claiming ownership of stock or another item possessed the "burdens and benefits of ownership." *See Grodt & McKay Realty, Inc. v. Comm'r of Internal Revenue*, 77 T.C. 1221, 1236-37 (1981); *see also Corliss v. Bowers*, 281 U.S. 376, 378 (1930); H.R. Rep. No. 98-432, pt. 2, at 1132 (1984) ("for Federal income tax purposes, the owner of property must possess meaningful burdens and benefits of ownership").  Among the factors relevant to this determination are: (i) whether the purchaser bears the risk of loss and opportunity for gain; (ii) which party receives the right to any current income from the property; (iii) whether legal title has passed; and (iv) whether an equity interest was acquired in the property.[21]  The mere record of stock ownership is but the starting point in this analysis – one consideration among many in determining whether one is the owner of property.[22]  Indeed, none of these factors is necessarily controlling; the incidence of ownership, rather, depends upon all the facts and circumstances.  *Int'l Paper Co. v. United States*, 33 Fed. Cl. 384, 393-94 (1995); *Baird v. Comm'r of Internal Revenue*, 68 T.C. 115, 124 (1977).  While these factors typically are applied in discerning when a sale occurs, particularly in contradistinguishing leases or loans, they have

In *Idol*, the corporation's sole shareholder, Idol, needed funds.  Seeking to withdraw cash from his corporation as capital gain rather than dividend, he sold a portion of his stock to a purchaser interested in acquiring certain corporate assets.  Idol then caused the corporation to distribute the desired assets in exchange for the purchaser's recently acquired shares.  The Tax Court held that the transaction should be treated as a sale of assets by the corporation followed by a dividend distribution to Idol.  In so holding, it stated –

> Not only is it plain from the evidence before us that [the purchaser] had no interest in acquiring any of [the corporation's] stock, but there is no indication here that Idol had any real desire to dispose of any part of  his 42 shares of the corporation's stock.  The only reason the transactions were cast in the form of a sale of stock followed by a redemption was the possibility of obtaining favorable tax treatment.

38 T.C. at 460.  Based on the foregoing, the court concluded that the taxpayers "have not established that . . . [the corporation] had a real intention to reduce its capital or to redeem any part of its outstanding stock."  *Id.*; *see also Davis v. United States*, 26 F. Supp. 1007 (Ct. Cl. 1939), *cert. denied*, 308 U.S. 574 (1939).

[21]  *See, e.g.*, *Speca v. Comm'r of Internal Revenue*, 630 F.2d 554, 556-57 (5th Cir. 1980); *Owens v. Comm'r of Internal Revenue*, 568 F.2d 1233, 1238-40 (6th Cir. 1977); *Bradford v. United States*, 444 F.2d 1133, 1144 (Ct. Cl. 1971); *U.S. Freight Co. v. United States*, 422 F.2d 887, 894 (Ct. Cl. 1970); *White Motor Co. v. United States*, 3 F. Supp. 635, 640 (Ct. Cl.), *cert. denied*, 290 U.S. 672 (1933); *Tensaw Land and Timber Co. Inc. v. United States*, 14 Cl. Ct. 668, 673-74 (1988); *Grodt & McKay Realty, Inc.*, 77 T.C. at 1236-37.

[22]  *See, e.g.*, *Frank Lyon Co. v. United States*, 435 U.S. 561, 581-84 (1978); *Helvering v. Clifford*, 309 U.S. 331, 334-35 (1940); *Helvering v. F. & R. Lazurus Co.*, 308 U.S. 252, 255 (1939); *Bailey v. Comm'r of Internal Revenue*, 912 F.2d 44, 47 (1990); *Sun Oil Co. v. Comm'r of Internal Revenue*, 562 F.2d 258, 263 (3d Cir. 1977), *cert. denied*, 436 U.S. 944 (1978).

also been employed more generally in determining to whom ownership, in a given transaction, was transferred, including the stock supposedly redeemed in a section 317(b) exchange.  *See, e.g.*, *Schmidt v. Comm'r of Internal Revenue*, 55 T.C. 335, 339-40 (1970); *see also Lisle v. Comm'r of Internal Revenue*, 35 T.C.M. (CCH) 627, 634-40 (1976).

In the case *sub judice*, several factors suggest that HCC's ownership of the Heinz stock was more than notional.  HCC incurred significant indebtedness to generate the funds that were used to purchase the Heinz stock on the market, indebtedness that was not guaranteed by its parent.  Further, unlike in other cases, HCC received dividends on the stock during the period of its possession.  *See generally*, *Provost v. United States*, 269 U.S. 443, 447 (1926) (discussing the impact of who receives dividends in differentiating between stock loan and custodial arrangement); *Lynch, Collector v. Horby*, 247 U.S. 339, 346 (1918).  And HCC, and not Heinz, bore the risk of loss and the opportunity for gain as to the value of the Heinz stock it possessed – indeed, from the time that it obtained the Heinz stock between August and November of 1994, to the time it sold it in January of 1995, the stock appreciated, a fact that was reflected in the purchase price in the parties' agreement.  Moreover, while the evidence on this point is a bit mixed, on balance, it appears that HCC was under no preexisting obligation to distribute or disgorge any profits it received  – either in the form of dividends received, gain realized on the sale, or otherwise – to its parent.  Finally, although defendant implies otherwise, it is well-established that, absent a sham, the fact that the transactions *sub judice* involved a parent corporation and a wholly-owned subsidiary, while suggesting a need for close scrutiny, does not alone provide a basis for ignoring the other indicia of ownership here.  *See Comm'r of Internal Revenue v. Bollinger*, 485 U.S. 340, 345 (1988); *Nat'l Carbide Corp. v. Comm'r of Internal Revenue*, 336 U.S. 422, 433-34 (1949); *Moline Properties, Inc. v. Comm'r of Internal Revenue*, 319 U.S. 436, 438-39 (1943); *Ocean Drilling & Exploration Co. v. United States*, 988 F.2d 1135, 1144 (Fed. Cir. 1993).

Accordingly, and setting aside, briefly, other substance-over-form considerations, it appears preliminarily that HCC possessed the burdens and benefits associated with the Heinz stock and, to that extent, the later redemption qualified under section 317(b).[23]

---

[23]  Implicit in several points made by defendant is yet another argument – that the stock in question was not exchanged for "property" within the meaning of section 317(b).  In this regard, section 317(a) defines property as money, securities and any other property other than the stock or right to acquire stock in the distributing corporation.  To be sure, "[i]f a corporation redeems its stock by issuing debt that later is reclassified as equity, . . . the transaction fails the definition of redemption in § 317(b), which excludes transactions where stock is repurchased in exchange for stock of the same corporation."  Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 9.01[3][b] (7th ed. 2006).  But, there is no indication here that the Note should be recharacterized as equity or otherwise treated as the equivalent of Heinz stock.  HCC certainly was not required to exercise the conversion feature of the Note and, indeed, that feature could not be exercised until three years after issuance.  Moreover, there was no assurance that the Note would ever be "in the money" – that is, that the value of the stock would

**B.      Was the transaction that gave rise to the capital loss here a sham?**

The right of a taxpayer to arrange its affairs to minimize taxes is well-established.  The Supreme Court observed long ago that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his [or her] taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering*, 293 U.S. 465, 469 (1935).  But to state this principle is not to decide the case.  In *Gregory*, for example, the Court proceeded to disregard the taxpayer's carefully arranged corporate reorganization.  In so doing, it asked: "[p]utting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find?"  *Gregory*, 293 U.S. at 469; *see also Principal Life Ins. Co. v. United States*, 70 Fed. Cl. 144, 145 (2006).  Invoking another permutation of this substance-over-form concept, defendant asserts that the transaction in question was an economic sham and thus did not qualify as a redemption under section 317(b).[24]

As recently noted by this court, there are two predominant "tests" for identifying economic shams.  *See Keener v. United States*, 2007 WL 1180476 at *10 (Fed. Cl. Apr. 18, 2007).  The Fourth Circuit has adopted a two-prong standard for disregarding a transaction under the so-called "sham transaction doctrine," stating that "[t]o treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits . . . *and* that the transaction has no economic substance because no reasonable possibility of a profit exists."  *Rice's Toyota World Inc. v. Comm'r of Internal Revenue*, 752 F.2d 89, 91 (4th Cir. 1985) (emphasis added); *see also Black & Decker Corp. v. Comm'r of Internal Revenue*, 436 F.3d 431, 441 (4th Cir. 2006).  As indicated in *Keener*, however, "[a] better approach to this sham analysis, which is more flexible and enjoys the support of a majority of the circuits, holds that 'the consideration of business purpose and economic substance are simply more precise factors to consider in the [determination of] whether the transaction had any practical economic effects other than the creation of income tax losses.'"  *Keener*, 2007 WL 1180476, at *10 (quoting *Sochin v. Comm'r of Internal Revenue*, 843 F.2d 351, 354 (9th Cir), *cert. denied*, 488 U.S. 824 (1988)).[25]  Critically, under the latter approach, a taxpayer must prove that its transaction was

---

exceed the value of the zero coupon bond.  Had Heinz's stock decreased in value or increased only marginally, HCC might well have continued to hold the debt instrument, perhaps to maturation.  In these circumstances, the court sees no factual basis upon which to treat the Note as the equivalent of Heinz stock for purposes of applying the limitation in section 317(b).

[24]  Economic shams – transactions that occurred but which exploit features of the tax Code in transactions that were purely tax-motivated or lacked economic substance – should be distinguished from so-called "factual shams" – transactions which either did not occur or did not occur as reported.  *See Rogers v. United States*, 281 F.3d 1108, 1113 n.2 (10th Cir. 2002); *Horn v. Comm'r of Internal Revenue*, 968 F.2d 1229, 1236 n.8 (D.C. Cir. 1992).  It is the application of the former doctrine that is at issue here.

[25]  *See also Winn-Dixie Stores, Inc. v. Comm'r of Internal Revenue*, 254 F.3d 1313, 1316 (11th Cir. 2001), *cert. denied*, 535 U.S. 986 (2002) (noting that the doctrine has "few bright

both purposeful and substantive – if proof in either regard is lacking, the transaction is a sham. As the Federal Circuit recently noted in *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 n.14 (Fed. Cir. 2006), *cert. denied*, 127 S.Ct. 1261 (2007), this more demanding approach is more in accord with *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978), where the Supreme Court stated that a transaction will be accorded tax recognition only if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached."[26]

    At least the economic substance prong of the sham transaction doctrine is virtually identical to the doctrine that holds that a transaction which lacks economic substance should be disregarded for tax purposes. The latter concept was recently examined thoroughly by the Federal Circuit in *Coltec*, an opinion that offers a wealth of guidance. First, the court there made clear that "[w]hile the doctrine may well also apply if the taxpayer's sole subjective motivation is

---

lines," but clearly applies to "'transactions whose sole function is to produce tax deductions'" (quoting *Kirchman v. Comm'r of Internal Revenue*, 862 F.2d 1486, 1492 (11th Cir. 1989)); *United Parcel Serv. of America v. Comm'r of Internal Revenue*, 254 F.3d 1014, 1018 (11th Cir. 2001); *ACM P'ship v. Comm'r of Internal Revenue*, 157 F.3d 231, 247 (3d Cir.1998), *cert. denied*, 526 U.S. 1017 (1999) ("these distinct aspects of the economic sham inquiry do not constitute discrete prongs of a rigid two-step analysis, but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes"); *James v. Comm'r of Internal Revenue*, 899 F.2d 905, 908-09 (10th Cir. 1990) (referring to this as the "better approach"); *Rose v. Comm'r of Internal Revenue*, 868 F.2d 851, 854 (6th Cir. 1989) ("the essential inquiry is whether the transaction had any practicable economic effect other than the creation of economic tax losses"). In one case the D.C. Circuit followed the Fourth Circuit's approach, *see Horn*, 963 F.2d at 1237, while in a later case, that court followed the prevailing rule, *see ASA Investerings P'ship v. Comm'r of Internal Revenue*, 201 F.3d 505, 511-12 (D.C. Cir.), *cert. denied*, 531 U.S. 871 (2000) ("the absence of a nontax business purpose is fatal").

[26] In this regard, the Federal Circuit stated in *Coltec* – "We think that the rule adopted by the Fourth Circuit and reiterated in *Black & Decker* – that a transaction will be disregarded only if it both lacks economic substance and is motivated solely by tax avoidance – is not consistent with the Supreme Court's pronouncements in cases such as *Frank Lyon*." 454 F.3d at 1355 n.14; *see also* Richard Lipton, "What Will Be the Impact of the Government's Economic Victory in Coltec?," 105 J. Tax'n 136, 142 (2006) ("[T]he Federal Circuit parted company with the Fourth Circuit concerning the manner in which the economic substance test is to be applied . . . . The Federal Circuit adopted a disjunctive test, under which the lack of either an objective or a subjective business purpose would be grounds to disregard a transaction."). As the Federal Circuit's decision suggests, the sham transaction doctrine, in many ways, is the converse of the *Frank Lyon* formulation, that is, the doctrine should apply if either the transaction is lacking in economic substance, is not imbued with tax-independent consideration **or** is shaped solely by tax-avoidance features.

-18-

tax avoidance even if the transaction has economic substance, a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance. *Coltec*, 454 F.3d at 1355 (citing *Dow Chemical Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006) and *United Parcel Serv.*, 254 F.3d at 1014). Second, contrary to implications in plaintiffs' brief here, the Federal Circuit established that "when the taxpayer claims a deduction, it is the taxpayer who bears the burden of proving that the transaction has economic substance," noting further that the Court of Claims in *Rothschild v. United States*, 407 F.2d 404, 411 (Ct. Cl. 1969) (quoting *Diggs v. Comm'r of Internal Revenue*, 281 F.2d 326, 330 (2d Cir. 1960)) had described this burden as "'unusually heavy,'" *Coltec*, 454 F.3d at 1355; *see also In re CM Holdings, Inc.*, 301 F.3d 96, 102 (3d Cir. 2002). Third, citing *Gregory*, 293 U.S. at 469-70 and other cases, the Federal Circuit emphasized that "[w]hile the taxpayer's subjective motivation may be pertinent to the existence of a tax avoidance purpose," "the economic substance of a transaction must be viewed objectively, rather than subjectively. *Coltec*, 454 F.3d at 1356; *see also Black & Decker*, 436 F.3d at 441-42; *In re CM Holdings, Inc.*, 301 F.3d at 103. Fourth, clarifying another point disputed by the parties here, the court explained that "the transaction to be analyzed is the one that gave rise to the alleged tax benefit," recognizing that "there is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction without a business purpose, in order to create a tax benefit (which is illegitimate)." 454 F.3d at 1356-57; *see also Black & Decker*, 436 F.3d at 441; *Nicole Rose Corp. v. Comm'r of Internal Revenue*, 320 F.3d 282, 284 (2d Cir. 2003). Finally, in words that resonate here, the Federal Circuit opined that "arrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny." 454 F.3d at 1357.

So, with these lessons in mind, what do we have here? Plaintiffs have the burden of proving that the portion of the transaction in question that saw HCC acquire shares and then transfer them to Heinz had both a business purpose and economic substance. As to the former, plaintiffs assert that HCC acquired the stock as an investment and to add "substance" to its operations for state tax law purposes. Both claims have decidedly hollow rings.

Plaintiffs' assertion that HCC acquired the Heinz stock for investment purposes finds cosmetic support in the relevant corporate minutes, which mention this as a reason for approving the acquisition. However, any notion that this claim was authentic is belied, *inter alia*, by the testimony of Mr. Crowe, a Heinz vice president and its chief tax advisor, who admitted that, before HCC purchased any Heinz stock, Heinz planned on redeeming all but a small portion of that stock, with the residue stock being left with HCC only as part of a plan to produce the desired carryback losses. Indeed, as will be described in greater detail below, HCC had already hired Goldman Sachs to design the Note that would be exchanged for the Heinz stock at least six weeks before it acquired its first share. Moreover, the record suggests that HCC could not have reasonably viewed its temporary holding of the Heinz stock as a *bona fide* short-term investment. For one thing, the investment fundamentals of the transaction were all wrong – HCC acquired that stock on the open market at the then current price even though it knew that, unless the stock was registered, it would have to sell it in a private placement at a discount (which is what occurred). Moreover, HCC not only had to borrow funds and pay interest to effectuate this

purchase, but incurred nearly $2 million in other expenses and fees in making the purchases, even though Heinz and HCC both knew that all but a small portion of the stock would be redeemed within a matter of months.  *See Boca Investerings P'ship v. United States*, 314 F.3d 625, 631 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 826 (2003) (rejecting alleged business purpose that "defies common sense from an economic standpoint"); *N. Pac. Ry. Co. v. United States*, 378 F.2d 686, 691 (Ct. Cl. 1967) (rejecting alleged investment motivation where stock could have been more economically held by parent).  Ironically, the most damning testimony on this point came from plaintiffs' expert, Mr. Hatton.  In explaining why he believed that it was not a foregone conclusion that HCC would exercise the stock conversion feature in the Note, Hr. Hatton emphasized how poorly Heinz's stock had fared in the three years prior to the transaction, noting that Heinz had "drastically underperformed the market."[27]  Mr. Hatton further testified that the actual increases that occurred in Heinz's stock value in the three years following the issuance of the Note were "unforseen," adding that during this bull market period, Heinz "still underperformed versus the S&P 500."

Lastly, HCC could not "invest" in the Heinz stock and also fully participate in the Heinz stock repurchase program.  The main purpose of that program – to reacquire common shares to be held in the Heinz treasury to deal with stock options, preferred stock conversions and other corporate purposes – could not be accomplished so long as HCC held the Heinz stock in its treasury as an "investment," a fact verified by several witnesses.  Moreover, unlike the shares held in its treasury, Heinz was obligated to pay dividends on the shares held by HCC, undercutting the impact that the repurchase would have on its equity standing.  Of course, this was not a problem as the record indicates that, *ab initio*, plaintiffs had every intention of making sure that the shares ended up with the parent.  For this and the others reasons discussed above,

---

[27]  Thus, in explaining why he felt that there was "little chance" that the conversion would occur within the first seven years of the Note, Mr. Hatton testified:

Q:    And can you give us a little explanation of why that's the case?

A:    Well, the performance of Heinz for three years prior to 1995, and I'm sort of relying on my memory here, but as I recall Heinz had a total performance, including dividend, of about 1.5 percent per year for those three years.  The market during those three years, as I recall, was up around six percent per year, so it drastically underperformed the market.

Based sort of on those correlations of Heinz' performance versus the market performance and just running an analysis out for seven years at 1.5 percent and even giving them the benefit of another two or three percent, you know, it would not have accreted at six percent a year . . . .

the court rejects the notion that a non-tax business purpose was served here by having HCC "invest" in its parent's stock.

Perhaps sensing this outcome, plaintiffs' banner assertion at trial was that HCC purchased the Heinz stock to bolster its "substance" as a Delaware-based corporation, so as to lessen the likelihood that it would be disregarded by state taxing officials. There are at least four major flaws in this assertion.

First, nothing in the record suggests that anyone associated with Heinz thought, at the time, that HCC's purchase of the Heinz stock would improve its stature as a Delaware holding company – there is no hint of this in the Heinz and HCC corporate minutes, the Heinz internal working papers, the series of memoranda prepared by Heinz tax officials detailing the steps that should be taken to bolster HCC's status, and even the documents discussing the Heinz stock purchase itself. Nothing whatsoever. It is thus fair to conclude that this claim is of relatively recent vintage, a fact that undercuts its legitimacy. *See Winn-Dixie Stores, Inc. v. Comm'r of Internal Revenue*, 113 T.C. 254, 286 (1999) (rejecting a newly-minted claim of business purpose), *aff'd*, 254 F.3d 1313 (11th Cir. 2001), *cert. denied*, 535 U.S. 986 (2002); *see also N. Pac. Ry. Co.*, 378 F.2d at 691. Second, the record reveals that Heinz officials knew or should have known that the stock purchase would not improve HCC's status in prior taxable years. By the time the stock acquisitions began in 1994, HCC had been operating either out of a desk drawer or with a single employee for a number of years and the debate over its operations already was coming to a head, with various states – among them, Pennsylvania, Connecticut, New York and North Carolina – already having challenged its status as a separate company. Internal documents tellingly reveal that Heinz officials knew full well that there was nothing that they could do in 1994 or 1995 to limit their exposure for prior taxable years, with Mr. Crowe, Heinz's primary tax manager, soberly stating that "[n]othing can be done about the lack of substance in prior years" and that "[w]e must simply hope that our luck holds." Third, the record demonstrates that Heinz officials knew or should have known that the stock acquisition would not improve HCC's status in fiscal year 1995 or thereafter. In fact, they knew that there very likely would not be such subsequent years because, according to testimony, Heinz was contemporaneously planning to have HCC cease its Delaware lending operations, such as they were.[28]

Overall, it strains credibility to imagine that, with state officials around the country actively pursuing the misuse of Delaware holding companies and with HCC already the target of various audits, Heinz officials seriously believed that having HCC act as a conduit, in purchasing

---

[28]  The HCC directors resolved to discontinue HCC's lending activities at the same January 10, 1995, meeting at which they approved the sale of the 3,325,000 shares of stock to Heinz. In this regard, the minutes state that "Mr. Renne stated that due to changing views among the states regarding the treatment of Delaware holding companies, the directors of [HCC] have decided to demand repayment of all affiliate loans, and discontinue all Delaware holding company lending activities as soon as reasonably possible."

and reselling its parent stock within the same fiscal year, would be viewed by state taxing officials as adding much of anything to HCC's "substance." Plaintiffs have not explained how they derived this conclusion – perhaps because they did not derive it at the time – nor have they cited a single case or authority suggesting that the transaction should have been the least bit helpful.[29] Instead, they rely solely upon the self-serving and conclusory testimony of various Heinz executives, views that simply cannot be squared with the record. Indeed, at the time of the stock transaction, HCC already owned billions of dollars of Heinz-related debt and stock – holdings that apparently gave the Heinz tax professionals no solace. Over more than a decade, those tax professionals argued that HCC should take a more active role in managing its own affairs, have employees and be charged by Heinz for services being rendered – steps that Heinz officials ignored for many years and never fully adopted. Yet, plaintiffs would have this court believe that the same Heinz officials readily embraced a step never mentioned by those same tax professionals to combat a problem that had already matured, and with virtually no hope that the steps taken would have any salutary impact. In light of the objective evidence (or, in plaintiff's case, the lack thereof), it is far more believable that the Heinz officials never seriously entertained this thought, let alone reasonably so. *See Coltec*, 454 F.3d at 1359 (a court should not adopt a proffered business purpose that lacks some "objective basis").

This court will not don blinders to the realities of the transaction before it. Stripped of its veneer, the acquisition by HCC of the Heinz stock had one purpose, and one purpose alone – producing capital losses that could be carried back to wipe out prior capital gains. There was no other genuine business purpose. As such, under the prevailing standard, the transaction in question must be viewed as a sham – a  transaction imbued with no significant tax-independent considerations, but rather characterized, at least in terms of HCC's participation, solely by tax-avoidance features.[30] The tax advantage sought by Heinz via this sham must be denied.[31]

---

[29] In *Geoffrey, Inc. v. South Carolina Tax Com'n.*, 437 S.E. 2d 13 (1993), *cert. denied*, 510 U.S. 992 (1993), the South Carolina Supreme Court laid the groundwork for states to tax the income of Delaware holding companies, finding that such a company that licensed the use of trademarks to stores that used such intangibles in South Carolina was subject to income tax in South Carolina. Notably, during the years in question, various Heinz officials were aware of *Geoffrey*, as it was cited in the working papers in the record.

[30] In light of this conclusion, the court need not specifically deal with the other potential basis upon which the transaction in question could be deemed a sham – whether the transaction lacked economic substance.

[31] Plaintiffs argue that under *Davis v. United States*, 397 U.S. 301 (1970), it need not show that there was a business purpose for the redemption. This assertion misses the mark for at least two reasons. First, plaintiffs grossly overstate the holding in *Davis*, in which the Court, adopting an argument raised by the government, simply held that the existence of a business purpose for a transaction is irrelevant in determining whether a stock redemption is essentially equivalent to a dividend under section 302(b) of the Code. *Id*. at 310-313. The Court did so based, *inter alia*, upon specific legislative history that stated that the inquiry under section

**C.      Does the step transaction doctrine require recharacterization of
          the transaction here?**

There is yet another important reason for denying the losses claimed – the step transaction doctrine.

A purchase by one person cannot be transformed into a purchase by another by using the latter as a mere conduit through which to pass title.  Two cases illustrate the contours of this rule.  In *Comm'r of Internal Revenue v. Court Holding Co.*, 324 U.S. 331 (1943), for example, the Supreme Court disregarded a transaction where a taxpayer, in order to avoid a large corporate income tax, transferred a building in the form of a liquidating dividend to two shareholders who, in turn, immediately conveyed the asset to a purchaser who had originally negotiated with the corporation to purchase the asset.  *Id.* at 332; *see also Coltec Indus.*, 454 F.3d at 1352.  In so ruling, the Court opined –

> [a] sale by one person cannot be transformed for tax purposes into a sale by
> another by using the latter as a conduit through which to pass title.  To permit the
> true nature of a transaction to be disguised by mere formalisms, which exist solely
> to alter tax liabilities, would seriously impair the effective administration of the
> tax policies of Congress.

*Id.* at 334.  Several years later, in *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 456 (1950), the Supreme Court upheld a transaction in which, to obtain favorable tax treatment, the shareholders of a corporation refused to sell their stock to a local cooperative, but instead liquidated the corporation and sold the assets to the cooperative.  The Court found held that "[w]hile the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes."  *Id.* at 454-55.  In so concluding, the Court distinguished *Court Holding Co.*, stating that unlike that case, the transaction "genuinely ended the corporation's activities," and the corporation itself never planned the sale.  *Id.* at 453.

Here, of course, we are faced not with a shareholder of a corporation selling an asset, but with a corporation purchasing an asset at the behest of its sole shareholder, with the apparent

---

302(b)(1) "will be devoted solely to the question of whether or not the transaction by its nature may properly be characterized as a sale of stock by the redeeming shareholder to the corporation."  *Id.* at 311 (*quoting* S. Rep. No. 83-1622, at 234 (1954)).  Moreover, the Court never suggested that a transaction lacking a business purpose would be immune from the sham transaction doctrine.  More importantly, plaintiffs overlook the fact that the problem with their transaction is not the absence of any business purpose for the redemption, but rather the lack of any business purpose for HCC to be involved in the transaction in the first place.  This point alone renders *Davis* inapposite.

intent of having that asset – the stock of the parent – later redeemed.  Yet, in this context, the so-called "step transaction doctrine" resonates.  Under this doctrine, "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." *Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 738 (1989); *see also Minn. Tea Co.*, 302 U.S. at 613; *Court Holding Co.*, 324 U.S. at 334; *Dietzsch v. United States*, 498 F.2d 1344, 1346 (Ct. Cl. 1974).  "By thus 'linking together all interdependent steps with legal or business significance, rather than taking them in isolation,'" the Supreme Court has stated, "federal tax liability may be based 'on a realistic view of the entire transaction.'" *Clark*, 489 U.S. at 738 (quoting 1 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 4.3.5, p. 4-52 (1981)).

As recently noted by the Federal Circuit, there are two primary formulations of this doctrine – the "end result" and "interdependence" tests. *The Falconwood Corp. v. United States*, 422 F.3d 1339, 1349-50 (Fed. Cir. 2005).  The Court of Claims described these two tests thusly –

> The "interdependence test" requires an inquiry as to "whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." . . . The "end result" test, on the other hand, establishes a standard whereby:  . . . "purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result."

*King Enters., Inc. v. United States*, 418 F.2d 511, 516-17 (Ct. Cl. 1969) (citations and footnote omitted); *see also Falconwood*, 422 F.3d at 1349-50; *McDonald's Rest. of Ill. v. Comm'r of Internal Revenue*, 688 F.2d 520, 524-25 (7th Cir. 1982); *NovaCare, Inc. v. United States*, 52. Fed. Cl. 165, 174 (2002).[32]  Though these tests are framed differently, the ultimate question under either is whether the taxpayer intended a series of actions to be part of a single, integrated

---

[32]  Both the Federal Circuit and the Court of Claims have identified a third test – the "binding commitment" test – under which steps are merged if there is a binding commitment to take the later steps.  *See Falconwood*, 422 F.3d at 1349-50; *King Enters.*, 428 F.2d at 517, 518.  Certainly, the existence of such commitments supports merger.  But, rejecting the application of the step transaction doctrine based upon the absence of such commitments has been viewed as problematic.  Recognizing this, the Court of Claims rejected the use of the binding commitment test in *King Enters.*, 428 F.2d at 518 (emphasis in original), stating that "the step transaction doctrine would be a dead letter if restricted to situations where the parties were ***bound*** to take certain steps."  This view was confirmed by *Falconwood*, 422 F.3d at 1349 n.5; *see also* Boris I. Bittker & Martin J. McMahon, Jr., Fed. Inc. Tax'n of Indiv. § 1.03[5] (2d. ed. 2007) ("Despite intimations to the contrary in the early cases," "there is ample authority for linking several prearranged or contemplated steps, even in the absence of a contractual obligation or financial compulsion to follow through.").

transaction. *See Security Indus. Ins. Co. v. United States*, 702 F.2d 1234, 1245 (5th Cir. 1983). As will be seen, that question is answered in the affirmative here.

That, from the outset, a redemption of the Heinz stock was the end result intended by plaintiffs is evidenced by several key pieces of evidence. First, various correspondence in the record indicates that HCC hired Goldman Sachs to design the zero coupon note that Heinz would use to effectuate the redemption before HCC was even authorized to buy its first share of Heinz stock. Thus, while on July 1, 1994, Mr. Darivoff wrote Mr. Crowe answering questions previously posed regarding the terms of the Note, HCC was not authorized to buy the relevant shares until August 2, 1994, and did not actually buy the first of those shares until August 11, 1994. Indeed, even when the relationship between Heinz and Goldman Sachs was formalized in a letter sent on August 24, 1994, HCC had purchased only 186,400 of the 3.5 million shares of Heinz stock it would eventually acquire. Any doubt that the end result of these transactions was to have Heinz redeem all but a small portion of the shares acquired by HCC was eliminated by admissions made by Mr. Crowe during his testimony. Thus, under cross-examination, he stated:

> Q:    And though there is no guarantee in stone that HCC would sell that
>       stock to Heinz, it's a pretty reasonable expectation to assume that it
>       would given that it was already designing the note it would use for
>       that purpose, correct?
>
> A:    We were planning a transaction. We've never denied that.
>
> Q:    Of course, there was a reasonable expectation that all the steps of
>       the transaction would be carried out.
>
> A:    We expected all the steps of the transaction to be carried out.

At another point in his testimony, Mr. Crowe admitted that "the primary purpose [of the transaction] was to put the company in the position of being able to realize a tax benefit from the possible future sale of the shares." This purpose, of course, could only be accomplished if HCC acquired stock and Heinz "redeemed" most of it, so that HCC's basis in the stock would be transferred to the remaining shares. And, as Mr. Crowe explained, in order to offset capital gain already recognized by the Heinz Consolidated Group in prior years, those shares had to be sold by the end of fiscal year 1995.[33]

As such, under the end result formulation of the step transaction theory, it is clear from the record that, from the start, the initial acquisition by HCC of Heinz stock and the subsequent redemption of that stock were "'really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.'" *Falconwood*, 422 F.3d at

---

[33]    In this regard, Mr. Crowe testified:  "Well, at the outset we knew that we had capital gains in a prior year, and that the carryback period to that year would expire at the end of fiscal '95.  So at the time we started the expectation was that the sale of the 175,000 shares would be completed before the end of fiscal '95."

1350 (quoting *King Enters.*, 418 F.2d at 516).  Those steps constituted part of a prearranged plan to have Heinz obtain the stock while having the basis therein shifted to the shares that would be sold by HCC to a third party.  Had Heinz directly acquired the 3,325,000 shares that it supposedly redeemed from HCC, this shift in basis would not have occurred.  And the Heinz Consolidated Group would have been obliged to report a gain, rather than a huge capital loss that it could carry back to prior years.  Plaintiffs may not avoid this result by employing mere formalisms thinly designed to mask their true intentions.  *See Brown v. United States*, 329 F.3d 664, 672 (9th Cir.), *cert. denied*, 540 U.S. 878 (2003) (courts have "readily ignored the role of the intermediary" where "a party acts as a 'mere conduit' of funds – a fleeting stop in a predetermined voyage toward a particular result"); *Stewart v. Comm'r of Internal Revenue*, 714 F.2d 977, 991-92 (9th Cir. 1983) (where corporation acted as "merely a conduit" for the sale of appreciated securities, several steps collapsed into one); *Security Indus. Ins. Co.*, 702 F.2d at 1247 (collapsing transaction under the end result test where "each element of the transaction was designed and executed as part of [a] plan").

    The same conclusion flows from the interdependence test, under which separate steps will be consolidated if "it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts." *Kuper v. Comm'r of Internal Revenue*, 533 F.2d 152, 156 (5th Cir. 1976); *see also NovaCare, Inc. v. United States*, 52 Fed. Cl. 165, 174 (2002).  Here, again, primary focus must be given to the court's findings that the purchase by HCC of Heinz stock lacked any non-tax business purpose.[34]  In this regard, it is worth reemphasizing not only that that purchase was neither made for investment purposes nor for state tax considerations, but also that the main purpose of the stock repurchase program – to fulfill Heinz's need for treasury stock – could not be accomplished so long as the Heinz stock resided in the HCC treasury.  Viewed in terms of the Heinz repurchase program, the initial acquisition of the stock by HCC plainly was taken only in contemplation of the subsequent redemption of the wide majority of those shares by Heinz and without any independent business purpose itself.  *See Andantech LLC v. Comm'r of Internal Revenue*, 83 T.C.M. 1476, 1506 (2002) (interdependence test met where "the steps involved in the transactions at issue lack any reasoned economic justification standing alone"); *see also Knetsch v. United States*, 364 U.S. 361, 365-66 (1960) (Court treated loans and annuity purchases as single transaction where no independent business purpose for segregating transactions); Rosenberg, *supra*, at 409 n.126.  Under the interdependence test, this purchase thus must be disregarded.  *See Associated Wholesale Groceries, Inc. v. United States*,

---

[34] Several commentators have noted the similarity between the interdependence test and the business purpose doctrine.  *See* Ray A. Knight & Lee G. Knight, "Substance over Form: the Cornerstone of our Tax system or a Lethal Weapon in the IRS's Arsenal?"  8 Akron Tax J. 91, 102 (1991)  ("where an entity acts as a conduit, having no business purpose of its own and merely acting to secure the taxpayer's literal compliance with the applicable provisions of law, mutual interdependency is almost always cited as justification for invoking the step-transaction doctrine"); Joshua D. Rosenberg "Tax Avoidance and Income Measurement," 87 Mich. L. Rev. 365, 409 (1988) ("[The interdependence] test essentially converts the business purpose doctrine into a test for application of the step transaction doctrine.").

927 F.2d 1517, 1527-28 (10th Cir. 1991) ("The degree of interconnectedness seen here is sufficient under the law to require us to ignore the form of these steps if that form belies the substance of the transaction as a whole.").

Hence, under either the end result or interdependence tests, it would appear that HCC's ownership of the Heinz stock must be ignored, with Heinz being viewed as having acquired that stock on the market.[35]  That other steps in the overall transaction here, or the transaction as a whole, may have had legitimate business reasons does not alter this result.  "To ratify a step transaction that exalts form over substance merely because the taxpayer can either (1) articulate some business purpose allegedly motivating the indirect nature of the transaction or (2) point to an economic effect resulting from the series of steps," the Tenth Circuit has stated, "would frequently defeat the purpose of the substance over form principle."  *True*, 190 F.3d at 1177. Numerous cases are to similar effect.  *See Aeroquip-Vickers, Inc. v. Comm'r of Internal Revenue*, 347 F.3d 173, 183 (6th Cir. 2003), *cert. denied*, 543 U.S. 809 (2004) ("although the individual steps of the transaction had a legitimate business reason, the transaction must be treated as a single unit and judged by its end result"); *Kuper*, 533 F.2d at 158  ("A legitimate business goal does not grant taxpayer *carte blanche* to subvert Congressionally mandated tax patterns."); *S. Bay Corp. v. Comm'r*, 345 F.2d 698, 704 (2d Cir. 1965) ("[I]t must be doubted that the degree of integration requisite . . . can, or ought to, go to the extreme of requiring that each step be devoid of business significance unless united with one or more of the other steps."); *but cf. Del Commercial Props., Inc. v. Comm'r*, 251 F.3d 210, 213-14 (D.C. Cir. 2001), *cert. denied*, 534 U.S. 1104 (2002) ("Under the step-transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step for no other purpose than to avoid U.S. taxes.").  Moreover, contrary to plaintiffs' opportunings, it is not the case that application of the step transaction doctrine here would require the court to invent new steps, rather than combining steps.  *Compare Grove v. Comm'r*, 490 F.2d 241, 247-48 (2d Cir. 1973).  Rather, application of the doctrine simply gives effect to the reality of the transaction here which, tax considerations aside, was a repurchase by Heinz of its own stock.

---

[35]  While it is certainly true that particular formulations of the step transaction doctrine may resonate more or less in a given factual situation, the decisional law establishes that, in order for the step transaction doctrine to apply, the transaction need only trigger one of the formulations.  *See True v. United States*, 190 F.3d 1165, 1175 (10th Cir. 1999) ("More than one test might be appropriate under any given set of circumstances; however, the circumstances need only satisfy one of the tests in order for the step transaction doctrine to operate."); *King Enters*., 418 F.2d at 516-19 (applying step transaction doctrine under end result test after rejecting binding commitment test and without applying the interdependence test); *NovaCare, Inc.*, 52. Fed. Cl. at 174 (noting the analysis in *King Enters*.); *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 191 (D. Conn. 2004), *aff'd*, 150 Fed. Appx. 40 (2d Cir. 2005) ("The doctrine will operate where the circumstances satisfy only one of the tests."); *see also Greene v. United States*, 13 F.3d 577, 583-85 (2d Cir. 1994).

Nor are plaintiffs correct in asserting that the transactions in question should be exempt from the step transaction doctrine because Congress has specifically dealt with abuses stemming from intercorporate dividends in sections 243, 246 and 1059 of the Code.[36]  While plaintiffs cite *Falconwood* for this proposition, that case is clearly inapposite.  There, the Federal Circuit found that upon completing a downstream merger for independent business reasons, the taxpayer was compelled by certain legislative regulations to file a consolidated return that included the income of its parent.  It concluded that "the regulations at issue leave no room for application of the step transaction doctrine."  422 F.3d at 1351; *see also Granite Trust Co. v. United States*, 238 F.2d 670, 675 (1st Cir. 1956); *Tandy Corp. v. Comm'r*, 92 T.C. 1165, 1172-73 (1989).  But, such is not the case with respect to the statutory provisions at issue, which, unlike the regulation in *Falconwood*, do not dictate the allowance of a loss or even the treatment of the transaction in question as a redemption, but rather are anti-abuse provisions.

In the latter regard, this case is more like *Knetsch*, *supra*, in which the Supreme Court concluded that the passage of a section in the 1954 Code limiting the availability of certain interest deductions did not preempt the application of more general substance-over-form principles – specifically, the sham transaction doctrine.  Writing for the Court, Justice Brennan opined  –

> The petitioners thus would attribute to Congress a purpose to allow the deduction of pre-1954 payments under transactions of the kind carried on by Knetsch with the insurance company without regard to whether the transactions created a true obligation to pay interest.  Unless that meaning plainly appears we will not attribute it to Congress.  "To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."  *Gregory v. Helvering*, [293 U.S. at 470].

*Knetsch*, 364 U.S. at 367.  Consistent with this view, the Federal Circuit, in *Coltec*, vacated a decision by this court which had held that because the anti-abuse provisions of sections 357(b)(1)

---

[36]  Pursuant to section 243(a)(3), corporations are entitled to claim as a deduction all "qualifying dividends" received from a domestic corporation; "qualifying dividends" are defined by section 243(b) as dividends distributed and received between members of the same affiliated group.  *See* 26 U.S.C. § 243.  Subsection 246(c) is an anti-abuse provision which eliminates this "dividends-received" deduction under very specific factual circumstances, such as when the receiving corporation holds the stock for an insufficient period of time during a specified interval before and after the distribution.  *See* 26 U.S.C. § 246(c)(1)(A).  Finally, section 1059 provides that a corporate shareholder's basis in stock may be reduced by the untaxed portion of any "extraordinary dividends."  26 U.S.C. § 1059(a)(1).  The statute defines an "extraordinary dividend" to include a stock redemption from a corporate shareholder in a transaction qualifying as a dividend, but which is not pro rata among all shareholders.  26 U.S.C. § 1059(e)(1).  The statute provides an exception to this definition of "extraordinary dividend," however, for "qualifying dividends," as defined in section 243(b).  *See* 26 U.S.C. § 1059(e)(2)(A).

and 358(d)(2) of the Code did not preclude the treatment sought by the taxpayer, the government could not invoke general substance-over-form considerations. *See Coltec, Inc. v. United States*, 62 Fed. Cl. 716, 752-55 (2004), *vac'd and rem'd*, 454 F.3d 1340 (Fed. Cir. 2006), *cert. denied*, 127 S.Ct. 1261 (2007). While agreeing that the transaction in question did not violate the cited provisions, the Federal Circuit, nonetheless, disregarded the transaction in question because it lacked economic substance. 454 F.3d at 1359-60. In so concluding, the court viewed the application of substance-over-form principles not as a judicial gloss on the Code, but rather as "merely a judicial tool for effectuating the underlying Congressional purpose that, despite literal compliance with the statute, tax benefits not be afforded based on transactions lacking in economic substance." *Id.* at 1354. Other decisions similarly have refused to give effect to transactions lacking substance, though those transactions complied with each and every of the relevant requirements imposed by the Code.[37]

While Congress undoubtedly has the power to authorize the deduction in question, as in *Knetsch* and *Coltec*, this court simply cannot conclude that the same Congress that passed provisions targeting the abuse of corporate dividends intended to favor such transactions by exempting them from substance-over-form considerations applicable virtually to the rest of the Internal Revenue Code.[38] Certainly, as in *Knetsch*, it is not the case that the intent to allow a deduction "plainly appears" either from the statutory provisions invoked by plaintiffs or the accompanying legislative history. Indeed, in passing the provisions cited by plaintiffs, Congress undoubtedly was aware that the step transaction doctrine had often been applied to recharacterize various transactions arising under the redemption and corporation distribution provisions of

---

[37] *See Associated Wholesale Grocer, Inc.*, 927 F.2d at 1525 (rejecting an argument that substance-over-forms principles, including the step transaction doctrine, did not apply because of the detailed nature of governing Code provisions); *Winn-Dixie Stores*, 113 T.C. at 293-94 ("we are not persuaded that Congress, by enacting and amending section 264 or other related provisions that restrict the deductibility of interest, intended to allow interest deductions under section 163 based on transactions that lacked either economic substance or business purpose"); *see also In re CM Holdings, Inc.*, 301 F.3d at 102 ("even if a transaction complies precisely with all requirements for obtaining a deduction, if it lacks economic substance it 'simply is not recognized for federal taxation purposes, for better or for worse'" (*quoting ACM P'ship*, 157 F.3d at 261)); *Winn-Dixie Stores*, 254 F.3d at 1316 (rejecting the notion that "Congress's failure to close a loophole . . . equated to blessing the loophole.").

[38] It worth noting that Treas. Reg. § 1.165-1(b) specifically limits the deductibility of losses under section 165 to those bona fidely incurred, stating "[s]ubstance and not mere form shall govern in determining a deductible loss." *See also Higgins v. Smith*, 308 U.S. 473, 475-76 (1940) (discussing this requirement); *DeMartino v. Comm'r of Internal Revenue*, 862 F.2d 400, 406 (2d Cir. 1988) (same); *N. Pac. Ry. Co.*, 378 F.2d at 692 ("to be recognized for tax purposes, a loss must be suffered, actually and in fact, by the taxpayer").

Subchapter C of the Code, despite the detailed nature of these provisions.[39]  Yet, there is no indication that Congress intended to ring down these efforts.  As such, the court sees no reason whatsoever to immunize the transaction *sub judice* from this step transaction version of the substance-over-form analysis.[40]  To do so, indeed, would be to turn the anti-abuse provisions cited by plaintiffs on their head.

### D.    Redux

Once it is determined that the purchase by Heinz of its stock from HCC did not qualify as a redemption within the meaning of section 317(b), the rest of the pieces of the puzzle readily fall into place.  Because, under both the sham and step transaction doctrines, Heinz cannot be viewed as having obtained the stock from HCC in a transaction that qualified as a redemption under section 317(b) of the Code, the transfer of the 3,325,000 shares to Heinz did not cause a dividend to arise under section 302(d) of the Code.  As such, the reattribution rules of Treasure Regulation §1.302-2(c) were not triggered here and HCC's basis in the 175,000 shares it retained was not increased by the cost basis of the shares it relinquished.  It follows, *a fortiori*, that the sale of the retained shares did not produce the capital losses claimed, making the loss carrybacks in question inappropriate.

---

[39]  *See Dietzsch*, 498 F.2d at 1347-48 (applying step transaction doctrine in a case involving section 317(b)); *King Enters.*, 418 F.2d at 516-17 (applying doctrine in treating stock acquisition followed by merger as a reorganization); *see also Schroeder v. Comm'r of Internal Revenue*, 831 F.2d 856, 858-89 (9th Cir. 1987) (applying doctrine in concluding that taxpayer's transfer of shares to a corporation and the corporation's assumption of a portion of a bank loan in exchange resulted in distribution substantially equivalent to a dividend under section 302(b)); *Schneider v. Comm'r of Internal Revenue*, 88 T.C. 906, 938-43 (1988), *aff'd*, 855 F.2d 435 (7th Cir. 1988) (applying doctrine in treating distribution of employee bonuses in the form of pre-endorsed checks, followed by purchase of stock, as stock redemption followed by distributions of the redeemed shareholders as employee compensation); *see generally, Basic Inc. v. United States*, 549 F.2d 740, 745-49 (Ct. Cl. 1977) (applying substance over form doctrine in recharacterizing distribution of stock from subsidiary to parent).

[40]  In their post-trial briefs, plaintiffs vigorously assert that defendant did not raise the step transaction doctrine in its pre-trial memorandum.  *Per contra*.  In fact, defendant expressly referenced the doctrine in its pretrial memorandum (*see* Defendant's Memorandum of Contentions of Fact and Law at 34-35 (Nov. 28, 2005)), doing so briefly, but adequately, in the court's view, to put plaintiffs on notice that the issue would be litigated.  *See Rodriques v. Ripley Indus., Inc.*, 507 F.2d 782, 787 (1st Cir. 1974) (noting that "[p]retrial statements are to be liberally construed to cover any of the legal or factual theories that might be embraced by their language."); *cf. Principal Life*, 70 Fed. Cl. at 157; *John D. Hensler, Inc. v. United States*, 5 Cl. Ct. 92, 94 (1984), *aff'd,* 765 F.2d 158 (Fed. Cir. 1985).  Plaintiffs' claims of surprise and unfairness thus fall flat.

### III.      CONCLUSION

A Heinz promotion from the late 1950s and early 1960s touted its tomato ketchup by stating – "It's Red Magic Time!"  But no amount of magic, red or otherwise, can hide the meat of the transactions in question, the connective tissues and gristle of which have been revealed by the multi-tined substance-over-form doctrine.  *Sans sa sauce*, it becomes plain that plaintiffs' transaction simply was not "the thing which the statute intended."  *Gregory*, 293 U.S. at 469.

This court need go no farther.  Based on the foregoing, it finds that plaintiffs are not entitled to recover any refund here.  The Clerk is hereby ordered to dismiss their complaint.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge